IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| FELICIA SANDERS, individually and as Legal Custodian of K.M., a minor, | ) ) ) | Civil Action No. 2:16-cv-2356-RMG |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNITED STATES' MOTION TO DISMISS**

## I.    NATURE OF THE CASE

Plaintiff, Felicia Sanders, as legal custodian for K.M., a minor, brought this action against the United States alleging jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671-2680.  Plaintiff alleges that K.M. was at the Emanuel African Methodist Episcopal ("AME") Church in Charleston, South Carolina, on June 17, 2015, and that she witnessed the shooting of her uncle, Tywanza Sanders, great-aunt, Susie Jackson, and seven others, and was herself threatened with imminent death.  Claiming that employees of the Federal Bureau of Investigation ("FBI") negligently failed to prevent Roof's purchase of the gun he used to kill his victims at the Emanuel AME Church, plaintiff seeks an award of damages against the United States for personal injuries, emotional distress, and "necessaries."

The United States will demonstrate herein that the Court lacks subject-matter jurisdiction because plaintiff's claims fall within the FTCA's discretionary-function and misrepresentation exceptions, 28 U.S.C. § 2680(a), (h).  The United States will further demonstrate that plaintiff's

claims fall outside the limited waiver of sovereign immunity contained in the FTCA because they are not actionable under South Carolina law. *See* 28 U.S.C. §§ 1346(b), 2674. Accordingly, the Court should dismiss this action.

## II.    STANDARD OF REVIEW

A defendant may move to dismiss the action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). The plaintiff bears the burden of proof on questions of subject-matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)) (citations omitted, alteration in original).

"[A] defendant may challenge subject matter jurisdiction in one of two ways." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)). "First, the defendant may contend that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (citing *Adams*, 697 F.2d at 1219). Alternatively, the defendant may contend "that the jurisdictional allegations of the complaint were not true." *Adams*, 697 F.2d at 1219. This motion presents the former challenge, a facial attack, to the Court's subject-matter jurisdiction. Alternatively, this motion seeks dismissal of the action for failure to state a claim within the FTCA's limited waiver of sovereign immunity.

If the defendant attacks a complaint facially for lack of subject-matter jurisdiction, "all

the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Adams*, 697 F.2d at 1219.  Accordingly, "all alleged facts are taken as true and the motion will be denied if the complaint alleges facts that, if proven, would be sufficient to sustain jurisdiction." *In re Seizure of 2007 GMC Sierra SLE Truck*, 32 F. Supp. 3d 710, 715 (D. S.C. 2014) (citation omitted).

Conversely, the Court should grant the motion if "well-pleaded facts do not permit the court to infer more than the mere possibility of [subject-matter jurisdiction]." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted).  Under both Rule 12(b)(1) and 12(b)(6), "[a] court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

/ / /

/ / /

/ / /

## III.   STATEMENT OF FACTS[1]

On February 28, 2015, during questioning by a police officer of the City of Columbia Police Department, the officer found in Dylann Roof's possession a bottle of Suboxone, which is a Schedule III controlled substance as defined in 21 U.S.C. § 802.  Compl. ¶¶ 8-9, ECF No. 1. Dylann Roof admitted to the arresting officer that he (Roof) was in possession of a controlled substance without a prescription.  *Id.* ¶ 10.

Based on his admitted possession of Suboxone without a prescription, the police officer arrested Dylann Roof, charging him with Possession of a Schedule III Drug in violation of S.C. Code Ann. § 44-53-370(d)(2) (2015).[2]  Compl. ¶ 11.  The City of Columbia Police Department created an incident report for the arrest that noted that Roof admitted to the arresting officer his

---

[1]     For purposes of this motion only, the United States assumes the truth of the complaint's well-pleaded factual allegations.  The United States does not accept the truth of allegations in the complaint that "'contradict matters properly subject to judicial notice,'" *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002) (quoting *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001)), or that contradict the facts set forth in the exhibit attached to and incorporated into the complaint.  *See Goines v. Valley Cmty. Servs. Bd.,* 822 F.3d 159, 166 (4th Cir. 2016) ("'In the event of conflict between the bare allegations of the complaint and any exhibit attached [thereto] . . . , the exhibit prevails.'" (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.,* 936 F.2d 1462, 1465 (4th Cir.1991)).  In addition, in ruling on a motion to dismiss a court may consider the contents of a document even if the document is not attached to the complaint where it is integral to and explicitly relied on in the complaint.  *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999); *but see Goines,* 822 F.3d at 167 ("[W]here the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of the document as true.").  Finally, no assumption of truthfulness attaches to the bare legal conclusions asserted in the complaint.  *See King v. Rubenstein,* 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim.") (quoting *Ashcroft v. Iqbal,* 556 U.S. at 679)).

[2]     South Carolina amended Section 44-53-370 effective April 21, 2016.  The United States refers herein to the statute as it existed when the Columbia Police Department arrested Roof for possession on February 28, 2015.  Subdivision (d)(2) of that statute provided, *inter alia*, that possession of a controlled substance is "a misdemeanor" and carries a sentence of imprisonment for "not more than six months or [a fine] not more than one thousand dollars, or both."  *Id.*

possession of a controlled substance without a prescription. *Id.* ¶ 12.[3/]

On April 11, 2015, approximately six weeks later, Dylann Roof attempted to purchase a handgun from Shooter's Choice, a federally licensed firearms dealer located in West Columbia, South Carolina. *Id.* ¶ 18.

On April 11, 2015, Shooter's Choice initiated a background check of Dylann Roof through the National Instant Criminal Background Check System ("NICS"). *Id.* ¶ 24. The FBI then "undertook to conduct a background check on Roof through NICS." *Id.* ¶ 25. The FBI, however, did not deny the sale of a firearm before Shooter's Choice transferred the weapon to Roof. *Id.* ¶ 31; *see also* Compl. Exhibit 1 (statement of FBI Director James Comey regarding

---

[3/]    Plaintiff further alleges that although Dylann Roof actually was charged with a misdemeanor, the incident report created by the City of Columbia Police Department mistakenly indicated that Roof had been indicted for a felony crime punishable by imprisonment for a term of imprisonment exceeding one year. Compl. ¶ 17. This allegation lacks any basis in fact, and is refuted by the incident report itself, which contains no indication that Roof was under indictment at the time it was prepared, let alone that he had been indicted for a felony crime punishable by imprisonment for a term of imprisonment exceeding one year.

A copy of the City of Columbia Police Department's incident report is attached hereto as Exhibit A. The Court may take judicial notice of this report because it is a matter of public record, the authenticity of which cannot reasonably be questioned. Fed. R. Evid. 201(b); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004); *Cobin v. Hearst-Argyle Television, Inc.*, 561 F. Supp. 2d 546, 550-51 (D. S.C. 2008) (court could take judicial notice of police report, which was not attached to pleading, as a matter of public record).

Further, the public records of the Court of General Sessions for Lexington County, South Carolina, conclusively show that although a grand jury later indicted Dylann Roof for misdemeanor possession of a Schedule III substance in violation of S.C. CODE ANN. 44-53-370(d)(2) (2015), it did not return the indictment against Roof until July 13, 2015, almost a month after the shooting that gave rise to this litigation.

A certified copy of the complete record in the case of *State v. Dylann Storm Roof*, Dkt. No. 2015GS3201700 (S.C. Ct. Gen. Sess. Lexington Cty.), is attached hereto as Exhibit B. This record is also subject to judicial notice. *See Green v. Wells Fargo Bank N.A.,* 927 F. Supp. 2d 244, 246 n.2 (D. Md. 2013) (district court may take judicial notice of state court proceedings and other public records).

Dylann Roof gun purchase) ("By Thursday, April 16, the case was still listed as 'status pending,' so the gun dealer exercised its lawful discretion and transferred the firearm to Dylann Roof."), ECF No. 1-1.

