IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| FELICIA SANDERS, individually and as Legal Custodian of K.M., a minor, | ) ) ) | Civil Action No. 2:16-cv-2356-RMG |
| Plaintiff, | ) ) | *consolidated with* 2:16-cv-2350; 2:16-cv-2351; 2:16-cv-2352; 2:16-cv-2354; 2:16-cv- |
| v. | ) ) ) | 2355; 2:16-cv-2357; 2:16-cv-2358; 2:16-cv-2359; 2:16-cv-2360; 2:16-cv-2378; 2:16-cv- |
| THE UNITED STATES OF AMERICA, | ) ) | 2405; 2:16-cv-2406; 2:16-cv-2407; 2:16-cv-2409; and 2:16-cv-2746 |
| Defendant. | ) ) | |
| | ) ) | |
| This document pertains to all cases | ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION TO DISMISS**

## I.    INTRODUCTION

Plaintiffs brought these actions against the United States seeking damages for the deaths of nine individuals who were murdered by Dylann Storm Roof at the Emanuel AME Church in Charleston, South Carolina, on June 17, 2015.  They claim that employees of the Federal Bureau of Investigation ("FBI") negligently failed to prevent Roof from purchasing the firearm he used to commit these murders.

In its original motion to dismiss, ECF No. 12, the United States made a *prima facie* showing that the Federal Tort Claims Act's ("FTCA") discretionary function exception, 28 U.S.C. § 2680(a), bars these actions because the FBI's operation of the National Instant Criminal Background Check System ("NICS") and the conduct of NICS background checks entail the exercise of judgment and choice in implementing the regulatory regime governing firearm purchases.  *United States v. Gaubert,* 499 U.S. 315, 322-23 (1991).  Accordingly, with

jurisdictional discovery now complete, it is plaintiffs' burden to show that the discretionary function exception is inapplicable. *Welch v. United States,* 409 F.3d 646, 651 (4th Cir. 2005). Plaintiffs cannot meet this burden because they cannot point to any conduct of FBI employees that violated any specific, mandatory statutory or regulatory directives. *Gaubert,* 499 U.S. at 324-25; *Berkovitz v. United States,* 486 U.S. 531, 536 (1988). Accordingly, the Court should dismiss these actions for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

Moreover, Plaintiffs have not stated a claim under South Carolina law against the United States. Under South Carolina law, neither the Brady Handgun Violence Prevention Act ("Brady Act") nor its implementing regulations imposed on the FBI any actionable duty to protect Roof's victims from the criminal acts of third parties. Plaintiffs have not alleged facts demonstrating that the FBI engaged in any affirmative activity that increased the risk of harm to the public at large or to Roof's victims in particular. Nor can plaintiffs satisfy South Carolina's negligence *per se* standard; indeed, the public duty rule forecloses such an argument. In short, plaintiffs cannot establish a legal duty and their negligence claims therefore fail as a matter of law. Thus, the Court also should dismiss plaintiffs' actions for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

## II.    STANDARD OF REVIEW

A defendant may move to dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Frederick, Md.,* 191 F.3d 394, 399 (4th Cir. 1999). Plaintiffs bear the burden of proof on questions of subject matter jurisdiction. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.

Sovereign immunity is jurisdictional in nature.  Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'"  *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)) (citations omitted, alteration in original).

"[A] defendant may challenge subject matter jurisdiction in one of two ways."  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)).  "First, the defendant may contend that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based."  *Id.* (citing *Adams*, 697 F.2d at 1219).  Alternatively, the defendant may contend "that the jurisdictional allegations of the complaint were not true."  *Adams*, 697 F.2d at 1219.  This motion presents a factual attack on the Court's subject matter jurisdiction.

Where, as here, the jurisdictional facts are at issue, the Court may evaluate the pleadings as evidence on the issue and may consider other evidence in the record "without converting the proceeding to one for summary judgment."  *Velasco v. Gov't of Indon.*, 370 F.3d 392, 398 (4th Cir. 2004) (citation omitted).  There is no presumption of truth and the Court weighs the evidence presented in a 12(b)(1) hearing to determine jurisdiction.  *Id.*

A defendant also may move to dismiss an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "A court decides whether [the

pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

## III.    STATUTORY AND REGULATORY BACKGROUND

The Gun Control Act of 1968, as amended, 18 U.S.C. §§ 921 *et seq.*, prohibits the possession of firearms by certain categories of individuals, including convicted felons, persons under indictment for felonies, and individuals who are unlawful users of or addicted to controlled substances.  In 1993, Congress passed the Brady Act which required the Attorney General to establish NICS in order to provide federal firearms licensees ("FFLs") a means by which to verify that potential purchasers could lawfully receive firearms.  *See* PUB. LAW NO. 103-159 (1993), 107 Stat. 1536.

NICS is operated by the NICS Section of the FBI's Criminal Justice Information Services Division located in Clarksburg, West Virginia.  *See generally* Statement of Rachel L. Brand, Assistant Attorney General for Legal Policy, Before the Subcommittee on Domestic Policy, Committee on Oversight and Government Reform, United States House of Representatives, May 10, 2007, at 2-4 (describing operation of NICS) ("Brand Statement") (Ex. 1).[1]

Briefly, the Brady Act provides that before selling firearms to individuals, FFLs first must request criminal background checks of the prospective purchasers through NICS.  18 U.S.C. § 922(t)(1).  When an FFL initiates a NICS background check, several national databases

---

[1]      Record citations are to document name (if available), Bates number or page number, and attached exhibit number.  Thus "Case History Report at FBI-00000101 (Ex. 7)" refers to the document entitled "Case History Report" at Bates number FBI-00000101, which is attached to this motion as Exhibit 7.

(specifically, the Interstate Identification Index ("III"); files of the National Crime Information Center ("NCIC"); and the NICS Index) are queried for any records matching the prospective purchaser, 28 C.F.R. § 25.6(c)(1)(iii), and the FFL is provided with one of three responses based on the results of these searches: (1) "Proceed," which signifies that no disqualifying information has been found relating to the individual; (2) "Denied," which signifies that information has been found that demonstrates that receipt of the firearm by the individual would violate federal or state law; or (3) "Delayed," which signifies that a record has been found that requires more research to determine whether the prospective purchaser is disqualified from possessing a firearm by federal or state law, 28 C.F.R. § 25.6(c)(1)(iv).

If an FFL receives a "Delayed" response, the Brady Act prohibits the FFL from completing the sale for no more than three business days while the FBI attempts to determine whether or not the prospective purchaser's receipt of a firearm would violate federal or state law. 18 U.S.C. § 922(t)(1)(B)(iii). If by the time this three-business-day period expires no determination has been made as to whether the prospective purchaser's receipt of a firearm would be unlawful, the FFL is permitted (but not required) to complete the sale and transfer the firearm to the individual. *Id.*

In approximately three percent of the NICS transactions it processes, the FBI is unable to make a final determination as to the prospective purchaser's eligibility to possess the firearm within the three business days during which the Brady Act prohibits the FFL from completing the firearm's sale absent such a determination. *See* Statement of Assistant Attorney General Brand, *supra*, at 4 (Ex. 1). In cases where the NICS Section receives prohibiting information about a delayed transaction more than three business days after the background check was submitted, the FBI contacts the FFL to change the status from "Delayed" to "Denied." *Id.* If the

FFL already has transferred the firearm, the FBI refers the case to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") so that ATF can investigate and retrieve the firearm or otherwise ensure that the firearm is not in the hands of a prohibited person. *Id.*

Determinations as to whether a matching record demonstrates that an individual's receipt of a firearm would violate federal or state law, or whether more research is needed before making such a determination, are made by NICS legal instrument examiners ("NICS Examiners") who are trained to analyze criminal history and other relevant information. *See* 28 C.F.R. §§ 25.2 ("NICS Representative"); 25.6(c) (NICS Operations Center response to inquiry from FFL). NICS Examiners review records returned by NICS searches to determine if they match the prospective firearm purchaser, if the matching records are complete, and whether a matching record indicates that the prospective purchaser is prohibited from possessing a firearm. 28 C.F.R. § 25.6(c). If a NICS Examiner determines that further research is needed before such a final determination can be made, the transaction automatically is placed into a "delay queue," and then assigned to another NICS Examiner who attempts to obtain the needed information so a final determination can be made as to the individual's eligibility to purchase a firearm. Brand Statement at 3 (Ex. 1).

The NICS Section has developed Standard Operating Procedures ("SOPs") to assist NICS Examiners in determining what kinds of information demonstrates that receipt of the firearm by the individual would violate federal or state law, when more research is needed to determine whether the prospective purchaser is disqualified from possessing a firearm by federal or state law, how such research is to be conducted, and which state and local law enforcement and criminal justice agencies are to be contacted in an effort to obtain missing information to allow a determination to be made as to the individual's eligibility to receive a firearm. Del

Greco Depo p. 33:12-16, 38:10-17 (Ex. 2).

