**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| FELICIA SANDERS, INDIVIDUALLY AND AS LEGAL CUSTODIAN FOR K.M., A MINOR, | ) ) ) ) | CASE NO.: 2:16-cv-2356-RMG |
| | ) | *consolidated with* 2:16-cv-2350; |
| Plaintiff, | ) ) | 2:16-2351; 2:16-cv-2352; 2:16-cv-2354; 2:16-cv-2355; 2:16-cv-2357; |
| | ) | 2:16-cv-2358; 2:16-cv-2359; 2:16- |
| Vs. | ) | cv-2360; 2:16-cv-2378; 2:16-cv- |
| | ) | 2405; 2:16-cv-2406; 2:16-cv-2407; |
| THE UNITED STATES OF AMERICA, | ) | 2:16-cv-2409; and 2:16-cv-2746 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| This document pertains to all cases | ) | |
| _____ | ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S**
**RENEWED MOTION TO DISMISS**

COME NOW Plaintiffs, by and through the undersigned counsel, in opposition to Defendant The United States of America's Renewed Motion to Dismiss pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. (Dkt. No. 43). The Court previously DENIED the United States' Motion to Dismiss and, in tandem, GRANTED Plaintiffs' Motion for Jurisdictional Discovery. (Dkt. No. 24). After discovery, the Court's Order allowed for the United States to renew its motion to dismiss as to: (1) lack of subject matter jurisdiction due to the government's conduct at issue falling under the discretionary-function exception and (2) failure to state a claim under South Carolina negligence law, particularly negligence *per se* and the negligent creation of the risk. (Dkt. No. 24).

**I.**   **STANDARD OF REVIEW**

Plaintiffs adopt the standard of review set forth in its Memorandum in Opposition to Defendant's original Motion to dismiss. (Dkt. No. 15).

## II. <u>SUMMARY OF ARGUMENT</u>

Jurisdictional discovery has established that the FBI Section that conducts background checks on prospective firearm purchasers is the National Instant Background Check ("NICS") section. This NICS section is a section of the Criminal Justice Information Services ("CJIS") Division of the FBI.[1] The Brady Handgun Violence Prevention Act, Public Law No. 103-159, 107 Stat. 1536, (hereinafter the "Brady Act"), the regulations implementing the Brady Act, 28 C.F.R. Part 25, and the Federal Bureau of Investigation's own policies and procedures, called Standard Operating Procedures ["SOPs"], specifically prescribed a course of action for the FBI employees to take in conducting the criminal background checks.

Defendant did not follow the law or its own procedures in conducting the background check of Dylann Roof. Defendant's negligent failure to follow the law and its own SOPs led to Roof illegally receiving the firearm on April 16, 2015. Roof then used the firearm he obtained illegally to shoot and kill nine parishioners, and to attempt to murder others, at the Mother Emanuel Church in Charleston on June 17, 2015.

Discovery to date has shown several important facts that require a denial of the United States' Renewed Motion to Dismiss. With regards to the Government's discretionary function defense, the FBI's NICS section failed to follow the Brady Act, the Brady Act regulations, and its own procedures in several respects when it performed the background check on Roof. Plaintiffs

---

[1] At the time of the Dylann Roof gun purchase the FBI Director was James Comey, and the Assistant Director of CJIS was Stephen L. Morris, whose deposition has been taken, parts of which will be referred to herein. The NICS examiner who was assigned and researched the transaction on the Roof purchase is Jennifer Conley, who is employed by CJIS. (**Exhibit A** – Conley Deposition, pp. 9, 10, 21, 42, 46).

would incorporate their prior arguments regarding the Government's Failure to follow the Brady Act and regulations from their brief in opposition to the original Motion to Dismiss. (Dkt. No. 15, Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss).

Broadly speaking, the FBI violated the Brady Law by failing to deny Roof's firearm purchase when Roof was ineligible to purchase a firearm because he was an "unlawful user" of a controlled substance. 18 U.S.C. § 922(d)(3). There should be no doubt that Roof was disqualified from purchasing a firearm in light of the admission of former FBI Director James Comey that "Dylann Roof should not have been able to legally buy that gun that day." (**Exhibit B** - Former FBI Director James Comey Statement).

As discovery has shown, the Government also violated its own internal procedures. When NICS discovers a potential disqualifier of a firearm purchaser, such as a drug arrest, it issues a "Delayed" response. A NICS examiner must then conduct "more [external] research to determine whether the prospective transferee [wa]s disqualified from possessing a firearm by Federal or state law." 28 C.F.R. § 25.6(c)(1)(B). NICS SOP 5.0 also requires further research if the record contains a potential disqualifier. (**Exhibit C** - SOP 5.0).

NICS external research is governed by SOP 5.5.5. (**Exhibit D**). SOP 5.5.5 speaks in mandatory language and requires that an examiner searching for potentially disqualifying documentation contact "the state POC [point of contact], the courts, district attorneys, probation offices, arresting agencies, etc. for disposition, level of offense, incident report, etc. . . " Moreover, "*[e]very effort must be made* to obtain the necessary information, in order reach a final decision on a NICS transaction during the research phase." (**Exhibit D** - SOP 5.5.5) (emphasis added).

The FBI did not follow this directive when conducting the Roof investigation. Jennifer Conley, the FBI examiner who conducted the external research on the Roof background check,

was aware of the potential drug use disqualifier arising from Roof's arrest in South Carolina.  She knew she needed the Incident Report from Roof's arrest.  (**Exhibit A** – Conley Deposition, p. 34).  However, Conley ignored SOP 5.5.5 and failed to contact the agency that arrested Roof (the Columbia Police Department), the South Carolina POC (the South Carolina Law Enforcement Division or "SLED"), or the South Carolina Court (Lexington County Clerk of Court).  (**Exhibit A** – Conley Deposition, pp. 78, 79, 83, 94).  Each of these agencies had either Roof's Incident Report (**Exhibit E**) or Roof's Arrest Warrant (**Exhibit F**).  Both Reports showed that Roof was a user of narcotics and disqualified from purchasing a firearm.  In other words, the Government did not reach a "dead end."  It abandoned the background check before contacting the agencies mandated by its own rules.

Because of these failures, the United States is liable to Plaintiffs under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), and the discretionary function exception does not apply to the prescribed course of governmental action at issue.  *See Berkovitz by Berkovitz v. U.S.*, 486 U.S. 531, 536-37 (1988).

As will also be shown herein, the Government owed a duty to Plaintiffs based on its negligent creation of the risk and negligence *per se* in violation of the Brady Act, federal regulations, and its own SOPs.  The Brady Act and its regulations required the Government to issue a denial where the record demonstrates that the person is prohibited from receiving a firearm.  This law specifically protects those individuals likely to be harmed by firearm violence by the prohibited person, because its purpose is to curb crime by keeping firearms out of the hands of those not legally entitled to possess them.  *Abramski v. U.S.,* 134 S.Ct. 2259, 2268 (2014).  *See also Norton v. Opening Break of Aiken, Inc.*, 443 S.E.2d 406, 409 (S.C. Ct. App. 1994).  As stated on the FBI's website:

4

> The National Instant Criminal Background Check System, or NICS, is all about saving lives and protecting people from harm – by not letting guns fall into the wrong hands.

(**Exhibit G**  - NICS Webpage).

The nine parishioners shot and killed by Roof are the identifiable members of the class that the Brady Act, its regulations, and the NICS SOPs all intend to protect.  The Government breached its duty to the Plaintiffs by negligently conducting the Roof background check in violation of its own SOPS and by failing to issue the denial of the firearm sale for him.   The Government's negligence *per se* was a proximate cause of the injuries and damages to Plaintiffs.  *E.g.*, *Childers v. Gaslines, Inc.*, 149 S.E.2d 761, 765 (S.C. 1966) (citations omitted) ("Liability exists for the natural and probable consequences of negligent acts and omissions, proximately flowing therefrom. If the actor's conduct is a substantial factor in the harm to another, the fact that he neither foresaw nor should have foreseen the extent of harm or manner which it occurred does not negative his liability.").

Accordingly, for the reasons that follow, Defendant's Motion to Dismiss should be DENIED, as the Court has subject matter jurisdiction over Plaintiffs' Complaints, and a valid cause of action is set forth by Plaintiffs.

## III.     STATEMENT OF FACTS

Plaintiff agrees with the facts stated in the Background Section of this Court's Order and Opinion filed March 23, 2017, pp. 1-4.  In addition Plaintiffs submit further facts as follows.

Defendant, the United States Government, would like the Court to believe that the FBI reached a "dead end" (Entry No. 43-1, pg. 18) [hereinafter "Defendant's Memorandum"] when conducting the criminal background check of Roof without locating any record that would disqualify Roof from purchasing a firearm in April of 2015.  This claim is not supported by the

facts. Rather, the evidence uncovered in discovery shows 1) that the FBI had in its possession an incident report that contained information disqualifying Roof from purchasing a firearm, and 2) that, had the FBI followed its own SOPs, it would have contacted the agency that arrested Roof, the Columbia Police Department, it would have received the disqualifying incident report, and it would properly have denied the sale. The FBI did not reach a "dead end." It arbitrarily abandoned its search and inexplicably failed to contact the Columbia Police Department, SLED, or the Lexington County Clerk of Court, all in contradiction of SOP 5.5.5. This failure resulted in Roof purchasing a firearm illegally and later using it to murder and injure Plaintiffs.

### A.    THE PURPOSE OF THE BRADY ACT

Plaintiffs first turn to the Brady Act that Congress enacted in 1993. (**Exhibit H** – Brady Act). The Congressional record for the Brady Act explicitly states that the Brady Act is to prevent certain persons, including unlawful drug users of any controlled substances, from purchasing, possessing or receiving firearms. 18 U.S.C. § 922(d)(3), 18 U.S.C. § 922(g)(3). The purpose of the Act is "to curb crime by keeping firearms out of the hands of those not legally entitled to possess them." *Abramski*, 134 S.Ct. at 2268.