On June 17, 2015, Roof used the handgun he had purchased from Shooter's Choice when he walked into the Emanuel AME Church in Charleston, South Carolina, and shot to death nine people, including Tywanza Sanders and Susie Jackson. *Id.* ¶¶ 34-35.

In her complaint, plaintiff asserts that by failing to deny the sale of the firearm to Dylann Roof, the United States violated mandatory, non-discretionary duties supposedly imposed on it by the Brady Handgun Violence Prevention Act, PUB. L. NO. 103-159 (1993), 107 Stat. 1536 ("Brady Act"),[4/] and regulations contained in 28 C.F.R. Part 25. *See id.,* at ¶ 32.

Plaintiff's assertion is incorrect, and as demonstrated herein the United States' failure to deny the sale of the firearm to Dylann Roof violated no mandatory, non-discretionary duties imposed on the United States by any statute, including the Brady Act, or any regulation, including those contained in 28 C.F.R. Part 25.

To the contrary, while the Brady Act authorizes the FBI to temporarily freeze firearms sales for three business days while it researches whether state or federal law prohibits a particular buyer from possessing a firearm, the FBI has no authority to prevent a sale if, after those three business days have elapsed, it has not yet found definitive information demonstrating that the prospective purchaser's receipt of a firearm would violate federal or state law. That is what

---

[4/]     The United States notes that plaintiff miscites the Brady Act as 18 U.S.C. § 922(d). Parts of the Brady Act are codified at 18 U.S.C. § 922(t) and (s) and 18 U.S.C. § 924(a)(5). Although both 18 U.S.C. § 922(d), which was enacted as part of the Gun Control Act of 1968, and some of the provisions of the Brady Act are codified together in section 922 of title 18, United States Code, § 922(d) is not itself part of the Brady Act.

occurred with respect to the sale of the firearm at issue in this case.  *See* Compl. Exhibit 1

(statement of FBI Director James Comey).[5/]

## IV.    STATUTORY AND REGULATORY BACKGROUND

"Federal law has for over 40 years regulated sales by licensed firearms dealers,

principally to prevent guns from falling into the wrong hands." *Abramski v. United States,* 573

U.S. ___, 134 S. Ct. 2259, 2263 (2014), *citing* Gun Control Act of 1968, 18 U.S.C. § 921 *et seq*.

Under 18 U.S.C. § 922(g), "certain classes of people . . . may not purchase or possess any

firearm." *Id*.  "And to ensure that they do not, [18 U.S.C.] § 922(d) forbids a licensed dealer

from selling a gun to anyone it knows, or has reasonable cause to believe, is such a prohibited

buyer." *Id.*; *see also Huddleston v. United States*, 415 U.S. 814, 825 (1974) ("[T]he focus of the

federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly

---

[5/]    As explained in Director Comey's statement, a copy of which plaintiff attached to her complaint and references therein, the FBI's initial check of Roof's criminal history record revealed that Roof had been arrested for what his rap sheet listed as a felony drug charge.  *Id.* at 1.  The mere fact that an individual had been arrested for a felony drug charge would not itself disqualify the individual from purchasing a firearm.  *Id.*  As Director Comey's statement explained, further research was needed to determine whether information existed demonstrating that federal or state law prohibited Roof from purchasing a firearm.  *Id.*  Director Comey's statement noted that the FBI examiner to whom Roof's case was assigned followed the FBI's protocols, but, for reasons the statement goes on to discuss, failed to contact the City of Columbia Police Department to request a copy of its incident report, and thus remained unaware that Roof had admitted to being in possession of a Schedule III controlled substance without a prescription.  *Id.* at 1-2.  The examiner's failure to request a copy of the incident report from the Columbia Police Department was, according to Mr. Comey's statement, largely attributable to two factors: (1) Roof's rap sheet misidentified the Lexington County Sheriff's Office as the arresting agency, and (2) unbeknownst to the examiner, the place where Roof was arrested (*i.e.,* the Columbiana Mall), although located in Lexington County, was situated in a small area of the county that was within the municipal limits of the City of Columbia.  *Id.*  Mr. Comey's statement further noted that the South Carolina contact sheet that FBI examiners used in processing NICS background checks did not account for this small piece of the City of Columbia (the remainder of which is located in adjacent Richland County), and therefore did not include the Columbia Police Department among the local law enforcement agencies to be contacted when obtaining information about arrests effected in Lexington County.  *Id.*

controls access to weapons by users.").

"The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully buy a gun." *Abramski,* 134 S.Ct. at 2263. Under 18 U.S.C. § 922(c), the would-be purchaser must, except in certain specified circumstances not applicable here, appear in person on the dealer's business premises. *Abramski*, 134 S. Ct. at 2263. "Before completing the sale, the dealer must 'verif[y] the identity of the transferee by examining a valid identification document' bearing a photograph." *Id.* (quoting 18 U.S.C. § 922(t)(1)(C)) (alteration by Court). "In addition, the dealer must procure the buyer's 'name, age, and place of residence." *Id.* (quoting 18 U.S.C. § 922(b)(5)). "And finally, the dealer must . . . submit that background information to the National Instant Background Check System (NICS) to determine whether the potential purchaser is for any reason disqualified from owning a firearm." *Id.* (citing 18 U.S.C. § 922(t)(1)(A)-(B)).

"To implement [these and other] statutory requirements, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) developed Form 4473 for gun sales." *Id.*; *see also Wilson v. Lynch,* ___ F.3d ___, No. 14-15700, 2016 WL 4537376, at *2 (9th Cir. Aug. 31, 2016) ("The ATF has . . . developed Form 4473, which confirms eligibility for gun ownership under § 922."); *Shawano Gun & Loan, LLC v. Hughes*, 650 F.3d 1070, 1073 (7th Cir. 2011) ("Firearms dealers are required to ensure that a Firearms Transaction Record, ATF Form 4473, is completed properly to record identifying information about firearms purchasers, to prohibit transfers to persons prohibited from possessing firearms, and to facilitate the tracing of firearms involved in crimes."); 27 C.F.R. § 478.124(a) ("A . . . licensed dealer shall not sell . . . any firearm to any person . . . unless the licensee records the transaction on a firearms transaction record, Form 4473 . . . .").

"The form . . . lists all the factors disqualifying a person from gun ownership, and asks the would-be buyer whether any of them apply. . . ." *Abramski*, 134 S. Ct. at 2264; *see also Wilson*, 2016 WL 4537376, at *2 (citing Firearms Transaction Record, Part I – Over-the-Counter, ATF Form 4473, https://www.atf.gov/file/61446/download (last visited Sept. 29, 2016)[6/] ("ATF Form 4473")); 27 C.F.R. § 478.124(c)(1) (requiring that, before transferring a firearm, licensed dealer obtain from transferee ATF Form 4473 showing "certification by the transferee that the transferee is not prohibited by the Act from . . . receiving a firearm which has been shipped or transported in interstate or foreign commerce").

Even if the prospective buyer certifies that he or she is not prohibited by the Gun Control Act from receiving a firearm, the licensed dealer still is prohibited from selling, delivering, or transferring the firearm to the prospective buyer, unless:

> (1) Before the completion of the transfer, the licensee has contacted NICS;
> (2)(i) NICS informs the licensee that it has no information that receipt of the firearm by the transferee would be in violation of Federal or State law and provides the licensee with a unique identification number; or
> (ii) Three business days (meaning days on which State offices are open) have elapsed from the date the licensee contacted NICS and NICS has not notified the licensee that receipt of the firearm by the transferee would be in violation of law; and
> (3) The licensee verifies the identity of the transferee by examining the identification document presented in accordance with the provisions of § 478.124(c).