One such NICS Section SOP, entitled "CONTROLLED SUBSTANCE," elaborates on the application of 18 U.S.C. § 922(g)(3), which prohibits the receipt or possession of a firearm by any person "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substance Act (21 U.S.C. 802))."  SOP No. 5.4.7 (Ex. 3).  The Gun Control Act does not itself define the term "unlawful user."  *See United States v. Jackson,* 280 F.3d 403, 406 (4th Cir. 2002).  In construing this term, however, the courts have held that "there must be some regularity of drug use in addition to contemporaneousness to meet the statute's requirements."  *United States v. Patterson,* 431 F.3d 832, 839 (5th Cir. 2005), *citing United States v. Augustin,* 376  F.3d 135, 139 (3d Cir. 2004) ("[T]o be an unlawful user, one needed to have engaged in regular use over a period of time proximate to or contemporaneous[ ] with the possession of the firearm."); *Jackson,* 280 F.3d at 406 (upholding district court's finding that prosecution must establish "a pattern of use and recency of use"); *United States v. Purdy*, 264 F.3d 809, 812-13 (9th Cir. 2001) ("[T]o sustain a conviction under § 922(g)(3), the government must prove . . . that the defendant took drugs with regularity, over an extended period of time, and contemporaneously with his . . . possession of a firearm.").

The NICS Section's controlled substance SOP quotes an ATF regulation defining "an unlawful user of or addicted to any controlled substance" as follows:

> A person who uses a controlled substance and has lost the power of self-control with reference to the use of controlled substance; and any person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician.  Such use is not limited to the use of drugs on a particular day, or within a matter of days or weeks before, but rather that the unlawful use has occurred recently enough to indicate that the individual is actively engaged in such conduct.  A person may be an unlawful current user of a controlled substance even though the substance is not being used at the precise time the person seeks to acquire a firearm or receives or possesses a firearm. An inference of current use may be drawn from evidence of a recent use or possession of a

> controlled substance or a pattern of use or possession that reasonably covers the present time, e.g., a conviction for use or possession of a controlled substance within the past year; multiple arrests for such offenses within the past 5 years if the most recent arrest occurred within the past year; or persons found through a drug test to use a controlled substance unlawfully, provided that the test was administered within the past year.

SOP No. 5.4.7 at FBI-00000234 (citing 27 C.F.R. § 478.11) (Ex. 3).  The SOP then goes on to state:

> Evidence of possession of a controlled substance within the past year could constitute a prohibitor even if the individual is actually convicted of a different offense.  In this case, a field or chemical test must have been administered to establish the substance seized from the defendant was a controlled substance (marijuana, not oregano; cocaine, not powdered sugar; paraphernalia that tests positive for a controlled substance, etc.).

*Id.*

The SOP then proceeds to catalog numerous scenarios and circumstances in which more research is needed.  For example, under the heading **"Drug Arrest Within the Past Year,"** the SOP states in relevant part:

> If there has been a drug arrest in the past year, without a conviction, you must determine **if** it can be proven that the individual, or the substance in his possession, **tested** positive for a controlled substance that has no federally accepted medical use, this would be enough to establish inference of current or recent drug use or possession.

> If an individual **admits** to using or possessing a controlled substance which has no federally accepted medical use, then this is enough to establish recent use/possession.

> * * *

> **The NICS will not rely on the officer's opinion that the material is a controlled substance.  The NICS will only accept the material is a controlled substance once proven by a field or chemical test.**

> **EXCEPTION:  in the case of prescription medication, the NICS will rely on identification (by markings on the pills) by the Poison Control Center or a Pharmacist in lieu of a chemical test.**

*Id.* at FBI-00000235 (bold font and underscoring in original).  In addition, under the heading

**<u>"Prescription Drugs"</u>** the SOP goes on to state:

> To qualify under federal prohibiter 922(g)(3), it must be determined that the prescription drug is a controlled substance as defined below by federal statute. The state definition of a controlled substance may not be the same as the federal definition under Title 21. Contact with the LAT [Legal Analysis Team] or outside agencies may be required to verify the type of drug involved to determine if it meets this definition which is required to establish 922(g)(3).
>
> Prescription drugs, as defined by Title 21, U.S.C., Section 802, which are scheduled controlled substances, may qualify under federal prohibiter 922(g)(3) if used in a non-prescribed manner.
>
> Per guidance from ATF legal counsel, it must be established that the individual's licensed physician issued the prescription and that the individual's prescription advises against the individual taking the substance in a particular manner (amount, taking with alcohol, taking while driving, etc.)  It is not enough to establish a general warning or guidance for the substance (whether or not that guidance is listed on the pill bottle). You must establish that a licensed physician prescribed the controlled substance with specific guidance and that the individual/subject took the controlled substance in a manner that is against the licensed physician's specific guidance.
>
> Prescription drugs may also qualify for federal prohibiter 922(g)(3) if a person has them in his/her possession by unlawful means, such as forging a prescription, stealing a prescription medication, taking a drug that was not prescribed for the individual but for someone else, or obtaining a prescription drug by fraud, and the drugs are a scheduled controlled substance.

*Id.* at FBI-00000241 to FBI-00000242.

## IV.    STATEMENT OF THE CASE

On Sunday, February 28, 2015, at approximately 8:42 p.m., an officer of the Columbia

Police Department ("Officer Fitzgerald") arrested Roof at the Columbiana Mall for possession of

Suboxone, a Schedule III Controlled Substance.  Incident Report at FBI-00000030 to FBI-

00000034 (Ex. 4).

The vast majority of the City of Columbia lies in Richland County, but a small part

extends into Lexington County.  According to geographical data published by the United States

Census Bureau, as of 2010, the total area of the City of Columbia is 134.93 square miles, of which 134.13 square miles are situated in Richland County; only eight-tenths (0.80) of a square mile of the city is situated in Lexington County.  *See* https://factfinder.census.gov/faces/ tableservices/jsf/pages/productview.xhtml?src=CF (last visited February 5, 2017).  The small portion of the City of Columbia that lies in Lexington County includes part of the Columbiana Mall.  FBI-00000035 (Ex. 5).

Officer Fitzgerald took Roof to the Lexington County Sherriff's Office for booking.  ECF No. 12-3 at 3.  On, or about Monday, March 1, 2015, Officer Fitzgerald presented an arrest warrant to Judge Spencer of the Columbia Municipal Court, which Judge Spencer executed that day.  *Id.*  A police officer served Roof with the arrest warrant and returned it executed on Tuesday, March 2, 2015.  *Id.*  Also on March 2, 2015, the Columbia Police Department submitted a document described as an Incident Report to the National Data Exchange ("N-DEx") database.  N-DEx Log at FBI-00000265 (Ex. 6).  The Lexington County Sherriff's Office also uploaded to N-DEx a document described as an Incident Report on March 3, 2015.  *Id.*

On March 16, 2015, the Lexington County Solicitor's Office initiated a criminal complaint against Roof in the Lexington County Eleventh Judicial District, charging Roof with violation of S.C. CODE ANN. § 44-53-370(c) (2016), possession of a controlled substance.  FBI-00000397.  A first offense for possession of a controlled substance is a misdemeanor.  S.C. CODE ANN. § 44-53-370(d)(2) (2016).  A grand jury did not indict Roof on this charge until July 13, 2015, after the shooting.  ECF No. 12-3 at 1.

On April 11, 2015, Roof initiated a NICS background check by seeking to purchase a firearm and filling out an ATF Form 4473.  In response to Shooter's Choice's (the FFL) request, the NICS system automatically queried for Roof in III, NCIC, and NICS Index.  The NICS

system returned "no NICS Index hits" and "no NCIC" warrants.  Case History Report at FBI-00000101 (Ex. 7).  NICS returned one III hit for Roof.  *Id.*  Specifically, it indicated a "criminal history record . . . *maintained and available from* . . . South Carolina" for Roof.  *Id.* (emphasis added).  The South Carolina III record for Roof, as of April 11, 2015, indicated a March 1, 2015, arrest for a felony violation of S.C. CODE ANN. 44-53-370(b)(1) (2016), manufacture, use, or sale of a narcotic.  FBI-00000106.  The South Carolina III record also stated that the "court disposition [is] pending" and "conviction status unknown."  *Id.*[2/]

This III data suggested two potential federal prohibitors under the Gun Control Act:  18 U.S.C. § 922(g)(1) (persons convicted of a crime punishable by a term of imprisonment of more than one year); and 18 U.S.C. § 922(g)(3) (persons who are unlawful users of or addicted to any controlled substance).  The NICS Examiner who received the call from Shooter's Choice noted these potential prohibitors, Case History Report at FBI-00000120 (Ex. 7), issued a "Delayed" response to Shooter's Choice, and notified Shooter's Choice that the Brady transfer date was April 16, 2015, *id.  See* 18 U.S.C. § 922(t)(1)(B)(ii) (permitting transfer if three business days elapse and NICS does not issue a "Denied" response); 28 C.F.R. § 25.6(c)(1)(iv)(B) (same).  Federal law, Brady Act regulations, and NICS policies required NICS's "Delayed" response to Shooter's Choice on April 11, 2015.