In the Brady Act's "background," Congress makes clear that the purpose of the Act is to address the "prevalence of gun violence" and protect innocent individuals hurt by gun violence by those who have been able to obtain a firearm despite laws prohibiting their gun possession:

> The United States is beset by an epidemic of gun violence, as evidenced by the following data: 15,377 Americans were murdered with firearms in 1992. 12,489 of these murders were committed with handguns. Gun murders in the United States increased by 41 percent between 1988 and 1992. 530,000 Americans were robbed or assaulted by firearm-wielding criminals in 1991. Armed rapists attacked nearly 15,000 women in the United States last year. Two University of California economists have estimated the direct medical cost of firearm injuries at $1.4 billion annually, and the indirect cost of lost productivity at $19 billion annually.

(**Exhibit H** – Brady Act) (internal footnotes omitted).

Congress goes on to explain that despite the existing Gun Control Act, 18 U.S.C. §§ 922 *et seq.*, prohibiting certain people from obtaining firearms (i.e. convicted felons, unlawful drug users), these prohibited people still have "relatively easy access to guns." *Id.* Thus, the Brady Act's congressional supporters mandated the creation of a national instant criminal background check system ("NICS") by which the federal government performs background checks prior to a firearm purchase. The stated purpose of the background checks is to prevent criminal firearm violence by those dangerous individuals who may injure or kill others while possessing a firearm.[2] Accordingly, as the title gives away, the Brady Act's essential purpose is to prevent a particular kind of harm — crimes with handguns by certain prohibited persons deemed dangerous when armed. Moreover, the background checks are designed to protect victims of prohibited persons by not letting guns fall into the wrong hands. (**Exhibit G** - NICS Webpage).

The FBI witnesses in this case testified that the Brady Act specifically bars several classes of persons from obtaining a firearm, including unlawful users of controlled substances. (**Exhibit N** – Morris Deposition, pp. 121-122, 170, 172). Discovery further shows that the reason that the

---

[2] For example, Representative Jill Long of Indiana stated that it has become apparent to members of Congress, Democrat and Republican alike, that violent crime is affecting our society like never before. (**Exhibit I**). Representative Cardiss Collins of Illinois stated that he was disgusted and fed up with the needless, random violence occurring daily in communities. He felt that the Brady Bill was an important step to solving the problem. (**Exhibit J**). Representative Nancy Pelosi of California stated that even in a state that has strong gun laws all one would have to do is cross over a state line to buy a gun, thus the necessity of the national gun law proposed by the Brady Act. (**Exhibit K**). Senator George Mitchell commented that the bill was a reasonable step forward in trying to keep weapons out of the hands of those who ought not to have them and that was what the legislation was all about. Drug addicts and others who ought not to be possessing firearms are included in this effort to keep guns out of their hands. (**Exhibit L**). Representative John Edward Porter stated about the bill that the level of crime in our society is frightening and legislation must be enacted to combat the violence. He felt that the Brady Bill was a step to prevent convicted or potential criminals from easily obtaining handguns and it would likely insure that drug addicts and other individuals are not easily able to purchase guns. (**Exhibit M**).

prohibited persons are denied the firearm is to prevent the prohibited persons from engaging in firearm violence against individuals they would injure or kill while armed. (**Exhibit N**– Morris Deposition, pp. 128-129, 156-158, 174-176; **Exhibit G** - NICS Website). Mr. Morris' testimony shows that the Brady Act directly imposed on the NICS section to guard against prohibited persons buying or receiving a firearm. Accordingly, people who are injured or killed by a prohibited person with a firearm comprise the class of persons the statute, regulations, and SOPs intend to protect.

In addition, the class of persons who are protected by the Brady Act is identifiable before the Government conducts the background check. It is not required that the name and identity of the individual be known where, as here, the class is identifiable. Finally, it is also clear from the discovery in this case that Plaintiffs are persons who were injured and killed by a prohibited person who had a firearm. Thus, the Plaintiffs are persons within the protected class.

If the Government does not properly conduct the background check a prohibited person obtains a firearm, which creates the opportunity for the prohibited person to engage in firearm violence. Mr. Morris, Chief of the CJIS Section, testified that he was aware that people who come in contact with a drug user who has a firearm are at an increased risk of danger. He also testified that he was aware that crime involving drugs and guns was a nationwide problem and that people who do use drugs are subject to irrational and unpredictable behavior. Thus, NICS actually knew of the likelihood of harm to members of the class if it failed to do its duty and perform a proper background check. (**Exhibit N** – Morris Deposition, pp. 122, 123, 125, 135-138, 141, 142).

B.    **STANDARD OPERATING PROCEDURES**

On April 11, 2015, Dylann Roof attempted to purchase a handgun from Shooter's Choice. Shooter's Choice was a South Carolina Federal Firearms Licensee ("FFL") required to contact NICS to perform a background check. Once an FFL initiates a background check, the Brady Act,

2:16-cv-02356-MBS    Date Filed 12/22/17    Entry Number 44    Page 9 of 45

its federal regulations, and the SOPs impose a mandatory course of action that "legal instrument examiners" or just "examiners" at the NICS must follow in conducting that criminal background check. The Act imposes a duty on NICS examiners to search for "prohibitors" under the Brady Act, namely documentation showing that a person is prohibited from buying or receiving a firearm. If an examiner finds a "prohibitor," the examiner *must* issue a denial. (**Exhibit N** – Morris Deposition, pp. 129-131 162).

The examiners conduct background checks in accordance with the Brady Act, 28 C.F.R. Part 25, and the FBI NICS's own SOPs that set out the mandatory steps to be followed by the examiner in carrying out a criminal background check. Plaintiffs have already detailed how the Government violated the Brady Act and regulations in their original brief in opposition to the initial Motion to Dismiss. This brief will focus on the examiner's failure to follow the NICS' SOPs.

As an initial matter, despite Defendant's argument to the contrary, the SOPs are undoubtedly mandatory and leave no discretion to the examiners. The SOPs themselves speak in mandatory terms. See, e.g., SOP 5.5.5 ("The Examiner *will* contact the state POC, the courts, district attorneys, probation offices, arresting agencies, etc. . . "; "The Examiner must follow the steps below . . .") (**Exhibit D**). Ms. Conley, who performed the external research, acknowledged that the SOPs are mandatory:

> A. We have to - - we have to follow federal law. We have to follow our SOPs.
> ***
> Q: Is that Standard Operating Procedures?
> A: Yes.
> Q. Are those mandatory, those things that you have to follow:
> A. Yes.

(**Exhibit A** – Conley Deposition, pg. 30, 32).

Deborah Russell testified:

9

Q: And Ms. Conley shared with us earlier that there are a lot of SOPs at the FBI. Would you agree with that?

A. Oh, absolutely.

Q: Okay.
And the SOPs that are part of the FBI agency, those are mandatory regulations, aren't they?

A. Yes.

(**Exhibit O** – Russell Deposition, p. 71, see also pp. 68-69, 72).

Stephen Morris, the assistant director of CJIS at the time testified:

Q: Are the Brady Act and the federal regulations and the standard operating procedures that have been enacted and implemented required to be followed by the FBI NICS legal instrument examiners?

A. Yes. We put them in place for that reason.
* * *

Q: Is it mandatory that they be followed?

A: We expect them to follow them, yes.

(**Exhibit N** – Morris Deposition, p. 132-133). See also Defendant's Responses to Requests to Admit No. 1-3, 6-8 ("Official policies governing National Instant Criminal Background Check ("NICS") Legal Instrument Examiners as of April 11, 2015, are set forth in the NICS Standard Operating Procedures ("SOPs")."); Response to Second Set of Interrogatories (**Exhibit P**).

Examiner Conley's background check of Roof was governed by SOP 5.5.5 titled "External Research." SOP 5.5.5 directs the examiners that "[a]ll internal research[3] must be conducted and documented **before** making any external contacts." (**Exhibit D** - SOP 5.5.5). Therefore, if an examiner has conducted all internal research and has yet to determine whether the matching record demonstrates that the potential transferee is prohibited by law from receiving the firearm, the examiner is to conduct "external research" as directed by SOP 5.5.5:

The examiner *will contact* the state POC, the courts, district attorneys, probation officers, arresting agencies, etc. for disposition, level of offense, incident report, etc. *via fax, phone, mail, email, and/or Nlets in accordance with the preference*

---

[3] In addition to the Government's violations of external research and federal regulations, the Government violated SOPs governing required "in-house research", which is discussed below.

10

*indicated on the state Processing Page and Contact List….Every effort must be made to obtain the necessary information, in order to reach a final decision on a NICS transaction during the research phase.*

The NICS Section maintains an accurate listing of the agencies that request a fee from NICS or will not assist the NICS. The State Contact Lists are updated to reflect these agencies. The NICS has an obligation to make every reasonable effort to obtain information; however, examiners **must not** contact an agency if: a) its listing states it charges a fee, since the NICS has no funding for this purpose; or b) its listing states **DO NOT CONTACT**.

(**Exhibit D** - SOP 5.5.5) (italics added; bold and CAPS in original). Thus, examiner Conley had a mandated course of action to contact all available sources in South Carolina (the state POC, the courts, arresting agency) to determine whether the drug use of Roof demonstrated his receipt of the firearm violated federal or state law.

Searches in South Carolina are governed by several documents, including the South Carolina Processing Page (**Exhibit Q**), which has information and contacts specific to South Carolina for the examiners to use, a South Carolina City/County List (**Exhibit R**), that purports to list the county in which each city is located, and County Contact Lists for Richland and Lexington (**Exhibit S**), which purport to list all agencies to contact in those counties (**Exhibit A** - Deposition of Conley, pp. 73).

The South Carolina Processing Page contains a clear directive on South Carolina research:

> **Contact Information:**
> - **Courts and arresting agencies are the primary contact (follow Contact List).**
> - **During Initial Research Please Contact ALL Available Agencies Per Contact List**.