27 C.F.R. § 478.102(a)(1)-(3).

The Brady Act required that, no later than November 30, 1998, the Attorney General

---

[6/]    A copy of ATF Form 4473 downloaded from the cited URL is attached hereto as Exhibit C. The form is subject to judicial notice, "as it is a matter of public record." *Enos v. Holder,* No. 2:10–CV–2911–JAM–EFB, 2011 WL 2681249, at *2 (E.D. Cal. July 8, 2011) (taking judicial notice of ATF Form 4473); *see also Gustavson v. Wrigley Sales Co.*, 961 F.Supp.2d 1100, 1113 n.1 (N.D. Cal. 2013) ("The Court may take judicial notice of materials available on government agency websites.").

establish "a national instant criminal background check system that any licensee may contact, by telephone or by other electronic . . . , for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would violate section 922 of title 18, United States Code, or State law." PUB. LAW NO. 103-159 § 103(b), 107 Stat. at 1541.

"A computerized system operated by the FBI, the NICS searches for disqualifying information in three separate databases: (1) the 'NICS Index,' containing records on persons known to be disqualified from possessing firearms under federal law; (2) the 'National Crime Information Center [NCIC],' containing records on protective orders, deported felons, and fugitives from justice; and (3) the 'Interstate Identification Index [III],' containing criminal history records." *Nat'l Rifle Ass'n v. Reno,* 216 F.3d 122, 125 (D.C. Cir. 2000); *see also* Notice, AG Order 1882-94, 59 Fed. Reg. 28,423, 28,423 (June 1, 1994) ("The NICS will build upon existing information systems. One of these systems is the National Crime Information Center (NCIC) Interstate Identification Index, which includes state as well as federal criminal history records.").

In those states like South Carolina which have not agreed to serve as NICS points of contact ("POCs"), federal firearms licensees ("FFLs") initiate background checks of prospective buyers by contacting the NICS Operations Center, "the unit of the FBI that receives telephone or electronic inquiries from FFLs, makes a determination based upon available information as to whether the receipt or transfer of a firearm would be in violation of Federal or state law, researches criminal history records, tracks and finalizes appeals, and conducts audits of system use." AG Order No. 2186-98, National Instant Criminal Background Check System Regulation, 63 Fed. Reg. 58,303, 58,308 (Oct. 30, 1998); *see also* Proposed Rule, 63 Fed. Reg. 30,430, 30,431 (June 4, 1998) ("In these non-POC states, the NICS Operations Center will perform the

NICS background check, analyze any matching records, and provide a response back to the FFL.").[7/]

Based on a search of the relevant databases, the Brady Act regulations authorize NICS to provide the FFL with one of three responses:

> (A) "Proceed" response, if no disqualifying information was found in the NICS Index, NCIC, or III.
> (B) "Delayed" response, if the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law. A "Delayed" response to the FFL indicates that the firearm transfer should not proceed pending receipt of a follow-up "Proceed" response from the NICS or the expiration of three business days (exclusive of the day on which the query is made), whichever occurs first . . . .
> (C) "Denied" response, when at least one matching record is found in either the NICS Index, NCIC, or III that provides information demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law. . . .

28 C.F.R. § 25.6(c)(1)(iv)(A)-(C); *see also* 28 C.F.R. § 25.2 (defining terms "Proceed," "Delayed," and "Denied").

As explained in the preamble to the final rule issued by the Attorney General on October 30, 1998:

> The definition of the term "Proceed" was modified in the final rule to clarify that it means that information available to the system at the time of the response did not demonstrate that transfer of the firearm would violate Federal or state law and that, notwithstanding a "Proceed" response from the NICS, an FFL may not lawfully transfer a firearm if he or she knows or has reasonable cause to believe that the prospective transferee is prohibited from receiving or possessing firearms, or is otherwise prohibited from transferring the firearm under applicable Federal or state law.

---

[7/]    A description of how FFLs initiate NICS background checks in non-POC states is available on the FBI's website. *About NICS*, https://www.fbi.gov/services/cjis/nics/about-nics (last visited Oct, 11, 2016). A copy of this webpage, downloaded from the cited URL, is attached hereto as Exhibit D.

63 Fed. Reg. at 58,306.[8/]  As for "Delayed" responses, the final rule's preamble noted:

> Some comments . . . objected to the use of a NICS "Delayed" response, arguing that the Brady Act only provides for approval and denial responses.  We note that the "Delayed" response is merely a way of communicating to the FFL that the system requires additional time to research and evaluate whether the prospective transferee is disqualified from receiving a firearm.  The definition of the "Delayed" response in the final rule was revised to reflect this and the fact that a "Delayed" response indicates that it would be unlawful to transfer the firearm pending receipt of a follow-up "Proceed" response from the NICS or the expiration of three business days, whichever occurs first.  The law does not prohibit the system from making such a response.

*Id.* at 58,305.[9/]  Lastly, with regard to "Denied" responses, the final rule's preamble further

noted:

> The proposed rule provided that a denial by the NICS of a firearm transfer would be based upon one or more matching records that provide reason to believe that receipt of a firearm by a prospective transferee would violate 18 U.S.C. 922 or state law.  The final rule changes the terminology relating to NICS denials to "information demonstrating" rather than "reason to believe" in order to conform the language of the regulation more closely to the language relating to denials in the Brady Act.

---

[8/]    Consistent with the regulations, the instructions printed on ATF Form 4473 contain the following warning to FFLs:

> **WARNING:**  Any seller who transfers a firearm to any person they know or have reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, even if the seller has complied with the background check requirements of the Brady law.

AFT Form 4473.

[9/]    The definition of the term "Delayed" as revised in the final rule published on October 30, 1998, provided as follows:

> *Delayed* means that more research is required prior to a NICS "Proceed" or "Denied" response.  A "Delayed" response to the FFL indicates that it would be unlawful to transfer the firearm until receipt of a follow-up "Proceed" response from the NICS or the expiration of three business days, whichever occurs first.

63 Fed. Reg. at 58,307.

*Id.* at 58,306.

Under these regulations, FBI examiners performing background checks have no choice but to issue a "Delayed" response when a record is found which, because it contains potentially prohibiting information, requires more research before either a "Proceed" or "Denied" response can be issued; and further, before a "Denied" response can be given to the FFL, definitive information must be found which not only provides "reason to believe," but in fact "demonstrat[es]," that the prospective purchaser's receipt of a firearm "would violate" applicable Federal or state law.  *See* 28 C.F.R. §§ 25.2 and 25.6(c)(iv)(C).

Amendments to the regulations adopted in 2004 confirm this reading; these same amendments also expressly recognized that in some cases the FBI will be unable to make a final determination as to whether federal or state law prohibits a prospective buyer from receiving a firearm within three business days after the FFL initiates a NICS background check of the prospective buyer.  *See* AG Order 2727-2004, National Criminal Background Check System, 69 Fed. Reg. 43,892 (July 23, 2004).  As explained in the preamble to the final rule adopting these amendments:

> The NICS cannot in some cases reach a final determination within three business days because relevant information is missing from the automated record system and must be obtained from other sources.  As discussed below, the final rule defines these cases as "open" responses and allows the NICS to retain information about them until a "proceed" determination is reached or for not more than 90 days, so that if records are returned to the NICS within that time showing that the transfer should have been denied, the case can be referred for firearm retrieval.

*Id.* at 43,893.  The final rule's preamble goes on to note:

> [Under the amended regulations] the FBI will . . . continue to be able to retain for up to 90 days (as it does under current law) information in "open" transactions—i.e., where the NICS has not yet provided a "proceed" or "deny" response because it has not received definitive information about the status of a prospective gun buyer's record (e.g., a missing arrest disposition).  If prohibiting information is received within 90 days, continued retention of such records will

allow the FBI to change an open transaction to a "denied" response and refer the case to the ATF for a firearm retrieval if the firearm has been transferred by the FFL (as allowed under the Brady Act when the FFL has not received within three business days a response on whether the transaction is lawful).