Pursuant to NICS policies, NICS automatically places delayed transactions into a "Delay

---

[2/]    "Criminal history record information" is a term of art, defined in the Code of Federal Regulations.  Specifically, it "means *information* collected by criminal justice agencies on individuals consisting of identifiable descriptions and notations of arrests, detentions, indictments, informations, or other formal criminal charges, and any disposition arising therefrom, including acquittal, sentencing, correctional supervision, and release."  28 C.F.R. § 20.3 (emphasis added).  III contains criminal history record information.  28 C.F.R. § 20.32(a).  III does not contain copies of "records" generated by local law enforcement agencies during a criminal encounter such as images of incident reports or warrants.

Queue." SOP 5.0 at FBI-00000129 (Ex. 8). NICS Examiners pull transactions from the Delay

Queue and assume "ownership" of the transaction. *Id.* The NICS Section's goal is "to answer

all Delayed transactions within the three-business-day time frame." *Id.* at FBI-00000133.

Resolving all "Delayed" transactions within the three business day timeframe is not possible, and

some background checks become "open" or "expired." 28 C.F.R. § 25.2 (defining "Open"

transactions); SOP 5.16 (addressing expired transactions) at FBI-000000374 (Ex. 9).

On Monday, April 13, 2015, another NICS Examiner pulled Roof's transaction from the

Delay Queue. Case History Report at FBI-00000099 (Ex. 7). First, the Examiner "checked in

house systems." *Id.* at FBI-00000120. This was consistent with SOP 5.5.4, which requires that

"[a]ll internal automated systems (NTN Inquiry [by name, FBI, social security number], NGI,

NCIC, DDF, ATFRDD, and Web sites) must be checked." SOP 5.5.4 at FBI-00000268 (Ex. 10).

The result of the internal automated systems check for Roof was as follows:

> NGI -- DOA ON FILE; NO ADD
> NCIC -- DOA ON FILE; NO ADD
> DDF -- NO FILES

Case History Report at FBI-00000120 (Ex. 7). This indicated that the internal systems contained

no additional information beyond what was reflected in III.

Because the III data for Roof did not contain disposition information for Roof's arrest,

the NICS Examiner checked the status of any criminal cases against Roof. SOP. 5.5.3 ("Missing

Disposition") at FBI-00000051 (Ex. 11). For South Carolina, the NICS Section does this

through the State's court web sites. SOP. 5.5.4 refers NICS Examiners "to state contact pages

for approved state-wide Web sited and contact lists for county Web sites." SOP 5.5.4 at FBI-

00000274 (Ex. 10). The NICS Section's South Carolina Processing Page, in turn, instructs

Examiners to research General Sessions/Circuit Courts for "[f]elony charges that can receive

more than 1 year." S.C. Contact Sheets at FBI-00000314 (Ex. 12).

The Examiner summarized her web site research as follows:

Case Type:     Criminal-Clerk Case Sub Type:
Status: Pending

Case History Report at FBI-00000120 (Ex. 7). The Lexington County Eleventh Judicial Circuit

Public Index identified *State v. Dylann Storm Roof*, Case No. 2015A4021600503. Lexington

Cty. Web Sites at FBI-00000395 to FBI-000000398 (Ex. 13). The County's web site accurately

identified the charge against Roof as a misdemeanor, rather than a felony, as had been

erroneously indicated in III. *Id.* at FBI-00000397. It further indicated that Lexington County

received the case on March 16, 2015, but indicated no true bill date. *Id.*

In South Carolina, "[w]ith limited exceptions, the South Carolina Constitution requires a

person be indicted by the grand jury before standing trial for a crime." *State v. Owens*, 552

S.E.2d 745, 750-51 (S.C. 2001) (citation omitted) (overruled on other grounds by *State v.*

*Gentry*, 610 S.E.2d 494, 500 (S.C. 2005)). Because the Lexington County court website did not

list a true bill date, the NICS Examiner concluded that there was no indictment and no

conviction. Russell Depo. pp. 141:18-142:18 (Ex. 14).

The NICS Examiner then turned to external research to assess whether 18 U.S.C. §

922(g)(1) prohibited the Roof transaction, contacting the Lexington County Solicitor's Office.

Conley Depo. pp. 94:20-95:2 (Ex. 15). At 2:00 p.m. on April 13, 2015, the NICS Examiner sent

an automated fax to the Lexington County Solicitor's Office requesting any information on an

indictment. Fax Summary at FBI-00000384 (Ex. 16); *see also* Case History Report at FBI-

00000121 ("The record for 03/01/2015 has been faxed on 04/13/2105 to Lexington Co. Solicitor

Office") (Ex. 7). This was consistent with SOP 5.5.3, which instructs NICS Examiners to seek

"Final Disposition/Level; Indictment; [or] Information" where "the disposition of a criminal

charge is missing or delayed."  SOP 5.5.3 at FBI-00000051 (Ex. 11).  This was also consistent

with the SOP governing external research, SOP 5.5.5, which instructs that "[i]f the disposition is

not available, inquire if an indictment, a bill of information, or a formal accusation exists."  SOP

5.5.5 at FBI-00000283 (Ex. 17).  Finally, this complies with SOP 5.5.5's requirement that NICS

Examiners contact "district attorneys . . . in accordance with the preference indicated on the State

Processing Page and Contact List."  *Id.* at FBI-00000282.  For South Carolina, the NICS Section

contacts the Solicitors Office "as a last resort . . ."  S.C. Contact Sheets at FBI-00000315 (Ex.

12).  In this case, the Solicitor's Office never responded to the NICS Section's fax inquiry.  Fax

Summary at FBI-00000384 (listing status as "Pending") (Ex. 16).

  In view of the foregoing, the NICS Section could not deny Roof's transaction based on

18 U.S.C. § 922(g)(1) because the III data indicated the case was pending and did not contain

disposition data for the arrest.  The NICS Examiner's in-house research revealed that the case

remained pending in Lexington County and did not have a true bill date.  This means there was

no indictment.  Nonetheless, the NICS Examiner conducted the appropriate external research by

faxing the Solicitor's Office for any indictment, but that office never responded to the inquiry.

  Further, the mere fact that Roof had been arrested for unlawful possession of a controlled

substance likewise did not demonstrate that Roof's transaction could be denied based on 18

U.S.C. § 922(g)(3).[3/]  Because the information in III did not establish unlawful use of any

controlled substance, the NICS Examiner did more research, specifically external research, to

assess whether Roof's arrest satisfied any of the prohibiting scenarios cataloged in SOP 5.4.7.

28 C.F.R. § 25.1 ("more research is required prior to a NICS 'Proceed' or 'Denied' response");

---

[3/]  Although the III data did not identify the type of controlled substance at issue, it was a
prescription drug.

SOP 5.4.7 ("Needs More Research") at FBI-00000235 (Ex. 3); SOP 5.0 ("If the record contains a potential disqualifier, further research is required.") at FBI-00000130 (Ex. 8).

Information that may enable a NICS Examiner to determine whether an individual is an unlawful user of any controlled substance may be contained in an incident report. Conley Depo. p. 102:11-14 (Ex. 15); Russell Depo. p. 154:16-22 (Ex. 14). III does not contain the incident report. The only means for the NICS Section to obtain the incident report is through external research. The SOP governing external research states, in pertinent part:

> The Examiner will contact the state POC, the courts, district attorneys, probation offices, arresting agencies, etc. for disposition, level of offense, incident report, etc. via fax, phone, mail, email, and/or Nlets in accordance with the preference indicated on the State Processing Page and Contact List.

SOP 5.5.5 at FBI-00000282 (Ex. 17). Thus, NICS Section policy required the NICS Examiner to follow the South Carolina State Processing Page to try to obtain the incident report for Roof's arrest. *Id.*

To obtain the incident report the NICS Examiner consulted the South Carolina State Processing Page for "Arresting Agencies." The processing page instructed the NICS Examiner to contact the Sheriff's Office or Police Department for "police/incident report, lab report, and disposition information unless otherwise noted on contact list." S.C. Contact Sheets at FBI-00000315 (Ex. 12).

No policy mandated that the NICS Examiner consult Google, and such research is discouraged. *Id*; *see also* Del Greco Depo. pp. 46:4-47:1 (NICS Section discourages use of internet for research purposes and would not accept information from internet for assessing prohibitor status) (Ex. 2). The State Processing Page did not permit NICS Examiners to contact the South Carolina Law Enforcement Division ("SLED") for "police/incident report(s)." S.C. Contact Sheets at FBI-00000316 (Ex. 12). NICS Examiners were permitted to contact SLED

*only* for (1) "clarification on SC record;" or (2) the charge of "DUI more than 1st." *Id.* NICS

Section policies also did not permit the NICS Examiner to contact the courts for arrest

information. *Id.* at FBI-00000314 to FBI-00000315. NICS Section policies required NICS

Examiners to contact the courts only for a "Disposition Sheet." *Id.* at FBI-00000314. Also,

NICS Examiners could not access N-DEx for background checks. U.S. Resp. to Interrogatory

No. 21 (Ex. 18); Nicholas Depo. pp. 135:9-136:8 (Ex. 19); Quinlan Depo pp. 66:5-14 (Ex. 20).