(**Exhibit Q**) (emphasis in original).

The South Carolina Processing Page also states that for courts (General Sessions/Circuit Courts) there is no fee to contact them, and that there is no "do not contact" provision that prevented the examiner from contacting the South Carolina Courts. As for arresting agencies, the

only prohibition is "Do not contact for 18 U.S.C. 922(g)(9) physical force element," which was not applicable to Conley's background check of Roof.  Further, the South Carolina Processing Page identifies the State Point of Contact ("POC") as the South Carolina Law Enforcement Division and provides SLED's address, phone number, fax number, a contact person at SLED, and hours of operation.  Again there is no fee for contacting SLED, and the only prohibition is the inapplicable prohibition to not contact for 18 U.S.C. 922(g)(9) physical force element.  The Processing Page specifically states: "Contact [SLED] for clarification on SC records; only has information that is on the SC record."

### C.     NICS' FAILURES TO FOLLOW SOPS IN ROOF BACKGROUND CHECK

Examiner Conley did not complete the background check of Roof.  She did not "make every effort" "to obtain the necessary information, in order to reach a final decision on [the Roof] transaction during the research phase." (**Exhibit D** - SOP 5.5.5).  She did not contact the arresting agency, SLED, or the court to obtain either the Incident Report or the Arrest Warrant.  (**Exhibit A** - Conley Deposition, pp. 78, 79, 83, 94).  Thus, Conley did not follow the non-discretionary steps set forth in SOP 5.5.5.

Examiners are not given the discretion to stop researching when the examiner knows that potential prohibitors exist, and she has not obtained the record(s) yet.  To the contrary, SOP Number 5.0, governing Processing Delay Queue Transactions, specifically directs "If the record contains a potential disqualifier, further research is required." (**Exhibit C** - SOP 5.0).  Abandoning research without completing the steps set forth in SOP 5.5.5 was a violation of Conley's non-discretionary duties.

### 1.     CONLEY DID NOT CONTACT ARRESTING AGENCY

Conley and Defendant claim she "exhausted" her research because she had contacted all agencies listed in the Lexington County Contact List. (**Exhibit S**). This ignores the fact that Conley was told that the Columbia Police Department was the arresting agency, and she never contacted them. On Monday, April 13, 2015, Conley sent a fax to the Lexington County Sheriff's Office, requesting information on Roof from the warrant number she had for Roof's arrest for a drug charge. Specifically, she asked the Sheriff's Office to "Please provide the incident report - need to know if field/lab tested – need to know if subject admitted to drugs thank you." (**Exhibit T** – April 13, 2015 NICS Fax to Lexington County Sheriff's Office). Thus, it is evident that Conley knew she needed to get the Incident Report from the arresting agency to determine if Roof's drug arrest disqualified him from purchasing a firearm. (**Exhibit A** – Conley Deposition, pp. 102, 103).

As pointed out above, the cover sheet of the facsimile specifically instructs the recipient:

**WHAT IF I DO NOT HAVE THE INFORMATION YOU NEED?**
Should be unable to furnish this information, please indicate below the person or
agency which may be able to provide the information requested.

(**Exhibit T**)

The Lexington County Sheriff's Office did exactly as Conley requested and faxed her back: "No arrest or report for this date. The last arrest was on 2-28-15. **Columbia PD will have the report.**" (**Exhibit T**) (emphasis added). Conley never followed up on this piece of information that her facsimile form explicitly requested.

Conley was supposed to have expertise in South Carolina and in depth knowledge of South Carolina as the "regional expert" examiner assigned to the transaction. (**Exhibit U** - Region Alignment). Nevertheless, she limited her search for the "Columbia PD" to those agencies listed on the Lexington County Contact List. On that same day of April 13, 2015, Conley faxed the West Columbia Police Department seeking the report. (**Exhibit V** – April 13, 2015 NICS Fax to West

13

Columbia Police Department).  The West Columbia Police Department quickly returned a fax to Conley with a handwritten note next to the warrant number, stating "Not a WCPD warrant   This is not a WCPD arrest."  (**Exhibit V**).

At this point, Conley knew there was a drug arrest (potential prohibitor) for Roof, that a warrant number existed for the arrest of Roof, and that the City of Columbia Police Department had the report.  In addition, April 13, 2015 was day <u>one</u> of the <u>three</u> business days Conley had to conduct the background check of Roof as mandated by federal law.  However, after Conley received the West Columbia facsimile response, she abandoned the background check.  In violation of SOPs 5.5.5 and 5.0 she (1) did not contact the arresting agency, (2) did not contact SLED as the POC for South Carolina records such as incident reports, and (3) did not contact the South Carolina Courts.  Conley did not reach a "dead end."  She simply abandoned the case in violation of the regulations and SOPs that told her exactly what to do and whom to contact.  She did not make "[e]very effort . . . to obtain the necessary information, in order to reach a final decision on a NICS transaction during the research phase."  (**Exhibit A** - Conley Deposition, pp. 68-69, 83, 94; **Exhibit D**- SOP 5.5.5).

Even after she was told to contact the City of Columbia Police Department for the Incident Report, Conley did not consult the South Carolina City/County List (**Exhibit R**) available to her. The City/County List would have informed her that the City of Columbia was in Richland County. Based on that information, all she had to do was consult the Richland County Contact List (**Exhibit S**) for the contact information for the City of Columbia Police Department and send them the same facsimile she had already sent to the Lexington County Sheriff's Office and City of West Columbia Police Department.  Conley and Russell both acknowledged that she could have done this. (**Exhibit A** –  Conley Deposition, pp. 62, 63, 70-74, 80-82; **Exhibit O** – Russell Deposition, pp.

14

45-48).  Finally, Conley admitted that, if she had done that and received the report, she should have denied the transaction. (**Exhibit A** – Conley Deposition, pp. 75-77, 81-82). Her failure is a violation of regulation and SOP 5.5.5.  (**Exhibit D**).

### 2.     CONLEY DID NOT CONTACT THE STATE POC, SLED

Next, included in the list of entities the examiner is to contact in conducting the background check is the State POC, which is SLED for South Carolina.  (**Exhibit D** - 5.5.5) (**Exhibit Q** – South Carolina Processing Page).   Conley never contacted SLED.   (**Exhibit A** - Conley Deposition, pp. 69, 78, 83-85, 127, 133, 140).  SOP 5.5.5 directed her to contact SLED, and the South Carolina Processing Page contained no applicable limitations on her contacting SLED. Moreover, the South Carolina Processing Page indicated that SLED was available to clarify South Carolina records, exactly what Conley was in need of to clarify the drug use prohibitor.  (**Exhibit Q** – South Carolina Processing Page; **Exhibit A** - Conley Deposition, pg. 103).  If Conley had contacted SLED, she would have obtained the narrative from the Columbia Police Department Incident Report that, when received after the shooting, led to an immediate denial of Roof's right to purchase a gun based on 18 U.S.C.A. § 922(g)(3) (**Exhibit W** – ATF NICS Referral Application, at ATF-00000017-ATF-00000019; **Exhibit X** – NICS Case History Report, at FBI-00000099, FBI-00000122- FBI-00000123; **Exhibit O** – Russell Deposition, pp. 26-33).

In addition, there is no dispute that the narrative of the Incident Report was in SLED's possession on April 13, 2015.  Defendant has acknowledged that on March 6, 2015, one month prior to Roof's attempted purchase of the firearm, SLED entered the Columbia Police Department Incident Report narrative into the FBI's National Data Exchange (N-DEx) (**Exhibit Y** – Quinlan Deposition, pp. 25, 29-34; **Exhibit Z** – N-DEx Roof Incident Report Summary; **Exhibit AA** – Defendant's Answers to Plaintiff's First Set of Jurisdictional Interrogatories, ATI No. 3; **Exhibit**

15

**O** – Russell Deposition, pp. 59-60).  Accordingly, if Defendant had complied with the mandated SOP 5.5.5 requiring "The Examiner will contact the state POC…" (SLED), the FBI NICS Operation Center would have obtained the narrative of the Incident Report of the Columbia Police from SLED, and the FBI would have denied Roof's firearm purchase.  Roof would not have been permitted to purchase the firearm he used to murder nine parishioners and to attempt to murder others in the attack on Mother Emanuel Church in Charleston.  (**Exhibit A** – Conley Deposition, pp. 75-77).

### 3.    CONLEY DID NOT CONTACT THE COURT

SOP 5.5.5 (**Exhibit D**) also mandates that the examiner contact the appropriate court to obtain information necessary to research and reach a final decision on a NICS transaction, yet Conley did not contact the Lexington County Court at any time during her research.[4]  (**Exhibit A** – Conley Deposition, pp. 93, 94, 127, 140).   She had the South Carolina contact list for Lexington County (**Exhibit A** – Conley Deposition, pp. 73), which reflected a facsimile and phone number to contact the Lexington County Clerk of Court.  (**Exhibit S**).  Moreover, during the NICS transaction in April, 2015, the Arrest Warrant (**Exhibit F**) was available from the office of the Clerk of Court for Lexington County.

This arrest warrant shows that the Columbia Police Department was the arresting agency along with an ORI (Originating Agency Identifier) number for the Columbia Police Department, which would readily allow the FBI to contact the Columbia Police Department.  (**Exhibit A** – Conley Deposition, p. 133; **Exhibit O** – Russell Deposition, p. 63).  Additionally, the warrant itself indicates that Roof was an unlawful user of a controlled substance based on his admission and

---

[4] Again, the South Carolina Processing Page directs the examiner to contact ALL agencies during initial research.  (**Exhibit Q**).

demonstrates that his receipt of a firearm violates federal law. Accordingly, information in the warrant was also sufficient to have denied the sale of the firearm to Roof on the basis of 18 U.S.C. § 922(g)(3).