*Id.* at 43,894.[10]

Thus, in summarizing how the NICS background check system works, the Department of Justice's Office of Legal Counsel ("OLC") has noted:

Upon receiving an inquiry, the NICS checks certain databases and in the ordinary course immediately responds with one of two determinations: "proceed," which indicates that the transfer is allowed, or "denied," which indicates that the transfer is not allowed. *See* 28 C.F.R. §§ 25.2 & 25.6(c)(1) (2006); *see also National Instant Criminal Background Check System Regulation,* 69 Fed. Reg. 43,892,

---

[10]    As amended, the new definition of the term "Delayed" provides:

*Delayed* means the response given to the FFL indicating that the transaction is in an "Open" status and that more research is required prior to a NICS "Proceed" or "Denied" response. A "Denied" response to the FFL indicates that it would be unlawful to transfer the firearm until receipt of a follow-up "Proceed" response from the NICS or the expiration of three business days, whichever occurs first.

69 Fed. Reg. at 43,900. The revised regulations also added the following definition of the term "Open:"

*Open* means those non-canceled transactions where the FFL has not been notified of the final determination. In cases of "open" responses, the NICS continues researching potentially prohibiting records regarding the transferee and, if definitive information is obtained, communicates to the FFL the final determination that the check resulted in a proceed or a deny. An "open" response does not prohibit an FFL from transferring a firearm after three business days have elapsed since the FFL provided to the system the identifying information about the proposed transferee.

*Id.* Finally, the provisions of 28 C.F.R. §§ 25.9 and 25.10 were amended to facilitate (1) the retrieval of firearms in cases in which the FFL exercised its option to complete the sale after three business days elapsed since the date the FFL initiated the background check, and (2) the relief of prospective purchasers in cases in which the FFL elects not to complete sales after the three-business-day period elapses. 69 Fed. Reg. at 43,900. As amended, 28 C.F.R. § 25.9(b)(1)(ii) now expressly allows the retention of records relating to "Open" transactions until NICS makes a final determination, but not for more than 90 days. Section 25.10 was amended by adding a new subsection (g), which allows an individual to authorize the FBI to maintain a Voluntary Appeal File for the purpose of preventing "extended delay" of firearm transfers.

43,897 (July 23, 2004) (discussing high rate of immediate or nearly immediate responses). If the NICS is unable to determine immediately whether or not the transaction may proceed, it issues a "delayed" response, and the inquiry remains "open." *See* 28 C.F.R. §§ 25.2 & 25.6(c)(1). Such a response temporarily prohibits the transfer and indicates that the NICS has found a "record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm." *Id.* § 25.6(c)(1)(iv)(B). The NICS "continues researching potentially prohibiting records" in an effort to obtain "definitive information." *Id.* § 25.2 (defining "Open"). If NICS is unable to issue a denial within three business days, the restriction on transfer by the licensee expires. 18 U.S.C. § 922(t)(1)(B)(ii). The NICS may, however, continue to investigate the transferee, for up to 90 days under current regulations. *See* 28 C.F.R. § 25.9(b)(1)(ii) (2006) (providing for destroying audit-log records regarding an open inquiry within 90 days of the inquiry). If it subsequently determines that the receipt of the firearm was unlawful, the NICS issues a "delayed denial." In such a case, the FBI will notify the ATF, *see id.* § 25.9(b)(2)(i), which may take action against the transferee.

*When a Prior Conviction Qualifies as a "Misdemeanor Crime of Domestic Violence,"* 31 Op.

O.L.C. 123, 136 (2007).

Turning to the standards governing the FBI's issuance of "denied" responses, OLC went

on to discuss the relevant provisions of the Brady Act:

> The Brady Act authorizes the NICS to issue a denial only if it has concluded "that the receipt of a firearm" by the prospective transferee "*would violate*" federal or state law. 18 U.S.C. § 922(t)(1)(B)(ii) (emphasis added); *see id.* § 922(t)(5) (addressing licensee's failure to contact the NICS when NICS "was operating and information was available to the system demonstrating that receipt would violate" federal or state law); Brady Act § 103(b) (requiring NICS to provide information "on whether receipt of a firearm by a prospective transferee would violate" federal or state law). Alternatively, the NICS must issue a "proceed" if it has concluded that such receipt "would *not* violate" federal or state law. 18 U.S.C. § 922(t)(2) (emphasis added). In addition, it may issue a "proceed" in cases in which it is not authorized to issue a denial (and decides that a "delayed" response is not warranted), given that in such cases there is no statutory authorization for a denial. *See id.* § 922(t)(4) (referring to the issuance by NICS of a "proceed" if "the information available in the system *does not demonstrate* that the receipt of a firearm by such other person would be" unlawful) (emphasis added).

*Id.* (emphasis added by OLC); *see also id.* at 138 (citing 18 U.S.C. § 922(t)(5) and concluding

that, to justify denial, "[t]he information that NICS possesses must demonstrate a violation").

- 15 -

As for the categories of persons prohibited from receiving a firearm by the Gun Control Act, only one of those categories was potentially relevant in this case.[11/]  Under 18 U.S.C. § 922(g)(3), it is unlawful for any person "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))" to receive a firearm.  *See Wilson*, 2016 WL 4537376, at *4 ("Section 922(g)(3) criminalizes possession or receipt of a firearm by an unlawful drug user  . . . ."); *see also id.* at *2 ("In addition, it is unlawful for 'any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe such person . . . is an unlawful user of . . . any controlled substance.'") (quoting 18 U.S.C. § 922(d)(3)).

Although 21 U.S.C. § 802 statutorily defines the term "controlled substance," "[t]he statute nowhere defines 'unlawful user.'"  *United States v. Jackson*, 280 F.3d 403, 406 (4th Cir. 2002).  Shortly before NICS became operational, however, ATF promulgated a regulation that defined, among other terms, "unlawful user of . . . any controlled substance."  *Definitions for the Categories of Persons Prohibited from Receiving Firearms*, 62 Fed. Reg. 34,634, 34,639 (June 27, 1997); *see also id.* at 34,634 ("The definitions will facilitate the implementation of the national instant criminal background check system (NICS) required under the Brady Handgun Violence Prevention Act."); 63 Fed. Reg. at 30,431 ("The ATF published a final rule concerning 'Definitions for Categories of Persons Prohibited From Receiving Firearms' in the Federal Register on June 27, 1997 . . . .  These regulations became effective August 26, 1997, and shall apply to the operation and the use of the NICS.").

---

[11/]    Although plaintiff references in her complaint a second category of persons to whom the Gun Control Act prohibits firearms dealers from selling or transferring a firearm, *i.e.,* those "under indictment . . . for a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(d)(1), that category is irrelevant to this case because Dylann Roof was not under indictment when the firearm at issue was transferred to him on April 16, 2015.

The ATF regulation defines "unlawful user" to include "any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician." 27 C.F.R. § 478.11 The regulation goes on to provide that in order to be disqualifying, the unlawful use of a controlled substance must have "occurred recently enough to indicate that the individual is actively engaged in such conduct." *Id.* Finally, the regulation describes evidence from which an inference of current use of a controlled substance may be drawn. *See id.* ("An inference of current use may be drawn from evidence of a recent use or possession that reasonably covers the present time, *e.g.*, a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year.")