An ORI, or Originating Agency Identifier, is a "nine-character identifier assigned by the

FBI to an agency . . . ." 28 C.F.R. § 25.2. This unique identifier allows the FBI to identify a

submitting agency and distinguish between law enforcement agencies with the same or similar

names. For example, Columbia Police Department and West Columba Police Department, or

Springfield Township in Montgomery County, Pennsylvania, and Springfield Township in

Delaware County, Pennsylvania. The ORI entered into III mis-identified the arresting agency for

Roof's drug arrest as the Lexington County Sherriff's Office. Case History Report at FBI-

00000107 (Ex. 7). III did not mention the Columbia Police Department or its ORI in Roof's

criminal history record as of April 13, 2015. *Id.*[4/]

Based on the ORI contained in III, at 1:58 p.m. on April 13, 2015, the NICS Examiner

sent an automated fax to the Lexington County Sherriff's Office. Fax Summary at FBI-

00000384 (Ex. 16); Fax to Lexington Cty. S.O. at FBI-00000045 to FBI-00000046 (Ex. 21);

---

[4/]     By law, "[a]ll law enforcement agencies" in South Carolina must report "all criminal data
and related information" to SLED, S.C. CODE ANN. § 23-3-120 (2009), and SLED must "ensure
that criminal history record information is accurate," S.C. CODE ANN. REGS. 73-27 (2017). Here,
"a clerical error led to the Lexington County Sheriff's Department being listed as the arresting
agency," and, although the Lexington County Sheriff's Department recognized this error and
made an "internal change" to correct this error, it did not correct the III data until after the
shooting. *Compare* "Lexington County statement on Dylann Roof gun purchase,"
http://www.lex-co.com/sheriff/media.aspx?mid=2330 (last visited Nov. 29, 2017) *with* Case
History Report at FBI-00000106, FBI-00000107 (Ex. 7); Fed. R. Evid. 201.

Case History Report at FBI-00000121 (Ex. 7). In that fax, the NICS Examiner specifically

requested the following:

> PLEASE PROVIDE INCIDENT REPORT
> -NEED TO KNOW IF SUBJECT ADMITTED TO DRUGS
> -NEED TO KNOW IF LAB/FIELD TESTED

Fax to Lexington Cty. S.O. at FBI-00000046 (Ex. 21).

At 4:05 p.m. on April 13, 2015, the NICS Examiner received the response fax from the

Lexington County Sherriff's Office. Case History Report at FBI-00000121 (Ex. 7). Handwritten

on the return fax was the following:

> No arrest or report for this date. The last arrest was on 2-28-15. Columbia PD
> will have the report.

Fax to Lexington Cty. S.O. at FBI-00000046 (Ex. 21). The Sheriff's Office did not provide an

ORI, phone number, or fax number for "Columbia PD." *Id.* The NICS Examiner noted,

"RECEIVED FAX FROM SO; CONTACT WEST COLUMBIA PD FOR DOA; 2-28-2015

ORIG DATE." Case History Report at FBI-00000121 (Ex. 7).

Pursuant to SOP 5.5.5, the NICS Examiner then sought to obtain the incident report "in

accordance with the preference indicated on the State Processing Page and Contact List."

Conley Depo. pp. 47:7-48:4, 79:15-23, 82:18-83:4 (Ex. 15). For Lexington County, in April

2015, the South Carolina contact list did not have a listing for "Columbia PD," but it did have a

listing for "West Columbia PD." S.C. Contact Sheets at FBI-00000319 to FBI-00000320 (Ex.

12). Again, SOP 5.5.5 requires the NICS Examiner to conduct external research consistent with

the state "*Contact List*." SOP 5.5.5 at FBI-00000282 (emphasis added) (Ex. 17). It does not

require NICS Examiners to conduct external research in accordance with the *City/County List*.

*Id.*

At 4:07 p.m., on April 13, 2015, the NICS Examiner sent an automated fax to the West

Columbia Police Department.  Fax Summary at FBI-00000384 (Ex. 16); Fax to WCPD at FBI-00000048 to FBI-00000049 (Ex. 22); Case History Report at FBI-00000121 (Ex. 7).  In that fax, the NICS Examiner again specifically requested the following:

> PLEASE PROVIDE INCIDENT REPORT
> -NEED TO KNOW IF SUBJECT ADMITTED TO DRUGS
> -NEED TO KNOW IF LAB/FIELD TESTED

Fax to WCPD at FBI-00000049 (Ex. 22).

At 8:46 a.m., on April 14, 2017, the NICS Examiner received the response fax from the West Columbia Police Department.  *Id.*  The NICS Examiner noted, "DOA 2015 NO RECORD."  Case History Report at FBI-00000121 (Ex. 7).  Handwritten on the return fax was the following:

> Not WCPD warrant.
> This is not a WCPD arrest.

Fax to WCPD at FBI-00000049 (Ex. 22).

Thus, the NICS Examiner's research trail ran into a dead end.  Without the Incident Report, the NICS Section could not issue a "Denied" response because it did not have "information *demonstrating* that receipt of a firearm by a prospective transferee *would violate* 18 U.S.C. 922 or state law."  28 C.F.R. § 25.1 (emphasis added).  The NICS Examiner attempted to obtain an Incident Report pursuant to NICS Section policies.  Nothing in those policies mandated that she undertake additional research efforts to obtain the Incident Report.

Because the NICS Section handles almost 9,000,000 background checks per year, NICS Statistics at FBI-00000449 (Ex. 23), with a staff of approximately 400, Del Greco Depo. p. 34:13-17 (Ex. 2), the NICS Examiner moved on to other transactions, Conley Depo. p. 49:6-9 ("you pull a transaction, you work it, you go on to the next transaction") (Ex. 15).  "Every examiner carries about 30 cases each."  Del Greco Depo. p. 45:9-14 (Ex. 2).  Accordingly, NICS

Examiners "do thorough research and they move on to the next transaction." *Id.*

On April 16, 2015, the NICS system automatically converted the Roof transaction to "open" status. Case History Report at FBI-00000122 (Ex. 7). On April 16, 2015, at approximately 7:15 p.m., Roof returned to Shooter's Choice and completed the purchase of the handgun. ATF-00000023 (Ex. 24). At no time, before or after April 16, 2015, did the Lexington County Solicitor's Office respond to the NICS Section inquiry regarding Roof. Fax Summary at FBI-00000384 (Ex. 16).

On May 11, 2015, Roof's background check went from "open" status to "expired." *See* SOP 5.5.4 at FBI-000000268 ("Transactions that have exceeded the 30-day time frame (previously known as default Proceed) are not considered a current transaction") (Ex. 10); *see also* Case History Report at FBI-00000122 ("This NTN has expired") (Ex. 7). Per Brady Act regulations, the NICS system purges open and expired transactions after ninety days. 28 C.F.R. § 25.9(b)(1)(ii). For the Roof background transaction, the purge date was July 10, 2015.

SOP 5.16 governs expired transactions. SOP 5.16 at FBI-00000374 (Ex. 9). The NICS Section researches expired transactions only in two circumstances. First, if the individual attempts another transaction that generates a second background check, then the Examiner must "thoroughly review the expired NTNs at the time the current NTN is given a final status." *Id.* This scenario does not apply here, because Roof did not initiate any additional background checks after April 11, 2015 (*i.e.*, he did not attempt to purchase a second firearm). Second, Examiners may review expired transactions when NICS management determined "the delay queue is at a manageable level and time is permitted to work on special projects." *Id.* NICS management did not authorize such a special project prior to the shooting.

On June 17, 2015, Roof murdered the pastor and eight parishioners at the Emanuel AME

Church in Charleston, South Carolina, with the Glock handgun he purchased from Shooter's Choice on April 16, 2015.  On June 19, 2015, the FBI placed an audit flag on Roof's background check, preserving the audit log from automatic destruction.  Case History Report at FBI-00000122 (Ex. 7).

On, or about, June 24, 2015, a NICS Region Coordinator heard from a colleague that the Incident Report for Roof's arrest was online.  Russell Depo. p. 26:11-16 (Ex. 14).  The Region Coordinator located the Incident Report online and asked her supervisor if she could use the online report to deny Roof's transaction.  *Id.* at p. 28:13-18.  Because NICS may only deny a background check based on information contained in III, NCIC, or the NICS Index, 28 C.F.R. § 25.6(c)(1)(iii), information obtained through authorized in-house research, SOP 5.5.4, or permissible external research, SOP 5.5.5, the Region Coordinator's supervisor "said I could not use what was online, but I could -- if I could get it, I could use it.  So I -- I was -- I could go ahead and try to get it."  Russell Depo. pp. 28:24-29:4 (Ex. 14).