Plaintiffs also note that the South Carolina processing page states that the Warrant Number is the same number listed as the court case number on the South Carolina Lexington County Court Web Site. (**Exhibit Q** - South Carolina Processing Page). The Lexington County Court Web Site, which was viewed by Conley, shows a warrant number and the date of filing as March 16, 2015, several weeks before the purchase of the firearm by Dylann Roof in April, 2015 (**Exhibit BB** – Lexington County Court Web Site Screen Shots; **Exhibit A** - Conley Deposition, p. 68). Accordingly, had the examiner contacted the court, as required, and obtained the arrest warrant, the examiner would have had sufficient information to contact the Columbia Police Department and/or, from the warrant itself, information requiring the FBI's denial of the gun sale to Roof as a prohibited transferee.

In sum, Defendant knew that Roof was arrested on a drug charge, that a specific warrant with a warrant number existed at the Lexington County Court, and that Columbia Police Department would have the incident report. Yet even with that information Conley stopped research on the background check. This was not a discretionary act, but a clear violation of the SOPs that required Conley to contact the arresting agency, the state POC, and the appropriate court, none of which Conley did.

### 4.  INFORMATION IN THE ROOF INCIDENT REPORT AND ARREST WARRANT WOULD HAVE LED TO A DENIAL.

Defendant argues that had the Incident Report been located, Conley would still have had discretion to deny or allow the purchase. However, former FBI Director Comey has admitted that the sale would have been denied if the report were located. (**Exhibit B** - Former FBI Director

James Comey Statement). In addition, after the shooting, the NICS Section did request and receive the Incident Report from the Columbia Police Department and then issued a belated denial of the sale to Roof based on information in the report showing that he was an unlawful drug user. This denial was issued approximately 40 minutes after receipt of the Columbia Police Department Incident Report showing Roof's possession of Suboxone without a prescription. (**Exhibit E** – Roof Incident Report; **Exhibit X** – NICS Case History Report, at FBI 00000123; **Exhibit O** - Russell Deposition, pp. 31-32; **Exhibit A** - Conley Deposition, pp. 76-77; **Exhibit B** - Former FBI Director James Comey Statement). Because the records demonstrated a clear prohibitor, Roof was disqualified from purchasing a firearm by mandatory Federal law and regulations. Conley would have had no discretion to allow the purchase had she completed her search in compliance with the SOPs and located the Roof Incident Report.

Defendant also suggests that the Incident Report did not contain sufficient information to issue a denial. This suggestion is directly contradicted by the NICS SOP 5.4.7 titled "Controlled Substance (Federal Prohibitor 922(g)(3))." This SOP provides specific instructions to the examiners regarding when a record of a drug arrest within the past year amounts to a disqualification to purchase a firearm, stating that if either the substance or individual tests positive for a controlled substance or the individual admits to using or possessing the controlled substance which has no federally accepted medical use "this is enough to establish recent use/possession." (**Exhibit CC** - SOP 5.4.7, at FBI-00000234); *see also* 27 C.F.R. § 478.11. The Incident Report shows that Roof admitted to possessing a prescription drug without a prescription. If Conley had followed the other SOPs and Federal Regulation and obtained the Incident Report, she would have been required to deny the firearm purchase.

### 5.      FAILURE TO FOLLOW INTERNAL RESEARCH RULES

Discovery also revealed evidence of a violation of SOP 5.5.4, governing "In House Research" (**Exhibit DD**).  As set forth in SOP 5.5.4, the examiner is required to check the DDF (Disposition Document File) Automated System.  This system contains incident reports and police reports.  (**Exhibit N** – Morris Deposition, pp. 54, 60).  Morris testified that "according to one of these documents that you put before me, it is clearly in the DDF."  (**Exhibit N** – Morris Deposition, pp. 73-74).  This answer was in response to a question asking about databases, other than N-DEx, in which the Roof incident report would exist.  Notwithstanding the clear mandate of SOP 5.5.4, the examiner in the transaction did not recall if she checked the DDF database.  (**Exhibit A** – Conley Deposition, p. 117).  Based on the testimony of Mr. Morris that the Incident Report was in the DDF database, the Government's failure to check the database was another non-discretionary action which resulted in Roof being able to purchase the firearm used to murder the nine parishioners at Mother Emanuel Church in Charleston.  Defendant contends that its files indicate that the DDF was checked, but in light of Mr. Morris' testimony, it appears that the Incident Report was in the DDF.  Conley simply failed to research the DDF database.

### D.     FAILURE TO MAINTAIN DATA INTEGRITY

The Government also failed to maintain data integrity in violation of federal regulations. 28 C.F.R. § 25.5 provides in pertinent part: "The FBI will be responsible for maintaining data integrity during all NICS operations that are managed and carried out by the FBI."

Debra Russell, who was a NICS examiner and a Region Coordinator in charge of managing and maintaining the Contact List for South Carolina, testified she was aware some cities are in more than one county.  (**Exhibit O** – Russell Deposition, pp. 14- 18).  Russell was in charge of the Lexington County Contact List since 2006 and had access to the internet.  Still, she made no effort to update the Contact List.  She never checked Wikipedia or any other source to determine whether

there were cities that were in more than one county. (**Exhibit O** – Russell Deposition, pp. 18- 20). The U.S. Census Bureau also had the information that part of Columbia was in Lexington County as of 2010. Defendant's Memorandum, pp. 9-10.

After the Mother Emanuel murders, Russell was the examiner who engaged in further research and easily obtained the Columbia Police Department Incident Report, which resulted in the FBI issuing a denial of the Roof transaction approximately one hour after the FBI received it. (**Exhibit O** – Russell Deposition, pp. 26, 27, 29-33; **Exhibit X** – NICS Case History Report, at FBI 00000123). In conducting the NICS research on Roof after the murders, Russell also found out that Columbia is located in both Richland County and Lexington County. (**Exhibit O** – Russell Deposition, pp. 65-66).

Mr. Morris testified that the South Carolina Contact List contained data used by the FBI NICS Section to carry out operations and research to facilitate the examiners' ability to contact arresting agencies. (**Exhibit N** – Morris Deposition, p. 144). Morris further testified that it is mandatory for the FBI to maintain data integrity during all NICS operations managed and carried out by the FBI. (**Exhibit N** – Morris Deposition, pp. 147-148). And, Morris also testified that keeping the contact list up to date is required to maintain data integrity of the contact list. (**Exhibit N** – Morris Deposition, p. 154).

Insofar as Ms. Russell failed to keep the contact list up to date by failing to include Columbia on the Lexington County list, Defendant has violated 28 C.F.R. § 25.5. Had the Lexington County list properly included the City of Columbia, examiner Conley, who checked the Lexington County Contact List, would have found the Columbia Police Department and its contact

20

information and subsequently contacted Columbia Police Department directly for the Incident Report.  (**Exhibit A** – Conley Deposition, pp. 75-77).[5]

### E.    THE FAILURE TO SEARCH NICS INDEX

Defendant also failed to comply with C.F.R. § 25.6, which required NICS examiners to search the "NICS Index."  The NICS Index is defined by the Federal Regulations as "the database to be managed by the FBI, containing information provided by Federal and state agencies about persons prohibited under Federal law from receiving or possessing a firearm." 25 C.F.R. § 25.2.  One database maintained by the FBI was the N-DEx.  As confirmed by the testimony of John Quinlan, Chief of N-DEx from 2013-2017, N-DEx was developed and is managed by the FBI and contains information provided by Federal and state agencies including incident reports and case reports of persons charged with crimes and is separate and apart from NCIC and Interstate Identification Index.  (**Exhibit Y** – Quinlan Deposition, pp. 27-28, 128-130).

Quinlan also confirmed that the Roof case narrative from the Columbia Police Department Incident Report, showing Roof was prohibited from possessing a firearm, was contained in N-DEx at the time of Roof's application for purchase.  (**Exhibit Y** – Quinlan Deposition, pp. 59-61, 69; **Exhibit N** – Morris Deposition, pp. 72, 73, 104, 105).  Accordingly, the testimony shows that N-DEx is a database managed by the FBI, containing information provided by Federal and state agencies (SLED) about persons (Roof) prohibited under Federal law from receiving or possessing a firearm.  The testimony also shows that N-DEx is separate and apart from NCIC and the Interstate

---

[5] Another failure to maintain data integrity is the FBI's failure to have provided the narrative of the Incident Report received from SLED by N-DEx to DDF.  Since the FBI N-DEx did receive the narrative incident report on Roof's arrest from SLED (and from the Columbia Police Department, Defendant's Memorandum, p. 10), any failure to have provided this incident report to DDF is a failure to maintain data integrity during the NICS operation at issue.  If the report was provided to DDF, Defendant violated SOP 5.5.4 by not searching DDF.

Identification Index (III). Thus, N-DEx meets the definition of "NICS Index" as that term is defined under 28 C.F.R. §25.2, and it is a violation of 28 C.F.R. §25.6 for the FBI to not allow the NICS examiners to search this database. Defendant's Memorandum, p. 16. Of course, had this database been available for searching, the Columbia Police Department Incident Report was in the database, and, upon receipt of this Incident Report, the transaction would have been denied.

Furthermore, it strains credulity for the Government to argue that the FBI examiners could not access N-DEx, or that the Incident Report was only in the N-DEx and not in the other FBI databases. The NICS Improvement Amendments Act of 2007, Public Law No 110-180, 121 STAT. 2559, January 8, 2008, requires that all Federal departments and agencies that have any record of a person demonstrating that the person falls within one of the prohibiting categories of 18 U.S.C. § 922(g) or (n) must, not less frequently than quarterly, provide the pertinent record to the NICS. Public Law No 110-180, 121 STAT. 2559, Sec. 101(a)(4)(C). The states also shall make electronically available to NICS all such records relevant to the FBI's determination of whether a person is disqualified from possessing or receiving a firearm. Public Law No 110-180, 121 STAT. 2559, Sec. 102(c)(1)(A). Here, SLED provided the Incident Report to N-DEx prior to Roof's attempted gun purchase. The Incident Report was in N-DEx, which the examiners were required to review. Even if the examiners did not review N-DEx, by the NICS Improvement Amendments Act, the FBI was required to share the Incident Report with NICS. In short, the Incident Report was accessible to the FBI NICS through its own databases.