Courts construing the term "unlawful user of . . . any controlled substance" have held that "there must be some regularity of drug use in addition to contemporaneousness to meet the statute's requirements." *United States v. Patterson,* 431 F.3d 832, 839 (5th Cir. 2005) (citing *United States v. Augustin,* 376 F.3d 135, 139 (3d Cir. 2004) ("[T]o be an unlawful user, one needed to have engaged in regular use over a period of time proximate to or contemporaneous-ness [*sic*] with the possession of the firearm.")); *Jackson,* 280 F.3d at 406 (upholding district court finding that prosecution must establish "a pattern of use and recency of use"); *United States v. Purdy,* 264 F.3d 809, 812-13 (9th Cir. 2001) ("[T]o sustain a conviction under § 922(g)(3), the government must prove . . . that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his . . . possession of a firearm.").[12]

---

[12]    In the complaint, Compl. ¶¶ 14-15, plaintiff asserts that due to the documentation of Roof's admitted possession of a controlled substance without a prescription, he was an "unlawful user of or addicted to any controlled substance" to whom a firearm could not lawfully be sold.

## V.     SUMMARY OF ARGUMENT

The Court should dismiss this action for three, independent, reasons. First, the discretionary function exception to the FTCA bars plaintiff's claims. The facts, as alleged, demonstrate that NICS regulations required issuance of a "Delayed" response when Dylann Roof sought to purchase a handgun based upon the data contained in the NICS databases. The NICS examiner's compliance with mandatory provisions of NICS regulations falls squarely within the discretionary function exception. Additionally, how the NICS system was designed, indexed, and maintained falls within the discretionary function exception. Finally, courts repeatedly recognize that the discretionary function exception precludes challenges to investigations, such as NICS's investigation of Dylann Roof's criminal history.

Second, the misrepresentation exception to the FTCA bars plaintiff's claims. At the core of all of plaintiff's claims is an allegation that NICS either failed to communicate information to Shooter's Choice or communicated wrong information to Shooter's Choice. The misrepresentation exception squarely bars these claims.

Third, plaintiff fails to state a claim that is cognizable under South Carolina law. South Carolina law does not impose a duty on private individuals to conduct handgun purchase

---

*But see United States v. Augustin,* 376 F.3d at 139 (overturning defendant's conviction for violating 18 U.S.C. § 922(g)(3) where, although prosecution presented evidence that he smoked marijuana one day before he was found in possession of firearm, it adduced no evidence he ever used drugs on any other occasion); *United States v. Williams,* 216 F. Supp. 2d 568, 576 (E.D. Va. 2002) (granting defendant's motion for judgment of acquittal on charge that he violated § 922(g)(3) where, although he admitted to being simultaneously in possession of handgun and half-burned, warm marijuana cigarette, prosecution adduced no evidence of his use of drugs on any other occasion). This Court need not (and should not) decide whether Roof's admitted possession of a Schedule III controlled substance on February 28, 2015, itself established that Roof was an unlawful user of a controlled substance, or that his receipt of a firearm therefore would violate 18 U.S.C. § 922(g)(3). The only person who, by receiving a firearm on April 16, 2015, could potentially have violated 18 U.S.C. § 922(g)(3) was Dylann Roof; he is not a party to this litigation.

background investigations and plaintiff fails to articulate any state law duty applicable to NICS's

conduct.  Thus, the Court should dismiss the entire action with prejudice.

## VI.    ARGUMENT

### A.    Plaintiff's Claims Are Barred by the Discretionary Function Exception.

#### 1.    Overview of 28 U.S.C. § 2680(a).

The FTCA's waiver of sovereign immunity is subject to several exceptions set forth in 28

U.S.C. § 2680.  These exceptions "are designed to protect certain important government

functions and prerogatives from disruption."  *Molzof v. United States*, 502 U.S. 301, 311 (1992);

*see also Richards v. United States*, 369 U.S. 1, 13 n.28 (1962).  Applicable here is the

discretionary function exception, which bars "[a]ny claim . . . based upon the exercise or

performance or the failure to exercise or perform a discretionary function or duty on the part of a

federal agency or an employee of the Government, whether or not the discretion involved be

abused."  28 U.S.C. § 2680(a).[13/]

The Supreme Court has enunciated a two-part test for determining whether a claim is

barred by the discretionary function exception.  First, courts must determine whether the act

"involv[es] an element of judgment or choice."  *United States v. Gaubert*, 499 U.S. 315, 322

(1991).  Pursuant to this first part, courts look to whether "a federal statute, regulation or policy

specifically prescribes a course of action for an employee to follow[.]"  *Id.* at 322 (quoting

*Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

Second, if the conduct involves judgment or choice, courts then look to "whether that

judgment is of the kind that the discretionary function exception was designed to shield."  *Id.* at

---

[13/]    Section 2680(a) also contains another exception which bars "any claim based upon an act
or omission of an employee of the Government, exercising due care, in the execution of a statute
or regulation, whether or not such statute or regulation be valid[.]"

322-23 (quoting *Berkovitz*, 486 U.S. at 536).  "The basis for the discretionary function exception was Congress' desire to 'prevent judicial second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *Berkovitz*, 486 at 536-537 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)).  Thus, the exception protects "governmental actions and decisions based on considerations of public policy."  *Gaubert*, 499 U.S. at 323 (citation and internal quotation marks).

It is immaterial whether government employees actually considered various policy considerations because "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325; *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993) ("[O]ur inquiry here must focus on the inherent, objective nature of the challenged decision; we find largely irrelevant the presence or absence of evidence that involved government agents which did or did not engage in a deliberative process before exercising their judgment.").  Thus, "a reviewing court in the usual case is to look to the nature of the challenged decision in an objective, or general sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy."  *Suter v. United States*, 441 F.3d 306, 311 (4th Cir. 2006) (quoting *Baum*, 986 F.2d at 720-721).

"Under the applicable precedents, . . . if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation."  *Gaubert*, 499 U.S. at 324 (citing *Dalehite v. United States*, 346 U.S. 15, 36 (1953)).  "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room

for choice and the action will be contrary to policy." *Id.* "On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulation." *Id.*.

The discretionary function exception applies even if the government's conduct was negligent or an abuse of discretion. *Id.* at 323; *Dalehite*, 346 U.S. at 33 (1953) (the discretionary function exception "applies to policy judgments, even to those constituting abuse of discretion."). Indeed, the exception applies "'even if the discretion has been exercised erroneously' and is deemed to have frustrated the relevant policy purpose." *Pornomo v. United States*, 814 F.3d 681, 687-88 (4th Cir. 2016) (quoting *Holbrook v. United States*, 673 F.3d 341, 350 (4th Cir. 2012)).

When the discretionary function exception applies, courts must dismiss the claim for lack of subject-matter jurisdiction. *Medina v. United States*, 259 F.3d 220, 223-24 (4th Cir. 2001). It is plaintiff's burden to demonstrate the discretionary function exception is not applicable. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir.1995) ("plaintiff bears the burden of persuasion if subject matter jurisdiction is challenged ... because 'the party who sues the United States bears the burden of pointing to ... an unequivocal waiver of immunity' "); *see also Gaubert*, 499 U.S. at 324-25 ("For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.").

### 2. Decisions to issue a "Delayed" response and not to issue a "Denied" response are protected by the discretionary function exception.