The Region Coordinator, pursuant to special permission from her supervisor, then "Googled . . . Lexington County, South Carolina, Columbia PD."  *Id.* at p. 29:5-22.  She obtained the phone number for the Columbia Police Department, which she called.  The Columbia Police Department asked for a fax request for the Incident Report, *id.*, which the Region Coordinator sent at 11:01 a.m.  Case History Report at FBI-000000122 (Ex. 7).  The Columbia Police Department sent the Incident Report to NICS that evening, at approximately 10:48 p.m.  *Id.*

The next Monday, June 29, 2015, the Region Coordinator reviewed the Incident Report received from the Columbia Police Department.  *Id.* at FBI-00000123.  Upon receipt, the Region Coordinator could not immediately deny the transaction.  Russell Depo. pp. 31:21-32:5 (Ex. 14).  Instead, she first presented the Incident Report to her management.  *Id.*  Her management

confirmed that the Incident Report supplied information sufficiently demonstrating Roof's

prohibited status. *Id.* Accordingly, on June 29, 2015, NICS issued a "Denied" response to

Roof's background check and, after confirming that Shooter's Choice transferred the weapon,

notified ATF. Case History Report at FBI-00000127 (Ex. 7).

## V.     ARGUMENT

### A.     The Discretionary Function Exception Bars Plaintiffs' Actions.

#### 1.     "Delayed" was the only permissible response to Shooter's Choice.

Applicable law required the NICS Section's "Delayed" response to Shooter's Choice on

April 11, 2015, and the government cannot be faulted for issuing that response. The Court must

"construe the nature of the statutory and regulatory regime as a whole." *Seaside Farm, Inc. v.*

*United States*, 842 F.3d 853, 859 (4th Cir. 2016). "[I]f a regulation mandates particular conduct,

and the employee obeys the direction, the Government will be protected because the action will

be deemed in furtherance of the policies which led to the promulgation of the regulation."

*Gaubert*, 499 U.S. at 324.

Here, Congress instructed the Attorney General to develop a national instant background

check system to assess whether the purchaser's receipt of a firearm "would violate" or "would

not violate" the Gun Control Act. 18 U.S.C. § 922(t). Congress did not instruct the Attorney

General to deny firearms transactions where information suggests that the transfer *may* violate

the Gun Control Act. The Attorney General and the FBI clearly understood this distinction when

they promulgated the Brady Act regulations.

As explained in the preamble to the final rule issued by the Attorney General on October

30, 1998:

> The definition of the term "Proceed" was modified in the final rule to clarify that
> it means that information available to the system at the time of the response did

not demonstrate that transfer of the firearm would violate Federal or state law and that, notwithstanding a "Proceed" response from the NICS, an FFL may not lawfully transfer a firearm if he or she knows or has reasonable cause to believe that the prospective transferee is prohibited from receiving or possessing firearms, or is otherwise prohibited from transferring the firearm under applicable Federal or state law.

63 Fed. Reg. at 58,306. As for "Delayed" responses, the final rule's preamble noted:

Some comments . . . objected to the use of a NICS "Delayed" response, arguing that the Brady Act only provides for approval and denial responses. We note that the "Delayed" response is merely a way of communicating to the FFL that the system requires additional time to research and evaluate whether the prospective transferee is disqualified from receiving a firearm. The definition of the "Delayed" response was revised to reflect this and the fact that a "Delayed" response indicates that it would be unlawful to transfer the firearm pending receipt of a follow-up "Proceed" response from the NICS or the expiration of three business days, whichever occurs first. The law does not prohibit the system from making such a response.

*Id.* at 58,305. Finally, with regard to "Denied" responses, the final rule's preamble further noted:

The proposed rule provided that a denial by the NICS of a firearm transfer would be based upon one or more matching records that provide reason to believe that receipt of a firearm by a prospective transferee *would violate* 18 U.S.C. 922 or state law. The final rule changes the terminology relating to NICS denials to "information demonstrating" rather than "reason to believe" in order to conform the language of the regulation more closely to the language relating to denials in the Brady Act.

*Id.* at 58,306 (emphasis added).

Thus, the final regulation provides that the NICS Section may issue a "Denied" response only when "at least one matching record is found in either the NICS Index, NCIC, or III that provides information *demonstrating* that receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or state law." 28 C.F.R. § 25.6(c)(1)(iv)(C) (emphasis added). As set forth above, the III record on Roof did not *demonstrate* that Roof was ineligible to purchase a firearm. Case History Report at FBI-00000101 (Ex. 7). The III record (erroneously) indicated a felony drug arrest, but did not contain disposition information. *Id.* at FBI-00000106. A drug

arrest within the past year, without a conviction, "needs more research." SOP 5.4.7 at FBI-00000235 (Ex. 3). Moreover, the III data for Roof did not indicate he was under indictment. Case History Report at FBI-000000106 (Ex. 7). So, even though the actual charge was a misdemeanor charge, the felony arrest data in III did not *demonstrate* Roof was under indictment for a felony (indeed, he was not). Thus, although 18 U.S.C. § 922(g)(1) and (g)(3) *potentially* disqualified Roof from purchasing the handgun, the III data did not *demonstrate* Roof's ineligibility. The NICS Examiner could not, by law, issue a "Denied" response.

Brady Act regulations permit a "Proceed" response only where "no disqualifying information was found in the NICS Index, NCIC, or III." 28 C.F.R. § 25.6(c)(1)(iv)(A); Del Greco Depo. p. 26:12-18 (Ex. 2). The NICS Examiner could not issue a "Proceed" response because the III data revealed two potential prohibitors.

Brady Act regulations require a "Delayed" response where "the NICS search finds a record that requires more research to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law." 28 C.F.R. § 25.6(c)(1)(iv)(B). NICS Section policy mirrors this regulatory requirement. SOP 3.4.B at FBI-00000094 (Ex. 25). Here, because of the III data discussed above, "Delayed" was the *only* response the NICS Section could give to Shooter's Choice on April 11, 2015. That is the response that the NICS Section provided. Case History Report at FBI-00000120 (Ex. 7). Because the NICS Examiner "obey[ed] the direction [of the regulation], the Government will be protected [by the discretionary function exception] because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324.

### 2. The government's investigation of Roof's potential prohibitors falls within the discretionary function exception.

The Brady Act and the Brady Act regulations are silent as to whether or how the NICS

Section should investigate "Delayed" transactions.  Congress only imposed restrictions on the

FFLs, precluding transfer prior to three-business days "since the licensee contacts the system,

and the system has not notified the licensee that the receipt of a firearm by such other person

would violate subsection (g) or (n) of this system."  18 U.S.C. § 922(t)(1)(B)(iii).  The Brady Act

regulations state that the NICS Section will do "more research," 28 C.F.R. §§ 25.2,

25.6(c)(1)(iv)(B), but do not specify how the NICS Section will perform that "more research."

"It is questionable, moreover, whether something as informal as a guidance manual can

overcome a statutory consignment of agency discretion."  *Seaside Farm, Inc.*, 842 F.2d at 859.

Here, no statute or regulation mandated that the NICS Section investigate Roof's arrest in any

particular manner.  Plaintiffs can point to no statute or regulation that required the Examiner to,

*e.g.*, Google Columbia Police Department, contact SLED for an Incident Report, contact the

Lexington County Court for Roof's executed warrant, *etc*.  This should be the end of the inquiry.

"The price of circulating internal guidance should not be an exponential increase in exposure to a

tort suit."  *Holbrook v. United States*, 673 F.3d 341, 347 (4th Cir. 2012); *see also* Del Greco

Depo. pp. 33:7-16, 34:13-17 (describing SOPs as standardized procedures that Examiners use as

guides) (Ex. 3).  The regulations simply call upon the NICS Section to perform "more research,"

and Courts have repeatedly held that how agencies conduct investigations is subject to the

discretionary function exception.  *See*, *e.g.*, *Gonzalez v. United States*, 814 F.3d 1022, 1033 n.4

(9th Cir. 2016) ("Even if the FBI negligently conducted an investigation, that does not detract

from the fact that the manner of conducting an investigation . . . is rife with discretion and policy

judgment and not appropriate for judicial review in a tort action."); *Dichter-Mad v. United*

*States*, 709 F.3d 749, 750 (9th Cir. 2013) (barring claims based upon allegedly negligent

investigations by SEC that failed to discover Ponzi scheme); *Baer v. United States*, 722 F.3d

168, 175 (3rd Cir. 2013) (same); *Molchatscky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013) (same).

Even if the Court looks to NICS Section policies, plaintiffs can point to no breach of a mandatory provision that led to their injuries. This Court may "not assume that government agents, in undertaking actions of the type normally thought to involve policy choices, in a particular case acted arbitrarily or on whim, disregarding those essential policy questions." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993). The inquiry "must focus on the inherent, objective nature of the challenged decision; we find largely irrelevant the presence or absence of evidence that involved government agents which did or did not engage in a deliberative process before exercising their judgment." *Id.*

As detailed above, Section III.B, *supra*, the NICS Examiner faithfully adhered to the in-house and external research SOPs when investigating Roof's potential prohibitors. "Whether the agency pursued its investigation, interpreted relevant evidence, or balanced policy considerations in what [plaintiff] believes to be an optimal manner does not affect the discretionary function analysis." *Seaside Farm, Inc.*, 842 F.3d at 860. The NICS Examiner researched all databases identified in the in-house research SOP. *Compare* SOP 5.5.4 at FBI-00000268 (Ex. 10) *with* Case History Report at FBI-00000120 (Ex. 7). The NICS Examiner searched the Lexington County Court web site for disposition information on Roof's arrest, consistent with the in-house research SOP and the South Carolina state processing page. *Compare* SOP 5.5.4 at FBI-00000274 (Ex. 10) and S.C. Contact Sheets at FBI-00000314 to FBI-00000315 (Ex. 12) *with* FBI-00000120 (web site results) (Ex. 13). This in-house research did not reveal disposition information for Roof's arrest (his court case was pending without a true bill date), but confirmed Roof was arrested for misdemeanor drug charges. Case History Report at FBI-00000120 (Ex. 7).