In sum, the Government failed to search the relevant databases for the records demonstrating Roof's receipt of the firearm violates law, failed to complete the background check of Roof by contacting the arresting agency, SLED, and the court to determine that there were matching records which demonstrated Roof's receipt of the firearm was unlawful, failed to

maintain data integrity, and failed to follow federal regulations requiring a search of the NICS Index — all in violation of the Brady Act, federal regulations, and the FBI's SOPs. These failures and violations resulted in Dylann Roof being allowed to obtain a firearm in violation of Federal law.

## LEGAL ARGUMENT

### I.    DISCRETIONARY-FUNCTION

Plaintiff brings suit against Defendant United States under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 2680(a), based on the government's failure (1) to conduct the NICS background check of Roof in accordance with regulations and SOPs prescribing how to carry out the background check; (2) its failure to issue a denial of the firearm sale for Roof based on the record(s) establishing he was prohibited from receiving the firearm; and (3) its failure to maintain data integrity during all NICS operations. *See* 28 C.F.R. §§ 25.5(a) & 25.6; (**Exhibit C** - SOP 5.0; **Exhibit D** – SOP 5.5.5; **Exhibit CC** - 5.4.7; **Exhibit DD** - 5.5.4).

The United States argues that the government's actions fall within the discretionary function exception to liability under the FTCA, which provides that the government will not be liable for claims "based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government…" 28 U.S.C. § 2680(a). The Government's conduct here did not involve the performance of a discretionary function or duty but was governed by mandatory directions and involved no considerations of social, economic, or political policy. *See Berkovitz*, 486 U.S. at 536-37. Accordingly, the discretionary function exception does not bar liability of the Government for its negligence at issue in this case.

The United States Supreme Court has set forth established principles for determining whether the discretionary function bars a suit against the Federal government. *Id.* The overarching principle is that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* at 536 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984)). Therefore, a court must examine the conduct at issue and "must first consider whether the action is a matter of choice for the acting employee….conduct cannot be discretionary unless it involves an element of judgment or choice." *Id.* (internal citation omitted). There is no element of judgment or choice "when a federal **statute**, **regulation or policy** specifically prescribes a course of action for an employee to follow….the employee has no rightful option but to adhere to the directive." *Id.* (emphasis added). The basic premise of the discretionary function exception is that discretion exists for the employee's actions, and the exception simply does not apply "if the employee's conduct cannot appropriately be the product of judgment or choice." *Id.*

However, even in cases of conduct that involve an element of judgment, the Supreme Court requires a second step to the analysis of whether the discretionary function applies, and "a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* Congress specifically included the discretionary function exception in order "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines*, 467 U.S. at 814. Therefore, where an element of judgment exists in the challenged governmental conduct, the court must then determine whether the conduct and decisions were based on considerations of public policy so as to fall under the discretionary function exception to tort liability. *Berkovitz*, 486 U.S. at 537.

24

Moreover, discretionary conduct cannot be grounded in a policy decision when that conduct is marked by individual carelessness or laziness. *Rich v. U.S.*, 811 F.3d 140, 147 (4th Cir. 2015) (citing *Coulthurst v. U.S.,* 214 F.3d 106 (2d Cir. 2000) (concluding that the discretionary function exception would not apply to a prison official's inspection of faulty weight equipment that caused plaintiff's injuries if that inspection was performed in a "carelessly inattentive" manner)).

In *Berkovitz*, the United States Supreme Court made clear that "[w]hen a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." *Id.* at 544. In that case, a young boy contracted a severe case of polio after ingesting a dose of a polio vaccine manufactured by Lederle Laboratories. The United States was sued under the FTCA for the National Institute of Health's Division of Biologic Standards licensing Lederle to produce the vaccine and for the Food and Drug Administration Bureau of Biologics approving the release to the public of the particular lot of vaccine ingested by the boy. *Id.* at 533. The Supreme Court held that the following Government actions were not barred by the discretionary function exception: licensing the vaccine without first receiving required safety data, licensing the vaccine without determining compliance with regulatory standards, and licensing the vaccine after determining that the vaccine failed to comply with regulatory standards. *Id.* at 542-544.

In the present case, the FBI NICS conducts background checks as required by federal regulation, 28 C.F.R. Part 25. How the background checks are to be conducted by the NICS examiners is further directed by the FBI's own SOPs, which govern both "in house research" of the FBI's own databases and "external research" to locate additional information on potential

disqualifiers.  The regulations and SOPs prescribe a course of action for the employees to take in conducting a background check.

There is no element of discretion in performing the check.  The employees had no discretion but to research the potential prohibitors indicated for Roof pursuant to federal regulation and SOPs 5.0, 5.4.7, 5.5.4 and 5.5.5.  The employees had no discretion on whether to search the "relevant databases" of the FBI, to include the N-DEx and DDF.  *See* 28 C.F.R. § 25.6(c)(1)(iii).  In conducting further research required by regulation, 28 C.F.R. § 25.6(c)(1)(iv)(B), the employees had no discretion on whether to contact the arresting agency, SLED, and the courts to determine whether Roof was prohibited from receiving the firearm.  (**Exhibit D** - SOP 5.5.5).  The FBI NICS's "South Carolina Processing Page" directed the examiner: "***During Initial Research Please Contact ALL Available Agencies Per Contact List***".  (**Exhibit Q**).  The regulations and SOPs directed the examiners to do the background check and directed them on how to do the background check.  There is no element of discretion in the mandate: "Every effort must be made to obtain the necessary information, in order to reach a final decision on a NICS transaction during the research phase."  (**Exhibit D** - SOP 5.5.5).

However, instead of following the prescribed course of action, the examiner stopped her research on day <u>one</u> of the <u>three</u> days allotted for the research per federal regulation instead of following the prescribed course of conducting the background check.  There is no option in the regulation or SOPs for the examiner to decide to abandon the research before it is complete, when a record indicates that a potential prohibitor exists.  The Government's conduct at issue did not involve discretionary functions.

As there was no element of judgment in the Government's conduct, the second element of the discretionary function exception need not be addressed: whether the conduct and decisions

were based on considerations of social, economic, or political policy.  *See Berkovitz*, 486 U.S. at 536-37.  However, even analyzing the FBI's conduct under the second prong establishes that the examiner's conducting of a background check does not involve considerations of social, economic, or political policy.  There is no cogent argument that the NICS background checks involve public policy decisions.  The examiners must follow a clear mandate to conduct the background check, with research as required and as specifically delineated for them in the SOPs.  They are told what to do, whom to contact, how to contact them, and what information demonstrates that a person attempting to purchase a firearm is prohibited by law to do so.  These employees are not involved in policy decisions in any way.

In addition, the FBI is mandated by federal regulation to maintain data integrity in the NICS operations.  28 C.F.R. § 25.  Former Assistant Director of CJIS, Mr. Morris, testified that the FBI is required to maintain data integrity.  There is no discretion but to follow the mandate to do so.  There are no overarching considerations of social, economic, or political policy in maintaining data integrity.

In sum, the discretionary function exception does not apply to the prescribed course of conduct the FBI was to take to conduct the background check of Roof and to maintain data integrity during all NICS operations.  Plaintiff's claims are based on the Government's failure to act in accordance with federal law and policies and procedures [SOPs] that governed the Government's conducting of the Roof background check and when a record demonstrated that Roof's receipt of a firearm violated federal law, to issue a denial of the gun sale.  As the facts demonstrate the course of action was prescribed and violated in this case.

## II.    <u>DEFENDANT'S BREACH OF DUTY IS TORTIOUS UNDER SOUTH CAROLINA LAW</u>

Pursuant to the FTCA, 28 U.S.C. § 1346(b), the United States is liable for wrongful acts and omissions of federal employees acting within the scope of their office in circumstances where a private person would be liable for similar claims in the jurisdiction where the claims arose— South Carolina for this case.  However, the United States Supreme Court has made clear that jurisdiction over FTCA claims is not so narrowly determined as to ask whether a private person would be liable for the exact conduct at issue— in this case, conducting background checks for the sale of firearms and issuing a denial of the sale where a prohibitor exists, as well as maintaining data integrity to do so.  Rather, jurisdiction is premised on whether the Government's actions breached a duty under the state's <u>negligence</u> law such that the breach would be tortious under state law if done by a private individual.  *E.g.*, *Florida Auto Auction of Orlando, Inc. v. U.S.*, 74 F.3d 498 (1996); *see also Indian Towing Co. v. U.S.*, 350 U.S. 61, 68-69 (1955).