Plaintiff, in effect, contends that the FBI had a nondiscretionary duty to issue a "Denied" response because Roof was an "unlawful user of . . . any controlled substance," 18 U.S.C. §

922(d)(3). Compl. ¶ 15. However, the FBI had no mandatory duty to issue a "Denied" response based on the information found through its search of the NICS databases. To the contrary, under the regulations, a "Denied" response may be issued only "when at least one matching record is found in either the NICS Index, NCIC, or III that provides information demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law." 28 C.F.R. §§ 25.6(c)(1)(iv)(C). NICS found no such record. Instead, Roof's rap sheet indicated only that the Lexington County Sheriff's Office arrested him on a felony drug charge. *See* Compl., Exhibit 1. As FBI Director Comey's statement noted, "[t]his charge alone [was] not enough to deny proceeding with the transaction." *Id.* This record instead "required further inquiry" into whether the underlying facts of the arrest demonstrated that Mr. Roof was an unlawful user or addict. *Id.* Thus, the issuance of the "Delayed" response was the only permitted response under the circumstances. *Id.* Plaintiff cannot assail the issuance of the "Delayed" response by citing a different record—*i.e.*, the City of Columbia Police Department's incident report—as the basis for a duty to have issued a "Denied" response, Compl. ¶¶ 26-28, as NICS did not obtain this incident report until after the shooting at issue in this case had already occurred. Compl. Exhibit 1.

Based on the records NICS found as a result of its search, the Brady Act regulations mandated the FBI issue a "Delayed" response. *See* 28 C.F.R. §§ 25.6(c)(1)(iv)(B) ("The FBI NICS Operations Center . . .will . . . [p]rovide [a] . . . 'Delayed' response, if the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law.").[14] Where, as here, "a regulation mandates particular conduct, and the employee obeys the direction, the Government

---

[14] *See also* 28 C.F.R. §§ 25.2, 25.6(c)(1)(iv)(B), 25.8(g)(2) (authorizing "delayed" responses); 63 Fed. Reg.at 58,305 ("The law does not prohibit the system from making [a delayed] response.").

will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324.[15/]

Further, deciding whether or not to issue a "Denied" response necessarily involves the exercise of judgment and discretion since such a response may not properly be issued without the NICS receiving "definitive information," 28 C.F.R. 25.2, "demonstrating that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law." *Id.* § 25.6(c)(1)(iv)(C). Determining whether particular information should be regarded as "definitive," and whether it "demonstrate[es]" that a prospective transferee's receipt of a firearm "would violate" 18 U.S.C. § 922(g) involves the exercise of judgment on the part of the deciding employee. "When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 323; *see also Dalehite,* 346 U.S. at 36 ("Where there is room for policy judgment and decision there is discretion.").

**3.    The design of NICS and the FBI's investigation are covered by the discretionary function exception.**

As noted above, the FBI did not find the Columbia Police Department's incident report, which plaintiff alleges contains information that would have compelled a "Denied" response, as a result of its search of the NICS databases or its follow-up investigation into the status of the charges against Mr. Roof and the circumstances of his arrest. Compl., Exhibit 1. In alleging negligence in creating, maintaining, indexing, and managing databases for background checks

---

[15/]    Indeed, when the regulation calls for a particular response, a challenge to that action is tantamount to a challenge to the regulation itself. It is well settled that a plaintiff cannot, through an FTCA action, challenge an agency's regulations. *See Dalehite*, 346 U.S. at 42 ("[T]he [agency's] regulations . . . could not be attacked by claimants under the [FTCA] by virtue of the first phrase of § 2680(a).").

that resulted in such information not being found, *id.* ¶ 51, plaintiff launches a broad-based challenge to the adequacy of the NICS system itself.  The discretionary function exception requires the Court to reject such a challenge.  The discretionary function exception also bars plaintiff's claim in so far as it challenges the FBI's investigative efforts following the "Delayed" response relating to the status of Roof's drug charge and the circumstances of his arrest.

In *Varig Airlines*, the Supreme Court heard two consolidated cases, both of which involved in-flight fires in aircraft that the Federal Aviation Administration ("FAA") was allegedly negligent in certifying as meeting minimum safety standards.  467 U.S at 800.  "Congress specifically empowered the Secretary to establish and implement a mechanism for enforcing compliance with minimum safety standards according to her 'judgment of the best course.'"  *Id*. at 816 (quoting *Dalehite*, 346 U.S. at 34).  At the heart of the claim was a challenge to this regulatory mechanism governing the inspection and certification of aircraft, whereby the duty to ensure that an aircraft conforms to FAA safety regulations lies with the manufacturer and operator, while the FAA retains the responsibility for policing compliance, which it performs by conducting a "spot check" of the manufacturer's work.  *Id*. 816-17.  Whatever deficiencies there may have been in the system devised by the FAA that allowed unsafe aircraft to be put in use, it could not be challenged in an FTCA action, because an agency's decisions regarding the best course to follow, in light of its limited resources, in fulfilling the objectives of the statutory scheme is "precisely th[e] sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent."  *Id*. at 819-20; *see also Holbrook,* 673 F.3d at 346 ("the FAA's establishment of procedures to govern the certification process is plainly a protected exercise of discretion").

*Varig Airlines* is controlling here.  The Brady Act required the Attorney General to

establish a national instant background check system, *see* 18 U.S.C. § 922(t); Pub. L. No. 103-159 § 103 (requiring Attorney General to certify NICS as operational), but left it to the Attorney General to determine how to implement this congressional directive.  The regulatory system devised by the Attorney General involves searching certain databases containing information that, to a large extent, the FBI relies on local law enforcement to provide voluntarily.  28 C.F.R. § 25.4.  As such, the regulations call for NICS to provide a response within a very short time-frame based on state-provided information that may not always be accurate or complete. Nevertheless, it is the system that the Attorney General, based on the discretion afforded to her by Congress, determined to be the best way to fulfill the goals and objectives of the applicable statutory scheme.  Thus, whatever alleged deficiencies with NICS that plaintiff believes allowed critical information to elude the FBI, they cannot be the basis for an FTCA action.

Nor can plaintiff recover on the theory that the FBI was negligent in conducting its investigation of Mr. Roof while his application was in a "Delayed" status.  Neither the Brady Act itself nor the regulations at 28 C.F.R. Part 25, Subpart A, prescribe a specific and mandatory course of action for NICS Examiners to follow when conducting such an investigation.  Indeed, plaintiff directs this Court to Director Comey's statement, wherein he notes that the NICS examiner did not fail to follow any of the FBI's protocols while performing the follow-up research after having found Roof's rap sheet through a search of the NICS databases.  Compl. Exhibit 1.  Moreover, it is well-settled that the manner in which a law enforcement agency carries out this sort of research or investigation is conduct that the discretionary function exception was intended to protect.  Simply put, "Congress did not intend to provide for judicial review of the quality of investigative efforts." *Pooler v. United States*, 787 F.2d 868, 871 (3d

Cir.)*, cert. denied,* 479 U.S. 849 (1986).[16/]  The discretionary function exception applies to claims challenging the sufficiency of investigations of all kinds, including those of a criminal, civil, or even administrative nature.  *See, e.g., Dichter-Mad v. United States*, 709 F.3d 749, 750 (9th Cir. 2013) (barring claims based upon allegedly negligent investigations by SEC that failed to discover Ponzi scheme).[17/]  Notably, the United States District Court for the Western District of Washington recently held that the discretionary function bars a claim based upon a law enforcement agency's allegedly negligent review of an application to import ammunition pursuant to the Gun Control Act, 18 U.S.C. § 923, on the grounds that reviewing employees exercise their judgment as to what follow-up investigative measures to pursue.  *PW Arms, Inc. v. United States*, No. 15-cv-1990-JCC, ___ F. Supp. 3d ___, 2016 WL 2758201, at *5 (W.D. Wash. May 12, 2016).

A fundamental premise underlying these decisions is that law enforcement agencies' investigative efforts inherently involve choices regarding priorities, which necessarily turn on considerations of available resources.[18/]  As the Fourth Circuit has held, decisions regarding

---

[16/]    *See also Gonzalez v. United States*, 814 F.3d 1022, 1032 (9th Cir. 2016) ("The investigation of crime involves policy judgments at the core of the executive branch."); *id.* at 1033 n.4. ("Even if the FBI negligently conducted an investigation, that does not detract from the fact that the manner of conducting an investigation . . . is rife with discretion and policy judgment and not appropriate for judicial review in a tort action.").