The NICS Examiner then, pursuant to the external research SOP, conducted external research "in accordance with the preference indicated on the State Processing Page and Contact List." SOP 5.5.5 at FBI-000000282 (Ex. 17). She sent a fax to the Lexington County Solicitor's Office seeking disposition information for the criminal case. *Compare* S.C. Contact Sheets at FBI-00000314 (contact courts for "Disposition Sheet") (Ex. 12) *with* Case History Report at FBI-00000121 (Ex. 7) and Fax Summary at FBI-00000384 (fax to Solicitor's Office) (Ex. 16). That office never responded to the NICS Section's request.

The NICS Examiner sent a fax to the identified arresting agency seeking the Incident Report for Roof's arrest, pursuant to SOP 5.5.5. *Compare* SOP 5.5.5 at FBI-00000282 (Ex. 17) and Case History Report at FBI-00000106 (identifying "Lexington Cty SO" as "Arresting Agency") (Ex. 7) *with* Fax to Lexington Cty. S.O. at FBI-00000045 to FBI-00000046 (Ex. 21) and Case History Report at FBI-00000121 (fax to Sherriff's Office) (Ex. 7). That agency did not have the arrest report and, in a handwritten note, referred the NICS Examiner to "Columbia PD." Fax to Lexington Cty. S.O. at FBI-00000046 (Ex. 21). Thus, as required by SOP 5.5.5, the NICS Examiner sought to obtain the Incident Report from "Columbia PD" "in accordance with the preference indicated on the State . . . *Contact List*." SOP 5.5.5 at FBI-00000282 (emphasis added) (Ex. 17). The only "Columbia PD" listed on the Lexington County *Contact List* in April 2015 was West Columbia PD. S.C. Contact Sheets at FBI-00000319 to FBI-00000320 (Ex. 12). Accordingly, the NICS Examiner sent a fax to the West Columbia Police Department seeking the Incident Report. Fax to WCPD at FBI-00000048 to FBI-00000049 (Ex. 22); Case History Report at FBI-00000121 (Ex. 7). That agency responded "This is not a WCPD arrest." Fax to WCPD at FBI-00000049 (Ex. 22).

Plaintiffs cannot demonstrate that the NICS Examiner failed to follow the NICS policies governing investigation of "Delayed" transactions. The opposite is true: the NICS Examiner faithfully adhered to the NICS policies to try to obtain the Incident Report within the Brady Act three-business day window. Even if the NICS Examiner was somehow negligent (she was not)—because she didn't know or divine that "Columbia PD" would be in Richland County—that is irrelevant. The discretionary function exception applies even if the government's conduct was negligent or an abuse of discretion. *Gaubert*, 499 U.S. at 323; *Dalehite v. United States*, 346 U.S. 15, 33 (1953) (the discretionary function exception "applies to policy judgments, even to those constituting abuse of discretion."). Indeed, the exception applies "'even if the discretion has been exercised erroneously' and is deemed to have frustrated the relevant policy purpose." *Pornomo v. United States*, 814 F.3d 681, 687-88 (4th Cir. 2016) (quoting *Holbrook*, 673 F.3d at 350).

### 3. Deciding whether Roof was an unlawful user of any controlled substance itself entailed the exercise of judgment.

The Brady Act and Gun Control Act do not define "an unlawful user of . . . any controlled substance." ATF's regulation interpreting "an unlawful user of . . . any controlled substance" provides that "[a]n inference of current use *may be drawn* from evidence of a recent use or possession. . . ," but says nothing about admitting possession without a prescription. 27 C.F.R. § 478.11 (emphasis added). And courts have consistently required the United States to show regular (as opposed to isolated) use of a controlled substance to obtain convictions under 18 U.S.C. § 922(g)(3). *See, e.g.*, *Patterson,* 431 F.3d at 839; *Augustin,* 376 F.3d at 139; *Williams,* 216 F. Supp. 2d at 576. Here, Roof admitted only to possession of a prescription drug, on one single occasion, not use of or addiction to the controlled substance.

The applicable NICS Section policy, SOP 5.4.7, instructs NICS Examiners to conduct

"more research" into potential disqualification and to make judgment calls in twenty-one

exemplar scenarios.  SOP 5.4.7 at FBI-00000234 to FBI-00000243 (Ex. 3).  Relevant here, one

of those described scenarios includes "Prescription Drugs."  *Id.* at FBI-00000241 to FBI-

000000242.  This section clearly states that possession of prescription controlled substances

"may" qualify as a prohibiting factor.  Possession "may" disqualify a purchaser "if a person has

them in his/her possession by unlawful means, such as forging a prescription, stealing a

prescription medication, taking a drug that was not prescribed for the individual but for someone

else, or obtaining a prescription drug by fraud . . . ."  *Id.*  Thus, the NICS Section policy does not

mandate a "Denied" response every time an Incident Report indicates the arrestee admitted to

possession of a controlled substance without a prescription.  Instead, the policy calls upon

Examiners to make judgment calls against the backdrop of ATF's interpretation of the statute,

the NICS Section's interpretation of the statute, and several court decisions interpreting the

statute; not all of which are entirely consistent.

Even if 18 U.S.C. § 922(g)(3), a mandatory federal law, prohibited Roof from purchasing

a gun, *how* the NICS Section reached that conclusion is steeped in discretion.  The use of the

word "may" in a regulation or policy suggests that it intends employees to have discretion in

applying the regulation or policy.  *Staton v. United States*, 685 F.2d 117, 120 (4th Cir. 1982).

Here, both the ATF regulation and NICS Section policy state that the Examiner "may" draw

certain inferences of unlawful use of a controlled substance based upon the specific facts

presented in each background check.  Indeed, the NICS Examiners and the Deputy Assistant

Director over NICS testified that the unlawful user prohibitor requires certain judgment calls.

Russell Depo. pp. 168:21-169:6 (Ex. 14); Del Greco Depo. pp. 33:7-16, 50:3-22 (Ex. 2).

The decision to apply the unlawful user of any controlled substance prohibitor, 18 U.S.C.

§ 922(g)(3), involves judgment or choice, even though, once applied, the prohibited individual cannot lawfully purchase a gun.  "[W]hen established government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Gaubert*, 499 U.S. at 324.  Thus, the discretionary function exception shields the United States from liability premised on how it decided that Roof was a prohibited person under the unlawful user of any controlled substance provision of the Gun Control Act.

### 4.    Plaintiffs' "database maintenance" theory fails.

A Brady Act regulation, 28 C.F.R. § 25.5, imposes separate obligations on the FBI and on other data sources for "maintenance of data used for [Roof's] background check."  Order & Op. 8, ECF No. 24.  First, the Brady Act regulation requires the FBI to maintain "data integrity during all NICS operations that are *managed and carried out* by the FBI," specifically: NICS Index records "supplied by Federal agencies;" rejecting NICS Index records "that contain detectable invalid data elements;" automatic purging of NICS Index records; and internal audits of the NICS Index.  28 C.F.R. § 25.5(a) (emphasis added).  The FBI has regulatory obligations over the NICS Index.  But even those obligations are limited, because state or local data sources, *see* 28 C.F.R. § 25.2 (defining "data source"), that submit information to the NICS Index are "responsible for ensuring the accuracy and validity of the data it provides to the NICS Index and will immediately correct any record determined to be invalid or incorrect."  28 C.F.R. § 25.5(b).  But NICS Index data is not at issue in this case.  There was no information in the NICS Index on Roof.

For III—the database accessible to NICS that contained information about Roof—the FBI had no regulatory "data integrity" obligations.  Where, as here, the III record was

"maintained and available from . . . South Carolina," Case History Report at FBI-00000101 (Ex. 7), "[i]t shall be the responsibility of each criminal justice agency contributing data to the III System and the FIRS to assure that information on individuals is kept complete, accurate, and current so that all such records shall contain to the maximum extent feasible dispositions for all arrest data included therein." 28 C.F.R. § 20.37. So South Carolina, not the FBI, was responsible for the accuracy of the data in III on Roof, and the FBI faces no responsibility for the fact that South Carolina erroneously listed the Lexington County Sherriff's Office as the arresting agency.

As for the South Carolina Contact Sheet, no statute, regulation, or policy addresses the accuracy of information in that document. NICS policy simply states that only Region Coordinators may update contact lists. SOP 12.0 at FBI-00000347 to FBI-00000350 (Ex. 26). The policy sets forth several steps the Region Coordinator must undertake to verify updated information, but does not mandate any periodic audit, accuracy, *etc*. *Id.* Because plaintiffs cannot point to "a federal statute, regulation, or policy [that] specifically prescribes a course of action for an employee to follow" such that "the employee has no rightful option but to adhere to the directive," *Berkovitz*, 486 U.S. at 536, with respect to the Contact Sheets, it is irrelevant that the Lexington County Contact Sheet did not identify the Columbia Police Department in Richland County.