In South Carolina, to establish a claim of negligence, a plaintiff must show: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; (3) damage actually and proximately resulting from that breach; and (4) injury or damages suffered by plaintiff.  *E.g., Madison ex rel Bryant v. Babcock Center, Inc.; S.C. Dep't of Disabilities and Special Needs; Batchelor*, 638 S.E.2d 650, 656 (S.C. 2006).  While South Carolina does not generally impose a duty to control the conduct of another or to warn a third person of danger, the duty to act with due care does extend to protect third parties where the defendant negligently created a foreseeable risk of harm to the third party.  *E.g.*, *Faile v. S.C. Dep't of Juvenile Justice*, 566 S.E.2d 536, 546 (S.C. 2002).  South Carolina specifies five circumstances where a defendant will be liable for controlling the conduct of another and, thus, liable to a third party: (1) the defendant has a special relationship with the victim; (2) the defendant has a special relationship

with the injurer; (3) the defendant voluntarily undertakes a duty; (4) the defendant negligently or intentionally creates the risk; or (5) a statute imposes a duty on the defendant. *Id.*

In addition, South Carolina courts continuously rely on "the controlling principles of law regarding intervening acts of a third party" established over the last century concerning proximate causation. *E.g., Stone v. Bethea*, 161 S.E.2d 171, 173 (S.C. 1968); *Green v. Atlanta & Charlotte Air line Railway Co.*, 126 S.E. 441, 444 (S.C. 1925). The original tort-feasor's proximate causation of the injury remains even when an intervening act of a third party occurs if the original tort-feasor "should have reasonably foreseen and anticipated [the third party's acts] in the light of attendant circumstances. The law requires only reasonable foresight[.]" *Stone*, 161 S.E.2d at 173. Further, although foreseeability of some injury from an act or omission is a prerequisite to the plaintiff establishing proximate cause, it is not necessary for the defendant to have contemplated the particular event which occurred. *Greenville Mem'l Auditorium v. Martin,* 391 S.E.2d 546, 547-548 (S.C. 1990). Rather, it is sufficient that the defendant should have foreseen that his negligence would probably cause injury to someone. *Id.*

### A.  The United States is liable under South Carolina's negligence *per se* law.

First, the Government's negligence in this case is actionable in South Carolina for breach of the Brady Act and the federal regulations implementing the Act, 28 C.F.R. Part 25.  A statute creates a duty of care the violation of which constitutes breach and establishes negligence *per se* where the statute's essential purpose is to protect from the kind of harm plaintiff suffered, and plaintiff is member of the class of persons the statute intends to protect. *Rayfield v. S.C. Dep't of Corrections*, 374 S.E.2d 910, 914-915 (S.C. Ct. App. 1988). Likewise, the violation of a regulation establishes negligence *per* se where a regulation creates a duty of care running to a special class of persons the regulation intends to protect. *Norton*, 443 S.E.2d at 409. To establish liability, the

29

defendant's violation of the statute or regulation must be causally linked, both in fact and proximately, to the plaintiff's injury. *Whitlaw v. Kroger Co.,* 410 S.E.2d 251, 253 (S.C. 1991).

South Carolina has a "public duty" rule that presumes statutes creating or defining the duties of a public office have the essential purpose of providing for the structure and operation of the government or of securing the general welfare and safety of the public. *Jensen v. S.C. Dep't of Soc. Services*, 297 S.C. 323, 328 (S.C. Ct. App. 1988). However, where the Legislature enacts a statute with the essential purpose of protecting an identifiable class of persons from a particular harm, the statute is said to create a "special duty," which will support an action for negligence. *Id.* A statute creates a special duty, and negligence *per se* if breached, where the following elements are met:

> (1) an essential purpose of the statute is to protect against a particular kind of harm;
> (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not cause that harm;
> (3) the class of persons the statute intends to protect is identifiable before the fact;
> (4) the plaintiff is a person within the protected class;
> (5) the public officer knows or has reason to know of the likelihood of harm to members of the class if he fails to do his duty; and
> (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

*Id.* at 329.

*Jensen v. S.C. Dep't of Soc. Services*, 297 S.C. 323, is useful for understanding the distinction between statutory provisions that create a public duty from those that create a special duty that supports a claim for negligence *per se*. In *Jensen*, the plaintiff brought claims of negligence in the prevention of child abuse and death of Michael Clark by South Carolina's Department of Social Services [DSS] and its employees for breaching duties imposed on the state agency by the South Carolina Child Protection Act (S.C. Code § 20-7-480). *Id.* at 326-328. The plaintiff claimed that DSS breached the statute by failing to train its staff; failing to staff the local

office with adequately trained staff; and failing to conduct an appropriate and thorough investigation of reported child abuse, which included the failure to determine on the facts discovered whether the report was "indicated" or "unfounded." *Id.* at 330-331.

First, the South Carolina Court of Appeals distinguished the sections of the Act that pertained to training and staffing as prescribing "general managerial duties" and relating to "to the general operations of the local child protection agency". *Id.* at 330-331. The essential purpose of these sections define and allocate duties in the public agency, and, accordingly, the public duty rule applies. *Id.*

However, the sections of the Act that mandate DSS investigate and intervene to remove an endangered child from the home "stand on a different footing." *Id.* at 331. The court explained these sections of the Act create a "special duty" for the state and its agency, because "[t]he essential purpose of these sections is to protect abused children when their cases have been reported to DSS officials." *Id.* This statutory section meets the elements of creating a "special duty":

> Such children comprise a clearly identifiable class; Michael Clark was plainly a person within the class. These sections impose on the local child protection agency and its social workers a specific duty to investigate and intervene in cases involving children like Michael. Jenkins received a report that children were being abused in the Clark home. She knew from personal observations that Shane Clark [Michael's brother] had visible physical injuries which pointed to child beating. In the circumstances, she could foresee that serious injury was likely to come to the Clark children if there were no interventions to protect them. Upon receipt of the report, Jenkins had full authority to investigate and to petition the family court for removal of the children from the home to prevent further injury.

*Id.* Thus, the plaintiff stated a negligence *per se* claim against the defendants for breach of the special duty to investigate and intervene in Michael's case. When Defendants closed his case as "unfounded" without making a home visit, it was foreseeable Michael would be abused, and the agency's failure to remove him from the home led to his death. *Id.* 331-332.

31

South Carolina negligence law also is clear that a when statute creates a special duty to protect an identifiable class of individuals, the class members need not be individually named and known. *Norton.*, 443 S.E.2d at 409; *Whitlaw*, 410 S.E.2d at 253. Specifically, the *Norton* case dealt with a South Carolina regulation that prohibits a business licensed by the Alcohol Beverage Control Commission from allowing a person under the age of 21 to possess or consume alcoholic liquors in or on the licensed premises. 443 S.E.2d at 408. The South Carolina Court of Appeals held that a licensee's violation of the regulation constitutes negligence *per se*, and the licensee's duty of care extends to both the underage drinker allowed to possess or consume alcohol on the licensee's premises <u>and</u> to members of the public likely to be harmed by the underage drinker's consumption of alcohol. *Id.* at 408-409 (citing *Whitlaw*, 410 S.E.2d at 252).

The third parties who come into contact with the intoxicated minor thereafter and are harmed by the minor's consumption of alcohol have an action against the licensee who violated the statute's special duty imposed on it. *Id.* (relying on *Whitlaw* for "teach[ing] that such rules have the additional purpose of protecting members of the public likely to be harmed by an underaged drinker".) The Court makes clear that the members of the public that the underage drinker injures while he is intoxicated due to the licensee's violation of the statute constitute an identifiable class of persons protected by the regulation before the fact and distinct from the public at large. *Id. See also Tobias v. Sports Club, Inc.*, 332 S.C. 90, 504 S.E.2d 318 (1998) ("In recognizing a private cause of action for a violation of these statutes, the Court of Appeals stated that their purpose is to promote public safety, and to prevent an already intoxicated person from becoming even more intoxicated, and thus *an even greater risk to the public at large*, when he leaves the establishment."); *Daley v. Ward*, 303 S.C. 81, 84, 399 S.E.2d 13, 15 (Ct. App. 1990)

("[T]he purpose of the statute is to protect not only the individual served in violation of the statute, but also the public at large, from the possible adverse consequences.").

In this case, the Brady Handgun Violence Prevention Act and the federal regulations implementing the Act create a special duty for the FBI and its NICS section and examiners to conduct background checks on prospective transferees, by searching relevant databases and conducting research for internal and external records when potential disqualifiers exist, within the three day regulatory window of time to determine whether the prospective transferee is disqualified from possessing a firearm by federal or state law. Further, the Act and regulations require the FBI issue a denial of the firearm transfer to a prospective transferee where a record shows he is disqualified to possess a firearm by federal or state law. *See* 28 C.F.R. Part 25. In addition, the federal regulations create a special duty for the FBI to maintain the data integrity of all NICS operations. *See Id.* The Brady Act and its regulations meet all of the elements of South Carolina's special duty rule.

Numerous courts have recognized *per se* negligence claims arising out of violation of the Brady Act and the Gun Control Act, while also recognizing that the purpose of those Acts is to protect victims of gun violence, like the Plaintiffs. In *Boles v. U.S.*, 3 F.Supp.3d 491 (M.D.N.C. 2014), Terry Porter, a civilian employee of the United States Coast Guard, was hospitalized for mental illness. The Coast Guard obtained and stored Porter's firearms. Later, a protective order was entered against Porter due to a domestic violence charge. Then, the Coast Guard gave Porter's guns back to him, even though he was disqualified from possessing firearms by 18 U.S.C. § 922(g)(4) (making it unlawful for anyone "who has been committed to a mental institution" to possess a firearm) and 922(g)(8) (making it unlawful for anyone to possess a firearm who is subject to certain domestic violence protective orders). Ten months later, Porter went to his estranged

wife's home and threatened her at gunpoint, using the firearms that the Government had returned to him.  Plaintiff Boles, a neighbor of Porter's estranged wife, came to his door and called out to Mrs. Porter.  In response, Porter shot Boles several times.  *Id.* at 496-97.

Boles sued the Government under a number of different theories, including negligence *per se* under Section 922.  The Government moved to dismiss in part on the grounds that there was not a private right of action under Section 922.