[17/]    *See also Baer v. United States*, 722 F.3d 168, 175 (3rd Cir. 2013) (barring claims based upon allegedly negligent investigations by SEC that failed to discover Ponzi scheme); *Molchatscky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013) (same).

[18/]    *See, e.g., Gonzalez*, 814 F.3d at 1032 (noting FBI's decisions involved consideration of "the agency's mission and resources"); *Molchatscky*, 713 F.3d at 162 ("the SEC's choices regarding allocation of agency time and resources being sufficiently grounded in economic, social and policy considerations."); *Bd. of Trade of City of Chicago v. SEC*, 883 F.2d 525, 531 (7th Cir. 1989) ("Agencies 'take Care that the Laws be faithfully executed' (Art. II, § 3) by doing the best they can with the resources Congress allows them. Judges could make allocative decisions only by taking over the job of planning the agency's entire agenda, something neither authorized by statute nor part of their constitutional role.").

"how best to allocate resources" are "inherently bound up in considerations of economic and political policy, and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second guessing through tort actions for damages." *Baum v. United States,* 986 F.2d 716, 724 (4th Cir. 1993). Such considerations are especially present here given that the follow-up investigation into Mr. Roof by the NICS Examiner, within what is effectively a three business day time-limit, took place while she "processed the many, many other firearms purchases in her queue." Compl. Exhibit 1.

In addition to the fact that law enforcement investigations of all stripes are inherently policy-laden activities, it also is noteworthy that in performing background checks the FBI also plays the role of regulator of gun transactions among firearm dealers and private individuals. As the Supreme Court has made clear, "whatever else the discretionary function exception may include, it plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals." *Varig Airlines*, 467 U.S. at 813-4; *accord Baxley v. United States*, 767 F.2d 1095, 1098 (4th Cir. 1985) (the Government "will not be held liable for torts caused by the negligent conduct of third-parties, even though the government agency had a statutory mandate to regulate the conduct of the private parties.").

**B.     The Misrepresentation Exception Bars Plaintiff's Claims.**

The FTCA also explicitly preserves the United States' sovereign immunity with respect to "claim[s] arising out of . . . misrepresentation." 28 U.S.C. § 2680(h). "[T]he essence of an action for misrepresentation, whether negligent or intentional, is the communication of misinformation on which the recipient relies." *Block v. Neal*, 460 U.S. 289, 296 (1983). The FTCA's misrepresentation exception "extends to a wide range of communicative activity (including failures of communication)." *Muniz-Rivera v. United States*, 326 F.3d 8, 13 (1st Cir.

2003).  As plaintiff premises her claims on the United States' failure to tell the FFL to deny the firearm sale to Roof, they must be dismissed for lack of subject-matter jurisdiction.

Though plaintiff characterizes her claims as a failure to properly manage databases and perform background checks, the FTCA's exceptions, including the misrepresentation exception, cannot be evaded through "[a]rtful pleading."  *Talbert v. United States*, 932 F.2d 1064, 1066-67 (4th Cir. 1991).  Rather, "[t]he test in applying the misrepresentation exception is whether the *essence* of the claim involves the government's failure to use due care in obtaining and communicating information."  *JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260, 1264 (11th Cir. 2000) ((emphasis added) (citing *Block*, 460 U.S. at 296 and *United States v. Neustadt*, 366 U.S. 696, 706-07 (1961)); *accord, e.g.*, *Russ v. United States*, 129 F. Supp. 2d 905, 909 (M.D.N.C. 2001), *aff'd*, 33 F. App'x 666 (4th Cir. 2002); *Mohr v. United States*, No. 3:09-cv-1587-JFA, 2009 WL 5216889, at *2 (D. S.C. Dec. 29, 2009).

Here, the essence of plaintiff's claims are that: (1) the Brady Act obligated the United States to notify the FFL that it should deny the firearm sale, *see* Compl. ¶¶ 23, 28, 31; (2) the FFL relied on the United States to tell it to deny the sale of the handgun to Roof, *see id.* ¶ 22; and (3) as a result of the United States' failure to do so, the FFL sold Roof a handgun, which Roof used in the Emanuel AME Church shooting, *id.* ¶¶ 33-35.  As the gravamen of plaintiff's claims is the government's failure to communicate a denial to Shooter's Choice, the misrepresentation exception squarely bars plaintiff's claims, and the Court should dismiss the case for lack of subject-matter jurisdiction.

Courts routinely dismiss tort actions against the United States that—like this one—are premised on similar failures to obtain and communicate information.  *See, e.g.*, *Muniz-Rivera*, 326 F.3d at 13 (actions based on "failure to communicate precautionary information" are barred

by the misrepresentation exception); *Lawrence v. United States*, 340 F.3d 952, 958 (9th Cir.

2003) (action based on "failure to communicate certain information at the exemption hearing"

was barred by the misrepresentation exception); *JBP Acquisitions, LP*, 224 F.3d at 1266 ("the

Government's failure to communicate to JBP that it was engaged in condemnation proceedings .

. . is encompassed by the misrepresentation exception."); *Roper Hospital, Inc. v. United States*,

869 F. Supp. 362, 365, 368 (D. S.C. 1994) (action based on government's failure to timely notify

insurer of insured's termination of employment is barred by the misrepresentation exception);

*Mullens v. United States*, 785 F. Supp. 216, 219-20 (D. Me. 1992) (action based on government's

"fail[ure] to notify [plaintiffs] that the home contained lead-based paint" is barred by the

misrepresentation exception), *aff'd*, 976 F.2d 724 (1st Cir. 1992).  The same result is warranted

here.

## C.    Plaintiff's Claims Are Not Actionable Under South Carolina Law.

South Carolina law does not impose a duty on private citizens to investigate purchasers of

firearms and does not impose negligence liability for inadequate background checks.  There are

only "two instances in which the FTCA would permit" plaintiff "to sue the Government for

negligence as a result" of the failure to enforce federal regulations: (1) if "the alleged breach of

duty is tortious under state law;" or (2) if plaintiff demonstrates the government breached "a duty

imposed by federal law that is similar or analogous to a duty imposed by state law."  *Fla. Auto*

*Auction of Orlando, Inc. v. United* States, 74 F.3d 498, 502 (citation omitted).  Because there is

no analogous state law applicable to the United States in this case, the Court should dismiss

plaintiff's claims for lack of subject-matter jurisdiction.

The existence of a duty is typically a question of law for the courts.  *Farwell v. Un*, 902

F.2d 282, 288 (4th Cir. 1990) (citations omitted).  The relevant question in FTCA cases is

"whether a state-law duty exists, not whether a court can create or 'recognize' one." *LeLeux v. United States*, 178 F.3d 750, 759 (5th Cir. 1999); *cf. Feres v. United States*, 340 U.S. 135 (1950) (effect of FTCA "is to waive immunity for recognized causes of action").

There is no common law or civil obligation to conduct background checks prior to selling a gun in South Carolina. Plaintiff identified no such duty in the complaint, and the United States is unaware of any such duty. Where plaintiff "do[es] not cite," and the Court cannot locate "any reported decision of a South Carolina court that suggests" an analogous duty, the claim should fail. *Fla. Auto Auction of Orlando, Inc.*, 74 F.3d at 506.

Plaintiff, in her complaint, even liberally construed, only articulates two potential duties. First, she argues the United States had a "duty to protect," Compl. ¶ 40, plaintiff from criminal acts as a result of a "relationship with [Mr.] Roof," *id.* ¶¶ 50, 58, due to its background investigation. Second, she argues the United States voluntarily accepted a duty of care to plaintiff under a "good Samaritan" theory, *see* Compl. ¶¶ 19, 21 ("accepted and assumed a duty), 51, 59 ("voluntary undertaking and acceptance"). Both arguments fail, and the Court should dismiss the action.