How the NICS Section chose to develop and maintain state contact sheets, as finding aids for NICS Examiners, involves judgment and choice (what information to include or not include and how to update that information), Russell Depo. p. 162:8-22 (Ex. 14), influenced by policy judgments (how to allocate resources and achieve its congressional objectives with available appropriated funds), *id.* at p. 18:13-24. *Berkovitz*, 486 U.S. at 536-37. Thus, the discretionary

function exception shields the United States from tort liability premised on plaintiffs' claims that the FBI was negligent in creating or maintaining its South Carolina Contact Sheet.

To the extent plaintiffs argue that Contact Sheets are "data" used during "NICS operations that are managed and carried out by the FBI," and that 28 C.F.R. § 25.5 therefore imposes upon the FBI a mandatory duty to guarantee the accuracy of all information in all Contact Sheets at all times, they are incorrect.  As mentioned above, "[t]he price of circulating internal guidance should not be an exponential increase in exposure to a tort suit."  *Holbrook*, 673 F.3d at 347.  Contact Sheets, which are finding aids for Examiners, are not "data" or "databases;" they are guides.  Del Greco Depo. p. 33:7-11 ("Each transaction is unique.  [The SOP] is a guide that guides [Examiners] through each transaction.") (Ex. 2).

Moreover, 28 C.F.R. § 25.5 is specifically directed at the NICS Index, *not* Contact Sheets.  "When Congress provides specific statutory obligations, we will not read a 'catchall' provision to impose general obligations that would include those specifically enumerated."  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011).  So too, here.  The Court should not interpret 28 C.F.R. § 25.5(a)'s catchall reference to "data" to negate 28 C.F.R. § 25.5(a)(1) to (3)'s specific reference to the "NICS Index."  28 C.F.R. § 25.5 simply does not apply to Contact Sheets and the Court should dismiss plaintiffs' actions for lack of subject-matter jurisdiction.

### B.    Plaintiffs Fail to State a Claim Under South Carolina Law.

The Court should also dismiss plaintiffs' actions for failure to state a claim under South Carolina law.  Fed. R. Civ. P. 12(b)(6); *Minns v. United States*, 155 F.3d 445, 448 (4th Cir. 1998) (FTCA waives the United States' sovereign immunity only for "recognized causes of action") (quoting *Feres v. United States*, 340 U.S. 135, 141 (1950)).  Neither the Brady Act nor the FBI's

operation of the NICS system creates a duty of care owed to plaintiffs or their decedents by the United States.  Accordingly, plaintiffs cannot establish an essential element of their negligence claim—the existence of a legal duty—and the Court should dismiss these actions.

An essential element of a negligence claim under South Carolina law is establishing that the "defendant owes a duty of care to the plaintiff."  *Doe v. Marion*, 645 S.E.2d 245, 250 (S.C. 2007).  The existence and scope of a duty under South Carolina law is a question of law.  *Miller v. City of Camden*, 451 S.E.2d 401, 403 (S.C. Ct. App. 1994).  Negligence is not actionable without a duty of care.  *Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78, 81 (S.C. 1998).

South Carolina does not recognize a general duty to prevent harm to victims by third-parties.  *Rogers v. S.C. Dep't of Parole & Cmty. Corr.*, 464 S.E.2d 330, 332 (S.C. 1995).  This rule has five recognized exceptions: (1) when the defendant has a special relationship to the victim; (2) when the defendant has a special relationship to the injurer; (3) when the defendant voluntarily undertakes a duty; (4) when the defendant intentionally or negligently creates the risk; and (5) when a statute imposes a duty on the defendant.  *Faile v. S.C. Dep't of Juvenile Justice*, 566 S.E.2d 536, 546 (S.C. 2002).  Here, only two of these exceptions are potentially at issue: "negligent creation of risk and negligence *per se* under South Carolina law."  Order & Op. 10.  The Court requested additional briefing on: (1) negligent creation of risk; (2) whether plaintiffs' injuries are within the class of harms the relevant statutes and regulations intend to prevent; and (3) the public duty rule.  *Id.* at 11, 13.  Here, neither negligent creation of risk nor negligence *per se* applies.  Plaintiffs cannot establish that the United States owed them a duty to protect them from Roof's criminal acts.

### 1.    Plaintiffs cannot establish negligent creation of risk.

As observed by the Fourth Circuit, "allowing continued exposure to an existing danger by

failing to intervene is not the equivalent of creating or increasing the risk of that danger." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015); *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989) ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them."). In this case, the United States did not "intentionally or negligently create[] the risk." *Faile*, 566 S.E.2d at 546. At most, the United States, through an alleged omission, failed to reduce an existing risk of harm. That is not actionable under South Carolina law.

In *Faile*, the South Carolina Supreme Court cited to Section 321 of the Restatement (Second) of Torts. *Id.* at 546 n.8. That provision applies when an actor who "*does an act . . . subsequently realizes or should realize that it had created an unreasonable risk of causing physical harm to another.*" RESTATEMENT (SECOND) TORTS § 321 (1965) (emphasis added). Thus, for negligent creation of the risk to apply the defendant must affirmatively act and that action must create the risk of harm. Negligent creation of the risk does not apply in cases of omission. *See Wintersteen v. Food Lion, Inc.*, 542 S.E.2d 728, 730-31 (S.C. 2001) (in premises liability context rejecting "duty to prevent" foreseeable risk of foreign objects on floor; shopkeeper only has duty to reduce risk if he has actual or constructive knowledge of foreign substance).

The examples provided by the Restatement all involve affirmative conduct by the defendant that creates a risk of harm to the plaintiff. RESTATEMENT (SECOND) TORTS § 321 cmt. a (1965) (hitting a golf ball; lending an automobile; jack-knifing a truck on an icy highway and then failing to warn other drivers). The Court should contrast those situations with the facts here. Roof "scouted" the Emanuel AME Church in December 2014. Gov't Ex. 367 in *United States v.*

*Roof*, No. 15-cr-427 (D.S.C.). On February 23, 2015, Roof called the Emanuel AME Church, and he again "scouted" the Church on February 27, 2015. Gov't Exs. 380 and 424 in *United States v. Roof*. Months before he attempted to purchase a handgun (in April 2015), Roof developed his criminal plan to attack the Emanuel AME Church. The United States did not create that risk. The United States did not sell the handgun to Roof. The only conduct of the United States was its alleged omission of failing to tell Shooter's Choice to not sell the handgun to Roof.

*Faile* also cites to *Montgomery v National Convoy & Trucking Company*, 195 S.E. 247 (S.C. 1938). *Faile*, 566 S.E.2d at 546 n.8. In *Montgomery*, a driver's truck, because of icy conditions, broke down after a curve in the road at the crest of a long hill. *Id.* at 250. Even if the original truck stall was not negligent, the driver clearly appreciated the risk his stalled truck posed on an icy road, just after a curve at the crest of a hill. *Id.* at 251 ("[t]hat appellants recognized that they owed a duty to others using the highway cannot be questioned"). That is not true here. The United States had no knowledge and no means of knowing that "it had created an unreasonable risk of causing physical harm to another" by permitting one of almost 9,000,000 annual background checks to remain in "Delayed" status past the Brady Date.

The Court should also contrast the facts of this case with those presented in *Edwards v. Lexington County Sheriff's Department*, 688 S.E.2d 125 (S.C. 2010). In *Edwards*, the county held a hearing with a domestic violence victim and her boyfriend (the abuser), with prior knowledge of the boyfriend's threats against the victim, without any security. *Id.* at 127. The county basically placed two people with a known history of violence into the same room without providing any security; it acted affirmatively. Those facts clearly established that the county "created a situation they knew or should have known posed a substantial risk of injury to" the

victim.  *Id.* at 130.  Not so here.  Roof had no history of gun violence, the United States had no way to know his criminal intentions, and it did nothing to place plaintiffs in any specific risk of harm.  The United States, even if its background investigation was flawed, did not create a situation which it "knew or should have known posed a substantial risk of injury" to plaintiffs.  *Id.*  The negligent creation of risk doctrine does not apply in this case.

Because the United States' acts or omissions did not create a risk of harm to plaintiffs, the United States owed plaintiffs no duty to protect them from the existing risk of harm from criminal acts of third-parties.  Similarly, because the United States did not create Roof's risk of violence (unbeknownst to the United States, Roof intended harm long before the United States conducted its background check), any alleged failure to reduce that risk is not equivalent to creating a risk.