The District Court considered whether Section 922 met the criteria for application of Virginia's negligence per se doctrine, which is similar to South Carolina's.  *Id.* at 509 ("Virginia permits a statute to be the basis of a negligence *per se* claim if it was enacted for the purpose of public safety, the plaintiff belongs to the class of persons for whom its benefits were enacted and the harm that occurred was of the type against which the statute was designed to protect, and the violation was a proximate cause of the plaintiff's injury.").  The District Court recognized that Section 922 was designed to prevent shooting deaths and, therefore, created a negligence *per se* claim for the plaintiff:

> As Boles notes, at least some courts have characterized section 922 as a public safety statute designed to prevent shooting deaths. *See, e.g., King v. Story's, Inc.,* 54 F.3d 696, 697 (11th Cir.1995) (vacating district court's award of summary judgment in favor of defendant who allegedly sold the rifle used to kill the plaintiff to a convicted felon in violation of section 922(d)(1), and confirming that "[t]he trial court [properly] recognized that this plaintiff ... is a member of the class of persons Congress intended to protect by enacting the Gun Control Act; that the injuries were of the type contemplated by the Act; and that the sale was made in violation of the Act").
>
> Even the cases cited by the Government actually undermine its argument. For example, in *Decker v. Gibson Prods. Co. of Albany, Inc.,* 679 F.2d 212 (11th Cir.1982), upon which the Government relies, the Eleventh Circuit reversed the district court's grant of summary judgment to the defendant. The plaintiffs— children and mother of a murder victim—had sued the defendant for negligence in selling a pistol to the shooter, a convicted felon. *Id.* at 213–14. Although the district court found that section 922(d) of the Act did not create a private cause of action, the Eleventh Circuit stressed that the plaintiffs were not asserting such; rather, they

claimed that section 922(d) set a standard against which the defendant's conduct should be measured for determining negligence *per se* under Georgia law. *Id.* at 214–15. Boles alleges nothing more here. Thus, the Government's argument on this point, not being properly developed, will not carry the day.

*Id.* at 509-10 (also citing in a footnote: *Martin v. Schroeder,* 105 P.3d 577, 582 (Ariz. Ct. App. 2005) (concluding that "[t]he Act is at least in part a public safety statute ... designed to keep firearms out of the possession of those persons not legally entitled to possess them because of age, criminal background, or incompetency") (citing *Huddleston v. United States,* 415 U.S. 814, 824, (1974)); *Coker v. Wal–Mart Stores, Inc.,* 642 So.2d 774, 777 (Fla. Dist. Ct. App.1994) (concluding that the "principal purpose" of the Act was "to prevent those deemed too dangerous or irresponsible due to age, criminal background, or incompetency from obtaining firearms and ammunition")). The *Boles* opinion is especially helpful in that the victim was not a predictable individual with a relationship with the shooter, namely Porter's wife, but a complete stranger to the shooter, namely the neighbor of Porter's wife who happened to be in the wrong place at the wrong time. If Boles, a complete a complete stranger to Porter, is a member of the protected class Section 922, then so are the Plaintiffs.

Similarly, the Eleventh Circuit Court of Appeals in the *King* opinion, cited in *Boles,* affirmed that shooting victims may bring negligence *per se* claims based on Section 922:

> The trial court recognized that this plaintiff, as a victim of a shooting by a convicted felon, *is a member of the class of persons Congress intended to protect by enacting the Gun Control Act*; that the injuries were of the type contemplated by the Act; and that the sale was made in violation of the Act. The fourth requirement for liability for violation of the Act is that the violation was a proximate cause of the harm. In deciding that the fourth requirement was not met because the sale without obtaining the buyer's signature was not the proximate cause of the harm, the court took away from the jury the question that we held in *Decker v. Gibson* was for the jury. This was error.

*King*, 54 F.3d at 697 (emphasis added). *See also*, *Shirley v. Glass*, 308 P.3d 1, 6-7 (Kan. 2013) ("The proper inquiry is therefore not whether the class of persons to be protected by a statute is

small or large, but whether the statute intends to protect the class, even if it includes all members of society, from a particular kind of harm) (quoting Prosser and Keeton, The Law of Torts § 36, p. 224 (5th ed. 1984)).

Defendant has suggested that the purpose of the Brady Act is distinguishable from the purpose of the Gun Control Act and is not intended to prevent gun violence.  Defendant's Memorandum, Pages 36-37.  In addition to contradicting its own website ("The National Instant Criminal Background Check System, or NICS, is all about saving lives and protecting people from harm – by not letting guns fall into the wrong hands"), this position is not supported by the law. In fact, the U.S. Supreme Court recently recognized that the Brady Act shares the same "principal purpose" as the Gun Control Act: "to curb crime by keeping firearms out of the hands of those not legally entitled to possess them."  *Abramski*, 134 S.Ct. at 2268 (2014) (quoting *Huddleston*, 415 U.S. at 824 (pre-Brady Act case interpreting the Gun Control Law); internal quotations omitted). The opinion in *Abramski* was rendered after passage of the Brady Act and after the Brady Act and Gun Control Act had been blended into the same set of codified statutes.  In discussing the background check that was created as part of the Brady Act, the Supreme Court cited the purpose of the Gun Control Act as set forth in *Huddleston*, which was decided before the Brady Act was passed:

> Start with the parts of § 922 enabling a dealer to verify whether a buyer is legally eligible to own a firearm. That task, as noted earlier, begins with identification—requesting the name, address, and age of the potential purchaser and checking his photo ID. See § 922(b)(5), (t)(1)(C); *supra*, at 2263. And that identification in turn permits a background check: The dealer runs the purchaser's name through the NICS database to discover whether he is, for example, a felon, drug addict, or mentally ill person. See § 922(d), (t)(1); *supra*, at 2263. **All those provisions are designed to accomplish what this Court has previously termed Congress's "principal purpose" in enacting the statute—"to curb crime by keeping 'firearms out of the hands of those not legally entitled to possess them.'** " *Huddleston,* 415 U.S., at 824, 94 S.Ct. 1262 (quoting S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968)).

36

*Abramski*, 134 S.Ct. at 2268 (emphasis added).

In other words, both the Brady Act and the Gun Control Act serve the same purpose: to curb crime by keeping firearms out of the hands of those not legally entitled to possess them and to prevent crime against innocent victims of firearm violence. As such, the Plaintiffs are members of the class of persons that the Brady Act intended to protect and, consequently, can bring a negligence *per se* claim based on the Government's failure to comply with the Brady Act and the regulations and procedures adopted to implement the same.

As pointed out above, the legislative history of the Brady Act, and the FBI witnesses' testimony, make clear that the essential purpose of the Brady Act and its federal regulations is to protect against a particular kind of harm, namely firearm violence perpetrated by those disqualified to possess a firearm by federal or state law. (**Exhibit H -** Brady Act; **Exhibit N -** Morris Deposition, pp. 128, 174-176). The Brady Act and regulations directly impose on the FBI NICS section the duty to guard against the foreseeable firearm violence by these prohibited individuals by requiring the carrying out of the background check, by searching the relevant databases and further research, if required, to determine whether the individual is prohibited by law from receiving the firearm. 28 C.F.R. § 25.6(c)(1)(iv)(B). The Act and regulations require the FBI to issue a denial of the sale where a matching record demonstrates the receipt of a firearm violates law. 28 C.F.R. §§ 25.2 & 25.6(c)(1)(iv)(C). The Act and regulations intend to protect an identifiable class of third parties likely to be harmed by gun violence perpetrated by individuals deemed prohibited from receiving a firearm. If the regulations are followed, the disqualified transferee has no gun, and the individuals he comes into contact with thereafter are protected from gun violence at his hands. As stated by the NICS website:

> The National Instant Criminal Background Check System, or NICS, is all about saving lives and protecting people from harm – by not letting guns fall into the wrong hands.

(**Exhibit G** - NICS Website).

The nine Mother Emanuel parishioners shot and killed by Roof after the Government's failed background check are within the identifiable class of persons that the Brady Act and its regulations intend to protect. The FBI knew, or should have known, of the likelihood of harm to individuals who come into contact with a transferee who has illegally received a firearm. The FBI also knew, or should have known, that, if it fails to properly conduct the background check and deny the sale of a firearm to a disqualified transferee, then firearm violence likely will come to individuals that transferee comes into contact with while possessing the firearm.

In sum, South Carolina's public duty rule does not apply to the Brady Act and its federal regulations. Rather the statute and regulations create a special duty of care owed by the Government to the innocent members of the class harmed by firearm violence when the Government fails to conduct the background check and issue the denial of the sale to a person prohibited by law from receiving the firearm. Here, the FBI violated its duty under the Brady Act and federal regulations when it failed to conduct the background check of Roof in compliance with the statute, the regulations, and its own procedures. The FBI could reasonably foresee criminal activity by the prohibited person against innocent victims arising from its negligence. As such, Plaintiffs are entitled to a full trial on this issue.

## B.  Creation of the risk

South Carolina negligence law also holds a person liable for his own actions that negligently create a reasonably foreseeable risk of harm by a third party. *E.g., Faile*, 566 S.E.2d at 546; *Greenville Memorial Auditorium v. Martin*, 391 S.E.2d 546, 547 (S.C. 1990). In this case,

38

Defendant negligently created a foreseeable risk of harm.  Defendant accepted the duty of performing background checks on FFLs in South Carolina.  Complaint, Dkt. No. 1, ¶¶ 19-40, 45-61.  Defendant had in its possession the incident report that disqualified Roof from purchasing a firearm.  Defendant also had the means of discovering the disqualifying incident report and would have discovered the report had it followed its own SOPs and contacted the arresting agency.  Defendant affirmatively undertook a duty to perform the background check.  Defendant negligently performed the background check, ignoring its own SOPs by not contacting the Columbia Police Department after it was identified as the arresting agency.  In addition, and again in violation of its own SOP, Defendant failed to contact the South Carolina POC, SLED, and the Lexington County Court both of which also had the disqualifying information on Roof.  In short, Defendant prematurely abandoned its background check on Roof.  As a direct result of Defendant's negligence, Roof was allowed to purchase a firearm.  This created a foreseeable risk of harm to Roof's victims.

There are only a handful of cases in South Carolina discussing liability for creation of the risk.  The most common scenario involves the defendant's failure to provide adequate security in the face of a risk that it knew or should have known.  *See Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 660 (2006) ("The Court found liability based on the city's negligence in adequately securing the premises where the negligence created a foreseeable risk of injury."); *Martin*, 391 S.E.2d at 548.