### 1. The United States owes plaintiff no duty to prevent Mr. Roof's criminal acts.

The United States did not assume a "duty to protect," *id.* ¶ 40, plaintiff from criminal acts as a result of a "relationship with [Mr.] Roof," *id.* ¶¶ 50, 58, due to its background investigation. Thus, any claims advanced by plaintiff under this theory fail.

In general, a person does not have a duty to protect others from criminal activities of third-parties. *See Cramer v. Balcor Prop. Mgmt., Inc.*, 441 S.E.2d 317, 318-19 (S.C. 1994) (premises liability). Applying North Carolina law, the Fourth Circuit held that the United States was not liable in a FTCA case to the victim of a service member's assault and rape because

"there is nothing in the record to indicate that the Army should have known that the [service member] was a threat to [plaintiff's] safety based solely upon [a prior burglary and assault] or his prior expressed desires to kill himself and members of his unit." *Durden v. United States*, 736 F.3d 296, 306 (4th Cir. 2013). The Fourth Circuit held that the United States owed plaintiff no duty to confine and surveil the service member. *Id.* The Fourth Circuit's reasoning is highly persuasive here.

Thus, even assuming that the United States knew or had reason to know that Mr. Roof was an unlawful user of controlled substances, the United States had no duty under South Carolina law to protect plaintiff from any conceivable criminal act Mr. Roof might commit. *Durden*, 736 F.3d at 306. "[A]n individual does not have a duty to protect the public from speculative harm from a dangerous individual within his control." *Faile v. S.C. Dep't of Juvenile Justice*, 566 S.E.2d 536, 546 (S.C. 2002). In this case, the FBI did not control or have custody of Mr. Roof, and therefore it owed no "duty to protect" plaintiff from his attack. *Contra id.* at 548 (where State "had custody of a known dangerous individual" it had "duty to control and supervise [him] to prevent him from harming others as long as it retained custody of him by court order."). Plaintiff fails to state a claim for breach of a "duty of protect" M.P. from criminal acts as a result of an alleged "relationship with [Mr.] Roof."

Also, the Brady Act itself does not impose upon the United States a state-law duty to protect plaintiff. In *Florida Auto Auction of Orlando, Inc.*, the plaintiffs alleged that the government failed to comply with its customs regulations when it permitted purchasers to export auctioned cars without a certificate of title. 74 F.3d at 500-501. Those allegations are similar to those at issue in this case, where plaintiff claims the government negligently discharged its NICS regulations when performing the background check for Dylann Roof. In *Florida Auto Auction of*

*Orlando, Inc.*, the Fourth Circuit reviewed South Carolina law on government liability for discharging statutory obligations. *Id.* at 503. The Fourth Circuit noted that "South Carolina courts consistently have been reluctant to find special duties statutorily imposed." *Id.* It held that the customs regulations at issue in that case did not create an actionable duty under state law. *Id.* at 504. The Brady Act and NICS regulations, like the customs regulations at issue in *Florida Auto Auction of Orlando*, also do not impose "special duties" actionable under state law.

The Brady Act and NICS regulations do not impose any duty on the United States owed to plaintiff. Instead, the Brady Act, in part, assists FFL compliance with the Gun Control Act. Under the Act and its implementing regulations, the only entity NICS communicates with is the FFL.[19] *See* 28 C.F.R. 25.6(c)(1)(iv) ("Provide the following NICS responses . . . *to the FFL* that requested the background check") (emphasis added). In doing so, the Brady Act protects "the general welfare and safety of the public," *Fla. Auto Auction of Orlando, Inc.*, 74 F.3d at 503, not an identifiable class of persons. No language in the Brady Act or its implementing regulations charge specific officers with a duty to plaintiff or individual members of the public. Thus, just as *Florida Auto Auction of Orlando, Inc.* concluded the customs regulations did not impose "a special duty, violation of which could subject the Government to liability for negligence under South Carolina law," *id.*, the Court should reach the same conclusion here with respect to the Brady Act and NICS regulations.

### 2.     Plaintiff fails to state a claim under a "good Samaritan" theory.

To the extent plaintiff alleges the United States undertook a duty of care to plaintiff under a "good Samaritan" theory, *see* Compl. ¶¶ 51, 59 ("voluntary undertaking and acceptance"), she fails to state a cognizable claim under South Carolina law. This also warrants dismissing

---

[19]     NICS may communicate with the prospective purchaser if it denies the transaction and the prospective purchaser administratively appeals that decision. 28 C.F.R. § 25.10.

plaintiff's claims.

Section 324A of the Restatement (Second) of Torts addresses an actor's duty to third-parties when he voluntarily undertakes "to render service to another which he should recognize as necessary for the protection of a third person." But South Carolina courts have not adopted this provision of the Restatement. *Miller v. City of Camden*, 494 S.E.2d 813, 816 n.2 (S.C. 1997) ("We decline to adopt the expanded liability of Restatement 2d of Torts § 324A (1965)."). South Carolina does not recognize an actor's "good Samaritan" duty to third-parties advanced by plaintiff in her complaint.

The FBI's maintenance of the NICS and its performance of background checks are similar to the facts presented in *Johnson v. Robert E. Lee Academy, Inc.*, 737 S.E.2d 512 (S.C. Ct. App. 2012). In *Johnson*, a school hired accountants to investigate a possible theft of $9,100. 737 S.E.2d at 512-13. In the course of his investigation, the accountant discovered that plaintiff deposited the $9,100 into the bank and that she did not steal the money. *Id.* at 513. Despite this discovery, the accountant failed to report his findings to the police. *Id.* Because prior representations by the school indicated plaintiff stole the money, and because the accountant failed to report his discovery to police, the plaintiff was fired, arrested, and charged with theft. *Id.* She sued the accounting firm, arguing, *inter alia*, that the accountant's investigation "constituted a voluntary undertaking that gave rise to a duty of care towards her." *Id.*

The South Carolina Court of Appeals rejected plaintiff's theory of liability, *id.*, acknowledging that South Carolina has not adopted the Restatement's "good Samaritan" rule for third-party beneficiaries. *Id.* at 514 n.5 ("We are cognizant of Restatement (Second) of Torts section 324A, although that section has not been adopted by our courts . . ."). But, even if the rule applied, the Court of Appeals concluded that the accountant "owed no duty of care" to

plaintiff as a result of his communications with police officials. *Id.* at 515.

The Court should reach the same conclusion in this case. Here, plaintiff alleges that the FBI, like the accountant in *Johnson*, undertook responsibility to perform a background check, giving rise to a duty of care to her. Plaintiff also alleges, like in *Johnson*, that the FBI failed to properly conduct the investigation, resulting in harm to plaintiff. Because South Carolina does not recognize the Restatement's "good Samaritan" third-party duty of care, the Court should dismiss plaintiff's claims.

/ / /

/ / /

/ / /

V.    CONCLUSION

The shooting at the Emanuel AME Church was an atrocity of unspeakable proportions. The perpetrator's actions were despicable. But the United States is not liable in tort for the tragic shooting. The FTCA's discretionary function and misrepresentation exceptions bar plaintiff's claims, and Plaintiff advances no viable theory of liability based on state law. The Court should dismiss the action for lack of subject-matter jurisdiction and failure to state a claim.

DATED the 14th day of October 2016.

<div style="margin-left:40%">

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director, Torts Branch
Civil Division

RUPERT M. MITSCH
Assistant Director, Torts Branch
Civil Division

 s/ Stephen R. Terrell
STEPHEN R. TERRELL
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC 20044
Stephen.Terrell2@usdoj.gov
(202) 353-1651

</div>