### 2.     Negligence *per se* does not apply.

No statute or regulation imposes a duty on the United States owed to plaintiffs enforceable in tort.  To establish that a statute or regulation imposes a duty enforceable in tort, plaintiffs "must show two things: (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) that [plaintiffs are] a member of the class of persons the statute is intended to protect."  *Rayfield v. S.C. Dep't of Corr.*, 374 S.E.2d 910, 914 (S.C. Ct. App. 1988).  But, under the "public duty" rule, public safety and welfare statutes can only be the basis of a negligence *per se* claim where "the class of persons the statute intends to protect is identifiable before the fact."  *Summers v. Harrison Constr.*, 381 S.E.3d 493, 496 (S.C. Ct. App. 1989).  The Court asked the parties to address whether plaintiffs' injuries are within the class of harms the statutes or regulations are intended to prevent.  Oder & Op. 13.  The Court also asked the parties to address whether plaintiffs are within the class of persons the statutes or

regulations are intended to protect and the public duty rule. *Id.* These former issues merge, and the issue is whether plaintiffs are members of a specific class of persons identifiable before the fact that the public safety and welfare statutes and regulations are intended to protect. *Summers*, 381 S.E.2d at 496. The answer to both inquiries is no, and the Court should dismiss these actions.

### a. The Brady Act and its implementing regulations are not intended to prevent plaintiffs' harms.

First, plaintiffs' injuries are not harms the Brady Act or its implementing regulations intend to protect against. The purpose of the Brady Act is to prevent convicted felons and other persons who are barred by law from purchasing guns from gun dealers. *See* H.R. REP. NO. 103-344 at 7 (1993). This purpose is served by the Attorney General establishing a national instant criminal background check system that is "capable of instant response to inquiries and use by licensed gun dealers . . . at the point of firearm purchase." *Id.* at 8. The Brady Act regulates FFLs, and intends to assist them to comply with the Gun Control Act. *See also* 28 C.F.R. § 25.1 (purposes of Brady Act regulations are to: (1) establish the NICS system; and (2) "ensure the privacy and security of the NICS and appeals procedures for persons who have been denied the right to obtain a firearm"). The Brady Act does not itself intend to prevent gun violence.

The Brady Act focuses "entirely, although not explicitly, on the duties" of FLLs to obtain background checks and the Attorney General to develop an instant check system. *See Doe v. Marion*, 645 S.E.2d 245, 249 (S.C. 2007) (Children's Code did not create duty for private doctor actionable under negligence *per se* theory because it focused on duties of the Department of Social Services). Accordingly, while a collateral benefit of the Brady Act may be reduced gun violence, the central purpose of the statute is not to protect plaintiffs from the harm they suffered at Roof's hands. Thus, it does not create a private right of action. *Id.*

The "essential purpose" of the Brady Act is to regulate FFLs and to develop a national criminal background check system, rather than to impose civil liability on the government for gun violence.  *See Hurst v. Sandy*, 494 S.E.2d 847, 851 (S.C. Ct. App. 1997) (architecture licensing statutes' "essential purpose . . . is the regulation of the practice of a profession, rather than the imposition of civil liability to private individuals.").  Congress clearly expressed this intent because it specifically exempted federal and state employees from liability for "failure to prevent the sale or transfer of a firearm to a person whose receipt or possession of the firearm is unlawful under this section."  18 U.S.C. § 922(t)(6)(A).  Where there is a mismatch between the harm claimed and the statute's purpose, it cannot be a basis for a negligence *per se* claim even where the defendant violates the statute.  *Trask v. Beaufort Cty.*, 709 S.E.2d 536, 540-41 (S.C. Ct. App. 2011) (defendant cremated plaintiff's son's body without his consent, in violation of statute, but harm claimed was loss of evidence to use in civil suit).  Here, the Court should conclude that the essential purpose of the Brady Act is not to protect plaintiffs from gun violence.

The Gun Control Act, in contrast, is intended to prevent crime.  *Huddleston v. United States*, 415 U.S. 814, 824 (1974) (principal purpose of Gun Control Act is to "curb crime"); *King v. Story's, Inc.*, 54 F.3d 696, 697 (11th Cir. 1995) (vacating district court's award of summary judgment in favor of defendant who allegedly sold the rifle used to kill the plaintiff to a convicted felon in violation of section 922(d)(1), and confirming that "[t]he trial court [properly] recognized that this plaintiff . . . is a member of the class of persons Congress intended to protect by enacting the Gun Control Act; that the injuries were of the type contemplated by the Act; and that the sale was made in violation of the Act").  But the United States did not violate the Gun Control Act.  It did not "sell or otherwise dispose of" the handgun Roof used in the shooting.  18

U.S.C. § 922(d). So even if plaintiffs' injuries are within the intended zone of prevention of the Gun Control Act, that fact is irrelevant here. To warrant recovery, plaintiffs must show that the breach of the statute or regulation proximately caused the damages they allegedly sustained. *Horne v. Beason*, 331 S.E.2d 342, 344 (S.C. 1985). Because plaintiffs do not allege, and cannot prove, that the United States violated the Gun Control Act, the fact that plaintiffs suffered harms that Act intends to prevent does not establish negligence *per se*.

**b.     The public duty rule bars plaintiffs' claims.**

The Brady Act and its implementing regulations are unquestionably general health and welfare statues designed to protect the public at large rather than anyone individually. Accordingly, even though plaintiffs, as members of the public, benefit from the protections of the Brady Act and Gun Control Act, the United States is immune from tort liability for discharging its public duties under those statutes. *Tanner v. Florence Cty. Treasurer*, 521 S.E.2d 153, 158 (S.C. 1999). Because plaintiffs cannot overcome the public duty rule, they cannot establish that they are members of a class of persons a statute or regulation allegedly breached by the United States intends to protect.

South Carolina has followed the public duty rule since 1940. *Edwards*, 688 S.E.2d at 129. The rule holds that public officials are not liable to individuals of the public for negligence in discharging their statutory obligations. *Tanner*, 521 S.E.2d at 158; *Steinke v. S.C. Dep't of Labor*, 520 S.E.2d 142, 149 (S.C. 1999). The South Carolina Supreme Court has created a single "narrow exception to the rule" that does not apply here. *Edwards*, 688 S.E.2d at 129. To invoke that exception, plaintiffs must establish: (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute imposes on a specific public officer a duty to guard against or not cause that harm; (3) the class of persons the statute intends to protect is

identifiable before the fact; (4) the plaintiff is a person within that class; (5) the public officers know or should know of the likelihood of harm to the class if he fails in his duty; and (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office. *Jensen v. Anderson County Dep't of Soc. Servs.*, 403 S.E.2d 615, 617 (S.C. 1991).

Plaintiffs have not, and cannot, invoke the "narrow exception" to the public duty rule. Relevant here, plaintiffs cannot establish, *inter alia*, that "the class of persons the statute intends to protect is identifiable before the fact." *Id.* The Brady Act and the Gun Control Act's central purpose "is one of law enforcement." *Trask*, 709 S.E.2d at 542 (autopsy statute requiring toxicology sample subject to public duty rule). Accordingly, the statutes benefit the public as a whole, not any specific class including plaintiffs. There is no meaningful category specifically identifiable before the fact that includes plaintiffs. The Brady Act and Gun Control Act are not specifically intended to protect parishioners at the Emanuel AME Church, victims of Roof's criminal scheme, or any other sub-group distinguishable from the public as a whole. Under such circumstances, South Carolina courts consistently hold the public duty rule applies to bar negligence *per se* claims. *See*, *e.g.*, *Brady Dev. Co. v. Town of Hilton Head Island*, 439 S.E.2d 266, 268 (S.C. 1993) (holding city owed lot purchaser no special duty of care in issuing development permit under municipal development standards ordinance, and thus, could not be held liable to purchaser for alleged negligence in issuing permit to developer); *Bellamy v. Brown*, 408 S.E.2d 219, 295 (S.C. 1991) (finding statutorily prescribed exceptions to the disclosure requirements of the state's Freedom of Information Act did not establish a duty to maintain confidentiality); *Wells v. City of Lynchburg*, 501 S.E.2d 746, 753 (S.C. Ct. App. 1998) (ruling plaintiff could not sue city for failing to maintain fire hydrants because suit was barred by a

provision of the Tort Claims Act and city owed duty only to public generally); *Summers*, 381

S.E.2d at 496 (concluding a State statute requiring officers who issue building permits to secure

evidence that the builders and renovators of residences are licensed did not create a special,

actionable duty to protect homeowners); *Rayfield*, 374 S.E.2d at 917 (explaining a State statute

requiring prison and parole officials to prepare adequate reports concerning parole candidates did

not create a special duty to protect particular members of the public against crimes committed by

released prisoners).

Plaintiffs are not members of a class distinguishable from the public as a whole in

relation to the Brady Act and its implementing regulations. The Brady Act and its implementing

regulations are indisputably public general health and welfare statues governing how officials

discharge their public duties. Thus, the public duty rule applies to bar plaintiffs' negligence *per

se* claims.

## VI.    CONCLUSION

This Court lacks subject-matter jurisdiction over plaintiffs' FTCA actions because of the

discretionary function exception. Moreover, plaintiffs fail to state a claim upon which relief can

be granted. Thus, the Court should dismiss these actions with prejudice.

Dated: November 30, 2017,

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General
Civil Division

THOMAS G. WARD
Deputy Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director, Torts Branch

RUPERT M. MITSCH
Assistant Director, Torts Branch

 s/ Stephen R. Terrell
STEPHEN R. TERRELL
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC 20044
Stephen.Terrell2@usdoj.gov
(202) 353-1651