In *Martin*, the plaintiff sought to hold an auditorium liable for its negligence in failing to provide adequate staffing of security officers and patrol at a concert in order to prevent a patron from throwing a bottle over the balcony, which in turn hit plaintiff on the head.  *Id.*  The South Carolina Supreme Court held that the auditorium was liable for its own actions in negligently

creating a reasonably foreseeable risk even though the auditorium could not have foreseen the precise course of events leading to the injury. *Id.* at 549. To establish liability based on the negligent creation of the risk:

> [I]t is not necessary the person charged with negligence should have contemplated the particular event which occurred. It is sufficient that he should have foreseen his negligence would probably cause injury to someone. He may be held liable for anything which appears to have been a natural and probable consequence of his negligence.

*Id.* Just like Defendant in this matter, the auditorium's security was inadequate, and that led to a reasonably foreseeable injury by a third party.

Defendant makes two different arguments that ignore the precedent established by these opinions. Defendant's first argument against application of the creation of the risk theory is that there must be some affirmative action by the Defendant to create the risk. Defendant's Memorandum, Pages 33-34. This argument is not supported by the law. Defendant first cites two federal Section 1983 opinions to support its argument that an omission will not support creation of the risk liability under South Carolina negligence law. *See Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989). Both *Doe* and *DeShaney* address the state-created danger doctrine as a path to liability under Section 1983, which requires conduct by the state actor that was "intended to injure in some way unjustifiable by any government interest" and more than even gross negligence. *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46, 849 (1998); *see also Slaughter v. Mayor of Baltimore*, 682 F.3d 317, 321 (4th Cir. 2012). As such, these opinions have no applicability to the creation of the risk doctrine under South Carolina negligence law.

Defendant also cites *Restatement (Second) of Torts* § 321 (1965) in support of its argument that there must be some affirmative action, as opposed to an omission, to support creation of the

risk because that Section was cited by the *Faile* opinion.  The *Faile* court also cites one South Carolina opinion to support the creation of the risk exception, *Montgomery v. Nat'l Convoy & Trucking Co.*, 195 S.E. 247, 251 (1938).  The opinion in *Montgomery*, cited by Defendant, unequivocally recognized that the creation of the risk exception could be through commission or omission:

> **One may be negligent by acts of omission as well as of commission**, and liability therefor will attach if the act of omission of a duty owed another, under the circumstances, is the direct, proximate and efficient cause of the injury.

*Montgomery*, 195 S.E. at 251 (emphasis added).

In *Montgomery*, a truck stalled on an icy highway on a blind curve, blocking the entire highway.  The truck driver's creation of the risk was a failure or omission to take action to address the dangerous situation that he created, namely failing to warn on-coming motorists.  *Id.* ("One of the acts of negligence alleged in the complaint is the failure of the appellants to warn approaching vehicles of the conditions existing.").  This is, of course, an act of omission.  *See also Madison ex rel. Bryant*, 638 S.E.2d at 657 ("Babcock Center allegedly acted negligently in creating the risk of injury to Appellant by not properly supervising her . . .").  Put simply, South Carolina courts have not created any distinction between acts of omission and acts of commission when considering creation of the risk.

Truly, the argument is entirely moot in that creation of the risk almost inevitably arises from a two-step process: an action by the defendant that creates the risk and then an omission that is either a failure to warn or a failure to take other action that protects the victim from the risk.  This two-step process is also recognized by the *Restatement (Second) of Torts* § 321:

> (1) If the actor does an act, and subsequently realizes or should realize that it has created an unreasonable risk of causing physical harm to another, he is under a duty to exercise reasonable care to prevent the risk from taking effect.

So again, the defendant breaches his duty when he creates a risk *and* then fails to take action to prevent the risk from taking effect. The second step can be an act of omission, such as failing to set out flares after stalling your truck on a blind curve. *Restatement (Second) of Torts* § 321, Illustration 3 ("A, carefully driving his truck, skids on an icy road, and his truck comes to rest in a position across the highway where he is unable to move it. A *fails to take any steps to warn approaching vehicles* of the blocked highway."). In short, Defendant's argument that an omission cannot support a negligence claims based on creation of the risk is not supported by the law.

Next, Defendant argues that it "had no knowledge and no means of knowing that 'it had created an unreasonable risk of causing physical harm to another . . .'" Defendant's Memorandum, Page 34. This, of course, ignores the standard Defendant faces in this motion (suggesting that Plaintiff has to prove knowledge at this point). This Court has already recognized the low standard that Plaintiff has to meet at this stage of the litigation:

> To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim "across the line from conceivable to plausible." If her explanation is plausible, her complaint survives . . . regardless of whether there is a more plausible alternative explanation.

*Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).

In addition, Defendant's argument ignores the facts revealed during discovery. The Defendant not only had the disqualifying Incident Report in its possession, in the N-DEx database, but also had every means of discovering the disqualifying report and would have discovered the report had it followed its own SOPs and contacted the arresting agency, SLED, or the courts. Defendant knows that the purpose of the background checks is to protect victims of firearm violence by ineligible purchasers. (**Exhibit G** - NICS Website). Defendant may not have foreseen

42

the massacre that ensued when it ignored its own procedures and allowed Roof to purchase a firearm, but it was entirely foreseeable that Roof was a threat.

Defendant also implies that Roof's actions created all the risk and somehow absolve Defendant of its responsibilities. Defendant's Memorandum, Pages 33-34. Roof's actions cannot be deemed an intervening force that is a superseding cause that relieves the Government from liability. For there to be relief from liability, the intervening cause must be one that could not have been reasonably foreseen or anticipated. *Rife v. Hitachi Const. Mach. Co.,* 609 S.E.2d 565, 569 (S.C. Ct. App. 2005). In other words, the intervening negligence of a third party will not excuse the first wrongdoer if such intervention ought to have been foreseen in the exercise of due care. *Bishop v. S.C. Dep't of Mental Health,* 502 S.E.2d 78, 83 (1998). "In such case, the original negligence still remains active, and a contributing cause of the injury." *Id.* Accordingly, if the intervening acts are set into motion by the original wrongful act and are the foreseeable result of the original act, the "final result, as well as every intermediate cause, is considered in law to be the proximate result of the first wrongful cause." *Wallace v. Owens–Ill., Inc.,* 389 S.E.2d 155, 157 (S.C. Ct. App.1989).

Roof's actions following the Government's failed background check are foreseeable. The Brady Act and the regulations passed in support of it are aimed at the prevention of gun violence by denying the purchase of firearms by those who are legally ineligible to obtain firearms. The ultimate goal is to protect or reduce the number of victims of firearm violence. When the Government fails in conducting its background check, it is entirely foreseeable that there will be more victims of firearm violence, which is precisely what occurred in this matter.

Based on the foregoing, Defendant's Motion to Dismiss Plaintiffs' claims under a creation of the risk theory should be denied.

**C. The United States is liable under South Carolina's negligence law for voluntarily undertaking to conduct background checks and issue denial of firearm sales for those prohibited by law from possessing a firearm.**

Plaintiff respectfully disagrees with the Court's prior holding that the United States is not liable in this case for its negligence under South Carolina law that one who volunteers to act for the benefit of others assumes the duty to carry forth those acts with due care. *See, e.g., Vaughn v. Town of Lyman*, 635 S.E.2d 631, 637-638 (S.C. 2006); *Miller v. City of Camden*, 494 S.E.2d 813, 815 (S.C. 1997); *Roundtree Villas Ass'n, Inc. v. 4701 Kings Corp.*, 321 S.E.2d 46, 51 (S.C. 1984); *Fickling v. City of Charleston*, 643 S.E.2d 110, 116-118 (S.C. Ct. App. 2007); *Crowley v. Spivey*, 329 S.E.2d 774, 780 (S.C. Ct. App. 1985). The Court's Order focused on the FBI and found that the FBI did not volunteer to conduct the background checks for gun purchases but instead is required to do so by law. (Dkt. No. 24). Respectfully, Plaintiffs advance for the Court's consideration that it is not whether the <u>FBI</u> volunteered to act but rather whether <u>the United States</u> voluntarily undertook actions for which it owed a duty to carry forth with due care.

It is the United States Federal Government that voluntarily enacted the Brady Act and its federal regulations that established the NICS and committed itself (the United States) to conducting the criminal background checks and maintaining the data integrity of the NICS operations. The United States is the Defendant here, properly so under the FTCA. No outside entity forced the United States to pass the Brady Act and its regulations and take on the responsibility for the background checks; the United States freely took on the responsibility due to the importance of the government acting in response to the national problem of firearm violence. That the United States delegated responsibility for actually carrying forth the background checks to one of its agencies does not negate the United States' volunteering the federal government to take on all that is required under the Brady Act and its regulations. *See Crowley*, 285 S.C. at 406,

44

329 S.E.2d at 780 (holding "that one who assumes to act, even though under no obligation to do so, may become subject to the duty to act with due care").

Accordingly, Plaintiff respectfully requests the Court reconsider its prior judgment to the contrary and find that the United States voluntarily undertook to conduct the NICS background checks and issue denials of firearm sales to those prohibited by law from receiving a firearm. Further, the United States failed to act with due care it conducting the background check of Roof and negligently failed to issue the denial of the firearm sale to him, proximately causing the deaths of the nine parishioners of Mother Emanuel Church.

III.    **<u>CONCLUSION</u>**

For the foregoing reasons, as well as those advanced in Plaintiff's prior brief in opposition to Defendant's earlier motion to dismiss, and for such reasons as well as may be advanced at any hearing held hereon Plaintiffs respectfully submit that Defendant's Motion to Dismiss should be DENIED.

Respectfully submitted,

By: /s/Gedney M. Howe, III
Gedney M. Howe, III (Fed Bar #1971)
Law Offices of Gedney M. Howe
P.O. Box 1034
Charleston, SC 29402
Phone: 843-722-8048
Fax: 843-722-2140
kleroy@gedneyhowe.com

Andrew J. Savage, III
Savage Law Firm
15 Prioleau St.
Charleston, SC 29401
Phone: 843-720-7470
Fax: 843-720-7478
andy@savagelaw.com
*Attorneys for Plaintiff*