# Exhibit A

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

### Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF SOUTH CAROLINA
 3                  CHARLESTON DIVISION
 4
 5   FELICIA SANDERS, Individually : CASE NO. 2:16-cv-2356-RMG
     and as Legal Custodian for   : Consolidated with
 6   K.M., a Minor         : 2:16-cv-2350; 2:16-cv-2351;
                           : 2:16-cv-2352; 2:16-cv-2354;
 7       Plaintiff         : 2:16-cv-2355; 2:16-cv-2357;
         v               : 2:16-cv-2358; 2:16-cv-2359;
 8                       : 2:16-cv-2360; 2:16-cv-2378;
     THE UNITED STATES OF AMERICA : 2:16-cv-2405; 2:16-cv-2406;
 9                       : 2:16-cv-2407; 2:16-cv-2409;
         Defendant       : and 2:16-cv-2746
10
11                  * * *
12           SUBJECT TO PROTECTIVE ORDER
13           Deposition of Jennifer Conley
14                  Volume I
15             Tuesday, June 13, 2017
16                  * * *
17
18   a witness herein, taken on behalf of the plaintiffs in
19   the above-entitled cause of action pursuant to subpoena
20   and the Federal Rules of Civil Procedure by and before
21   Diana L. Baker, Registered Professional Reporter and
22   Notary Public within and for the State of West Virginia,
23   taken at the Hilton Garden Inn, 606 Emily Drive,
24   Clarksburg, West Virginia 26301, commencing at 9:58 a.m.
```

### Page 2

```
 1   APPEARANCES:
 2
 3          On behalf of the Plaintiffs,
 4   Tyrone Sanders, Personal Representative of the Estate of
 5   Tywanza Sanders; Felicia Sanders; Felicia Sanders,
 6   individually and as legal custodian of K.M., a minor;
 7   Jennifer Pinckney, Personal Representative of the Estate
 8   of Clementa Pinckney; Jennifer Pinckney; and Jennifer
 9   Pinckney, Individually and as Parent, Natural Guardian,
10   and Next Friend of M.P., a minor; Polly Sheppard;
11   Walter B. Jackson, Personal Representative of the Estate
12   of Susie Jackson; Laura Moore, Personal Representative
13   of the Estate of Ethel Lance; Bethan Middleton-Brown,
14   Personal Representative of the Estate of DePayne
15   Middleton-Doctor; Anthony Thompson and Kevin Singleton,
16   as Co-Personal Representatives of the Estate of Myra
17   Singleton Quarles Thompson:
18          ALVIN HAMMER, Esquire
19          GEDNEY M. HOWE, III, Esquire
20   Law Offices of Gedney M. Howe, III, PA, 8 Chalmers Street,
21   Charleston, South Carolina 29401
22       Telephone: (843) 722-8048
23       Fax: (843) 722-2140
24   E-mail: ghowe@gedneyhowe.com; kleroy@gedneyhowe.com
```

### Page 3

```
 1   APPEARANCES (Cont.):
 2
 3          On behalf of the Plaintiffs,
 4   Tyrone Sanders, Personal Representative of the Estate of
 5   Tywanza Sanders; Felicia Sanders; Felicia Sanders,
 6   individually and as legal custodian of K.M., a minor;
 7   Polly Sheppard; Walter B. Jackson, Personal
 8   Representative of the Estate of Susie Jackson;
 9   Laura Moore, Personal Representative of the Estate of
10   Ethel Lance; Bethan Middleton-Brown, Personal
11   Representative of the Estate of DePayne
12   Middleton-Doctor; Anthony Thompson and Kevin Singleton,
13   as Co-Personal Representatives of the Estate of Myra
14   Singleton Quarles Thompson:
15          ANDREW J. SAVAGE, III, Esquire
16   Savage Law Firm, 15 Prioleau Street, Charleston,
17   South Carolina 29401
18       Telephone: (843) 720-7470
19       Fax: (843) 720-7478
20       E-mail: andy@savlaw.com
21
22
23
24
```

### Page 4

```
 1   APPEARANCES (Cont.):
 2
 3          On behalf of the Plaintiffs,
 4   Shalisa Coleman, as Personal Representative of the Estate
 5   of Sharonda Coleman-Singleton; Anthony Thompson; Anthony
 6   Thompson and Kevin Singleton, as Co-Personal
 7   Representatives of the Estate of Myra Singleton Quarles
 8   Thompson; Arthur Stephen Hurd, as Personal
 9   Representative of the Estate of Cynthia Graham Hurd; and
10   Arthur Stephen Hurd:
11          W. MULLINS McLEOD, JR., Esquire
12   McLeod Law Group, LLC, 3 Morris Street, Suite A,
13   Charleston, South Carolina 29403
14       Telephone: (843) 277-6997
15       Fax: (843) 277-6655
16       E-mail: mullins@mcleod-lawgroup.com
17           and
18          J. STEPHEN SCHMUTZ, Esquire
19   Schmutz & Schmutz, PA, 24 Broad Street, Charleston,
20   South Carolina 29401
21       Telephone: (843) 577-5530
22       Fax: (843) 577-9204
23       E-mail: steve@schmutzlaw.com
24
```

1 (Pages 1 to 4)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 5

1  APPEARANCES (Cont.):
2
3        On behalf of the Plaintiff,
4  Daniel Simmons, Jr., as Personal Representative of the
5  Estate of Daniel L. Simmons, Sr.:
6      JOSEPH C. WILSON, IV, Esquire
7  Pierce, Herns, Sloan & Wilson, LLC, The Blake House, 321
8  East Bay Street, Charleston, South Carolina 29401
9      Telephone: (843) 722-7733
10         Fax: (843) 722-7732
11     E-mail: joewilson@phsm.com
12
13
14        On behalf of the United States of
15  America:
16      STEPHEN R. TERRELL, Esquire
17  U.S. Department of Justice, Civil Division, Ben Franklin
18  Station, P.O. Box 888, Washington, DC 20044
19     Telephone: (202) 353-1651
20         Fax: (202) 616-5200
21     E-mail: stephen.terrell2@usdoj.gov
22
23        and
24

Page 6

1  APPEARANCES (Cont.):
2
3        On behalf of the United States of
4  America:
5      CHRISTOPHER R. DONOVAN, Esquire
6  U.S. Department of Justice, Civil Litigation Unit I,
7  1970 East Parham Road, Richmond, Virginia 23228
8      Telephone: (804) 627-4432
9         Fax: (804) 627-4591
10     E-mail: chris.donovan@ic.fbi.gov
11        and
12      JULIE BUMGARDNER, Esquire
13      ELISSA A. OKONIEWSKI, Esquire
14      VANESSA WELCH, Esquire
15  U.S. Department of Justice, 1000 Custer Hollow Road,
16  Clarksburg, West Virginia 26330
17     Telephone: (304) 625-2000
18         Fax: (304) 625-3944
19     E-mail: julie.bumgardner@ic.fbi.gov
20      elissa.okoniewski@ic.fbi.gov
21      vanessa.welch@fbi.gov
22
23  ALSO PRESENT:
24      Cheryl L. Savage - Savage Law Firm

Page 7

1          I N D E X
2  WITNESS                    PAGE
3  Jennifer Conley
4      Examination by Mr. Hammer................  8
5
6          E X H I B I T S
7                         PAGE
8  Conley Deposition Exhibit No. 1...............  64
9  Conley Deposition Exhibit No. 2...............  69
10  Conley Deposition Exhibit No. 3...............  73
11  Conley Deposition Exhibit No. 4...............  88
12  Conley Deposition Exhibit No. 5...............  99
13  Conley Deposition Exhibit No. 6............... 115
14  Conley Deposition Exhibit No. 7............... 115
15  Conley Deposition Exhibit No. 8............... 144
16
17
18
19
20
21
22
23
24

Page 8

1              * * *
2      JENNIFER CONLEY,
3  being first duly sworn, was examined and deposed as
4  follows:
5              * * *
6          E X A M I N A T I O N
7  BY MR. HAMMER:
8      Q.  I'm going to get you to state your full name,
9  please.
10      A.  Jennifer Conley.
11      Q.  Okay.
12          Ms. Conley, my name is Alvin Hammer, and I,
13  along with these other lawyers, are representing several
14  plaintiffs in some cases which I think you're aware of.
15          And I just want to start out by letting you
16  know that we understand this might be a little stressful
17  for you, and we're going to try and do everything we can
18  to keep the stress level down and, you know, to not go
19  into anything that we don't need to, but there will be
20  some areas that we do need to go into.
21      A.  Okay.
22      Q.  The other thing is, if during the deposition
23  you need a break or you need to -- whatever reason you
24  want to stop, whatever it is, just let me know.  We'll

2  (Pages 5 to 8)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 9

1  stop and adjourn for a few minutes or however long you
2  need, and then we'll come back.  So it's not -- it's not
3  an endurance test for you.  You've just got to let me
4  know when you want to do that.
5      A.  Okay.
6      Q.  The other thing is that I'm required to tell
7  you under our rules of court that I'm supposed to
8  instruct you that any questions you have are to be
9  directed to me and the people who are asking questions
10 rather than to counsel for the Government as far as any
11 clarification, definitions, explanations of any words,
12 or questions or documents that we might present during
13 the deposition.  Do you understand that and are you
14 willing to abide by that?
15     A.  Yes.
16     Q.  And by whom are you employed?
17     A.  The Federal Bureau of Investigation.
18     Q.  Okay.
19         And are you employed by one section of the --
20 or one division?
21     A.  CJIS.
22     Q.  All right.
23         And tell me what -- C-J-I-S?  Is that what it
24 is?

Page 10

1      A.  Yes.
2      Q.  And what does that stand for?
3      A.  I don't want to misspeak, so...
4      Q.  Well, I'll tell you what I think, and you can
5  tell me whether you think this is correct.  My
6  understanding is that it stands for Criminal Justice
7  Information Services.  Is that what your understanding
8  is, to the best of your knowledge?
9      A.  Yes.
10     Q.  Okay.
11         And my understanding is CJIS is a division of
12 FBI.
13     A.  Yes.
14     Q.  And tell me, is NICS a section of CJIS?
15     A.  Yes.
16     Q.  Tell me what you have done to prepare for your
17 deposition today.  For example, have you looked over any
18 documents or talked to any people in your office or
19 looked at any notes you may have or anything else to
20 prepare for your testimony today?
21     A.  I have not -- I have not looked at any notes.
22 I -- I did consult with my attorneys yesterday.
23     Q.  Anybody else?  Did you consult with any of
24 your supervisors at work?

Page 11

1      A.  No.
2      Q.  Okay.
3         When did you find out about this deposition?
4      A.  I'm not sure of the date.
5      Q.  Like a week or two ago or longer?
6      A.  I -- without a document, I -- I don't want to
7  state the date.
8      Q.  Okay.
9      A.  I know it's been probably a few weeks.
10     Q.  Okay.
11         And after you found out that your deposition
12 was being taken, did you talk to anybody at work about
13 it?
14     A.  I mean, clarify.
15     Q.  Well, I want -- did you speak to anyone to let
16 them know you were going to be deposed?
17     A.  Yes.
18     Q.  And who have you talked to?
19     A.  To my supervisor.
20     Q.  And who was that?
21     A.  Brett Antill.
22     Q.  Pardon me?
23     A.  Brett Antill.
24     Q.  And what was the substance of your

Page 12

1  conversation as best you can tell it to me?
2      A.  I just told them that I was -- received an
3  e-mail from Julie Bumgardner that I was going to have to
4  give a deposition.
5      Q.  Okay.
6         And did you-all discuss the topic of the
7  deposition or anything?
8      A.  They knew the case that was going to be --
9      Q.  Okay.
10         But did you discuss any of the details of the
11 case or any --
12     A.  No.
13     Q.  -- part of the case --
14     A.  No.
15     Q.  -- with your supervisor?
16     A.  No.
17     Q.  And how about any coworkers?  Have you
18 discussed it with any coworkers other than your
19 supervisor?
20     A.  My coworkers know that I had to do this
21 deposition, but, you know, as far as giving, you know,
22 information about the case, no.
23     Q.  Anything else that you have done other than
24 speak with your lawyers and what you've already told me

3  (Pages 9 to 12)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

## Page 13

1  to get ready for this deposition?
2    A.  No, I have not.
3    Q.  Okay.
4      Tell me what you understand the case is about
5  as best you understand it.
6    A.  Clarify the question.
7    Q.  Well, you understood you're giving the
8  deposition about this case.
9    A.  Yes.
10    Q.  What do you understand this case to be about?
11    A.  I'm not sure.
12    Q.  I mean, do you know what the plaintiffs, the
13  ones that are bringing the lawsuit, are claiming?
14    A.  No.
15    Q.  Do you know what the Government position in
16  response to whatever the claim is?
17    A.  No.
18    Q.  So you're here cold on this today.
19    A.  Yes.  Yes.
20    Q.  Okay.
21      Tell me a little bit about background on you.
22  Where are you from originally?
23    A.  I'm originally from Grafton, West Virginia.
24    Q.  Okay.

## Page 14

1      And is that close to Clarksburg?
2    A.  Yes.
3    Q.  So you grew up here?
4    A.  Yes.
5    Q.  Went to high school here?
6    A.  Yes.
7    Q.  Did you graduate?
8    A.  Yes.
9    Q.  When did you graduate?
10    A.  1991.
11    Q.  And tell me what your education has been since
12  1991.
13    A.  I went to WVU, West Virginia University.
14    Q.  Right.
15    A.  And have a bachelor's in finance and
16  management.
17    Q.  Okay.
18      And after that -- that would take you to about
19  1995?
20    A.  Correct.
21    Q.  And what did you do after 1995?
22    A.  I actually sold Kirby sweepers, and I was --
23  worked for Cell One as a telemarketer, and Sears Siding,
24  I was a telemarketer.

## Page 15

1    Q.  Okay.
2      And how long did you do that?
3    A.  Kirby sweepers, I lasted two weeks.  It was a
4  little heavy, so -- I didn't last very long with that.
5  And Cell One I stayed there, and Sears, I did both
6  part-time, until I got to the FBI in 1997.
7    Q.  Okay.
8      And so you've been with the FBI since 1997?
9    A.  Correct.
10    Q.  What have been your job titles and where have
11  you worked within the FBI?
12    A.  I was a fingerprint examiner.  That's what I
13  started out as.  I did fingerprints before.  It was
14  before even the system came about.  I had the little
15  glass where you looked at the fingerprint card and
16  classified.  That's what I started doing.  And then I
17  went -- in 2004 I went to NICS.
18    Q.  So was the fingerprint also in the CJIS
19  Division?
20    A.  Yes.
21    Q.  So --
22    A.  Yes.  It's just a different department.
23    Q.  Okay.
24      So CJIS has both fingerprint and NICS?

## Page 16

1    A.  Yes.
2    Q.  What else does CJIS have?
3      MR. TERRELL:  Objection.  Foundation.
4  You may answer to the extent of your knowledge.
5    A.  I can't answer that.
6  BY MR. HAMMER:
7    Q.  Okay.
8      If you don't know, that's a perfectly good
9  answer.  Okay?
10      Have you lived in this area your entire life?
11  I think you told me you had.
12    A.  Yes.
13    Q.  Okay.
14      And how far from Clarksburg is your home?
15    A.  20 minutes.
16    Q.  And how long have you lived at this residence
17  you're at now?
18    A.  Approximately probably ten years at my house.
19    Q.  At the same residence?
20    A.  Yes.  Yes.
21    Q.  And are you married?
22    A.  Yes.
23    Q.  And to whom are you married?
24      MR. TERRELL:  Objection.  Relevance.

4 (Pages 13 to 16)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 17

1  BY MR. HAMMER:
2      Q.  Unless he tells you not to answer, you have to
3  answer.
4          MR. TERRELL:  Yeah, you can answer.
5      A.  Is there...
6  BY MR. HAMMER:
7      Q.  Yeah.  I'm asking the questions, so you've got
8  to answer.
9      A.  Is there -- is it relevant?
10     Q.  It could be.  So tell me who you're married
11  to.
12     A.  Robert Conley.
13     Q.  Okay.
14         And how long have you-all been married?
15     A.  Since 2001.
16     Q.  Do you have any children?
17     A.  Yes.
18     Q.  And do your children live with you?
19     A.  Yes.
20     Q.  And how old are your children?
21     A.  13.  I have one.
22     Q.  One child.  Okay.
23     A.  Uh-huh.  I do have stepchildren, but they do
24  not live with me.

Page 18

1      Q.  Okay.
2          And what does your husband do for a living?
3      A.  He is a security guard.
4      Q.  Okay.
5          And where is he a security guard?
6      A.  At the Fairmont General Hospital.
7      Q.  In Clarksburg?
8      A.  Fairmont.
9      Q.  Fairmont.
10     A.  Uh-huh.
11     Q.  Okay.
12         Have you had any discussions with either any
13  of your children or your husband about your work at the
14  FBI?
15         MR. TERRELL:  Objection.  Vague.  You can
16  answer.
17     A.  Can you clarify, like...
18  BY MR. HAMMER:
19     Q.  I'm talking about -- about the events that
20  we're here to discuss today.
21     A.  He knows I had to come here today to give a
22  deposition.
23     Q.  Okay.
24         Did he know of your role in this case at all?

Page 19

1      A.  He knew that I worked the transaction.
2      Q.  Okay.
3          And how did he know that?
4      A.  We, actually -- I guess we -- you know, we
5  talked about me coming here today and why I had to come
6  here today.
7      Q.  And that was the first time you talked about
8  the transaction with him?
9      A.  Yes.
10     Q.  And when was that discussion held?
11     A.  It was when I found out that I had to do this.
12     Q.  Okay.
13         And tell me as best you can exactly what you
14  told him and what he told you.
15     A.  I don't recall the exact words.  I just told
16  him that I would have to give a deposition; it was
17  related to a transaction that I had worked.
18         He said, "Are you nervous?  Are you worried?"
19         And I said, "Yes, I'm nervous.  I've never had
20  to do this before.  You know, I was told I would never
21  have to do this."  "So," I said, "yes, my nerves are a
22  little, you know, shot, but, you know, I have to do it,
23  so..."
24     Q.  Did you-all discuss anything substantive about

Page 20

1  what your role was in the transaction?
2      A.  No.  No.
3      Q.  That's what I'm trying to find out.
4      A.  No.
5      Q.  And I think you already told me that you were
6  with the Fingerprint Division beginning in 1997?
7      A.  Correct.
8      Q.  And I was given an interview that says that,
9  so that's correct information.
10         And then I think it says you stayed in there
11  till around two-thousand --
12     A.  Four.
13     Q.  -- four?
14     A.  Correct.
15     Q.  And did you become a legal instrument examiner
16  in 2004?
17     A.  Yes.
18     Q.  What training did you have to become a legal
19  instrument examiner?
20     A.  This was a long time ago when I actually was
21  trained to -- I think it was a six-week course that we
22  had our -- you know, we had our training for six weeks.
23  We sat with examiners that already was doing the job for
24  training as well.

STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249
Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 21

1    Q.   Okay.
2         What exactly are your duties as a legal
3    instrument examiner?
4    A.   Clarify.
5    Q.   Well, do you have a job description?
6    A.   Legal instruments examiner.
7    Q.   Okay.
8         What does that consist of?  What do you do as
9    a legal instrument examiner?
10   A.   You work transactions.
11   Q.   Okay.
12        And what do you do in order to work the
13   transactions?
14   A.   Clarify.
15   Q.   Well, I'm trying to get the details.  Like,
16   you go in, you get a transaction.  What do you do when
17   you get the transaction?  What is the first thing that
18   you do?
19   A.   So the first step when you pull a transaction.
20   Q.   Right.
21   A.   You do an NTN inquiry.
22   Q.   Okay.
23        That's -- NTN means what?  National --
24   Number -- what is NTN?  Do you know what the initials --

Page 22

1    A.   NTN is what is assigned to the transaction.
2    Q.   Okay.
3         That's a number, NTN number?
4    A.   Yes.
5    Q.   Okay.
6         And then what do you do after you get that
7    number?
8    A.   Once -- once you pull the transaction, you'll
9    have that NTN.
10   Q.   Right.
11   A.   Okay.
12        The number that is assigned to that
13   transaction.
14   Q.   Right.
15   A.   Okay.
16        Then you work that transaction.  So the first
17   step was an NTN inquiry.
18   Q.   Okay.
19        And how do you do that?
20   A.   An NTN inquiry is when you -- you click on the
21   inquiry to see if there's any additional transactions
22   for that subject out there.
23   Q.   Okay.
24        And when you click on that transaction, where

Page 23

1    do you -- what do you -- what databases are you clicking
2    on?
3         MR. TERRELL:  Objection.  Vague.
4    A.   Yeah.  Clarify.
5    BY MR. HAMMER:
6    Q.   Well, what database -- what is it that you're
7    clicking onto when you click on the transaction?  What
8    comes up on your screen?
9    A.   I'm not sure how to answer.
10   Q.   Well, suppose it's somebody who has been
11   arrested and has -- has a lot of or some criminal
12   history, would that come up on the screen when you
13   click?
14   A.   The first information that you see is
15   their -- their name, date of -- their descriptors.
16   Q.   Okay.
17   A.   Okay.  That's what will pop up on the screen
18   when you pull the transaction.
19   Q.   Okay.
20   A.   At the bottom there is databases highlighted.
21   That would be hits that he would be in.
22   Q.   Okay.
23        What databases, for example, would be
24   highlighted?

Page 24

1    A.   III.
2    Q.   And what does III stand for?
3    A.   I don't know off the top of my head.
4    Q.   Okay.
5    A.   The III database contains FBI and state
6    records.
7    Q.   Okay.
8         And criminal records?
9    A.   Yes.
10   Q.   Is III Interstate Identification Index?
11   A.   Yes.
12   Q.   Okay.
13        So they have federal and state records in
14   that?
15   A.   Yes.
16   Q.   And is that pretty normal, the main database
17   that you look at?
18   A.   That is one of the databases that -- like I
19   said, it would be highlighted if he would hit on --
20   like, if he would have something out there, his name --
21   we go by descriptors.  So if there's a descriptor, like,
22   with him, it would hit on that -- the III would
23   highlight at the bottom of the screen.  So that's when I
24   know that there is an actual hit.

6 (Pages 21 to 24)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 25

1    Q.  Okay.
2        And there -- there's other databases that
3    you're supposed to check too -- is that correct? --
4    other than the III.
5        MR. TERRELL: Objection. Incomplete
6    hypothetical. You can answer.
7    A.  There is other databases, but, like I said,
8    they would be highlighted if the subject would hit upon
9    them.
10   BY MR. HAMMER:
11   Q.  Okay.
12       Are you required to check those other
13   databases?
14       MR. TERRELL: Objection. Vague.
15   Incomplete hypothetical. You can answer.
16   A.  Can you clarify the question?
17   BY MR. HAMMER:
18   Q.  I'm just asking you do you have any databases
19   that you're required to check?
20       MR. TERRELL: Same objection. You can
21   answer.
22   A.  It depends on the transaction. It depends on
23   what is needed.
24   BY MR. HAMMER:

Page 26

1    Q.  Okay.
2        What is the next step you do after you have a
3    hit?
4    A.  Like I said, I did the NTN inquiry which shows
5    to see if there's any additional hits, that he has any
6    other possible -- he's trying to purchase any additional
7    firearms. So that is an NTN inquiry. So that's what I
8    would check first.
9        Then the next step is I would look at to see
10   if it is a match, to see if the subject is a matching to
11   the record, because we get -- we only go by name
12   descriptors, so we do not have any other additional
13   information unless whatever they provide. So we based
14   on -- you know, that information is how we match the
15   record.
16       Once we match the record, we look through
17   their history, their state record or their -- if they
18   have an FBI record, federal record. Whatever they have
19   listed on that III, we look at it to see if there's any
20   disqualifiers.
21   Q.  Okay.
22       The interview summary that I was given says
23   that your primary responsibility is to research
24   transactions for Region II, which includes South

Page 27

1    Carolina?
2    A.  Correct.
3    Q.  And did you -- is that part of what you do is
4    research after you see there's a hit?
5    A.  Research, yes, because you're researching the
6    database to see what, you know, what kind of history
7    they have.
8    Q.  Okay.
9        And what -- what do you do to research?
10   That's what I'm asking in general. I'm not talking
11   about this case. We're going to get to this case later.
12   But I'm trying to see the scope of how you operate right
13   now. So tell me what -- what does your research consist
14   of? What do you do to research?
15   A.  Okay.
16       So I would check -- I would run his FBI record
17   to see if there's any additional charges, to see if --
18   the charges on his FBI record. Because what is usually
19   in the database is his state -- state South Carolina
20   record. Okay? So we run the FBI number just to make
21   sure there's no additional charges listed. That -- once
22   we do that, the state record has already responded, so
23   we don't have to run an NCIC, because NCIC is where you
24   would try to obtain a state record. We already have the

Page 28

1    state record on file. It's already on the computer.
2    Q.  Okay.
3    A.  So then we would check to see in our DD -- DDF
4    if there's any highlighted on that database.
5    Q.  Tell me what DDF is now.
6    A.  That's where -- I don't know the actual
7    acronym. That is where we keep things that have --
8    we've already received from agencies. It's the actual
9    documents that come in that we've had, maybe he's tried
10   to purchase before, that we've saved. We can save
11   actual information that we receive from agencies on
12   that.
13   Q.  Okay. And then --
14   A.  So if there's anything -- if that box would be
15   highlighted, I would check that -- that database.
16   Q.  Is the NICS Index also something that you
17   research? Isn't there a NICS Index?
18   A.  We have a NICS Index, yes.
19   Q.  Uh-huh. Do you look at that?
20   A.  If it's highlighted.
21   Q.  Okay.
22       Tell me what the NICS Index has.
23   A.  NICS Index is where we have people who are --
24   we go by the federal prohibitors, people who have felony

7 (Pages 25 to 28)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 29

1  convictions that is not on the record that we found in
2  other databases like the website, or, of course, come
3  back with us and told us that he has this additional
4  felony conviction. We have indictments. We put
5  indictments, people who have been indicted and who have
6  not had a court date as of yet, so they're still under
7  felony indictment. We have fugitive from justice;
8  people with warrants; we have controlled substance users
9  that we have -- that we go by federal law; we have
10 mental defective; dishonorable discharge, like, for
11 military; renounced citizenship; protection orders;
12 misdemeanor crime of domestic violence; so all the
13 prohibitors that we can enter into that database.
14     Q.   So you -- do you check that in a normal case
15 too?
16     A.   If it would be highlighted, yes.
17     Q.   Okay.
18         And if it's not highlighted?
19     A.   Then he's not in there.
20     Q.   Okay.
21         And the interview also says you pride yourself
22 on being a thorough examiner; is that a fair statement?
23     A.   I -- I work, yes. I do try to make sure that
24 I do every transaction correctly to the best of my

Page 30

1  knowledge.
2      Q.   Is the NICS -- I think you already said that
3  it's part of the FBI?
4      A.   Yes.
5      Q.   Okay.
6          And does it -- is it one of the functions to
7  make sure that handguns don't get into the wrong hands
8  to -- as part of your job?
9          MR. TERRELL: Objection. Foundation.
10 You can answer.
11     A.   Clarify the question.
12 BY MR. HAMMER:
13     Q.   Well, would you say that NICS is -- one of the
14 main things that it does is to save lives and protect
15 people from harm by not letting guns get into the wrong
16 hands?
17     A.   We have to -- we have to follow federal law.
18 We have to follow our SOPs. We follow the information
19 that -- the federal guidelines.
20     Q.   Okay.
21         What I'm asking is, is that one of the things
22 that -- sort of your mission is to make sure that you
23 protect people by not letting guns get into the wrong
24 hands?

Page 31

1          MR. TERRELL: Objection. Foundation.
2  Vague.
3      A.   Clarify.
4  BY MR. HAMMER:
5      Q.   Well, I'm just asking you, you're in the NICS
6  Section, and one of the missions that I understand is,
7  is to protect people from harm by not letting guns fall
8  into the wrong hands.
9          MR. TERRELL: Objection. Vague.
10 BY MR. HAMMER:
11     Q.   Is that correct?
12         MR. TERRELL: Foundation. You can
13 answer.
14     A.   We go by -- like I said, we have to follow the
15 federal law. We have to follow procedure.
16 BY MR. HAMMER:
17     Q.   I understand that. But I'm asking you a
18 specific question. Is that a correct understanding of
19 your -- of what NICS is set up to do?
20         MR. TERRELL: Objection. Foundation.
21 BY MR. HAMMER:
22     Q.   That's a "yes" or "no," and then you can
23 explain. If you don't know, you can say you don't know.
24     A.   I don't know.

Page 32

1      Q.   Okay.
2          You talked about SOPs just a minute ago.
3      A.   Yes.
4      Q.   Is that Standard Operating Procedures?
5      A.   Yes.
6      Q.   Are those mandatory, those things that you
7  have to follow?
8      A.   Yes.
9      Q.   What are the responses that you can give once
10 you've -- is there any more research that you can tell
11 me that you -- you do on these transactions?
12         MR. TERRELL: Objection. Vague.
13 Incomplete hypothetical.
14     A.   Clarify.
15 BY MR. HAMMER:
16     Q.   Well, I'm asking you what research you've
17 done. You've told me about some of it. I'm asking you
18 is there other research that you do on these
19 transactions?
20     A.   We do if there is websites that we have
21 actually been approved that we can research for certain
22 states.
23     Q.   Okay.
24     A.   So we -- I did check the website for South

8 (Pages 29 to 32)

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

## Page 33

1  Carolina.
2  Q.  Okay.
3  A.  We do have a website.
4  Q.  Okay.
5  And is there any other research that you can
6  do?
7  A.  Clarify.
8  Q.  Well, you've given me -- you just said you
9  have a website.
10  A.  Correct.
11  Q.  And I don't know what you do, so I'm asking
12  you, is that all of it or is there more?  If there's
13  more, you've got to tell me what it is.
14  A.  I already ran through the other databases.
15  Q.  I understand.  I'm not talking about what
16  you've already told me.  I'm talking about anything
17  else.
18  A.  After the website?
19  Q.  Yes.
20  A.  Then we would fax out for information.
21  Q.  Okay.
22  Is that part of your research?
23  A.  Yes.
24  Q.  Okay.

## Page 34

1  And then what do you do when you get the fax
2  response back?
3  A.  I would document into the transaction.
4  Q.  Okay.
5  What is the purpose of faxing out for
6  information?  What are you looking for?
7  A.  It depends on the charge.
8  Q.  Okay.
9  Give me "for examples," just --
10  MR. TERRELL:  Number four?
11  MR. HAMMER:  No.  For example.
12  BY MR. HAMMER:
13  Q.  Give me an example of what you're talking
14  about.
15  MR. TERRELL:  Objection.  Relevance.  You
16  can answer.
17  A.  For instance, if you had a charge of DUI.
18  BY MR. HAMMER:
19  Q.  Right.
20  A.  I would fax out for the incident report to
21  obtain the incident report to see if it was alcohol or
22  drug related.  I would try to get the disposition.  In
23  some states you would need the conviction level for
24  that -- for that charge.

## Page 35

1  Q.  So when you get some charge that you're
2  unclear about whether it's a prohibitor or not --
3  A.  Correct.
4  Q.  -- what you do is research by trying to obtain
5  information from wherever you can obtain it from; is
6  that fair?
7  MR. TERRELL:  Objection.  Vague.
8  A.  Clarify.
9  BY MR. HAMMER:
10  Q.  Well, what do you -- do you try and obtain
11  information to make a final determination when you --
12  when you have a question?
13  A.  When I actually need to research?
14  Q.  Yes.
15  A.  Yes.
16  Q.  Okay.
17  Anything else in research that you do?
18  A.  Clarify.
19  Q.  Well, if you don't -- can't think of anything
20  right now, just tell me you can't.
21  A.  Okay.  I don't -- I don't know.
22  Q.  Okay.  That's okay.
23  A.  Okay.
24  Q.  After you do your research, are you trying to

## Page 36

1  get a final answer to whether or not the transaction
2  should go forward or be delayed or --
3  A.  Denied.
4  Q.  -- or denied?
5  A.  Yes.
6  Q.  Is that what you're looking for from your
7  research?
8  A.  Yes.
9  Q.  Okay.
10  And when do you decide that it's proper to go
11  forward and allow the transaction?
12  A.  Clarify.
13  Q.  Well, what is your understanding of what the
14  rules are or the regulations that allow you to issue a
15  "proceed" on a transaction, or do you know?
16  A.  If I would get a dismissal, then it could be a
17  "proceed."
18  Q.  Okay.
19  And do you know when it's proper to give a
20  "delayed" response?
21  A.  It is in "delay" when I receive it.
22  Q.  Okay.
23  And when you receive it, it's already in
24  "delayed"?

9  (Pages 33 to 36)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 37

1  A.  Yes.
2  Q.  And do you keep it in "delayed"?
3  A.  Yes.
4  Q.  Okay.
5      So you don't make the determination to delay
6  or not.  You didn't make that determination.
7  A.  Correct.
8  Q.  Okay.
9      And do you know when it's proper to give a
10 "denied" response?
11 A.  Yes.
12 Q.  So when it comes to you, it's in "delayed,"
13 and your objective is either to get it into "approved"
14 or "denied"?
15 A.  Correct.
16 Q.  Is that correct?
17 A.  Correct.
18 Q.  And that's what the research is for?
19 A.  Correct.
20 Q.  And when do you deny it?  Under what
21 circumstances would you give a denial?
22 A.  When it would meet one of the federal
23 prohibitors.
24 Q.  Okay.

Page 38

1      And I think you said you have access to the
2  NCIC database?
3  A.  Yes.
4  Q.  And to the III database?
5  A.  Yes.
6  Q.  And to the NICS Index database?
7  A.  NICS Index, correct.
8  Q.  Is that a separate database?
9  A.  It's -- it's still all part of where -- I
10 mean, there's -- NICS Index is where they put the, like
11 I said, the denied people, the ones that are -- would
12 be, like, already have a deny of some sort.  That's why
13 they would be in NICS Index.
14 Q.  They would be in NICS Index if they were
15 already denied?
16 A.  Yes.
17 Q.  And who maintains the NICS Index?
18     MR. TERRELL:  Objection.  Foundation.
19 BY MR. HAMMER:
20 Q.  Is that a CJIS-maintained index?
21     MR. TERRELL:  Objection.  Foundation.
22 You can answer.
23 A.  It's part of NICS.
24 BY MR. HAMMER:

Page 39

1  Q.  Okay.
2      And is NICS part of CJIS?
3  A.  Yes.
4  Q.  And so CJIS maintains that database?
5  A.  The NICS Index?
6  Q.  Yes.
7  A.  Yes.
8  Q.  Okay.
9      And does that mean the FBI maintains it?
10     MR. TERRELL:  Objection.  Foundation.
11 A.  I -- I don't know.
12 BY MR. HAMMER:
13 Q.  Well, CJIS is a section of the FBI.
14 A.  Right.  So, yes.
15 Q.  Do you know what the N-DEx database is?
16 A.  No.
17 Q.  Ever heard of that?
18 A.  No.  I have heard of it, but I -- I do not
19 know anything about it.
20 Q.  Okay.
21     What did you hear about it?  Where have you
22 heard about it?
23 A.  I just heard that -- that there was something
24 that we was going to look into after the inspection.

Page 40

1  Q.  When did you hear that?
2  A.  It was -- it was during the inspection.  I
3  don't recollect, but I know that it was something that
4  was brought up.
5  Q.  What inspection are you talking about?
6  A.  We had an inspection.  I -- I'm not sure
7  how -- how late after all this had happened.
8  Q.  You mean an inspection about this transaction
9  that we have with Dylann Roof?  Was that --
10 A.  I think the inspection was for the overall
11 of -- of NICS.
12 Q.  So it really wasn't geared to that.  It was
13 just a regular inspection?
14 A.  I -- I can't answer that.
15 Q.  Okay.
16     Were you interviewed during that inspection?
17 A.  Yes.
18 Q.  Okay.
19     When did you first hear about the shooting at
20 Mother Emanuel church?  Do you know?
21 A.  Clarify.
22 Q.  Did you hear about the shooting in Charleston,
23 South Carolina, where people were killed at the church?
24 A.  I know that it happened.

10  (Pages 37 to 40)

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 41

1    Q.   Okay.
2         When did you first hear about that, best you
3    can remember?
4    A.   I really -- I don't remember.
5    Q.   Okay.
6         When you first heard about it, what exactly
7    came to your mind?
8    A.   I thought it was terrible.
9    Q.   And when did you realize that the gun used in
10   that shooting was -- was one on which you had performed
11   the background check?
12   A.   I don't remember the date when someone had
13   told me. I don't remember.
14   Q.   Okay.
15        Was it shortly after the shooting or long
16   after the shooting?
17   A.   I don't remember.
18   Q.   And you didn't realize you had done it;
19   someone else told you that you had done the check?
20   A.   Correct.
21   Q.   Who was it that told you?
22   A.   I don't remember.
23   Q.   I mean, was it somebody at work, one of your
24   supervisors?

Page 42

1    A.   I really -- I don't remember when -- like I
2    said, that was so long ago I really don't remember. I
3    don't want to give names because I don't know.
4    Q.   Okay.
5         What was -- which SOPs do you follow? Can you
6    give me some idea about what your SOPs require you to
7    do?
8         MR. TERRELL: Objection. Vague.
9    A.   Yeah. Clarify.
10   BY MR. HAMMER:
11   Q.   Well, you said -- you said -- you told me that
12   there are certain SOPs that are mandatory, that you're
13   required to follow those.
14   A.   We have a lot of SOPs.
15   Q.   Okay.
16   A.   I pull them up when I -- because I couldn't --
17   I couldn't tell you offhand.
18   Q.   Okay.
19        What was your role in the Dylann Roof
20   background check?
21   A.   Clarify.
22   Q.   Well, I want to know --
23   A.   I worked the transaction.
24   Q.   You worked the transaction. So did

Page 43

1    you -- were you following standard operating procedures
2    when you were working that transaction?
3    A.   Yes, I did.
4    Q.   To the best of your knowledge?
5    A.   Yes.
6    Q.   Okay.
7         And what I'm asking you is what standard
8    operating procedures governed what you did in that
9    transaction?
10        MR. TERRELL: Objection. Foundation.
11   You can answer.
12   A.   Clarify the question.
13   BY MR. HAMMER:
14   Q.   Well, if you don't know, just tell me. I
15   don't know that -- you said there's a lot of them.
16   A.   I don't have the SOPs in front of me. I
17   don't -- like I said, I can't honestly answer that
18   without having them.
19   Q.   Okay. We'll get to that later, then.
20        Do you remember what you -- what you did
21   generally in that transaction?
22   A.   Every transaction I do an NTN inquiry. I look
23   to see if it's a match. I -- I looked at the databases
24   to see what's highlighted, to see what he has hit on. I

Page 44

1    like to see if he has any criminal charges that need
2    researched.
3    Q.   You had an interview about this transaction,
4    though, with the Inspection Division later, didn't you?
5    A.   It was -- it was -- yes. It was -- it was
6    questioned.
7    Q.   Okay.
8         And do you remember what you told them you
9    did?
10   A.   I -- I went through the steps like I told you
11   of what I -- step by step of the transaction.
12   Q.   Did you -- did you remember contacting the
13   Lexington County Sheriff's Department? Do you remember
14   telling them you did that, or you don't remember that?
15   A.   If that was the arresting agency that was on
16   the transaction, then that's who I contacted.
17   Q.   Does the SOPs require you to contact the
18   arresting agency?
19   A.   It depends on the information that is
20   required.
21   Q.   Okay.
22        If you have a hit that shows something
23   potentially prohibiting, are you required to contact the
24   arresting agency?

11 (Pages 41 to 44)

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 45

1    A.   It depends on the charge and what I'm looking
2    for.
3    Q.   Okay.
4         Say it's a felony.
5    A.   If they have disposition information, then I
6    would contact the agency.
7    Q.   But you wouldn't know that until you contacted
8    them; right?
9    A.   Our information that we have -- our
10   information pages usually list or our contact list
11   usually lists what the agencies will have.
12   Q.   Okay.
13        I think we've gone over some of these things,
14   and I just want to confirm with you.  You tell me
15   whether this is a correct statement:  NICS receives
16   requests for background checks on potential buyers from
17   firearm dealers.  Is that correct?
18   A.   Can you say that again?
19   Q.   NICS receives requests for background checks
20   on potential buyers from the firearms dealers.
21   A.   Yes.
22   Q.   NICS searches its databases, the databases it
23   maintains, for matching information.
24   A.   So, clarify, like...

Page 46

1    Q.   As to the person who --
2    A.   To make sure it's a match.
3    Q.   Yeah.  Is that correct?
4    A.   Correct.
5    Q.   And then you provide one of three possible
6    responses to the dealer, either proceed, delayed, or
7    denied.
8    A.   Correct.
9    Q.   Is that correct so far?
10   A.   Uh-huh.
11   Q.   And I think you said you were assigned to the
12   Roof transaction.
13   A.   I pulled it from the delay queue, yes.
14   Q.   Do you remember that he was listed as having
15   been arrested on a felony drug charge?
16   A.   I don't remember.  I have not seen the case.
17   Q.   Okay.
18   A.   I -- so unless I would see the actual case
19   report, like, the actual transaction --
20   Q.   Okay.
21   A.   -- I can't state.
22   Q.   Okay.
23        And you don't remember whether it was
24   Lexington County Sheriff's Office or another office was

Page 47

1    listed?
2    A.   I mean, it was in 2015, so, like I said, if
3    I -- I -- we do not -- I do not -- I did not keep
4    anything of this.  This -- you know, this was -- we
5    don't keep transactions, like, documents and stuff like
6    that.
7    Q.   I'll get to this more specifically later.  I
8    just want to know right now if you remember any of these
9    things just from having talked to the examiner or
10   anything else.  Do you remember that you were told to
11   check with the Columbia Police Department to get the
12   report?
13   A.   I received a fax back, and it -- and I
14   remember it saying Columbia PD.  I went to my contact
15   list for Lexington County.  We had a West Columbia PD
16   listed, so I faxed out to that agency.
17   Q.   And you actually were told to go to the
18   Columbia police, and you faxed out to the West Columbia
19   police?
20   A.   Like I said, in Lexington County, that was the
21   actual county that was listed on his record that -- so a
22   lot of time the agencies will just write, you know, to
23   the point, you know, they don't write a lot of
24   information, you know, so they -- you know, they didn't

Page 48

1    tell me that it was in a different county.  They just
2    wrote "Columbia."  So by my contact list, I went to West
3    Columbia PD because that was the closest thing that I
4    had in that county.  That is why I went there.
5    Q.   Okay.
6         And you found that they had no record of
7    Roof's arrest from West Columbia; is that correct?
8    A.   I don't remember the response, if I got a
9    response from them.
10   Q.   If you got a response and it said it
11   was -- there was no record of his request, would that
12   surprise you?
13   A.   No.
14   Q.   Okay.
15        And do you remember anything else you did
16   after you got that record of no -- had no record of his
17   report from the arrest from the West Columbia Police
18   Department?
19   A.   Like I said, I don't remember if I received a
20   response or not.
21   Q.   Okay.
22        Do you remember anything else about the case
23   other than what we just talked about?
24   A.   Without looking at the case history, I would

12 (Pages 45 to 48)

**STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249**
**Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA**

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 49

1    not want to...
2        Q.    Do you remember anything else that was going
3    on that day or anything else, any other cases you were
4    working on?
5        A.    No.
6        Q.    Was it a pretty normal, routine time?
7        A.    It was just -- I mean, a normal day is you
8    pull a transaction, you work it, you go to the next
9    transaction.
10       Q.    Do you know whether the NICS Section is a
11   criminal justice -- is a -- I'm sorry.  Withdraw the
12   question.  I'll just ask you some others.
13           You don't know anything about the N-DEx
14   system --
15       A.    No.
16       Q.    -- data system?
17           Did you hear anything about it after -- after
18   the fact that they had an incident report from the
19   Columbia police in the N-DEx database?  N-D-E-x.
20       A.    I don't remember.
21       Q.    Have you ever heard that?
22       A.    I have heard of -- like I said, I know that
23   after this had happened, that someone had brought up the
24   N-DEx, about possibly if NICS could get this.

Page 50

1        Q.    "Somebody" being who had brought it up?
2        A.    I don't -- I don't remember.  I just know that
3    I remember hearing about it, but I can't give names.  I
4    don't remember.
5        Q.    All right.
6            Was it at work you heard about it?
7        A.    Yes.
8        Q.    Okay.
9            So it was somebody who worked with you?
10       A.    Like I said, I just -- I remember talk
11   about -- about the NICS Index -- or N-DEx, but I don't
12   remember exactly.  Like I said, I don't remember who
13   said what.
14       Q.    Was the talk -- did the talk say the N-DEx
15   system is developed and managed by the FBI's CJIS
16   Division, as best you know?
17       A.    The N-DEx?
18       Q.    N-D-E-x.
19       A.    I don't know.
20       Q.    You don't know?
21       A.    I don't --
22       Q.    You didn't hear that?  You said you heard
23   talk.  I'm trying to hear what you're trying --
24       A.    Like I say, I just know after that they were

Page 51

1    trying to see if we could obtain this database.
2        Q.    Okay.
3            Let me ask you something.  When you heard that
4    talk -- this is a specific question -- did you hear that
5    the N-DEx system is managed by the CJIS?
6        A.    No, I didn't hear that.
7        Q.    If it was managed by the CJIS, is there any
8    reason that NICS, being a section of CJIS, could not get
9    that?
10           MR. TERRELL:  Objection.  Foundation.
11       A.    I can't answer that.
12   BY MR. HAMMER:
13       Q.    Is that something you just don't know?  It's
14   beyond your knowledge?
15       A.    Correct.
16       Q.    Okay.
17           Do you know anything more about the N-DEx
18   system?  For example, did you know that it has
19   information available that would not be contained in the
20   NCIC or the III?
21       A.    I -- I think that when someone said about
22   introducing, that they would have additional reports and
23   information.
24       Q.    Was your understanding they would have the

Page 52

1    records and N-DEx would include the incident or case
2    reports?
3        A.    It just -- yeah.  It would be, like,
4    additional police reports.
5        Q.    Okay.
6            What is the regional POC database?  Do you
7    know what that is?
8        A.    Clarify.
9        Q.    Well, in the interview I think it says you
10   checked the regional POC database is what the
11   interviewer said.  Do you know what that means?
12       A.    No.
13       Q.    Do you know what that is?
14       A.    No.
15       Q.    There's a NICS Index team.  Do you know what
16   that is?
17       A.    NICS Index team?
18       Q.    Yes.
19       A.    Yes.
20       Q.    Who is that?  Or what is that?
21       A.    NICS Index is where, like I said before about
22   the federal prohibitors being in the database, that
23   the -- it would enter someone who would have, like I
24   said, a felony conviction that may not be on the record,

13  (Pages 49 to 52)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

## Page 53

1    additional information we found from a court
2    that -- that we need to put into the system that would
3    not normally be there.
4        Q.  Okay.
5            Is it against the law for certain people to
6    have -- to obtain a firearm?
7            MR. TERRELL:  Objection.  Calls for a
8    legal conclusion.  Foundation.
9        A.  Yeah.  I can't answer that.
10   BY MR. HAMMER:
11       Q.  As far as you know?
12           Are there certain prohibitors that you would
13   prohibit someone from obtaining a firearm, if you found
14   out it wouldn't go through?
15       A.  If they had one of the federal prohibitors
16   prohibiting them.
17       Q.  It would make it illegal for them to have a
18   gun?
19       A.  Yes.
20       Q.  So that would make it against the law to have
21   a gun if they had one of the federal prohibitors?
22           MR. TERRELL:  Objection.  Calls for a
23   legal conclusion.  Foundation.
24   BY MR. HAMMER:

## Page 54

1        Q.  Is that correct?
2        A.  Clarify.
3        Q.  Well, you just told me that if there's a
4    federal prohibitor, it would be illegal --
5        A.  If they actually have a conviction.
6        Q.  Yes.  If they have a federal prohibitor.  Some
7    of them are not convictions.  Like users of drugs, you
8    don't need a conviction for that.
9        A.  That would be -- that is something different.
10       Q.  Okay.
11           But that's one of the prohibitors, isn't it?
12       A.  The -- for -- for drugs?
13       Q.  Yes.
14       A.  Yes.  But there's stipulations.  Like I said,
15   you would have to have -- follow the federal -- federal
16   law, the SOPs, and...
17       Q.  And what I'm asking you, those are criminal
18   justice violations, criminal law violations, if somebody
19   tries to obtain a gun or obtains a gun that is
20   prohibited from obtaining a gun.  In other words, a
21   felon who obtains a gun, that's illegal; right?
22           MR. TERRELL:  Objection.  Calls for a
23   legal conclusion.  Foundation.
24       A.  Yeah.  I -- I mean, I can't answer.  If I

## Page 55

1    didn't know that they had a felony conviction --
2    BY MR. HAMMER:
3        Q.  No, but I'm just saying if they did have a
4    felony conviction and they obtained a gun, is that
5    illegal?
6            MR. TERRELL:  Objection.  Calls for a
7    legal conclusion.  Foundation.
8            MR. McLEOD:  Mr. Terrell, just -- I'm not
9    fussing, but under our rules, you can't make speaking
10   objections.  And under our rules, if we agree as
11   opposing counsel that any objection you have other than
12   privilege is not waived, which we are all agreeing, then
13   all your objections are not waived except for privilege.
14   There's no need to state your objection.  I'm just
15   giving you a little caution before I start asking
16   questions.
17           MR. TERRELL:  I understand.
18           MR. McLEOD:  Okay.  Good.
19           MR. TERRELL:  I can't make speaking -- I
20   agree.  This is not a speaking objection.
21           MR. McLEOD:  Good.
22           MR. TERRELL:  I'm providing the basis for
23   my objection.  Calls for a legal conclusion.
24           MR. HAMMER:  All you have to do is just

## Page 56

1    say, "Object."
2            MR. HOWE:  You don't have to provide --
3            MR. HAMMER:  You don't have to provide
4    the basis.
5            MR. McLEOD:  What I'm telling you is all
6    of your objections, okay, belong to you and they are not
7    waived because we agree that they aren't waived.  So the
8    "object to the form of the question" is the only proper
9    objection.
10           MR. TERRELL:  Well, this is a form
11   objection.
12           MR. WILSON:  Well --
13           MR. HAMMER:  You can say, "Object to the
14   form," but that's all you have to say.
15           MR. McLEOD:  We can keep going.  I'm just
16   giving you warning before I start asking.
17           MR. WILSON:  Let me just clarify because
18   our local rules specifically state that you're not
19   supposed to make any sort of objection that suggests an
20   answer to the witness.  And I am going to -- yeah, I
21   mean, I'm going to start --
22           MR. McLEOD:  And that's Local Rule
23   30.4 -- 30.04.
24           MR. WILSON:  And I'm sure that's a

14 (Pages 53 to 56)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 57

1  commonly adopted local rule.
2  BY MR. HAMMER:
3      Q.  So let me ask you this:  Is it a crime for a
4  felon to have a gun?
5          MR. TERRELL:  Objection to form.
6      A.  Legally, if he has a felony conviction, then
7  he would be -- he would be denied.
8  BY MR. HAMMER:
9      Q.  Okay.
10      A.  Unless -- unless he would have restoration of
11  rights.
12      Q.  Okay.
13          But under one of the prohibitors that you
14  have, if any of those prohibitors are found to exist,
15  then it's illegal for the person who is trying to obtain
16  a gun to obtain it; is that correct?
17          MR. TERRELL:  Objection.  Vague.
18      A.  I'm going to say clarify.  I want to make sure
19  that I'm answering correctly.
20  BY MR. HAMMER:
21      Q.  Okay.
22          There's certain prohibitors that you look for
23  when you're doing your search.
24      A.  Correct.

Page 58

1      Q.  Okay.
2          If you find one of those prohibitors, does it
3  prohibit the person who is trying to get the gun from
4  getting the gun?
5          MR. TERRELL:  Objection.  Foundation.
6      A.  It depends on, like I said, the information
7  that I find.
8  BY MR. HAMMER:
9      Q.  Okay.
10          If you find that one of the prohibitors
11  exists --
12      A.  If I actually have where the subject has been
13  convicted or if the subject is under indictment or if
14  the subject has firearm restrictions, if the subject
15  would have a positive drug test, it depends on what the
16  situation -- what the charge, what the situation is.
17      Q.  Okay.
18          But certain things are prohibited.  You would
19  deny the transaction if you found these prohibitors?
20      A.  If -- if I had had the actual documentation
21  from the court saying that he does have a felony
22  conviction, yes, I would deny it.
23      Q.  Okay.
24          And some of the things don't even require

Page 59

1  conviction.
2      A.  Correct.
3      Q.  Okay.
4      A.  The -- the actual federal prohibitor for
5  Number 3, which is drugs --
6      Q.  Right.
7      A.  -- for inference, current inference --
8      Q.  Right.
9      A.  -- you can deny on within the past year.
10      Q.  And what I'm asking you is, is that a criminal
11  law violation for the person to get a gun if they're
12  prohibited?
13          MR. TERRELL:  Objection.  Foundation.
14      A.  Legally, I can't --
15  BY MR. HAMMER:
16      Q.  You don't know whether that is or not?
17      A.  Huh-uh.
18      Q.  Is that what you're saying, you don't know?
19      A.  I don't know.
20      Q.  Okay.
21          Well, is NICS a criminal justice agency?  Do
22  you know that?
23      A.  I -- clarify.
24      Q.  Well, do you know what a criminal justice

Page 60

1  agency is?
2      A.  I don't know.
3      Q.  Okay.
4          Do you know the Code of Federal Regulations
5  requires you to undertake some actions when you're doing
6  a search of the databases?
7          MR. TERRELL:  Objection.  Vague.
8  BY MR. HAMMER:
9      Q.  Are you familiar with that?
10      A.  I need clarification.
11      Q.  Do you -- are you familiar with any of the
12  Code of Federal Regulations which apply to your work?
13      A.  I don't -- I don't know.
14      Q.  Okay.
15          So you're not familiar with them?
16      A.  I -- I don't know what you're asking.
17      Q.  Okay.
18          Well, the Code of Federal Regulations says
19  you're required to search certain databases.  Did you
20  know that?
21      A.  Like I said, I follow our procedures, our
22  standard operating procedures, so that's what I go by.
23      Q.  So you don't follow the Code of Federal
24  Regulations?

15 (Pages 57 to 60)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 61

1    A.   I don't know if that's the same thing.  I
2    don't know.
3    Q.   Do you search the NICS database, the NCIC, and
4    the III in each transaction for -- to find any matching
5    records?
6    A.   I -- I already stated that if the database is
7    highlighted, that I would check that database to see if
8    it is a match.
9    Q.   Do you issue a denial when at least one
10   matching record is found in either the NICS Index, NCIC,
11   or III that provides information demonstrating that
12   receipt of a firearm by the prospective transferee would
13   violate 18 U.S.C. 922?
14        MR. TERRELL:  Objection.  Foundation.
15   A.   Can you -- can you --
16   BY MR. HAMMER:
17   Q.   I can repeat the question.
18   A.   Yeah.  Okay.
19   Q.   Do you issue a denial when at least one
20   matching record is found in either the NICS Index, NCIC,
21   or III that provides information demonstrating that the
22   receipt of a firearm by the prospective transferee would
23   violate 18 U.S.C. 922?
24   A.   If he is an actual match to one of the

Page 62

1    databases, that actually would prohibit him.  As far as,
2    like, NICS Index, if he was a match to NICS Index, then
3    he would be denied.
4    Q.   How about if he was a match to NCIC or III?
5    A.   NCIC is -- usually, further information is
6    needed.  That's where your warrants, your protection
7    orders, probation, sexual offenders, that's usually
8    where those pop up.  So you would have to have
9    additional information if it was on one of those -- on
10   that database.
11        III, now, if he has an actual conviction on
12   his III record that would prohibit him, then, yes, he
13   could be denied.
14   Q.   Okay.
15        In your research that you do, do you
16   understand that you're required to make every effort to
17   obtain the necessary information in order to reach a
18   final disposition on a NICS transaction in the research
19   phase?
20   A.   Yes.
21   Q.   You do?
22   A.   (Moves head up and down.)
23   Q.   And do you understand that making every effort
24   would at least make it mandatory that you check the

Page 63

1    available databases -- the databases that are available
2    to obtain the necessary information in order to reach a
3    final decision on the NICS transaction?
4         MR. TERRELL:  Objection.  Vague.
5    A.   The -- the actual databases that we are --
6    that we are required, that we have access to, that would
7    be relevant to the -- to that -- to that transaction,
8    yes.
9    BY MR. HAMMER:
10   Q.   So you're required to check the available
11   databases relevant to the transaction?
12   A.   That we have access to.
13   Q.   Okay.
14        MR. HAMMER:  Can you get me page 282,
15   please.
16   BY MR. HAMMER:
17   Q.   I'm going to show you what has been provided
18   to us by the Government as FBI-00000282.  Would you take
19   a look at that for me?  Take a minute to read it.
20        MR. TERRELL:  I would ask that the
21   witness be provided the complete document.
22        MR. HAMMER:  Well, I'm asking the
23   questions, and if she wants the complete documents,
24   we'll get her the complete documents, but I've got a

Page 64

1    question about that page.
2    Q.   Okay.
3    BY MR. HAMMER:
4    Q.   And is that part of SOP Number 5.5.5 that I
5    just showed you?
6    A.   Yes.
7         MR. HAMMER:  Can we mark that as Exhibit
8    Number 1, please.
9                    * * *
10        (Whereupon, Conley Deposition Exhibit
11   No. 1 marked for purposes of identification.)
12                    * * *
13   BY MR. HAMMER:
14   Q.   Is that one of the SOPs that you're required
15   to follow?
16   A.   Yes.
17   Q.   Okay.
18        And I'm going to get you some more pages to go
19   behind that.
20        MR. HAMMER:  Let's get page 20, 41, 45.
21   I might have them already here for you.
22                    * * *
23        (Whereupon, a discussion was held off the
24   record.)

16  (Pages 61 to 64)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 65

1              * * *
2    BY MR. HAMMER:
3        Q.  I want you to take a look at these documents.
4    FBI-41, 45, 46, 48, 49, 82, 83, and 84.  (Tendered)
5              MR. WILSON:  382, 383, and 384.
6              MR. HAMMER:  That's it.  I'm sorry.
7    BY MR. HAMMER:
8        Q.  Do you recognize that package?
9        A.  I recognize the website, South Carolina
10   website.
11       Q.  Give me the page number.
12       A.  41.
13       Q.  Okay.
14       A.  This is the website that I had found the
15   subject -- the case -- the status was pending.
16       Q.  Okay.  All right.  Go to the next page.
17       A.  This was the --
18       Q.  Page number?
19       A.  45.  Lexington County Sheriff.  This was our
20   fax out to the sheriff's office.
21       Q.  Right.
22       A.  46 was the response back --
23       Q.  Right.
24       A.  -- from the sheriff's office.

Page 66

1        Q.  Right.  Next page.
2        A.  West Columbia PD, 48.  It was a fax received
3    back from them.
4        Q.  It was a fax sent to them too; right?
5        A.  Yes.
6        Q.  And they received back?
7        A.  Yes.  And I received back.
8        Q.  Keep going.  49 is -- what's the next page?
9    You just skipped over a page.
10       A.  It was just the same, the 49.
11       Q.  49?
12       A.  Yeah.  With the response back, yes.
13       Q.  Okay.
14       A.  I don't know.  Is it 382?
15       Q.  Yes.  Just look at all 382, 383, and 384
16   together.
17       A.  Okay.  I would say this is a screenshot of the
18   "Waiting for Dispo-."
19       Q.  Okay.
20           Where it shows -- if you look on -- what
21   number are you on now?
22       A.  This was 384.
23       Q.  All right.  384.  It looks like, on the
24   right-hand side, the agency that you'd sent some faxes

Page 67

1    to?
2        A.  Yes.
3        Q.  Lexington County --
4        A.  -- Sheriff's Office.
5        Q.  -- Sheriff's Office?
6        A.  Yes.
7        Q.  Lexington County Solicitor's Office?
8        A.  Correct.
9        Q.  And the West Columbia Police Department?
10       A.  Yes.
11       Q.  The top one is dated 6/29.  I don't think that
12   was something you did.
13       A.  No.
14       Q.  Okay.
15           But the bottom three are dated on 4/13.  Is
16   that faxes that you sent out?
17       A.  Yes.
18       Q.  Okay.
19           I didn't see a fax -- an actual fax to the
20   Lexington County Solicitor's Office, but I did have this
21   screenshot.
22       A.  I never received anything back from the
23   solicitor.
24       Q.  So all we have is you sent a fax and never

Page 68

1    received anything back?
2        A.  Correct.
3        Q.  But the other two that we have from Lexington
4    County Sheriff's Office and the West Columbia Police
5    Department you did receive back?
6        A.  Correct.
7        Q.  And you also had the screenshot from the
8    court?  Page 3 -- no.  Page 41.
9        A.  The website.
10       Q.  Yeah.  That's right.  That's from the court
11   website; is that correct?
12       A.  Correct.
13       Q.  Do you know of anything else that you did as
14   far as faxes or checking websites during the Roof
15   transaction?
16       A.  Clarify.
17       Q.  Well, I see that you looked on the website.
18       A.  Correct.
19       Q.  And got a screenshot.
20       A.  Correct.
21       Q.  That you sent a fax to the Lexington County
22   Sheriff's Office.
23       A.  Correct.
24       Q.  And you received a response from them.

17 (Pages 65 to 68)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 69

1    A.  Correct.
2    Q.  And you sent a fax to the West Columbia Police
3  Department.
4    A.  Correct.
5    Q.  And you received a response from them.
6    A.  Correct.
7    Q.  And you sent a fax to the Lexington County
8  Solicitor's Office, and you didn't receive a response.
9    A.  Correct.
10    Q.  Is there anything else that you know of that
11  you did in researching this transaction?
12    A.  No.
13    Q.  Now I want you to look at -- we'll mark those
14  as Exhibit Number 2, that set of documents that we had,
15  all those numbers.
16            * * *
17        (Whereupon, Conley Deposition Exhibit
18  No. 2 marked for purposes of identification.)
19            * * *
20  BY MR. HAMMER:
21    Q.  And so I'll ask you again, now that we have a
22  sticker on there, is there anything else that you -- any
23  other research that you did other than what's in Exhibit
24  Number 2?

Page 70

1    A.  I don't -- I don't -- I don't recall anything
2  else.
3    Q.  Okay.  All right.  Let's go back to Exhibit
4  Number 1.
5        Well, before we go back to Exhibit Number 1, I
6  want to find out from you, because I've been given
7  certain documents from the lawyers, and they say these
8  were the documents that were available to you, and I
9  want to just make sure that -- that we're correct on
10  these things.  And I'm going to give you a set of
11  documents to go through with me, so you can look at
12  these as we go.
13        Do you see the first page?  It has -- it's
14  called "Objections and Responses to Requests for
15  Production."
16    A.  (Moves head up and down.)
17    Q.  And I want you to turn to the next page and
18  look at Request Number 8.  And what we're requesting the
19  Government to produce to us is the contact sheets,
20  contact list, POC list reviewed or utilized by NICS
21  examiners in the firearm sale background check of Dylann
22  Roof, including all versions available to the examiner
23  from April 11th through April -- through the 20th, 2015,
24  and including the Lexington County contact sheet.

Page 71

1        And you see what their answer was?  The answer
2  says -- you tell me if I'm reading it wrong.  The answer
3  says "Response:  The South Carolina processing page, the
4  South Carolina city/county list, the South Carolina
5  record example, and contact sheets for Lexington and
6  Richland Counties as of April 11, 2015, will be produced
7  separately as soon as practical."  Do you see that?
8    A.  (Moves head up and down.)
9    Q.  Is that correct?  Did I read that correctly?
10    A.  (Moves head up and down.)
11    Q.  You've got to answer verbally.
12    A.  Yes.
13    Q.  Now let's turn over to the next sheet.  And
14  you'll see this is a letter.  If you look at the second
15  page, you'll see it's from Mr. Terrell to us.  Turn back
16  to the page before.  And I want you to look at the
17  second page -- second paragraph.  And it says --
18        MR. WILSON:  It's the May 12th, 2017,
19  letter?
20  BY MR. HAMMER:
21    Q.  Yeah, May 12th, 2017.  And he says "The South
22  Carolina processing page, the South Carolina city/county
23  list, South Carolina record example, and contact sheets
24  for Lexington and Richland Counties as of April 11,

Page 72

1  2015, is produced as FBI-00000312 to FBI-341."  Do you
2  see that?
3    A.  Yes.
4    Q.  Did I read that correctly?
5    A.  Yes.
6    Q.  "This document supplements United States'
7  response to Request For Production Number 8."  Do you
8  see that?
9    A.  Yes.
10    Q.  Number 8 is the one where you just read.
11    A.  Yes.
12    Q.  Okay.
13        And I want you to go through, after
14  Mr. Terrell's letter, turn -- turn to the next page,
15  keep turning, and you should begin with a document
16  FBI-312.
17    A.  Yes.
18    Q.  And you should have, according to
19  Mr. Terrell's letter, to 341.  Would you look through
20  those documents?
21    A.  Do you want me to see if all the pages are
22  here?
23    Q.  Just see if those are the documents that were
24  available to you.

18  (Pages 69 to 72)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 73

1      A.   Okay.
2      Q.   Have you had a chance to look at those
3  documents?
4      A.   Yes.
5      Q.   And is Mr. Terrell correct that you had
6  available to you pages 312 through 341?
7      A.   Yes.
8           MR. HAMMER:  Okay.  Let's mark that as
9  Exhibit Number 3.
10              * * *
11          (Whereupon, Conley Deposition Exhibit
12  No. 3 marked for purposes of identification.)
13              * * *
14  BY MR. HAMMER:
15     Q.   I think you said that you were given questions
16  and answers in an interview sort of way when they did
17  the inspection interview.  Do you remember that?
18     A.   I -- I, actually -- they -- yes, they did ask
19  me questions.
20     Q.   Okay.
21          Do you remember you telling them that the NICS
22  was unable to obtain the needed information to clarify
23  the application of possible prohibitions related to the
24  charges?

Page 74

1      A.   I did not receive any information being able
2  to deny the transaction.
3      Q.   So this is correct that NICS was unable to
4  obtain needed information to clarify the application of
5  the possible prohibitors related to this transaction?
6      A.   Yes.
7      Q.   Is that correct?
8      A.   Yes.
9      Q.   And what I would like to show you is FBI-30
10  and 31 and ATF Numbers 17, 18, and 19.  If you'll just
11  look at those for me.
12          Have you had a chance to look at those
13  documents?
14     A.   Yes.
15     Q.   And I think the Number 30 is the Columbia
16  Police Department incident report; is that correct?
17     A.   I did not receive this.
18     Q.   I understand that, but you see what -- I'm
19  just asking you is that what it is?
20          MR. TERRELL:  Objection.  Foundation.
21  BY MR. HAMMER:
22     Q.   Look at the top of the page where it says --
23     A.   It says "Incident Report, City of Columbia
24  Police Department."

Page 75

1      Q.   Okay.
2          And that's two pages, 30 and 31?
3      A.   Correct.
4      Q.   And this next page, 17, is that a summary of
5  what -- of the transactions that you were talking about
6  earlier?
7      A.   That's my comments from the NTN inquiry down
8  until the six -- yeah, the six is not me, from June on.
9      Q.   Okay.
10          Do you know Ms. Russell?
11     A.   Yes.
12     Q.   Okay.
13          And if you look at the top of page 18, and I
14  think it says she received this report from the City
15  of Columbia; is that correct?
16     A.   "Received fax from incident report," yes.
17     Q.   And do you read what it says on the report?
18     A.   I -- what she stated?
19     Q.   "Report states."  See what it says?
20     A.   Yes.
21     Q.   And at the end of the report, it says "I asked
22  Mr. Dylann if he had a prescription for them" -- he's
23  talking about the Suboxone -- "and he stated he did
24  not."  "Suboxone is a Schedule III narcotic."  Do you

Page 76

1  see that on that report, the last couple lines on there?
2      A.   Yes.
3      Q.   Okay.
4          And then where she has "Comments" under 6/29,
5  that also was dated 6/29 at 20:07; right?  I'm sorry.
6  Eight --
7      A.   Yeah, 8:21.
8      Q.   8:21.  And then -- then at 6/29 at 8:58 she
9  has a comment -- tell me if I'm reading this right --
10  "Comments.  Decision to deny based upon Federal
11  Prohibitor 922(g)(3)."  Is that correct?
12     A.   Correct.
13     Q.   So she got this police report and was --
14  within an hour she just -- there was a decision to deny
15  that?
16     A.   Correct.
17     Q.   Is that correct?
18     A.   (Moves head up and down.)
19     Q.   And you didn't get that report?
20     A.   No.
21     Q.   Okay.
22          You don't fault Ms. Russell for denying it on
23  getting that report, do you?
24     A.   I can't speak for another examiner.

19  (Pages 73 to 76)

493b03a2-c53a-4527-b64d-80932cc952cc

## Page 77

1  Q.  Okay.
2      You don't have -- do you disagree that what
3  she did was correct after receiving that report?
4      A.  Like I said, I can't speak for what she did --
5      Q.  Okay.
6      A.  -- in the transaction.
7      Q.  I understand that.  If you had gotten that
8  same report, would you have done the same thing?
9      A.  Yes.
10     Q.  Okay.
11         And now let's go back to Exhibit Number 1.  I
12  think you have that in front of you.  And tell me if I'm
13  reading this correct.  "The examiner" -- that would be
14  you; correct?
15     A.  Correct.
16     Q.  -- "will contact state POC, the courts,
17  district attorneys, probation officers, arresting
18  agencies, et cetera, for disposition, level of offense,
19  incident report, et cetera, via fax, phone, mail,
20  e-mail, and/or" -- "and Netlets" --
21     A.  Nlets.
22     Q.  -- "Nlets in accordance with preference
23  indicated in the state processing page and contact
24  list."  Now, I think we went through Exhibit Number 2

## Page 78

1  has the state processing page and Exhibit -- and --
2      A.  No.
3      Q.  Was it Exhibit Number 3?
4      A.  Uh-huh.
5      Q.  Exhibit Number 3?
6      A.  Yeah.  It has the contact.
7      Q.  Okay.
8         And then at the bottom of that, the last
9  sentence in SOP -- is it 5.5.5?
10     A.  Correct.
11     Q.  -- states "every effort must be made to obtain
12  the necessary information in order to reach a final
13  decision on a NICS transaction during the research
14  phase."
15     A.  Correct.
16     Q.  Is that correct?
17     A.  Correct.
18     Q.  Did you contact the state POC?
19     A.  No.
20     Q.  Did you contact the court?
21     A.  The case was pending; therefore, it would not
22  have been to court.
23     Q.  Okay.
24     A.  So I contacted the solicitor in Lexington

## Page 79

1  County because that -- on the website is where it was
2  being held in Lexington County, so we contacted the
3  solicitor for indictment information.
4      Q.  My question is --
5      A.  And for prior restrictions.
6      Q.  My question is did you contact the court?
7      A.  No.
8      Q.  And did you contact the arresting agency?
9      A.  Yes.
10     Q.  And what were you told by the arresting
11  agency?
12     A.  "No arrest or report for the State.  The last
13  arrest was on 2/28/15.  Columbia PD will have the
14  report."
15     Q.  Okay.
16         Did you contact Columbia PD?
17     A.  No.
18     Q.  Okay.
19         The arresting agency told you to contact
20  Columbia PD and you did not do so?
21     A.  I went to the contact list in Lexington
22  County, and I looked for Columbia PD.  I had West
23  Columbia PD for that county.  That is who I contacted.
24     Q.  Okay.

## Page 80

1         Now, you -- you knew that you had been told it
2  was Columbia PD?
3      A.  It's stated on the fax.
4      Q.  Okay.
5         And I think is it Exhibit 3 that you have a --
6  let's just look at this page, if I can get to it.  These
7  pages were all available to you at the time you did your
8  search?
9      A.  Correct.
10     Q.  Okay.
11         Let's look at page 326.  That's 00000326 FBI.
12  And if you had looked at that page, would you see
13  Columbia on there?
14     A.  Yes.
15     Q.  Okay.
16         And would it show what county it's in?
17     A.  Yes.
18     Q.  And what county would it show?
19     A.  Richland.
20     Q.  And did you have a state contact list for
21  Richland County?
22     A.  Yes.
23     Q.  Okay.
24         And so you could have looked at this page,

STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249
Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 81

1    found that Columbia was in Richland County, and
2    contacted the Columbia police.
3        A.    But my research led me --
4        Q.    I'm not --
5        A.    -- to Lexington County.
6        Q.    I understand that. I'm not asking what your
7    research led you to. You had information that -- from
8    Lexington County that Columbia Police Department had the
9    report.
10       A.    Like I said, I was -- looked at Lexington
11   County, looked for Columbia, and I went to West Columbia
12   PD.
13       Q.    All I'm asking you is the Lexington County
14   Sheriff's Office told you Columbia Police Department
15   will have the report.
16       A.    Yes.
17       Q.    And Columbia is listed on your cities in South
18   Carolina that you had available to you.
19       A.    The city contact list, yeah.
20       Q.    And you didn't look on that?
21       A.    No.
22       Q.    Okay.
23             And had you looked on it, you would have seen
24   that Columbia was in Richland County; is that correct?

Page 82

1        A.    It states that, yes.
2        Q.    Okay.
3             And so you would have been able to contact the
4    arresting agency had you looked at page 326; is that
5    correct?
6        A.    I would -- if I would have looked at that
7    page, yes.
8        Q.    And is there any reason that you think that
9    Columbia would not have sent you the report if you'd
10   have asked for it?
11       A.    I can't determine that.
12       Q.    Okay.
13             They had the report. They sent it as soon as
14   they were asked for it?
15       A.    Like I said, my research, I was looking in the
16   Lexington County because that is on the website as where
17   the case was pending.
18       Q.    I understand what you did. I was just seeing
19   if there was some alternative with the information that
20   you had available that you could have done.
21       A.    Like I said, I -- I went to the contact list
22   where I felt that that is what they were -- were
23   asking -- were actually giving me was the West Columbia
24   PD. That's why I contacted that agency or I would not

Page 83

1    have contacted that agency if I didn't think -- like I
2    said, if the website didn't lead me to believe that it
3    was being held in Lexington County. I didn't have any
4    reason to go to any other county.
5        Q.    Okay. All right.
6             And you did contact the South Carolina point
7    of contact, state -- state POC; right?
8        A.    No, I did not. Like I said, you go by the
9    processing page to see if you would need to contact that
10   agency. Go by what is -- what agency you need to
11   contact.
12       Q.    All right.
13             Well, let's -- let's look at the page that you
14   do have, and it -- I think it begins -- the processing
15   page begins on FBI-314.
16       A.    Right.
17       Q.    And if you go 314, 315, and 316, all
18   processing pages?
19       A.    Yes.
20       Q.    Okay.
21             And on page 316 it has "State Point of
22   Contact: South Carolina Law Enforcement Division"?
23       A.    Correct.
24       Q.    An ORI number?

Page 84

1        A.    Correct.
2        Q.    A listing in Columbia, South Carolina; is that
3    correct?
4        A.    Columbia, South Carolina, yes.
5        Q.    And that was the city that you were told had
6    the police report?
7        A.    The state POC is actual -- is the actual point
8    of contact.
9        Q.    I understand that. But they're located in
10   Columbia, South Carolina, if you look on this; correct?
11       A.    Yes.
12       Q.    And that was the same city that you were told
13   by Lexington had the police report; is that correct?
14       A.    They stated Columbia PD.
15       Q.    And that's Columbia, South Carolina; correct?
16       A.    Yes.
17       Q.    And that's exactly where SLED is; right?
18       A.    Correct.
19       Q.    And then it says "Contact for clarifications
20   on SC records."
21       A.    Correct.
22       Q.    And you didn't do that.
23       A.    I didn't need to do that.
24       Q.    I'm saying you did not do that.

21  (Pages 81 to 84)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 85

1    A.   No.
2    Q.   Okay.
3         And did you understand that SLED had actually
4    sent in the incident report for the Columbia Police
5    Department to the N-DEx on March the 6th, 2015 --
6    A.   No.
7    Q.   -- before April 11th, 2015?
8    A.   I did not know that.
9    Q.   If you had contacted them, they could have
10   given you that report; is that correct?
11   A.   Per our processing page, we call for
12   clarification.  We don't contact just to contact.
13   Q.   Okay.
14        Well, let's look at 5.5.5 again.  Okay?
15   That's Exhibit 1.  And that says you will contact the
16   state POC and these other agencies, and it says "for
17   disposition, level of offense, incident report."
18   A.   "...with the preference indicated on the state
19   processing page and contact list."
20   Q.   Okay.
21        Where is the preference indicated?
22   A.   Like I said, South Carolina State's POC,
23   "Contact for clarifications on the South Carolina
24   record."  It does not state to contact for incident

Page 86

1    reports.
2    Q.   Okay.
3         MR. WILSON:  What page number did you
4    just read that from?
5         THE WITNESS:  316.
6    BY MR. HAMMER:
7    Q.   Okay.
8         Let me ask you this:  You had told me that you
9    were unable to -- that you needed further information to
10   clarify the application of possible prohibitors, didn't
11   you?
12   A.   I -- say the question again.
13   Q.   Didn't you just tell me when you were
14   interviewed that you needed further information to
15   clarify the application of possible prohibitors on this
16   transaction?
17   A.   You would do your research.  You do try to
18   find information.
19   Q.   Okay.
20        So you needed to clarify that; correct?
21   A.   That's -- clarify what?
22   Q.   To clarify the application of possible
23   prohibitors.
24   A.   No.  I know the prohibitor was 1 or 3.  It was

Page 87

1    federal -- for a felony conviction or for Federal
2    Prohibitor 3, the drugs.
3    Q.   Yes.
4    A.   So I -- that's what I was researching for.  I
5    didn't need to clarify that.
6    Q.   Okay.
7         Well, you didn't -- you didn't -- you were
8    unable to -- to find out whatever information you needed
9    to clarify that; correct?
10   A.   I went to the agencies that was listed per the
11   processing page, what those agencies had.  The sheriff's
12   office obtain -- per the processing, you obtain your
13   incident reports from the sheriff's office, which I did
14   contact.  The solicitor has indictment information.  You
15   check for firearm restrictions, drug testing from the
16   solicitor, which I contacted.  Possible indictments,
17   that's why I contacted them.  Because I knew the case
18   was pending, I knew it has not went to trial per the
19   website, so that is why I went to those agencies for
20   that information.
21        THE WITNESS:  Can we have a little break?
22        MR. HAMMER:  Yeah.  Sure.  Sure.  Be glad
23   to take a break.
24        * * *

Page 88

1         (Brief break)
2         * * *
3    BY MR. HAMMER:
4    Q.   Before we took a break, we were talking about
5    the Columbia incident report and the pages from the ATF
6    which was the summary of the transaction on the
7    computer, I think.
8    A.   That was the case history, yes.
9    Q.   Case history, yes.  And those are pages
10   003 -- 30, 31, ATF-17, 18 and 19.  Can we mark those as
11   Exhibit Number 4.
12        * * *
13        (Whereupon, Conley Deposition Exhibit
14   No. 4 marked for purposes of identification.)
15        * * *
16   BY MR. HAMMER:
17   Q.   Exhibit Number 4 is what we were talking about
18   that Ms. Russell had received the report, and her
19   denial -- is that correct -- is shown on that Exhibit
20   Number 4?
21   A.   Repeat the question.
22   Q.   Page 18.  It shows Ms. Russell received the
23   Columbia police report and shortly after that issued a
24   denial?

22  (Pages 85 to 88)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 89

1    A.  Yes.
2    Q.  Okay.
3        And then the incident report is also attached.
4    And the incident report is something that you say you
5    never got; right?
6    A.  I never received.
7    Q.  Okay.
8        And I think you say that you got a screenshot
9    from the court.  Would you pull the exhibit that has
10   that on there?
11   A.  The website?
12   Q.  The website, yes.
13   A.  Yes.
14   Q.  And if I could just take a look at that for a
15   minute.
16   A.  (Tendered)
17   Q.  I want to show you -- what's the number of
18   that page that you have there?
19   A.  41.
20   Q.  41.  I want to show you 397, this is FBI-397,
21   and ask you if that's a similar document.  Actually,
22   I'll give you 396, -97, and -98.  If you'd just look at
23   those three for me.
24       I'm going to let you look at the ones that are

Page 90

1    not highlighted just so we'll have clean copies and you
2    hand me the other ones back.
3    A.  They are the same -- dealing with the same
4    case, just different screenshots.
5    Q.  Right.  And 397 shows that -- possession of
6    controlled substance?
7    A.  Three -- which one?
8    Q.  397.
9    A.  Yes.  It has the charge listed.
10   Q.  And 396 is actually some things that happened
11   in June.  It was after the -- the event.  I think some
12   things at the bottom.
13   A.  Beginning date, yes, it started --
14   Q.  So that would be after that?
15   A.  Uh-huh.
16   Q.  And then the other one was -- I think these
17   are dated 3/16 when they were updated, and they have the
18   name of the police officer and the subject, Dylann Roof;
19   is that correct?
20   A.  I'm not sure what the individual, the Brandon
21   Fitzgerald, I'm not sure who -- it says "Officer."
22   Q.  It says "Officer."
23   A.  Yes.
24   Q.  And the bottom one says "Defendant."

Page 91

1    A.  Right.
2    Q.  So those were all screenshots that you had,
3    that you have in your file somewhere, that were given to
4    us, so I assume you had them.
5    A.  Well, I mean, I don't know if I have the
6    June 18th.
7    Q.  Not the -- okay.  You didn't have the
8    June 18th available to you?
9    A.  Right.
10   Q.  But the other two you did --
11   A.  Yes, but the one with -- that shows the
12   actual --
13   Q.  So 398 --
14   A.  -- officer and the --
15   Q.  -- 397 and 398 --
16   A.  Yes.
17   Q.  -- you did have available to you?
18   A.  Yes.
19   Q.  Okay.
20       And if you would just look at the case number
21   on page 397 at the top left-hand page.  It says "Case
22   Number."
23   A.  Yes.
24   Q.  I'm going to show you another document, and

Page 92

1    I'm going to -- just wanted to let you know, this
2    document was supplied to us by the Government in --
3    attached to a motion that it made in court.  So I want
4    you to look at that document.
5    A.  Okay.
6    Q.  Have you had a chance to review it?
7    A.  Yes.
8    Q.  Okay.
9        I'm going to want to do a couple of things.
10   On the screenshot for 397 and 398, it has a case number
11   which I'm going to read to you, and you tell me if I
12   read it correctly.  Okay?
13   A.  Uh-huh.
14   Q.  It's 2015A4021600503.
15   A.  Yes.
16   Q.  Did I read that correctly?
17   A.  Yes.
18   Q.  All right.
19   This last document that I -- that I gave to you is -- it
20   looks like an arrest warrant on the left and on the
21   right it says "Affidavit."
22   A.  Arrest warrant.  Yes.
23   Q.  Okay.
24       And that document, the number that I see for

STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249
Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 93

1    the arrest warrant, is also 2015A4021600503.
2        A.   Correct.
3        Q.   And on that document, I have a true copy,
4    Lexington County C.C.P., Grand -- General Sessions.  Do
5    you see where it says at the bottom -- on the right side
6    toward the middle of the -- toward the bottom, "True
7    Copy"?
8        A.   Yes.
9        Q.   Okay.
10           And that would be the General Sessions Court?
11       A.   I would -- I would say that would be -- like I
12   said, I -- this is the first time I've seen this
13   document.
14       Q.   Okay.  I understand that.  But the numbers
15   match up; correct?
16       A.   Yes.
17       Q.   And you didn't contact the court to ask them
18   for their documents, did you?
19       A.   I -- like I said, from the website
20   information, the case was pending.
21       Q.   Right.
22       A.   So, therefore, he was not convicted or charged
23   with anything.
24       Q.   Okay.

Page 94

1        But you did not contact the court for
2    disposition, level of offense, incident report, via fax,
3    phone, mail, e-mail, or Nlets, did you?
4        A.   No.  Per processing page, in South Carolina --
5        Q.   You can give me that explanation, but did
6    you -- is that correct that you didn't contact the court
7    via those methods?
8        A.   I did not contact the court per processing
9    page because the court has information about
10   felony -- if the subject has a felony conviction, it's
11   contact for physical force element and as last resort
12   for relationship, per General Sessions.
13       Q.   What page are you reading off of, please?
14       A.   This is on 314, the South Carolina Processing
15   Page.
16       Q.   Let me just get to that.  My thing says
17   "Courts and arresting agencies are the primary contact"
18   on page 314.  Do you see that?
19       A.   Yes, they are the primary contact.
20       Q.   Okay.
21       A.   But it lists what they have, the courts have.
22   Felony charges that can receive more than one year.  But
23   I knew from the website that the case was pending, so I
24   knew the court would not have a disposition.  So,

Page 95

1    therefore, that's why I contacted the solicitor to see
2    if he was under indictment, felony indictment.
3        Q.   Okay.
4            But you also knew there was a potential drug
5    use case?
6        A.   Which I contacted the arresting agency for the
7    incident report, which states on here "Contact for
8    police/incident report, lab reports, disposition unless
9    otherwise noted on the contact list."
10       Q.   And if you had contacted the court, could you
11   have gotten this arrest warrant?
12           MR. TERRELL:  Objection.  Calls for
13   speculation.
14       A.   I don't know.
15   BY MR. HAMMER:
16       Q.   Okay.
17           Does the arrest warrant show that the Columbia
18   Police Department with the AR agency ORI number is right
19   on this document?
20       A.   The -- for the Columbia PD?
21       Q.   It says "Prosecuting Agency."
22       A.   Arresting agency.  But I would have to look at
23   the contact list as to verify that's the correct ORI
24   and -- which it's not listed on this copy.

Page 96

1        Q.   Okay.
2        A.   The ORI is not listed.
3        Q.   Okay.
4        A.   But -- so I can't answer that without it not
5    being listed on here to verify that, if that is the
6    correct ORI.
7        Q.   If it is the correct ORI, you could have
8    contacted them?
9        A.   I could have looked at the -- yes, I could
10   have looked at the ORI and went to the contact list for
11   that ORI.
12       Q.   Okay.
13           MR. HAMMER:  Stephen, do you have an
14   unredacted copy she can look at so she can answer my
15   question?
16           MR. TERRELL:  No, I don't.  Not here.
17           MR. HAMMER:  Okay.  Not on your computer
18   or anything?
19           MR. TERRELL:  No.
20   BY MR. HAMMER:
21       Q.   Okay.
22           We can check that ourselves and see if it's
23   the same number, though; right?
24       A.   I -- I don't know what information that you

24  (Pages 93 to 96)

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 97

1   guys --
2       Q.   If they have the information, they can give us
3   that information and check and see whether it's the same
4   as it is on this arrest warrant?
5       A.   The contact list?
6       Q.   Yes.
7       A.   Yes.  The contact list would show that ORI.
8       Q.   Okay.
9            And if you had gotten that and it is the
10  correct ORI, you could have been in touch with Columbia
11  police a lot easier; right?
12      A.   I could have contacted them based on that.
13      Q.   Okay.
14           And it says also on the bottom that City of
15  Columbia was the -- on there it has several places -- it
16  has Columbia as the prosecuting, it has City of Columbia
17  at the top over here, it has City of Columbia at the
18  bottom, the judge's address in Columbia.  Is that
19  correct?  So there are a lot of references to Columbia
20  on this sheet?
21      A.   Like I said, I can't verify to see if I would
22  actually -- if I would have received the same document
23  as you.
24      Q.   Okay.

Page 98

1            Well, this document has the same number as the
2   court document, doesn't it, the screenshot?
3       A.   On the website?
4       Q.   Yes.
5       A.   Yes, it does have the same case number.
6       Q.   Okay.
7            And this document is dated "Sworn to before me
8   3/1/2015"?  Right down here (indicating).
9       A.   That's the date it states on there.
10      Q.   Okay.
11           And the date that the court document shows is
12  3/16/2015; correct?
13      A.   The arrest date states 3/2.
14      Q.   Okay.
15      A.   The file date is -- that's a 16 or a 15,
16  but...
17      Q.   Okay.
18      A.   It says 3/15 or 16/2015 is the file date.
19      Q.   And you were checking in 4/11/2015 --
20  4/13/2015?
21      A.   In April.
22      Q.   Right.
23      A.   I don't know the exact date.
24      Q.   So that would be after the file date of that?

Page 99

1       A.   Yes.
2       Q.   Yeah, I want to mark those --
3       A.   I was wondering.
4       Q.   Yeah.  Let's mark those exhibits, the ones
5   we've just been talking about, page number 386, 387
6   and -- is that correct?
7       A.   396, -97, and -98.
8       Q.   Okay.
9       A.   And this is a separate -- do you want this
10  separate?
11      Q.   No.  We'll mark that together with that.
12      A.   Okay.
13      Q.   And that's called -- it's got some numbers at
14  the top on the side of the document.  Court date, court
15  entry numbers.
16           MR. TERRELL:  12-3.
17           MR. HAMMER:  Huh?
18           MR. TERRELL:  Docket 12-3.
19           THE WITNESS:  12-3?
20           MR. HAMMER:  Yeah.  Docket 12-3.  If we
21  could just mark those.
22           * * *
23           (Whereupon, Conley Deposition Exhibit
24  No. 5 marked for purposes of identification.)

Page 100

1            * * *
2   BY MR. HAMMER:
3       Q.   I just want to show you these and see if --
4   this is FBI-55 and 56.  I've marked some notes on the
5   top of the page.  Just disregard that.
6       A.   Okay.
7       Q.   You said you were asked some questions.  Is
8   that sort of what you remember being asked?
9       A.   Was -- are you asking about the inspection?
10      Q.   Yeah, the inspection.
11      A.   I don't recall what the actual -- like, all
12  the questions and answers to that.
13      Q.   Does that look familiar, though, the questions
14  that they have there?
15      A.   I never seen any of it.
16      Q.   Okay.
17           You don't know what it is?
18      A.   No.
19      Q.   The reason I ask, it says -- one of the
20  questions that they say -- says, "When did the FBI come
21  to know about this?"
22           Said, "This is unclear.  However, if asking
23  when the FBI learned of the shooting, it was learned on
24  6/17 via the news."

25 (Pages 97 to 100)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 101

1    And then he says, "How often does oversight
2    error -- error rate?"
3    And then it says, "The NICS was unable to
4    obtain the needed information to clarify application of
5    possible prohibitions related to the aforementioned
6    charge."
7    And I'm just wondering, did they get that
8    information from you that you're unable to -- to get the
9    needed information to clarify?
10    A.    I did not receive the incident report, so I
11    did not receive that, so that's --
12    Q.    Would that be --
13    A.    -- probably what you're asking.
14    Q.    Okay.
15    In other words, it probably came from you the
16    information that you were unable --
17    A.    I did not receive the information to --
18    Q.    -- that you were unable to obtain the needed
19    information --
20    A.    -- to make a final --
21    Q.    -- to clarify the application for possible
22    prohibitors related to the charge?
23    A.    Right.  I did not make a final status.
24    Q.    When it came to you, there were two possible

Page 102

1    prohibitors right there?
2    A.    Yes.
3    Q.    And one of them was a felony?
4    A.    Right.
5    Q.    And one of them was unlawful use of drugs;
6    correct?
7    A.    Correct.  Correct.
8    Q.    And for the felony you would need to see the
9    indictment?
10    A.    He needs to be under felony indictment.
11    Q.    Right.  And for the unlawful use of drugs,
12    that could be determined from the incident report that
13    we read, the Columbia police report?
14    A.    The incident report, yes, could prohibit him.
15    Q.    So you wouldn't need to see a conviction or
16    indictment or anything.  It would just be something like
17    the incident report?
18    A.    The incident report could be one aspect, yes.
19    Q.    Okay.
20    And that's what you're talking about, that you
21    were unable to get the needed information to clarify.
22    A.    I was unable -- I left it in a delayed status
23    because I did not receive any information regarding
24    the -- the incident report, and I did not hear anything

Page 103

1    back from the solicitor.
2    Q.    So you were unable to get the Columbia police
3    report to clarify this?
4    A.    I did not -- I did not receive the Columbia PD
5    incident report.
6    Q.    And that was what you were really looking for
7    to clarify this.
8    A.    That is for the Federal Prohibitor 3, for the
9    drugs.
10    Q.    And that's what you were looking for to do
11    your clarification --
12    A.    Part.  Part.
13    Q.    The talk that you heard after the fact about
14    this N-D-E-x, N-DEx, was just at the office; is that
15    correct?
16    A.    Yes.
17    Q.    And did you hear that the N-DEx did contain
18    information about Dylann Roof which would prohibit him
19    from receiving or possessing a firearm?
20    A.    I don't recall the exact verbiage of -- if
21    that was actually told to me or -- I don't remember.
22    Q.    Okay.
23    But do you remember something similar to that,
24    that --

Page 104

1    A.    I just know that the -- what the inspection --
2    Q.    -- it was in the --
3    MR. TERRELL:  Let him finish and then you
4    can...
5    THE WITNESS:  I'm sorry.
6    BY MR. HAMMER:
7    Q.    Do you remember the -- something similar to
8    that, that there was something in the N-DEx, which if
9    they had found it, would have prohibited him from having
10    a gun?
11    A.    I -- I don't remember.  Like I said, I
12    remember them actually wanting NICS to get the N-DEx to
13    help prevent similar situations, but I -- I don't recall
14    or I don't remember if it actually was told to me that
15    they found a report there.  I don't remember.
16    Q.    Who is the person responsible for the contact
17    list for Lexington County?  Do you know who that is?
18    A.    I know the region coordinators actually update
19    the contact list back then.
20    Q.    Yeah.
21    A.    So they would be the ones who check to -- to
22    verify phone numbers and fax numbers.
23    Q.    Were you aware that some cities are in more
24    than one county?

STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249
Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

## Page 105

1   A.  No, I was not.  And that's -- like I said,
2   that's why I contacted Lexington County.
3   Q.  And did the regional coordinator -- do you
4   know who the name of that regional coordinator was?
5   A.  It was Debbie Russell at that time.
6   Q.  She was the one who -- who had done the
7   Lexington County contact list?
8       MR. TERRELL:  Objection.  Foundation.
9   A.  You would have to ask her, like, the extent.
10  BY MR. HAMMER:
11  Q.  Okay.
12      But as far as you know --
13  A.  We -- we give the region coordinators -- like,
14  if we would contact an agency and they say, "Our phone
15  number has changed to," or, "Our fax number is changing
16  to," we would give that to the region coordinator.
17  Q.  Yeah.  Is the region coordinator responsible
18  for maintaining and updating the contact list for the
19  counties?
20  A.  I don't know to what extent, but, like I said,
21  we give them the information, so I -- I don't know what
22  they do after that.
23  Q.  Is the N-DEx, as far as you know, a database
24  managed by the FBI?

## Page 106

1       MR. TERRELL:  Objection.  Foundation.
2   A.  I don't know.
3   BY MR. HAMMER:
4   Q.  Who would know that?
5       MR. TERRELL:  Objection.  Foundation.
6   A.  I don't know.
7   BY MR. HAMMER:
8   Q.  Well, who is the person at -- is there a head
9   person at CJIS?
10  A.  Who would actually be in charge of that, I
11  don't know.
12  Q.  Who is the person at CJIS who is the head of
13  CJIS?
14  A.  I don't know.
15  Q.  Don't know who that is?
16  A.  No.
17  Q.  Well, who is your immediate boss?
18  A.  My supervisor is Brett Antill.
19  Q.  And who is his -- is he a man?
20  A.  Yes.
21  Q.  Who is his supervisor?
22  A.  His would be Angie Vandergrift.
23  Q.  And do you know -- can you go up the line?
24  A.  Then she would go Monica Shonsberg (phonetic).

## Page 107

1   I'm not sure if I pronounced that correctly.
2   Q.  Okay.
3   A.  And then Robin Nutter would be her boss.  And
4   then I'm not sure who Robin Nutter's boss.
5   Q.  Would you think one of those bosses would know
6   who maintains the C -- the N-DEx?
7   A.  I don't -- I can't speculate.  I don't know.
8   Q.  Okay.
9       Did you know the N-DEx is provided information
10  from federal and state agencies?
11  A.  I --
12      MR. TERRELL:  Objection.  Foundation.
13  A.  I don't know.
14  BY MR. HAMMER:
15  Q.  Did you know that when you received a call
16  from the Federal Firearms Licensee on a request for a
17  background check, that you were required to search the
18  relevant databases, including NICS Index, NCIC, and III
19  for any matching records?
20      MR. TERRELL:  Objection.  Assumes facts
21  not in evidence.
22  BY MR. HAMMER:
23  Q.  Did you know that?
24  A.  Clarify.

## Page 108

1   Q.  I'm just asking is that something within your
2   knowledge that you were required to, upon receiving a
3   call from the Federal Firearms Licensee for a request
4   for a background check, that you were required to search
5   the relevant databases including --
6   A.  Are you stating when a call comes in?
7   Q.  Yes.
8   A.  Okay.  I didn't take the call that came in.
9   Q.  I understand that.  But when the call comes
10  in, is it required to search the relevant databases?
11  A.  The things that actually hit upon that
12  subject's descriptors.
13  Q.  Okay.
14      But is it required to search NICS Index?
15  A.  NICS Index?
16  Q.  Yes.
17  A.  If it's highlighted, yes.
18  Q.  If it's not highlighted?
19  A.  Then it's not a hit.
20  Q.  So you don't have to search it if it's not
21  highlighted?
22  A.  Correct.
23  Q.  And you don't have to search NCIC if it's not
24  highlighted?

27 (Pages 105 to 108)

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 109

1    A.  If it's not a hit, no.
2    Q.  Okay.
3        And III, you don't have to search that?
4    A.  If it's highlighted, yes.
5    Q.  I'm not talking about if it's highlighted.
6    I'm talking about --
7    A.  If nothing was hit in the databases, then he
8    would be proceeded by the call center.
9    Q.  All right.
10       But let me ask you something.  Do you have to
11   search those indexes, those databases, for matching
12   records?
13   A.  Yes.
14   Q.  Okay.
15       And when you search those for matching
16   records, that's when you get a hit or not; right?
17   A.  When the -- the call comes in with the -- with
18   the subject's descriptors, it will search the databases
19   to see if there's any possible hits on any of those
20   databases.
21   Q.  Now, tell me that.  Does it search it
22   automatically, or does the examiner have to search each
23   one of those?
24   A.  Like I said, it comes into the system -- into

Page 110

1    our system.  What it hits upon is highlighted at the
2    bottom of our screen, which is -- it has NCIC, it has
3    III, it has NICS Index.
4    Q.  Okay.
5        And do you search each of those for matching
6    records?
7    A.  If they are highlighted.  They will be
8    highlighted if they would hit upon any of those
9    databases.
10   Q.  Do you know anything about these documents I'm
11   handing to you?  Just take a look at them.  Page 3, I
12   think it's from N-DEx.
13   A.  I've never seen this.
14   Q.  Okay.
15       Have you ever seen documents like that or
16   anything?
17   A.  I mean, incident reports come in all different
18   different styles.
19   Q.  Okay.
20   A.  So -- but as far as, like, something like
21   this, I have not received anything like this.
22   Q.  Okay.  Just hand that back to me, then.
23       MR. HAMMER:  Where is the ATF pages?
24            * * *

Page 111

1        (Whereupon, a discussion was held off the
2    record.)
3            * * *
4    BY MR. HAMMER:
5    Q.  I want to just let you look at a couple of
6    pages.  I think you said you wanted to see what actually
7    came in, and I'm just wondering, can you look at these
8    two pages which are -- it's ATF-4 and 5, and see if
9    you've seen something like that before.
10   A.  We don't -- I have never seen a document from
11   ATF.
12   Q.  Okay.
13       But does that come from ATF or from
14   Interstate --
15   A.  I -- I don't know where you received this,
16   so...
17   Q.  Okay.
18       I received it from -- so you hadn't seen
19   those.  Let me see if I can find some others that maybe
20   you had received.
21       These are documents from the FBI.  Maybe you
22   saw these.  They look similar to me, but maybe I'm
23   wrong.
24   A.  Yes.

Page 112

1    Q.  Are you familiar with those documents?
2    A.  It looks like a state record.
3    Q.  Okay.
4        And is it the Interstate record that you
5    received on Dylann Roof showing I think you said it was
6    Lexington County?
7    A.  Yes.
8    Q.  Okay.
9        And if you look at page 105, I think it says
10   "This Interstate Identification Index response is the
11   result of your record request for FBI," whatever it is,
12   "the following will respond to your agency."  Is that
13   correct?
14   A.  The III response data?
15   Q.  See up here?  It says --
16   A.  Oh, okay.  Yes.  Uh-huh.
17   Q.  -- "This Interstate Identification
18   response" --
19   A.  Uh-huh.
20   Q.  So, apparently, there was a request made to
21   the Interstate, III; right?
22   A.  Because when he was trying to purchase, his
23   name, apparently, hit on the III.
24   Q.  So the FBI, the NICS Section, checks with the

**28 (Pages 109 to 112)**

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 113

1   Interstate agency, and they get back this report --
2       A.  Yes.
3       Q.  -- which is this page and the next page; is
4   that correct?
5       A.  Uh-huh.  Yes.
6       Q.  So that's page 105 --
7       A.  -5 and -6.
8       Q.  -- and 106.
9       A.  Correct.
10      Q.  And that's the information that you had when
11  you were -- when it came to you?
12      A.  Correct.
13      Q.  Okay.
14          Now let's look at page 105.  And it says "This
15  information" -- "the information in this rap sheet" --
16  is that what this is?  A rap sheet?
17      A.  Yes.
18      Q.  -- "is subject to the following caveats:
19  Requested for criminal justice purposes, authorized
20  criminal justice agents only."  Is that right?  Did I
21  read that correct?
22      A.  For our purposes only.  We are not to divulge
23  information to --
24      Q.  But it's "authorized criminal justice agency

Page 114

1   use only."  So is NICS a criminal justice agency?
2           MR. TERRELL:  Objection.  Foundation.
3   BY MR. HAMMER:
4       Q.  Does it appear to you --
5       A.  I don't want to assume.
6       Q.  Yeah.  But if that's what it says --
7       A.  It says that.
8       Q.  It says that -- in other words, NICS couldn't
9   get this unless it were a criminal justice agency, could
10  they?
11          MR. TERRELL:  Objection.  Foundation.
12  BY MR. HAMMER:
13      Q.  Is that what this is?
14      A.  I don't want to -- like I said, I don't want
15  to assume.  I'm not a --
16      Q.  Well, it says --
17      A.  -- legal expert.
18      Q.  I understand that, but you agree that it does
19  say -- does appear to say that "The information in this
20  rap sheet is subject to the following caveats"; is that
21  correct?
22      A.  Yes.  Yes, it says that.
23      Q.  And the caveat is "requested for criminal
24  justice purposes, authorized criminal justice agency use

Page 115

1   only."
2       A.  Yes.
3       Q.  That was one of the caveats; correct?
4       A.  It does state that, yes.
5       Q.  And that NICS did get this document?
6       A.  Yes.
7       Q.  Okay.
8           And then the next page shows that it's the
9   report that you had that showed it was a felony and a
10  drug charge --
11      A.  Yes.
12      Q.  -- correct?
13      A.  Correct.
14      Q.  Okay.
15          We'll mark those two pages as the next exhibit
16  number.
17              *  *  *
18          (Whereupon, a discussion was held off the
19  record.)
20              *  *  *
21          (Whereupon, Conley Deposition Exhibit
22  No. 6 marked for purposes of identification.)
23              *  *  *
24  BY MR. HAMMER:

Page 116

1       Q.  I want to show you page -- these two pages
2   which are 268.  Is that what I showed you?
3       A.  Yes.  It's 268, 269.
4       Q.  And that has an SOP number, 5.5.4; is that
5   correct?
6       A.  That's correct.
7           MR. HAMMER:  Let's mark those two pages
8   as the next numbered exhibit, please.
9               *  *  *
10          (Whereupon, Conley Deposition Exhibit
11  No. 7 marked for purposes of identification.)
12              *  *  *
13  BY MR. HAMMER:
14      Q.  Would you read the first paragraph of that?
15      A.  Before A, the "All internal automated
16  systems"?
17      Q.  Right.  "NTN inquiry (by name, FBI, social
18  security number) NGI, NCIC, DDF, ATF, and websites must
19  be checked.  The NICS Library (state information page,
20  terminology page) Westlaw, when applicable" --
21          THE COURT REPORTER:  Could you slow down,
22  please.
23          THE WITNESS:  Sorry.
24      A.  -- "must be researched by the examiner.  The

29 (Pages 113 to 116)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

### Page 117

1  LAT" -- L-A-T -- "may then be contacted prior to calling
2  or faxing any external agency to determine the
3  level/disposition of the arrest charge."
4      Q.  Okay.
5          Did you check the NGI database?
6      A.  Yes.  That's, like, when you put the FBI
7  number in to check to see if there's any records that
8  come up.
9      Q.  Okay.
10         Did you check the NCIC database?
11     A.  No.  The state record had responded.
12     Q.  Okay.
13         Did you check the DDF database?
14     A.  If it was highlighted, yes.
15     Q.  And if it wasn't?
16     A.  Then I would not -- there would be nothing in
17  there.
18     Q.  Did you know whether you checked it in this
19  case?
20     A.  I don't recall.
21     Q.  Okay.
22         Did you check the ATFRDD?
23     A.  If it was not highlighted, I did not check it.
24     Q.  Okay.

### Page 118

1          And how do we find out whether you did or did
2  not check it?  Do we know?
3      A.  It might be -- do you remember where the case
4  history was?  What was it?  Number 3?
5      Q.  No.  I think it was that --
6          MR. WILSON:  Is that it right there?
7      A.  This wasn't it.  Maybe...
8  BY MR. HAMMER:
9      Q.  It was --
10         MS. BUMGARDNER:  They haven't given you
11  an entire case history yet.
12         THE WITNESS:  They gave me one.
13  BY MR. HAMMER:
14     Q.  I think it was in that incident report and
15  case history.  That one.
16     A.  Because it had Debbie's as well as mine.
17  Okay.  NGI:  I put DOA was on file.  NCIC:  DOA on file;
18  no additional.  DDF:  No files.  So ATF, apparently, was
19  not highlighted or I would have -- I would have
20  referenced it.
21     Q.  Okay.
22         MR. WILSON:  Page?
23  BY MR. HAMMER:
24     Q.  Tell me which one -- what's the document

### Page 119

1  you're reading from?
2      A.  This was the Number 4 exhibit.
3      Q.  And the page number from Number 4?
4      A.  17.
5      Q.  ATF-17?
6      A.  Yes.
7      Q.  Okay.
8          And tell me which ones you did not check.
9      A.  The ATF was not relevant because it -- like I
10  said, it was not highlighted.
11     Q.  That's ATFRDD.  You did not check that?
12     A.  No.
13     Q.  And did you check the NGI?
14     A.  Yes.
15     Q.  And did you check NCIC?
16     A.  I put "DOA on file" because the state record
17  did respond, so that was -- it's automatic that, you
18  know, there would be nothing additional on NCIC.  I put
19  "no additional."
20     Q.  But did you check it?
21     A.  No.  Technically, I would not have to.
22     Q.  Okay.
23         And you did not?
24     A.  No.

### Page 120

1      Q.  Okay.
2          And which websites were you required to check?
3      A.  The South Carolina website.
4      Q.  And did you check that?
5      A.  Yes.
6      Q.  Okay.
7          How about the NICS Library?
8      A.  That's the processing state information page,
9  terminology pages.  I would have definitely looked at my
10  information pages to see if there was anything that I
11  needed to -- to -- what I needed to look for or where to
12  go.
13     Q.  And give me the page number in the exhibit.  I
14  think it's the big exhibit in front of you right there
15  that -- the pages you say you checked.
16     A.  The state processing pages, 314, 315, 316, 317
17  is the total processing pages.
18     Q.  Okay.
19         And that's what you call the NICS Library?
20     A.  That is part of -- it would be part of the
21  processing.
22     Q.  Is that the full NICS Library?
23     A.  No.
24     Q.  What else is in the NICS Library?

30  (Pages 117 to 120)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 121

1    A.   The terminology pages.
2    Q.   Did you --
3    A.   That's just definition terms of what South
4    Carolina would use for certain things.
5    Q.   Did you check that?
6    A.   I didn't need to.
7    Q.   But did you?
8    A.   No.
9    Q.   Okay.
10         And then down on further, on page 268, did you
11   notify your supervisor?
12   A.   For what?
13   Q.   For anything.
14   A.   No.
15   Q.   Okay.
16         It says "If a current" -- "if a current
17   transaction exists (delay/open that is actively being
18   processed), notify your Supervisor/Team Leader and have
19   the transaction placed into the correct examiner's
20   ownership."
21   A.   "If a current transaction exists." There was
22   no current -- there was no other transactions besides
23   the one that I was working.
24   Q.   Okay.

Page 122

1         So you didn't contact a supervisor.
2    A.   No.
3    Q.   This is one that you had gotten from the
4    one -- from Ms. Jones before you; right?
5    A.   She delayed the transaction.
6    Q.   Right.
7    A.   So I pulled it from the -- from the delay
8    queue.
9    Q.   Okay.
10         But -- but it was delayed when it came to you?
11   A.   Yes.
12   Q.   And did you -- and you didn't need to contact
13   your supervisor --
14   A.   No.
15   Q.   -- to see if the right examiner was doing it?
16   A.   I was the right examiner.
17   Q.   Okay.
18         And who had contacted the supervisor to make
19   sure you were the right examiner?
20         MR. TERRELL:  Objection.  Foundation.
21   A.   That's not part of the process.
22   BY MR. HAMMER:
23   Q.   Okay.
24         So when do you -- when are you required to

Page 123

1    contact your --
2    A.   That is --
3    Q.   -- supervisor or team leader?
4    A.   Oh, I'm sorry.  That is when additional
5    transactions you find that someone may have -- already
6    have ownership of, like for that subject.  So if Roof
7    had another transaction out there and another examiner
8    was working on it, then I would notify them, the
9    supervisor, and let them know that they have a multiple
10   NTN.  That's when you would contact someone else,
11   contact the supervisor.
12   Q.   And if that happened within 30 days of that
13   date, if there was another transaction that came in
14   within 30 days, that -- you would be required to contact
15   your supervisor?
16   A.   You -- no.  The supervisor would actually --
17   you contact the supervisor to make sure the examiner
18   gets ownership of it, the one who is handling the case.
19   That's what that is.
20   Q.   Even after the time that the three-day time
21   period ends, there's another 30-day period that you'll
22   be looking for new transactions?
23   A.   Right.  If another call would come in, like,
24   you would try to purchase another firearm --

Page 124

1    Q.   Okay.
2    A.   -- then that examiner that took the call would
3    see that I have ownership of the first one.
4    Q.   All right.
5    A.   And then --
6    Q.   How about if another -- another arrest came
7    in?  Would you be aware of that?
8    A.   The -- I would only be aware if I would go
9    back into the transaction.  So if a new transaction
10   popped up, then, yes, I would see additional charges.
11   Q.   Okay.
12         But if there was no new transaction that
13   popped up, you don't look at it again after the
14   three-day period is over with?
15   A.   When I receive information, I do go back into
16   the transaction.
17   Q.   Okay.
18         But you don't automatically check this
19   periodically during the 30-day period?
20   A.   No.
21   Q.   Okay.  All right.
22         Now, you see at the bottom of the page it says
23   "...is the absolute responsibility of the examiner
24   handling the transaction" -- "handling the most current

31 (Pages 121 to 124)

493b03a2-c53a-4527-b64d-80932cc952cc

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 125

1  NTN to ensure all procedures are followed."
2  A.  What page are you on?
3  Q.  Pardon me?
4  A.  Where are you?
5  Q.  I'm on page -- at the bottom of 268.
6  A.  You said the bottom?
7  Q.  Second to the last line, it says "...it is the
8  absolute responsibility..."
9  A.  "...absolute responsibility of the examiner
10  handling the most current NTN to ensure all procedures
11  are followed."
12  Q.  Okay.  And it goes on to the next page.
13  A.  "If the previous examiner neglected to follow
14  an SOP, this does not negate any responsibility to
15  adhere to all NICS SOPs on subsequent NTNs."
16  Q.  So that means that if the person before you
17  hadn't done what they're supposed to do, you've got to
18  do it?
19  A.  Yes.
20  Q.  Okay.
21  And did the person before you contact the
22  court?
23  A.  That was not their -- their responsibility.
24  Q.  Okay.

Page 126

1  Well, there's an SOP that applies to NICS
2  people to require them to contact the court.
3  A.  No.  They just took the phone call.  They just
4  actually initiated the delay.
5  Q.  Okay.
6  A.  So that's different.
7  Q.  Okay.
8  So they're not required to follow the SOP?
9  A.  It's -- it's -- it's different.  It's -- it's
10  not research.  They're not doing research.  When they
11  actually take phone calls --
12  Q.  Okay.
13  A.  -- they're not doing research.
14  Q.  Okay.
15  A.  They actually take the phone call, look at the
16  transaction, look at the information, make sure it's a
17  match.  And if there's a prohibitor, they delay the
18  transaction.  That is -- when you're on the phones, that
19  is your responsibility.
20  Q.  Okay.
21  And that's on the bottom of page 2-what?
22  A.  For the -- what I just read, from the bottom
23  to the top?
24  Q.  Yeah.  What page is the bottom of?

Page 127

1  A.  It was 268, 269.
2  Q.  268 and 269.
3  A.  Uh-huh.
4  Q.  And then -- so the first examiner is not
5  required to call the court or the --
6  A.  No.
7  Q.  -- state POC, but when you get it, this other
8  SOP that we talked about, Exhibit Number 1, comes into
9  play?
10  A.  Yes.
11  Q.  Okay.  So you're required to do that.
12  Now, just so the record will be clear, you did
13  not contact the state POC?
14  A.  No.
15  Q.  Okay.
16  And you did not contact the court?
17  A.  No.
18  Q.  And you did not contact the arresting agency?
19  A.  Yes.
20  Q.  You did?
21  A.  Yes.
22  Q.  All right.
23  Who was the arresting agency?
24  A.  Lexington Sheriff's Office.

Page 128

1  Q.  And who did they tell you had the report?
2  A.  Columbia PD.
3  Q.  Okay.
4  And who does the court document show as the
5  arresting agency -- the arrest warrant show as arresting
6  agency?
7  A.  Lexington Sheriff's Office.
8  Q.  Look at --
9  A.  Oh, this document.
10  Q.  Yes.
11  A.  I thought you meant the actual --
12  Q.  The arrest warrant.
13  A.  -- the state record.
14  Q.  Yeah, the arrest warrant.
15  A.  The state -- the -- the arrest warrant shows
16  Columbia Police Department.
17  Q.  As the arresting agency.
18  A.  Which I did not receive.
19  Q.  Okay.
20  But the court had that and you could have
21  gotten that if you contacted the court.  You agree with
22  that?
23  MR. TERRELL:  Objection.  Calls for
24  speculation.

32 (Pages 125 to 128)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 129

1    MR. HAMMER: You can't -- you can't give
2  her the answer. You've got to object. There's not
3  "Objection. Calls for..."
4    MR. TERRELL: I can state the basis for
5  my objection.
6    MR. HOWE: Not in South Carolina.
7    MR. TERRELL: Yes, I can.
8    MR. WILSON: Only object to form.
9    MR. HAMMER: That's a speaking objection.
10    MR. TERRELL: There's nothing speaking --
11    MR. HAMMER: You're telling the
12  witness --
13    MR. TERRELL: Objection. Foundation.
14  Calls for speculation.
15    MR. HAMMER: But --
16    MR. HOWE: Object to the form. That's
17  all you can do.
18    MR. WILSON: That's all you can do.
19    MR. TERRELL: That is the form.
20    MR. HAMMER: That isn't the form. That's
21  a speaking objection.
22    MR. WILSON: No. The form of the
23  question.
24    MR. TERRELL: Well, there's nothing

Page 130

1  speaking about it.
2    MR. HAMMER: Well, the judge will decide
3  that.
4    MR. TERRELL: Yeah, the judge will decide
5  that.
6  BY MR. HAMMER:
7    Q. All right.
8    Tell me why you couldn't have contacted the
9  court.
10    A. Based on the information that I had found from
11  the website, the case was pending. Therefore, the court
12  does not -- we get the information for the felony
13  indictment from the solicitor to see if they're under
14  felony indictment. So that's why I contacted the
15  solicitor's office, because I knew from the website that
16  there was no conviction, the case was still pending, it
17  was still in the air, there was no decision made.
18    Q. Okay.
19    Let me ask you something. Why were you
20  prohibited from contacting the court?
21    A. Let me look at the contact list. It doesn't
22  state that. It says "Call or fax for criminal records."
23    Q. Well, this is a criminal record, isn't it?
24    A. Yes.

Page 131

1    Q. The arrest warrant is a criminal record.
2    A. Yes.
3    Q. So you could have contacted the court.
4    A. Technically, I would have contacted Lexington
5  County General Sessions.
6    Q. I'm not asking what you did. I'm saying you
7  could have contacted Lexington County General Sessions
8  Court to get that record, couldn't you have?
9    A. Well, apparently not because it's in Columbia
10  PD, if that's a Richland County document.
11    Q. Well, let's look and see if it's a Richland
12  County document. What does that say right over there?
13    A. It says "Lexington County General Sessions."
14    Q. Right. So if you'd have contacted Lexington
15  County General Sessions, you could have gotten that
16  document?
17    A. I can't --
18    MR. TERRELL: Objection. Foundation.
19    A. -- I can't speculate that they would have gave
20  me that actual document.
21  BY MR. HAMMER:
22    Q. Well, if you'd have asked for the court
23  records, that was a court record, wasn't it?
24    MR. TERRELL: Objection. Foundation.

Page 132

1    A. When we contact a court, that -- necessarily,
2  we don't always get the same information that you may be
3  given. So I can't -- I can't say for certain that I
4  would actually receive that actual document that you
5  have in hand.
6  BY MR. HAMMER:
7    Q. Okay.
8    Let's just say -- can you say for certain that
9  it has the exact same number as the court file number?
10    A. Yes. But, like I said, I -- there's no
11  guarantee that the court would actually have sent me the
12  actual arrest warrant documentation.
13    Q. Okay.
14    A. When we fax out for the court information,
15  sometimes they only give NICS certain information.
16    Q. But you didn't ask at all. You didn't even
17  contact them to try and get it, did you?
18    A. Like I said, I went to the solicitor's office
19  because of the website saying the charge was pending.
20  That's why I contacted the solicitor.
21    Q. Okay.
22    And do you know that this is a matter of
23  public record, this document right here?
24    A. No.

33  (Pages 129 to 132)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 133

1    Q.   Exhibit Number 5, the arrest warrant?
2    A.   No.
3    Q.   And you actually had the case number for the
4    court; right?
5    A.   Yes.
6    Q.   And if you had asked for the case file on
7    that, you could have obtained the arrest warrant,
8    couldn't you?
9         MR. TERRELL:  Objection.  Foundation.
10   A.   I don't know.
11   BY MR. HAMMER:
12   Q.   Okay.
13        And if you had obtained the arrest warrant, it
14   would have directed you to Columbia police with an ORI
15   number; correct?
16   A.   If I obtained that information.
17   Q.   If you obtained the arrest warrant, had the
18   Columbia police as the arresting agency with their ORI
19   number?
20   A.   If I would have obtained that document.
21   Q.   Okay.
22        And then you also did not contact the state
23   point of contact, SLED; correct?
24   A.   No.

Page 134

1    Q.   Okay.
2         And were you aware that on March 6, 2015, SLED
3    entered a record categorized as an incident report on
4    behalf of the Columbia Police Department to N-DEx?
5    A.   No.
6    Q.   Would you agree that if they entered that on
7    March 6th, the record characterized as the Columbia
8    police report, that they could have given you the
9    Columbia police report if you had contacted them?
10        MR. TERRELL:  Objection.  Foundation.
11   A.   The process -- South Carolina Processing Page
12   for the South Carolina POC states "contact for
13   clarification."
14   BY MR. HAMMER:
15   Q.   Okay.
16        And you needed some clarification, didn't you?
17   A.   No.
18        MR. TERRELL:  Objection.
19   BY MR. HAMMER:
20   Q.   You didn't have the record, did you?
21   A.   I had the state record from Lexington County
22   Sheriff's Office.
23   Q.   But you didn't have the Columbia Police
24   Department record that Lexington County

Page 135

1    Police -- Lexington County Sheriff's Office told you
2    would have the report, did you?
3    A.   Like I said, I went through our contact list.
4    I went to West Columbia PD because it was in Lexington
5    County.  That is why I contacted the West Columbia PD.
6    Q.   Look on your processing sheet.  That's 314 or
7    316, I think.
8    A.   The processing pages?
9    Q.   Right.  314 to 316.
10   A.   Okay.
11   Q.   Okay.
12        First I want to make sure, on Exhibit
13   Number 1, it says "The examiner will contact the state
14   POC."  Is that what it says?  The first --
15   A.   "The examiner will contact the state POC, the
16   courts, district attorneys, probation offices" --
17        MR. TERRELL:  Slow down.
18   A.   -- "arresting agencies, et cetera, for
19   disposition, level of offense, incident reports,
20   et cetera, via fax, phone, mail, e-mail, or Nlets in
21   accordance with the preference indicated on the state
22   processing page and contact list."
23   BY MR. HAMMER:
24   Q.   All right.

Page 136

1         Now, show me where on the state processing
2    page it says not to contact the state POC.
3    A.   "State POC:  Contact for clarifications on the
4    South Carolina record; only has information that is on
5    the South Carolina record."
6    Q.   Okay.
7         Well, that was on the South Carolina record.
8    A.   Lexington County Sheriff was on the South
9    Carolina record.
10   Q.   But the SLED had the -- had the Columbia
11   police incident report.  That's part of the South
12   Carolina record, too, isn't it?  Is that not part of the
13   South Carolina record, the Columbia police incident --
14   A.   But there was no need.
15   Q.   I'm just asking you, is the South Carolina --
16   is the Columbia Police Department -- Columbia, South
17   Carolina, Police Department report -- incident report
18   part of the South Carolina record?
19        MR. TERRELL:  Objection.  Vague.
20   A.   At the time I thought the Lexington County
21   Sheriff's Office was the arresting agency.
22   BY MR. HAMMER:
23   Q.   But that isn't what I asked you.  I asked, Is
24   the Columbia police report, incident report, a part --

STRESKI REPORTING & VIDEO SERVICE  1-800-659-2249
Wheeling, WV  Morgantown, WV  Martinsburg, WV  Charleston, WV  Steubenville, OH  Pittsburgh, PA

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 137

1  Columbia, South Carolina -- is the Columbia police --
2  Columbia, South Carolina, police report a part of the
3  South Carolina record?
4      A.  At the time I did not know that.
5      Q.  I understand that.  But now you do know that,
6  don't you?
7          MR. TERRELL:  Objection.  Vague.
8  Argumentative.
9  BY MR. HAMMER:
10     Q.  You can answer that "yes" or "no."
11     A.  At the time of the transaction, I -- at the
12  best of my knowledge and my research, I did the
13  following steps because that is why I was -- I thought I
14  was doing the correct thing.
15     Q.  But you've got to answer my question.  I know
16  what you're doing.  You can say "yes" or "no" and
17  explain it any way you want.
18         But I'm asking you, are you aware that the
19  Columbia, South Carolina, incident report on Dylann Roof
20  is a part of the South Carolina record?
21         MR. TERRELL:  Objection.  Vague as to
22  time.
23     A.  At the beginning of the transaction I did not.
24  BY MR. HAMMER:

Page 138

1      Q.  Okay.
2         Right now, do you?
3      A.  Based on all the information that I have seen,
4  yes.
5      Q.  Okay.
6         And had you contacted SLED and they gave you
7  that report, you would have had the information that you
8  needed; correct?
9      A.  Per the processing page, our state POC, we do
10  not contact for incident reports.
11     Q.  Okay.
12         You contact for South Carolina records?
13     A.  We contact for clarification.
14     Q.  Okay.
15         And if you had asked for clarification -- you
16  knew that as soon as you got back the fax from Lexington
17  County, that Columbia Police Department had the report;
18  correct?
19     A.  And I contacted West Columbia PD.
20     Q.  I'm not asking you what you did.  I'm asking
21  you a specific question.  Did you know when you got back
22  the fax from the Lexington County Police Department that
23  they indicated that Columbia Police Department had the
24  report?

Page 139

1      A.  Yes.
2      Q.  Okay.
3         And had you contacted the Columbia Police
4  Department, you could have gotten the report; correct?
5          MR. TERRELL:  Objection.  Foundation.
6      A.  Like I said --
7  BY MR. HAMMER:
8      Q.  That's a "yes" or "no."  You can explain it
9  afterwards.
10         If you had contacted the Columbia Police
11  Department, would you have gotten the report?
12         MR. TERRELL:  Objection.  Foundation.
13     A.  I don't know.
14  BY MR. HAMMER:
15     Q.  Okay.
16         If you'd have asked for it -- if you'd have
17  contacted them and asked for it, do you think you would
18  have gotten it?
19         MR. TERRELL:  Objection.  Speculation.
20     A.  I can't assume that.
21  BY MR. HAMMER:
22     Q.  You can?  Can't?
23     A.  I can't assume that.
24     Q.  Cannot assume that.  Okay.

Page 140

1         And if you had contacted SLED and asked them
2  for the records that they had, the South Carolina
3  records that they had, would you have received the
4  report that they had?
5          MR. TERRELL:  Objection.  Foundation.
6      A.  I can't assume that.
7  BY MR. HAMMER:
8      Q.  Okay.
9         But you did not contact the SLED and you did
10  not contact the court?
11         MR. TERRELL:  Objection.  Asked and
12  answered.
13  BY MR. HAMMER:
14     Q.  That's correct, isn't it?
15     A.  I've already, yes, answered the question.
16     Q.  And you didn't contact the Columbia Police
17  Department?
18         MR. TERRELL:  Objection.  Asked and
19  answered.
20     A.  Yes.
21         MR. HAMMER:  They're going to put
22  something on the record about their right to ask
23  questions, and you can respond, and then we'll go to
24  witness number two so we get her out of there.

35 (Pages 137 to 140)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 141

1      MR. McLEOD:  This is Mullins McLeod on
2  the behalf of the Estate of Myra Thompson, Sharonda
3  Coleman-Singleton, and Cynthia Hurd.
4      We're here today for depositions that were
5  noticed in the master case file that Mr. Hammer issued
6  the notice on pursuant to Judge Gergel's order granting
7  jurisdiction on discovery dated March 23rd, 2017.  My
8  understanding is based upon the Court's consolidating
9  these cases for discovery and assigning them to a master
10  case file, the purpose of which was so that witnesses
11  like Ms. Conley would not have to endure multiple
12  depositions, and, consequently, we have appeared today
13  to ask our questions and so not to inconvenience either
14  the Agency or Ms. Conley.  Mr. Terrell, however, has
15  indicated that he's not going to allow any of the other
16  counsel of record in the other cases, all of which have
17  been consolidated for discovery purposes, to ask any
18  questions.
19      And so at this point, because Mr. Terrell has
20  instructed his witness not to answer any of my
21  questions, my hands are tied unless or until Judge
22  Gergel can rule on this motion -- rule on this issue.
23      MR. HAMMER:  You want to say anything?
24      MR. WILSON:  Yeah.  I'll just join in

Page 142

1  that position.  Joe Wilson representing the Estate of
2  Daniel Simmons.  I'm not sure there's anything I have to
3  add, though, other than I'm joining.
4      MR. HAMMER:  Stephen, do you want to
5  respond?
6      MR. TERRELL:  Sure.  So the United
7  States' position is that the Court consolidated these
8  cases for jurisdictional discovery and for briefing
9  purposes on motions.  Therefore, the United States will
10  file a single renewed motion to dismiss, and plaintiffs
11  collectively will file a single renewed opposition to
12  the United States' motion to dismiss.
13      And the -- we were noticed Ms. Conley's
14  deposition in Sanders.  We have no objection to any
15  attorney conducting the deposition, but our position is
16  that one attorney is allowed to examine the witness
17  during the deposition.  As you know, Federal Rule of
18  Civil Procedure 30(c)(1) states that depositions shall
19  be conducted pursuant to the Federal Rules of Evidence
20  as if at trial, except for Rule 601 and 103.  You also
21  know that Local Civil Rule 83.VI.02 states that only one
22  counsel may examine a witness at trial.
23      I understand we're not at trial.  I understand
24  we're at a deposition.  But Ms. Conley has been here now

Page 143

1  about three hours, and you've conducted a thorough
2  examination that includes her spouse's identity, the age
3  of her child; we've been over whether or not she's
4  contacted the State of South Carolina POC at least three
5  or four times.  If you have certain questions that you
6  feel Mr. Hammer did not ask, you are free to discuss
7  that.  He can ask those questions before we conclude the
8  deposition.  But we do not believe, for both fairness
9  and efficiency reasons, that Ms. Conley should be passed
10  around the table and potentially subject to seven
11  attorneys' examination.
12      MR. McLEOD:  And for the record, there
13  are only three attorneys who have come here today to ask
14  Ms. Conley questions.  That's Mr. Hammer, Mr. Wilson,
15  and myself.  Our co-counsels are also here because of
16  the public import and significance of these cases.  I
17  respect your position.  I think you're dead wrong.  What
18  we'll have to do is wait for Judge Gergel to issue the
19  order on this.  In the interim, we're going to reserve
20  our right for Mr. Hammer to ask eight hours' worth of
21  questions of Ms. Conley --
22      MR. TERRELL:  It's seven hours.
23      MR. McLEOD:  -- per the rules, and we'll
24  go to witness two.  We don't have a choice.

Page 144

1      MR. HAMMER:  Do you want to put this on
2  the record?
3      MR. WILSON:  Well -- yeah -- the rules
4  allow each party to question a witness, and we are --
5  we're here representing different plaintiffs, different
6  parties.
7      I'm going to put deposition record -- I mean
8  the deposition notice as an Exhibit -- what's the next
9  exhibit number?
10      THE COURT REPORTER:  Number 8.
11      MR. WILSON:  Number 8.  It's our
12  consolidated deposition notice.  And -- I'll leave it at
13  that.
14          *  *  *
15      (Whereupon, Conley Deposition Exhibit
16  No. 8 marked for purposes of identification.)
17          *  *  *
18      MR. McLEOD:  All right.  So we'll go to
19  witness two.  We'll try to get Judge Gergel on the
20  phone.  If we can't, we'll hold her deposition in
21  abeyance --
22          *  *  *
23      (Simultaneous speakers)
24          *  *  *

36  (Pages 141 to 144)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 145

1    THE COURT REPORTER:  I can't hear
2  everything you're saying.  "We'll hold her deposition in
3  abeyance..."
4        MR. McLEOD:  Yeah.  So we're going to go
5  to witness two today because of time constraints, and,
6  hopefully, we'll get a ruling from Judge Gergel today.
7  If he's unavailable by the close of business today, then
8  we will leave Ms. Conley's deposition in abeyance and
9  reserve the unused portion of the seven hours allotted
10  to be used at a later date with Mr. Hammer should the
11  plaintiffs see fit.
12        MR. TERRELL:  We agree to suspend the
13  deposition subject to Court ruling.  In the event that
14  the deposition is closed, the United States requests,
15  pursuant to Rule 30(e)(1), that the witness be afforded
16  an opportunity to read and sign the transcript.
17              * * *
18        (Whereupon, the deposition was adjourned
19  at 1:32 p.m.)
20              * * *
21
22
23
24

Page 146

1  THE STATE OF   :
2  WEST VIRGINIA  :
        : SS: C E R T I F I C A T E
3  COUNTY OF OHIO :

4        I, DIANA BAKER, Registered Professional
Reporter and Notary Public within and for the State of
5  West Virginia, duly commissioned and qualified, do
hereby certify that the within-named witness,
6  JENNIFER CONLEY, was by me first duly sworn to testify
to the truth, the whole truth and nothing but the truth
7  in the cause aforesaid.

8        I do further certify that the within testimony
was by me reduced to stenotype in the presence of the
9  witness; afterwards reduced to Computer-Aided
Transcription under my direction and control; that the
10  foregoing is a true and correct transcription of the
testimony given by said witness; and this deposition was
11  adjourned to be continued at a later date.

12        I further certify that the reading and signing
of the transcript was requested.
13        I do further certify that I am not a relative,
counsel, or attorney of either party, or otherwise
14  interested in the event of this action.
15  I, to the best of my ability, do further
certify that the attached transcript meets the
16  requirements set forth within Article 27, Chapter 47 of
the West Virginia Code.
17
       IN WITNESS WHEREOF, I have hereunto set my hand
18  and affixed my seal of office in Wheeling, West
Virginia, on the 26th day of June, 2017.
19
20        *Diana Baker*
21        DIANA BAKER, RPR
       Notary Public within and for the
22        State of West Virginia
23
My Commission expires:
24  May 24, 2021

37 (Pages 145 to 146)

493b03a2-c53a-4527-b64d-80932cc952cc

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 147

| A | | |
|---|---|---|
| **a.m** 1:24 | **agree** 55:10,20 56:7 114:18 | **Argumentative** 137:8 |
| **abeyance** 144:21 145:3,8 | 128:21 134:6 145:12 | **arrest** 48:7,17 79:12,13 |
| **abide** 9:14 | **agreeing** 55:12 | 92:20,22 93:1 95:11,17 |
| **ability** 146:15 | **air** 130:17 | 97:4 98:13 117:3 124:6 |
| **able** 74:1 82:3 | **alcohol** 34:21 | 128:5,12,14,15 131:1 |
| **above-entitled** 1:19 | **allotted** 145:9 | 132:12 133:1,7,13,17 |
| **absolute** 124:23 125:8,9 | **allow** 36:11,14 141:15 144:4 | **arrested** 23:11 46:15 |
| **access** 38:1 63:6,12 | **allowed** 142:16 | **arresting** 44:15,18,24 77:17 |
| **acronym** 28:7 | **alt** 124:7 | 79:8,10,19 82:4 94:17 95:6 |
| **action** 1:19 146:14 | **alternative** 82:19 | 95:22 127:18,23 128:5,5,17 |
| **actions** 60:5 | **Alvin** 2:18 8:12 | 133:18 135:18 136:21 |
| **actively** 121:17 | **America** 1:8 5:15 6:4 | **Arthur** 4:8,10 |
| **actual** 24:24 28:6,8,11 46:18 | **and/or** 77:20 | **Article** 146:16 |
| 46:19 47:21 58:20 59:4 | **ANDREW** 3:15 | **asked** 75:21 82:10,14 100:7 |
| 61:24 62:11 63:5 67:19 | **andy@savlaw.com** 3:20 | 100:8 131:22 133:6 136:23 |
| 84:7,7 91:12 100:11 | **Angie** 106:22 | 136:23 138:15 139:16,17 |
| 128:11 131:20 132:4,12 | **answer** 16:4,5,9 17:2,3,4,8 | 140:1,11,18 |
| **add** 142:3 | 18:16 23:9 25:6,15,21 | **asking** 9:9 17:7 25:18 27:10 |
| **additional** 22:21 26:5,6,12 | 30:10 31:13 34:16 36:1 | 30:21 31:5,17 32:16,17 |
| 27:17,21 29:3 51:22 52:4 | 38:22 40:14 43:11,17 | 33:11 43:7 54:17 55:15 |
| 53:1 62:9 118:18 119:18 | 51:11 53:9 54:24 56:20 | 56:16 59:10 60:16 63:22 |
| 119:19 123:4 124:10 | 71:1,1,2,11 96:4,14 129:2 | 74:19 81:6,13 82:23 100:9 |
| **address** 97:18 | 137:10,15 141:20 | 100:22 101:13 108:1 131:6 |
| **adhere** 125:15 | **answered** 140:12,15,19 | 136:15 137:18 138:20,20 |
| **adjourn** 9:1 | **answering** 57:19 | **aspect** 102:18 |
| **adjourned** 145:18 146:10 | **answers** 73:16 100:12 | **assigned** 22:1,12 46:11 |
| **adopted** 57:1 | **Anthony** 2:15 3:12 4:5,5 | **assigning** 141:9 |
| **Affidavit** 92:21 | **Antill** 11:21,23 106:18 | **assume** 91:4 114:5,15 |
| **affixed** 146:18 | **anybody** 10:23 11:12 | 139:20,23,24 140:6 |
| **afforded** 145:15 | **apparently** 112:20,23 | **Assumes** 107:20 |
| **aforementioned** 101:5 | 118:18 131:9 | **ATF** 74:10 88:5 110:23 |
| **aforesaid** 146:6 | **appear** 114:4,19 | 111:11,13 116:18 118:18 |
| **age** 143:2 | **APPEARANCES** 2:1 3:1 | 119:9 |
| **agencies** 28:8,11 45:11 47:22 | 4:1 5:1 6:1 | **ATF-17** 88:10 119:5 |
| 77:18 85:16 87:10,11,19 | **appeared** 141:12 | **ATF-4** 111:8 |
| 94:17 107:10 135:18 | **applicable** 116:20 | **ATFRDD** 117:22 119:11 |
| **agency** 44:15,18,24 45:6 | **application** 73:23 74:4 86:10 | **attached** 89:3 92:3 146:15 |
| 47:16 59:21 60:1 66:24 | 86:15,22 101:4,21 | **attorney** 142:15,16 146:13 |
| 79:8,11,19 82:4,24 83:1,10 | **applies** 126:1 | **attorneys** 10:22 77:17 |
| 83:10 95:6,18,21,22 105:14 | **apply** 60:12 | 135:16 143:13 |
| 112:12 113:1,24 114:1,9,24 | **approved** 32:21 37:13 | **attorneys'** 143:11 |
| 117:2 127:18,23 128:5,6,17 | **Approximately** 16:18 | **authorized** 113:19,24 114:24 |
| 133:18 136:21 141:14 | **April** 70:23,23 71:6,24 85:7 | **automated** 116:15 |
| **agents** 113:20 | 98:21 | **automatic** 119:17 |
| **ago** 11:5 20:20 32:2 42:2 | **AR** 95:18 | **automatically** 109:22 124:18 |
| | **area** 16:10 | **available** 51:19 63:1,1,10 |
| | **areas** 8:20 | |

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

70:8,22 72:24 73:6 80:7
81:18 82:20 91:8,17
**aware** 8:14 104:23 124:7,8
134:2 137:18

**B**

**B** 2:11 3:7 7:6
**bachelor's** 14:15
**back** 9:2 29:3 34:2 47:13
65:22 66:3,6,7,12 67:22
68:1,5 70:3,5 71:15 77:11
90:2 103:1 104:19 110:22
113:1 124:9,15 138:16,21
**background** 13:21 41:11
42:20 45:16,19 70:21
107:17 108:4
**Baker** 1:21 146:3,21
**based** 26:13 76:10 97:12
130:10 138:3 141:8
**basis** 55:22 56:4 129:4
**Bay** 5:8
**beginning** 20:6 90:13 137:23
**begins** 83:14,15
**behalf** 1:18 2:3 3:3 4:3 5:3
5:14 6:3 134:4 141:2
**believe** 83:2 143:8
**belong** 56:6
**Ben** 5:17
**best** 10:8 12:1 13:5 19:13
29:24 41:2 43:4 50:16
137:12 146:15
**Bethan** 2:13 3:10
**beyond** 51:14
**big** 120:14
**bit** 13:21
**Blake** 5:7
**boss** 106:17 107:3,4
**bosses** 107:5
**bottom** 23:20 24:23 67:15
78:8 90:12,24 93:5,6 97:14
97:18 110:2 124:22 125:5
125:6 126:21,22,24
**box** 5:18 28:14
**Brandon** 90:20
**break** 8:23 87:21,23 88:1,4
**Brett** 11:21,23 106:18

**Brief** 88:1
**briefing** 142:8
**bringing** 13:13
**Broad** 4:19
**brought** 40:4 49:23 50:1
**Bumgardner** 6:12 12:3
118:10
**Bureau** 9:17
**business** 145:7
**buyers** 45:16,20

**C**

**C** 5:6 107:6 146:2,2
**C-J-I-S** 9:23
**C.C.P** 93:4
**call** 85:11 107:15 108:3,6,8,9
109:8,17 120:19 123:23
124:2 126:3,15 127:5
130:22
**called** 70:14 99:13
**calling** 117:1
**calls** 53:7,22 54:22 55:6,23
95:12 126:11 128:23 129:3
129:14
**card** 15:15
**Carolina** 1:2 2:21 3:17 4:13
4:20 5:8 27:1,19 33:1
40:23 65:9 71:3,4,4,22,22
71:23 81:18 83:6,22 84:2,4
84:10,15 85:22,23 94:4,14
120:3 121:4 129:6 134:11
134:12 136:4,5,7,9,12,13
136:15,17,18 137:1,2,3,19
137:20 138:12 140:2 143:4
**case** 1:5 12:8,11,13,22 13:4,8
13:10 18:24 27:11,11
29:14 46:16,18 48:22,24
52:1 65:15 78:21 82:17
87:17 88:8,9 90:4 91:20,21
92:10 93:20 94:23 95:5
98:5 117:19 118:3,11,15
123:18 130:11,16 133:3,6
141:5,10
**cases** 8:14 49:3 141:9,16
142:8 143:16
**categorized** 134:3

**cause** 1:19 146:6
**caution** 55:15
**caveat** 114:23
**caveats** 113:18 114:20 115:3
**Cell** 14:23 15:5
**center** 109:8
**certain** 32:21 42:12 53:5,12
57:22 58:18 60:19 70:7
121:4 132:3,8,15 143:5
**certify** 146:5,7,11,13,15
**cetera** 77:18,19 135:18,20
**Chalmers** 2:20
**chance** 73:2 74:12 92:6
**changed** 105:15
**changing** 105:15
**Chapter** 146:16
**characterized** 134:7
**charge** 34:7,17,24 35:1 45:1
46:15 58:16 90:9 101:6,22
106:10 115:10 117:3
132:19
**charged** 93:22
**charges** 27:17,18,21 44:1
73:24 94:22 124:10
**Charleston** 1:3 2:21 3:16
4:13,19 5:8 40:22
**check** 25:3,12,19 26:8 27:16
28:3,15 29:14 32:24 41:11
41:19 42:20 47:11 61:7
62:24 63:10 70:21 87:15
96:22 97:3 104:21 107:17
108:4 117:5,7,10,13,22,23
118:2 119:8,11,13,15,20
120:2,4 121:5 124:18
**checked** 52:10 116:19
117:18 120:15
**checking** 68:14 98:19
**checks** 45:16,19 112:24
**Cheryl** 6:24
**child** 17:22 143:3
**children** 17:16,18,20 18:13
**choice** 143:24
**chris.donovan@ic.fbi.gov**
6:10
**CHRISTOPHER** 6:5
**church** 40:20,23

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 149

circumstances 37:21
cities 81:17 104:23
citizenship 29:11
city 74:23 75:14 81:19 84:5
  84:12 97:14,16,17
city/county 71:4,22
Civil 1:20 5:17 6:6 142:18
  142:21
CJIS 9:21 10:11,14 15:18,24
  16:2 39:2,4,13 50:15 51:5
  51:7,8 106:9,12,13
CJIS-maintained 38:20
claim 13:16
claiming 13:13
clarification 9:11 60:10
  85:12 103:11 134:13,16
  138:13,15
clarifications 84:19 85:23
  136:3
clarify 11:14 13:6 18:17 21:4
  21:14 23:4 25:16 30:11
  31:3 32:14 33:7 35:8,18
  36:12 40:21 42:9,21 43:12
  45:24 52:8 54:2 56:17
  57:18 59:23 68:16 73:22
  74:4 86:10,15,20,21,22
  87:5,9 101:4,9,21 102:21
  103:3,7 107:24
Clarksburg 1:24 6:16 14:1
  16:14 18:7
classified 15:16
clean 90:1
clear 127:12
Clementa 2:8
click 22:20,24 23:7,13
clicking 23:1,7
close 14:1 145:7
closed 145:14
closest 48:3
co-counsels 143:15
Co-Personal 2:16 3:13 4:6
Code 60:4,12,18,23 146:16
cold 13:18
Coleman 4:4
Coleman-Singleton 4:5
  141:3

collectively 142:11
Columbia 47:11,14,15,18,18
  48:2,3,7,17 49:19 66:2
  67:9 68:4 69:2 74:15,23
  75:15 79:13,16,20,22,23
  80:2,13 81:1,2,8,11,11,14
  81:17,24 82:9,23 84:2,4,10
  84:14,15 85:4 88:5,23
  95:17,20 97:10,15,16,16,17
  97:18,19 102:13 103:2,4
  128:2,16 131:9 133:14,18
  134:4,7,9,23 135:4,5
  136:10,13,16,16,24 137:1,1
  137:2,19 138:17,19,23
  139:3,10 140:16
come 9:2 18:21 19:5 23:12
  28:9 29:2 100:20 110:17
  111:13 117:8 123:23
  143:13
comes 23:8 37:12 108:6,9
  109:17,24 127:8
coming 19:5
commencing 1:24
comment 76:9
comments 75:7 76:4,10
Commission 146:23
commissioned 146:4
commonly 57:1
complete 63:21,23,24
computer 28:1 88:7 96:17
Computer-Aided 146:8
conclude 143:7
conclusion 53:8,23 54:23
  55:7,23
conducted 142:19 143:1
conducting 142:15
confirm 45:14
Conley 1:13 7:3,8,9,10,11,12
  7:13,14,15 8:2,10,12 17:12
  64:10 69:17 73:11 88:13
  99:23 115:21 116:10
  141:11,14 142:24 143:9,14
  143:21 144:15 146:5
Conley's 142:13 145:8
consequently 141:12
consist 21:8 27:13

consolidated 1:5 141:17
  142:7 144:12
consolidating 141:8
constraints 145:5
consult 10:22,23
Cont 3:1 4:1 5:1 6:1
contact 44:17,23 45:6,10
  47:14 48:2 70:19,20,24
  71:5,23 77:16,23 78:6,18
  78:20 79:6,8,16,19,21
  80:20 81:19 82:3,21 83:6,7
  83:9,11,22 84:8,19 85:12
  85:12,15,19,23,24 87:14
  93:17 94:1,6,8,11,17,19
  95:7,9,23 96:10 97:5,7
  104:16,19 105:7,14,18
  122:1,12 123:1,10,11,14,17
  125:21 126:2 127:13,16,18
  130:21 132:1,17 133:22,23
  134:12 135:3,13,15,22
  136:2,3 138:10,12,13 140:9
  140:10,16
contacted 44:16 45:7 78:24
  79:2,23 81:2 82:24 83:1
  85:9 87:16,17 95:1,6,10
  96:8 97:12 105:2 117:1
  122:18 128:21 130:8,14
  131:3,4,7,14 132:20 134:9
  135:5 138:6,19 139:3,10,17
  140:1 143:4
contacting 44:12 130:20
contain 103:17
contained 51:19
contains 24:5
continued 146:10
control 146:9
controlled 29:8 90:6
conversation 12:1
convicted 58:13 93:22
conviction 29:4 34:23 52:24
  54:5,8 55:1,4 57:6 58:22
  59:1 62:11 87:1 94:10
  102:15 130:16
convictions 29:1 54:7
coordinator 105:3,4,16,17
coordinators 104:18 105:13

**copies** 90:1
**copy** 93:3,7 95:24 96:14
**correct** 10:5 14:20 15:9 20:7
20:9,14 25:3 27:2 31:11,18
33:10 35:3 37:7,15,16,17
37:19 38:7 41:20 45:15,17
46:3,4,8,9 48:7 51:15 54:1
57:16,24 59:2 67:8 68:2,6
68:11,12,18,20,23 69:1,4,6
69:9 70:9 71:9 73:5 74:3,7
74:16 75:3,15 76:11,12,16
76:17 77:3,13,14,15 78:10
78:15,16,17 80:9 81:24
82:5 83:23 84:1,3,10,13,15
84:18,21 85:10 86:20 87:9
88:19 90:19 93:2,15 94:6
95:23 96:6,7 97:10,19
98:12 99:6 102:6,7,7
103:15 108:22 112:13
113:4,9,12,21 114:21 115:3
115:12,13 116:5,6 121:19
133:15,23 137:14 138:8,18
139:4 140:14 146:9
**correctly** 29:24 57:19 71:9
72:4 92:12,16 107:1
**counsel** 9:10 55:11 141:16
142:22 146:13
**counties** 71:6,24 105:19
**county** 44:13 46:24 47:15,20
47:21 48:1,4 65:19 67:3,7
67:20 68:4,21 69:7 70:24
79:1,2,22,23 80:16,18,21
81:1,5,8,11,13,24 82:16
83:3,4 93:4 104:17,24
105:2,7 112:6 131:5,7,10
131:12,13,15 134:21,24
135:1,5 136:8,20 138:17,22
146:2
**couple** 76:1 92:9 111:5
**course** 20:21 29:2
**court** 1:1 9:7 29:6 53:1
58:21 68:8,10 78:20,22
79:6 89:9 92:3 93:10,17
94:1,6,8,9,24 95:10 98:2,11
99:14,14 116:21 125:22
126:2 127:5,16 128:4,20,21

130:9,11,20 131:3,8,22,23
132:1,9,11,14 133:4 140:10
142:7 144:10 145:1,13
**Court's** 141:8
**courts** 77:16 94:17,21
135:16
**coworkers** 12:17,18,20
**crime** 29:12 57:3
**criminal** 10:6 23:11 24:8
44:1 49:11 54:17,18 59:10
59:21,24 113:19,20,24
114:1,9,23,24 130:22,23
131:1
**current** 59:7 121:16,16,21
121:22 124:24 125:10
**Custer** 6:15
**custodian** 1:5 2:6 3:6
**Cynthia** 4:9 141:3

## D

**D** 7:1
**Daniel** 5:4,5 142:2
**data** 49:16 112:14
**database** 23:6 24:5,16 27:6
27:19 28:4,15 29:13 38:2,4
38:6,8 39:4,15 49:19 51:1
52:6,10,22 61:3,6,7 62:10
105:23 117:5,10,13
**databases** 23:1,20,23 24:18
25:2,7,13,18 29:2 33:14
43:23 45:22,22 60:6,19
62:1 63:1,1,5,11 107:18
108:5,10 109:7,11,18,20
110:9
**date** 11:4,7 23:15 29:6 41:12
90:13 98:9,11,13,15,18,23
98:24 99:14 123:13 145:10
146:10
**dated** 67:11,15 76:5 90:17
98:7 141:7
**day** 49:3,7 146:18
**days** 123:12,14
**DC** 5:18
**DD** 28:3
**DDF** 28:3,5 116:18 117:13
118:18

**dead** 143:17
**dealer** 46:6
**dealers** 45:17,20
**dealing** 90:3
**Debbie** 105:5
**Debbie's** 118:16
**decide** 36:10 130:2,4
**decision** 63:3 76:10,14 78:13
130:17
**defective** 29:10
**Defendant** 1:9 90:24
**definitely** 120:9
**definition** 121:3
**definitions** 9:11
**delay** 36:21 37:5 46:13 122:7
126:4,17
**delay/open** 121:17
**delayed** 36:2,20,24 37:2,12
46:6 102:22 122:5,10
**demonstrating** 61:11,21
**denial** 37:21 61:9,19 88:19
88:24
**denied** 36:3,4 37:10,14
38:11,15 46:7 57:7 62:3,13
**deny** 37:20 38:12 58:19,22
59:9 74:2 76:10,14
**denying** 76:22
**department** 5:17 6:6,15
15:22 44:13 47:11 48:18
67:9 68:5 69:3 74:16,24
81:8,14 85:5 95:18 128:16
134:4,24 136:16,17 138:17
138:22,23 139:4,11 140:17
**DePayne** 2:14 3:11
**depends** 25:22,22 34:7 44:19
45:1 58:6,15
**deposed** 8:3 11:16
**deposition** 1:13 7:8,9,10,11
7:12,13,14,15 8:22 9:13
10:17 11:3,11 12:4,7,21
13:1,8 18:22 19:16 64:10
69:17 73:11 88:13 99:23
115:21 116:10 142:14,15
142:17,24 143:8 144:7,8,12
144:15,20 145:2,8,13,14,18
146:10

**depositions** 141:4,12 142:18
**description** 21:5
**descriptor** 24:21
**descriptors** 23:15 24:21
  26:12 108:12 109:18
**details** 12:10 21:15
**determination** 35:11 37:5,6
**determine** 82:11 117:2
**determined** 102:12
**developed** 50:15
**Diana** 1:21 146:3,21
**different** 15:22 48:1 54:9
  90:4 110:17,18 126:6,9
  144:5,5
**directed** 9:9 133:14
**direction** 146:9
**disagree** 77:2
**discharge** 29:10
**discovery** 141:7,9,17 142:8
**discuss** 12:6,10 18:20 19:24
  143:6
**discussed** 12:18
**discussion** 19:10 64:23
  111:1 115:18
**discussions** 18:12
**dishonorable** 29:10
**dismiss** 142:10,12
**dismissal** 36:16
**Dispo-** 66:18
**disposition** 34:22 45:5 62:18
  77:18 85:17 94:2,24 95:8
  135:19
**disqualifiers** 26:20
**disregard** 100:5
**district** 1:1,2 77:17 135:16
**division** 1:3 5:17 9:20 10:11
  15:19 20:6 44:4 50:16
  83:22
**divulge** 113:22
**DOA** 118:17,17 119:16
**Docket** 99:18,20
**document** 11:6 34:3 63:21
  72:6,15 89:21 91:24 92:2,4
  92:19,24 93:3,13 95:19
  97:22 98:1,2,7,11 99:14
  111:10 115:5 118:24 128:4

128:9 131:10,12,16,20
  132:4,23 133:20
**documentation** 58:20
  132:12
**documents** 9:12 10:18 28:9
  47:5 63:23,24 65:3 69:14
  70:7,8,11 72:20,23 73:3
  74:13 93:18 110:10,15
  111:21 112:1
**doing** 15:16 20:23 57:23
  60:5 122:15 126:10,13
  137:14,16
**domestic** 29:12
**DONOVAN** 6:5
**Drive** 1:23
**drug** 34:22 46:15 58:15
  87:15 95:4 115:10
**drugs** 54:7,12 59:5 87:2
  102:5,11 103:9
**DUI** 34:17
**duly** 8:3 146:4,5
**duties** 21:2
**Dylann** 40:9 42:19 70:21
  75:22 90:18 103:18 112:5
  137:19

**E**
**E** 7:1,6 8:6 146:2,2
**e-mail** 2:24 3:20 4:16,23
  5:11,21 6:10,19 12:3 77:20
  94:3 135:20
**earlier** 75:6
**easier** 97:11
**East** 5:8 6:7
**education** 14:11
**efficiency** 143:9
**effort** 62:16,23 78:11
**eight** 76:6 143:20
**either** 18:12 37:13 46:6
  61:10,20 141:13 146:13
**element** 94:11
**ELISSA** 6:13
**elissa.okoniewski@ic.fbi....**
  6:20
**Emanuel** 40:20
**Emily** 1:23

**employed** 9:16,19
**ends** 123:21
**endurance** 9:3
**endure** 141:11
**Enforcement** 83:22
**ensure** 125:1,10
**enter** 29:13 52:23
**entered** 134:3,6
**entire** 16:10 118:11
**entry** 99:15
**error** 101:2,2
**Esquire** 2:18,19 3:15 4:11
  4:18 5:6,16 6:5,12,13,14
**Estate** 2:4,7,11,13,14,16 3:4
  3:8,9,11,13 4:4,7,9 5:5
  141:2 142:1
**et** 77:18,19 135:18,20
**Ethel** 2:13 3:10
**event** 90:11 145:13 146:14
**events** 18:19
**evidence** 107:21 142:19
**exact** 19:15 98:23 103:20
  132:9
**exactly** 19:13 21:2 41:6
  50:12 84:17
**examination** 7:4 143:2,11
**examine** 142:16,22
**examined** 8:3
**examiner** 15:12 20:15,19
  21:3,6,9 29:22 47:9 70:22
  76:24 77:13 109:22 116:24
  122:15,16,19 123:7,17
  124:2,23 125:9,13 127:4
  135:13,15
**examiner's** 121:19
**examiners** 20:23 70:21
**example** 10:17 23:23 34:11
  34:13 51:18 71:5,23
**examples** 34:9
**exhibit** 7:8,9,10,11,12,13,14
  7:15 64:7,10 69:14,17,23
  70:3,5 73:9,11 77:11,24
  78:1,3,5 80:5 85:15 88:11
  88:13,17,19 89:9 99:23
  115:15,21 116:8,10 119:2
  120:13,14 127:8 133:1

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 152

135:12 144:8,9,15
**exhibits** 99:4
**exist** 57:14
**exists** 58:11 121:17,21
**expert** 114:17
**expires** 146:23
**explain** 31:23 137:17 139:8
**explanation** 94:5
**explanations** 9:11
**extent** 16:4 105:9,20
**external** 117:2

───────────────
**F**
**F** 146:2
**fact** 49:18 103:13
**facts** 107:20
**fair** 29:22 35:6
**Fairmont** 18:6,8,9
**fairness** 143:8
**fall** 31:7
**familiar** 60:9,11,15 100:13
112:1
**far** 9:10 12:21 16:14 46:9
53:11 62:1 68:14 105:12
105:23 110:20
**fault** 76:22
**fax** 2:23 3:19 4:15,22 5:10
5:20 6:9,18 33:20 34:1,20
47:13 65:20 66:2,4 67:19
67:19,24 68:21 69:2,7
75:16 77:19 80:3 94:2
104:22 105:15 130:22
132:14 135:20 138:16,22
**faxed** 47:16,18
**faxes** 66:24 67:16 68:14
**faxing** 34:5 117:2
**FBI** 10:12 15:6,8,11 18:14
24:5 26:18 27:16,18,20
30:3 39:9,13 80:11 100:20
100:23 105:24 111:21
112:11,24 116:17 117:6
**FBI's** 50:15
**FBI-00000282** 63:18
**FBI-00000312** 72:1
**FBI-30** 74:9
**FBI-312** 72:16

**FBI-314** 83:15
**FBI-341** 72:1
**FBI-397** 89:20
**FBI-41** 65:4
**FBI-55** 100:4
**federal** 1:20 9:17 24:13
26:18 28:24 29:9 30:17,19
31:15 37:22 52:22 53:15
53:21 54:4,6,15,15 59:4
60:4,12,18,23 76:10 87:1,1
103:8 107:10,16 108:3
142:17,19
**feel** 143:6
**Felicia** 1:5 2:5,5 3:5,5
**felon** 54:21 57:4
**felony** 28:24 29:4,7 45:4
46:15 52:24 55:1,4 57:6
58:21 87:1 94:10,10,22
95:2 102:3,8,10 115:9
130:12,14
**felt** 82:22
**file** 28:1 91:3 98:15,18,24
118:17,17 119:16 132:9
133:6 141:5,10 142:10,11
**files** 118:18
**final** 35:11 36:1 62:18 63:3
78:12 101:20,23
**finance** 14:15
**find** 11:3 20:3 58:2,7,10 61:4
70:6 86:18 87:8 111:19
118:1 123:5
**fingerprint** 15:12,15,18,24
20:6
**fingerprints** 15:13
**finish** 104:3
**firearm** 45:17 53:6,13 58:14
61:12,22 70:21 87:15
103:19 123:24
**firearms** 26:7 45:20 107:16
108:3
**Firm** 3:16 6:24
**first** 8:3 19:7 21:17,19 22:16
23:14 26:8 40:19 41:2,6
70:13 93:12 116:14 124:3
127:4 135:12,14 146:5
**fit** 145:11

**Fitzgerald** 90:21
**follow** 30:17,18,18 31:14,15
32:7 42:5,13 54:15 60:21
60:23 64:15 125:13 126:8
**followed** 125:1,11
**following** 43:1 112:12
113:18 114:20 137:13
**follows** 8:4
**force** 94:11
**foregoing** 146:9
**form** 56:8,10,14 57:5 129:8
129:16,19,20,22
**forth** 146:16
**forward** 36:2,11
**found** 11:11 19:11 29:1 48:6
53:1,13 57:14 58:19 61:10
61:20 65:14 81:1 104:9,15
130:10
**Foundation** 16:3 30:9 31:1
31:12,20 38:18,21 39:10
43:10 51:10 53:8,23 54:23
55:7 58:5 59:13 61:14
74:20 105:8 106:1,5
107:12 114:2,11 122:20
129:13 131:18,24 133:9
134:10 139:5,12 140:5
**four** 20:12,13 34:10 143:5
**Franklin** 5:17
**free** 143:6
**Friend** 2:10
**front** 43:16 77:12 120:14
**fugitive** 29:7
**full** 8:8 120:22
**functions** 30:6
**further** 62:5 86:9,14 121:10
146:7,11,13,15
**fussing** 55:9

───────────────
**G**
**Garden** 1:23
**geared** 40:12
**Gedney** 2:19,20
**general** 18:6 27:10 93:4,10
94:12 131:5,7,13,15
**generally** 43:21
**Gergel** 141:22 143:18

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

Page 153

144:19 145:6
**Gergel's** 141:6
**getting** 58:4 76:23
**ghowe@gedneyhowe.com**
2:24
**give** 12:4 18:21 19:16 32:9
34:9,13 36:19 37:9,21 42:3
42:6 50:3 65:11 70:10
89:22 94:5 97:2 105:13,16
105:21 120:13 129:1
132:15
**given** 20:8 26:22 33:8 70:6
73:15 85:10 91:3 118:10
132:3 134:8 146:10
**giving** 12:21 13:7 55:15
56:16 82:23
**glad** 87:22
**glass** 15:15
**go** 8:18,20 21:16 24:21 26:11
28:24 29:9 31:14 36:2,10
47:17 49:8 53:14 60:22
64:18 65:16 70:3,5,11,12
72:13 77:11 83:4,8,10,17
106:23,24 120:12 124:8,15
140:23 143:24 144:18
145:4
**goes** 125:12
**going** 8:8,17 11:16 12:3,8
27:11 39:24 49:2 56:15,20
56:21 57:18 63:17 64:18
66:8 70:10 89:24 91:24
92:1,9,11 140:21 141:15
143:19 144:7 145:4
**good** 16:8 55:18,21
**gotten** 77:7 95:11 97:9 122:3
128:21 131:15 139:4,11,18
**governed** 43:8
**Government** 9:10 13:15
63:18 70:19 92:2
**graduate** 14:7,9
**Grafton** 13:23
**Graham** 4:9
**Grand** 93:4
**granting** 141:6
**grew** 14:3
**Group** 4:12

**guarantee** 132:11
**guard** 18:3,5
**Guardian** 2:9
**guess** 19:4
**guidelines** 30:19
**gun** 41:9 53:18,21 54:19,19
54:20,21 55:4 57:4,16 58:3
58:4 59:11 104:10
**guns** 30:15,23 31:7
**guys** 97:1

## H

**H** 7:6
**Hammer** 2:18 7:4 8:7,12
16:6 17:1,6 18:18 23:5
25:10,17,24 30:12 31:4,10
31:16,21 32:15 34:11,12,18
35:9 38:19,24 39:12 42:10
43:13 51:12 53:10,24 55:2
55:24 56:3,13 57:2,8,20
58:8 59:15 60:8 61:16 63:9
63:14,16,22 64:3,7,13,20
65:2,6,7 69:20 71:20 73:8
73:14 74:21 86:6 87:22
88:3,16 95:15 96:13,17,20
99:17,20 100:2 104:6
105:10 106:3,7 107:14,22
110:23 111:4 114:3,12
115:24 116:7,13 118:8,13
118:23 122:22 129:1,9,11
129:15,20 130:2,6 131:21
132:6 133:11 134:14,19
135:23 136:22 137:9,24
139:7,14,21 140:7,13,21
141:5,23 142:4 143:6,14,20
144:1 145:10
**hand** 90:2 110:22 132:5
146:17
**handguns** 30:7
**handing** 110:11
**handling** 123:18 124:24,24
125:10
**hands** 30:7,16,24 31:8
141:21
**happened** 40:7,24 49:23
90:10 123:12

**harm** 30:15 31:7
**head** 24:3 62:22 70:16 71:8
71:10 76:18 106:8,12
**hear** 39:21 40:1,19,22 41:2
49:17 50:22,23 51:4,6
102:24 103:17 145:1
**heard** 39:17,18,22,23 41:6
49:21,22 50:6,22 51:3
103:13
**hearing** 50:3
**heavy** 15:4
**held** 19:10 64:23 79:2 83:3
111:1 115:18
**help** 104:13
**hereunto** 146:17
**Herns** 5:7
**high** 14:5
**highlight** 24:23
**highlighted** 23:20,24 24:19
25:8 28:4,15,20 29:16,18
43:24 61:7 90:1 108:17,18
108:21,24 109:4,5 110:1,7
110:8 117:14,23 118:19
119:10
**Hilton** 1:23
**history** 23:12 26:17 27:6
48:24 88:8,9 118:4,11,15
**hit** 24:19,22,24 25:8 26:3
27:4 43:24 44:22 108:11
108:19 109:1,7,16 110:8
112:23
**hits** 23:21 26:5 109:19 110:1
**hold** 144:20 145:2
**Hollow** 6:15
**home** 16:14
**honestly** 43:17
**hopefully** 145:6
**Hospital** 18:6
**hour** 76:14
**hours** 143:1,22 145:9
**hours'** 143:20
**house** 5:7 16:18
**Howe** 2:19,20 56:2 129:6,16
**Huh** 99:17
**Huh-uh** 59:17
**Hurd** 4:8,9,10 141:3

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

husband 18:2,13
hypothetical 25:6,15 32:13

**I**

idea 42:6
identification 24:10 64:11
    69:18 73:12 88:14 99:24
    112:10,17 115:22 116:11
    144:16
identity 143:2
II 26:24
III 2:19,20 3:15 24:1,2,5,10
    24:22 25:4 26:19 38:4
    51:20 61:4,11,21 62:4,11
    62:12 75:24 107:18 109:3
    110:3 112:14,21,23
illegal 53:17 54:4,21 55:5
    57:15
immediate 106:17
import 143:16
incident 34:20,21 49:18 52:1
    74:16,23 75:16 77:19 85:4
    85:17,24 87:13 88:5 89:3,4
    94:2 95:7 101:10 102:12
    102:14,17,18,24 103:5
    110:17 118:14 134:3
    135:19 136:11,13,17,24
    137:19 138:10
include 52:1
includes 26:24 143:2
including 70:22,24 107:18
    108:5
Incomplete 25:5,15 32:13
inconvenience 141:13
index 24:10 28:16,17,18,22
    28:23 38:6,7,10,13,14,17
    38:20 39:5 50:11 52:15,17
    52:21 61:10,20 62:2,2
    107:18 108:14,15 110:3
    112:10
indexes 109:11
indicated 77:23 85:18,21
    135:21 138:23 141:15
indicating 98:8
indicted 29:5
indictment 29:7 58:13 79:3

87:14 95:2,2 102:9,10,16
    130:13,14
indictments 29:4,5 87:16
individual 90:20
individually 1:5 2:6,9 3:6
inference 59:7,7
information 10:7 12:22 20:9
    23:14 26:13,14 28:11
    30:18 33:20 34:6 35:5,11
    44:19 45:5,9,10,23 47:24
    51:19,23 53:1 58:6 61:11
    61:21 62:5,9,17 63:2 73:22
    74:1,4 78:12 79:3 81:7
    82:19 86:9,14,18 87:8,14
    87:20 93:20 94:9 96:24
    97:2,3 101:4,8,9,16,17,19
    102:21,23 103:18 105:21
    107:9 113:10,15,15,23
    114:19 116:19 120:8,10
    124:15 126:16 130:10,12
    132:2,14,15 133:16 136:4
    138:3,7
initials 21:24
initiated 126:4
Inn 1:23
inquiry 21:21 22:17,20,21
    26:4,7 43:22 75:7 116:17
inspection 39:24 40:2,5,6,8
    40:10,13,16 44:4 73:17
    100:9,10 104:1
instance 34:17
instruct 9:8
instructed 141:20
instrument 20:15,19 21:3,9
instruments 21:6
interested 146:14
interim 143:19
internal 116:15
Interstate 24:10 111:14
    112:4,10,17,21 113:1
interview 20:8 26:22 29:21
    44:3 52:9 73:16,17
interviewed 40:16 86:14
interviewer 52:11
introducing 51:22
Investigation 9:17

issue 36:14 61:9,19 141:22
    143:18
issued 88:23 141:5
IV 5:6

**J**

J 3:15 4:18
Jackson 2:11,12 3:7,8
Jennifer 1:13 2:7,8,8 7:3 8:2
    8:10 146:5
job 15:10 20:23 21:5 30:8
Joe 142:1
joewilson@phsm.com 5:11
join 141:24
joining 142:3
Jones 122:4
JOSEPH 5:6
Jr 4:11 5:4
judge 130:2,4 141:6,21
    143:18 144:19 145:6
judge's 97:18
Julie 6:12 12:3
julie.bumgardner@ic.fbi....
    6:19
June 1:15 75:8 90:11 91:6,8
    146:18
jurisdiction 141:7
jurisdictional 142:8
justice 5:17 6:6,15 10:6 29:7
    49:11 54:18 59:21,24
    113:19,20,24 114:1,9,24,24

**K**

K.M 1:6 2:6 3:6
keep 8:18 28:7 37:2 47:3,5
    56:15 66:8 72:15
Kevin 2:15 3:12 4:6
killed 40:23
kind 27:6
Kirby 14:22 15:3
kleroy@gedneyhowe.com
    2:24
knew 12:8 19:1 80:1 87:17
    87:18 94:23,24 95:4
    130:15 138:16
know 8:16,18,24 9:4 11:9,16

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

12:20,21,21 13:12,15 16:8
18:24 19:3,4,20,22,22
20:22 21:24 24:3,24 26:14
27:6 28:6 31:23,23,24
33:11 35:21 36:15,19 37:9
39:11,15,19 40:3,20,24
42:3,22 43:14,15 45:7 47:4
47:8,22,23,24,24 49:10,13
49:22 50:2,16,19,20,24
51:13,17,18 52:7,11,13,15
53:11 55:1 59:16,18,19,22
59:24 60:2,4,13,16,20 61:1
61:2 66:14 68:13 69:10
75:10 85:8 86:24 91:5 92:1
95:14 96:24 98:23 100:17
100:21 104:1,17,18 105:4
105:12,20,21,23 106:2,4,6
106:11,14,15,23 107:5,7,9
107:13,15,23 110:10
111:15 117:18 118:2
119:18 123:9 132:22
133:10 137:4,5,15 138:21
139:13 142:17,21
**knowledge** 10:8 16:4 30:1
43:4 51:14 108:2 137:12
**knows** 18:21

---

**L**

**L** 1:21 5:5 6:24
**L-A-T** 117:1
**lab** 95:8
**Lance** 2:13 3:10
**lasted** 15:3
**LAT** 117:1
**late** 40:7
**Laura** 2:12 3:9
**law** 2:20 3:16 4:12 6:24 29:9
30:17 31:15 53:5,20 54:16
54:18 59:11 83:22
**lawsuit** 13:13
**lawyers** 8:13 12:24 70:7
**lead** 83:2
**leader** 121:18 123:3
**learned** 100:23,23
**leave** 144:12 145:8
**led** 81:3,7

**left** 92:20 102:22
**left-hand** 91:21
**legal** 1:5 2:6 3:6 20:15,18
21:2,6,9 53:8,23 54:23
55:7,23 114:17
**Legally** 57:6 59:14
**let's** 64:20 70:3 71:13 73:8
77:11 80:6,11 83:13,13
85:14 99:4 113:14 116:7
131:11 132:8
**letter** 71:14,19 72:14,19
**letting** 8:15 30:15,23 31:7
**level** 8:18 34:23 77:18 85:17
94:2 135:19
**level/disposition** 117:3
**Lexington** 44:13 46:24
47:15,20 65:19 67:3,7,20
68:3,21 69:7 70:24 71:5,24
78:24 79:2,21 81:5,8,10,13
82:16 83:3 84:13 93:4
104:17 105:2,7 112:6
127:24 128:7 131:4,7,13,14
134:21,24 135:1,4 136:8,20
138:16,22
**Library** 116:19 120:7,19,22
120:24
**Licensee** 107:16 108:3
**life** 16:10
**line** 106:23 125:7
**lines** 76:1
**list** 45:10,10 47:15 48:2
70:20,20 71:4,23 77:24
79:21 80:20 81:19 82:21
85:19 95:9,23 96:10 97:5,7
104:17,19 105:7,18 130:21
135:3,22
**listed** 26:19 27:21 46:14 47:1
47:16,21 81:17 87:10 90:9
95:24 96:2,5
**listing** 84:2
**lists** 45:11 94:21
**Litigation** 6:6
**little** 8:16 13:21 15:4,14
19:22 55:15 87:21
**live** 17:18,24
**lived** 16:10,16

**lives** 30:14
**living** 18:2
**LLC** 4:12 5:7
**local** 56:18,22 57:1 142:21
**located** 84:9
**long** 9:1 15:2,4 16:16 17:14
20:20 41:15 42:2
**longer** 11:5
**look** 24:17 26:9,16,19 28:19
39:24 43:22 57:22 63:19
65:3 66:15,20 69:13 70:11
70:18 71:14,16 72:19 73:2
74:11,12,22 75:13 80:6,11
81:20 83:13 84:10 85:14
89:14,22,24 91:20 92:4
95:22 96:14 100:13 110:11
111:5,7,22 112:9 113:14
120:11 124:13 126:15,16
128:8 130:21 131:11 135:6
**looked** 10:17,19,21 15:15
43:23 68:17 79:22 80:12
80:24 81:10,11,23 82:4,6
96:9,10 120:9
**looking** 34:6 36:6 45:1 48:24
82:15 103:6,10 123:22
**looks** 66:23 92:20 112:2
**lot** 23:11 42:14 43:15 47:22
47:23 97:11,19

---

**M**

**M** 2:19,20 8:6
**M.P** 2:10
**mail** 77:19 94:3 135:20
**main** 24:16 30:14
**maintaining** 105:18
**maintains** 38:17 39:4,9
45:23 107:6
**making** 62:23
**man** 106:19
**managed** 50:15 51:5,7
105:24
**management** 14:16
**mandatory** 32:6 42:12 62:24
**March** 85:5 134:2,7 141:7
**mark** 64:7 69:13 73:8 88:10
99:2,4,11,21 115:15 116:7

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

**marked** 64:11 69:18 73:12 88:14 99:24 100:4 115:22 116:11 144:16
**married** 16:21,23 17:10,14
**master** 141:5,9
**match** 26:10,14,16 43:23 46:2 61:8,24 62:2,4 93:15 126:17
**matching** 26:10 45:23 61:4 61:10,20 107:19 109:11,15 110:5
**matter** 132:22
**McLEOD** 4:11,12 55:8,18 55:21 56:5,15,22 141:1,1 143:12,23 144:18 145:4
**mean** 11:14 13:12 38:10 39:9 40:8 41:23 47:2 49:7 54:24 56:21 91:5 110:17 144:7
**means** 21:23 52:11 125:16
**meant** 128:11
**meet** 37:22
**meets** 146:15
**mental** 29:10
**methods** 94:7
**middle** 93:6
**Middleton-Brown** 2:13 3:10
**Middleton-Doctor** 2:15 3:12
**military** 29:11
**mind** 41:7
**mine** 118:16
**minor** 1:6 2:6,10 3:6
**minute** 32:2 63:19 89:15
**minutes** 9:1 16:15
**misdemeanor** 29:12
**mission** 30:22
**missions** 31:6
**misspeak** 10:3
**Monica** 106:24
**Moore** 2:12 3:9
**Morris** 4:12
**Mother** 40:20
**motion** 92:3 141:22 142:10 142:12
**motions** 142:9
**Moves** 62:22 70:16 71:8,10

76:18
**Mullins** 4:11 141:1
**mullins@mcleod-lawgrou...** 4:16
**multiple** 123:9 141:11
**Myra** 2:16 3:13 4:7 141:2

## N

**N** 7:1 8:6,6
**N-D-E-x** 49:19 50:18 103:14
**N-DEx** 39:15 49:13,19,24 50:11,14,17 51:5,17 52:1 85:5 103:14,17 104:8,12 105:23 107:6,9 110:12 134:4
**name** 8:8,12 23:15 24:20 26:11 90:18 105:4 112:23 116:17
**names** 42:3 50:3
**narcotic** 75:24
**National** 21:23
**Natural** 2:9
**NCIC** 27:23,23 38:2 51:20 61:3,10,20 62:4,5 107:18 108:23 110:2 116:18 117:10 118:17 119:15,18
**necessarily** 132:1
**necessary** 62:17 63:2 78:12
**need** 8:19,20,23,23 9:2 34:23 35:13 44:1 53:2 54:8 55:14 60:10 83:9,10 84:23 87:5 102:8,15 121:6 122:12 136:14
**needed** 25:23 62:6 73:22 74:4 86:9,14,20 87:8 101:4 101:9,18 102:21 120:11,11 134:16 138:8
**needs** 102:10
**negate** 125:14
**neglected** 125:13
**nerves** 19:21
**nervous** 19:18,19
**Netlets** 77:20
**never** 19:19,20 67:22,24 89:5,6 100:15 110:13 111:10

**new** 123:22 124:9,12
**news** 100:24
**NGI** 116:18 117:5 118:17 119:13
**NICS** 10:14 15:17,24 28:16 28:17,18,22,23 30:2,13 31:5,19 38:6,7,10,13,14,17 38:23 39:2,5 40:11 45:15 45:19,22 49:10,24 50:11 51:8 52:15,17,21 59:21 61:3,10,20 62:2,2,18 63:3 70:20 73:21 74:3 78:13 101:3 104:12 107:18 108:14,15 110:3 112:24 114:1,8 115:5 116:19 120:7,19,22,24 125:15 126:1 132:15
**Nlets** 77:21,22 94:3 135:20
**normal** 24:16 29:14 49:6,7
**normally** 53:3
**Notary** 1:22 146:4,21
**noted** 95:9
**notes** 10:19,21 100:4
**notice** 141:6 144:8,12
**noticed** 141:5 142:13
**notify** 121:11,18 123:8
**NTN** 21:21,23,24 22:1,3,9,17 22:20 26:4,7 43:22 75:7 116:17 123:10 125:1,10
**NTNs** 125:15
**number** 21:24 22:3,3,7,12 27:20 34:10 59:5 64:4,8 65:11,18 66:21 69:14,24 70:4,5,18 72:7,10 73:9 74:15 77:11,24 78:3,5 83:24 86:3 88:11,17,20 89:17 91:20,22 92:10,24 95:18 96:23 98:1,5 99:5 105:15,15 115:16 116:4,18 117:7 118:4 119:2,3,3 120:13 127:8 132:9,9 133:1,3,15,19 135:13 140:24 144:9,10,11
**numbered** 116:8
**numbers** 69:15 74:10 93:14 99:13,15 104:22,22

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

**Nutter** 107:3
**Nutter's** 107:4

---

**O**

**O** 8:6
**object** 56:1,8,13 129:2,8,16
**objection** 16:3,24 18:15 23:3
25:5,14,20 30:9 31:1,9,20
32:12 34:15 35:7 38:18,21
39:10 42:8 43:10 51:10
53:7,22 54:22 55:6,11,14
55:20,23 56:9,11,19 57:5
57:17 58:5 59:13 60:7
61:14 63:4 74:20 95:12
105:8 106:1,5 107:12,20
114:2,11 122:20 128:23
129:3,5,9,13,21 131:18,24
133:9 134:10,18 136:19
137:7,21 139:5,12,19 140:5
140:11,18 142:14
**objections** 55:10,13 56:6
70:14
**objective** 37:13
**obtain** 27:24 34:21 35:4,5,10
51:1 53:6 54:19 57:15,16
62:17 63:2 73:22 74:4
78:11 87:12,12 101:4,18
**obtained** 55:4 133:7,13,16
133:17,20
**obtaining** 53:13 54:20
**obtains** 54:19,21
**offenders** 62:7
**offense** 77:18 85:17 94:2
135:19
**offhand** 42:17
**office** 10:18 46:24,24 65:20
65:24 67:4,5,7,20 68:4,22
69:8 81:14 87:12,13
103:14 127:24 128:7
130:15 132:18 134:22
135:1 136:21 146:18
**officer** 90:18,21,22 91:14
**officers** 77:17
**offices** 2:20 135:16
**Oh** 112:16 123:4 128:9
**OHIO** 146:2

**okay** 8:11,21 9:5,18 10:10
11:2,8,10 12:5,9 13:3,20,24
14:17 15:1,7,23 16:7,9,13
17:13,22 18:1,4,11,23 19:2
19:12 21:1,7,11,22 22:2,5
22:11,15,18,23 23:16,17,19
23:22 24:4,7,12 25:1,11
26:1,21 27:8,15,20 28:2,13
28:21 29:17,20 30:5,20
32:1,23 33:2,4,21,24 34:4,8
35:16,21,22,22,23 36:9,18
36:22 37:4,8,24 39:1,8,20
40:15,18 41:1,5,14 42:4,15
42:18 43:6,19 44:7,21 45:3
45:12 46:17,20,22 48:5,14
48:21 50:8 51:2,16 52:5
53:4 54:10 55:18 56:6 57:9
57:12,21 58:1,9,17,23 59:3
59:20 60:3,14,17 61:18
62:14 63:13 64:2,17 65:13
65:16 66:13,17,19 67:14,18
70:3 72:12 73:1,8,20 75:1
75:9,12 76:3,21 77:1,5,10
78:7,23 79:15,18,24 80:4
80:10,15,23 81:22 82:2,12
83:5,20 85:2,13,14,20 86:2
86:7,19 87:6 89:2,7 91:7
91:19 92:5,8,12,23 93:9,14
93:24 94:20 95:3,16 96:1,3
96:12,17,21 97:8,13,24
98:6,10,14,17 99:8,12
100:6,16 101:14 102:19
103:22 105:11 107:2,8
108:8,13 109:2,14 110:4,14
110:19,22 111:12,17 112:3
112:8,16 113:13 115:7,14
117:4,9,12,21,24 118:17,21
119:7,22 120:1,6,18 121:9
121:15,24 122:9,17,23
124:1,11,17,21 125:12,20
125:24 126:5,7,12,14,20
127:11,15 128:3,19 130:18
132:7,13,21 133:12,21
134:1,15 135:10,11 136:6
138:1,5,11,14 139:2,15,24
140:8

**OKONIEWSKI** 6:13
**old** 17:20
**once** 22:8,8 26:16 27:21 32:9
**ones** 13:13 38:11 89:24 90:2
99:4 104:21 119:8
**operate** 27:12
**operating** 32:4 43:1,8 60:22
**opportunity** 145:16
**opposing** 55:11
**opposition** 142:11
**order** 1:12 21:12 62:17 63:2
78:12 141:6 143:19
**orders** 29:11 62:7
**ORI** 83:24 95:18,23 96:2,6,7
96:10,11 97:7,10 133:14,18
**originally** 13:22,23
**overall** 40:10
**oversight** 101:1
**ownership** 121:20 123:6,18
124:3

---

**P**

**p.m** 145:19
**P.O** 5:18
**PA** 2:20 4:19
**package** 65:8
**page** 7:2,7 63:14 64:1,20
65:11,16,18 66:1,8,9 68:8,8
70:13,17 71:3,15,16,17,22
72:14 74:22 75:4,13 77:23
78:1 80:6,11,12,24 82:4,7
83:9,13,15,21 85:11,19
86:3 87:11 88:22 89:18
91:21,21 94:4,9,13,15,18
99:5 100:5 110:11 112:9
113:3,3,6,14 115:8 116:1
116:19,20 118:22 119:3
120:8,13 121:10 124:22
125:2,5,12 126:21,24
134:11 135:22 136:2 138:9
**pages** 45:10 64:18 72:21
73:6 75:2 80:7 83:18 88:5
88:9 110:23 111:6,8
115:15 116:1,7 120:9,10,15
120:16,17 121:1 135:8
**paragraph** 71:17 116:14

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

**Pardon** 11:22 125:3
**Parent** 2:9
**Parham** 6:7
**part** 12:13 27:3 30:3,8 33:22 38:9,23 39:2 64:4 103:12 103:12 120:20,20 122:21 136:11,12,18,24 137:2,20
**part-time** 15:6
**parties** 144:6
**party** 144:4 146:13
**passed** 143:9
**PD** 47:14,15 48:3 66:2 79:13 79:16,20,22,23 80:2 81:12 82:24 84:14 95:20 103:4 128:2 131:10 135:4,5 138:19
**pending** 65:15 78:21 82:17 87:18 93:20 94:23 130:11 130:16 132:19
**people** 9:9 10:18 28:23,24 29:5,8 30:15,23 31:7 38:11 40:23 53:5 126:2
**perfectly** 16:8
**performed** 41:10
**period** 123:21,21 124:14,19
**periodically** 124:19
**person** 46:1 57:15 58:3 59:11 104:16 106:8,9,12 125:16,21
**Personal** 2:4,7,11,12,14 3:4 3:7,9,10 4:4,8 5:4
**phase** 62:19 78:14
**phone** 77:19 94:3 104:22 105:14 126:3,11,15 135:20 144:20
**phones** 126:18
**phonetic** 106:24
**physical** 94:11
**Pierce** 5:7
**Pinckney** 2:7,8,8,9
**placed** 121:19
**places** 97:15
**Plaintiff** 1:7 5:3
**plaintiffs** 1:18 2:3 3:3 4:3 8:14 13:12 142:10 144:5 145:11

**play** 127:9
**please** 8:9 63:15 64:8 94:13 116:8,22
**POC** 52:6,10 70:20 77:16 78:18 83:7 84:7 85:16,22 127:7,13 134:12 135:14,15 136:2,3 138:9 143:4
**point** 47:23 83:6,21 84:7 133:23 141:19
**police** 47:11,18,19 48:17 49:19 52:4 67:9 68:4 69:2 74:16,24 76:13 81:2,8,14 84:6,13 85:4 88:23 90:18 95:18 97:11 102:13 103:2 128:16 133:14,18 134:4,8,9 134:23 135:1 136:11,13,16 136:17,24 137:1,2 138:17 138:22,23 139:3,10 140:16
**police/incident** 95:8
**Polly** 2:10 3:7
**pop** 23:17 62:8
**popped** 124:10,13
**portion** 145:9
**position** 13:15 142:1,7,15 143:17
**positive** 58:15
**possessing** 103:19
**possession** 90:5
**possible** 26:6 46:5 73:23 74:5 86:10,15,22 87:16 101:5,21,24 109:19
**possibly** 49:24
**potential** 45:16,20 95:4
**potentially** 44:23 143:10
**practical** 71:7
**preference** 77:22 85:18,21 135:21
**prepare** 10:16,20
**prescription** 75:22
**presence** 146:8
**present** 6:23 9:12
**pretty** 24:16 49:6
**prevent** 104:13
**previous** 125:13
**pride** 29:21
**primary** 26:23 94:17,19

**Prioleau** 3:16
**prior** 79:5 117:1
**privilege** 55:12,13
**probably** 11:9 16:18 101:13 101:15
**probation** 62:7 77:17 135:16
**procedure** 1:20 31:15 142:18
**procedures** 32:4 43:1,8 60:21,22 125:1,10
**proceed** 36:15,17 46:6
**proceeded** 109:8
**process** 122:21 134:11
**processed** 121:18
**processing** 71:3,22 77:23 78:1 83:9,14,18 85:11,19 87:11,12 94:4,8,14 120:8 120:16,17,21 134:11 135:6 135:8,22 136:1 138:9
**produce** 70:19
**produced** 71:6 72:1
**Production** 70:15 72:7
**Professional** 1:21 146:3
**prohibit** 53:13 58:3 62:1,12 102:14 103:18
**prohibited** 54:20 58:18 59:12 104:9 130:20
**prohibiting** 44:23 53:16
**prohibitions** 73:23 101:5
**prohibitor** 35:2 54:4,6 59:4 76:11 86:24 87:2 103:8 126:17
**prohibitors** 28:24 29:13 37:23 52:22 53:12,15,21 54:11 57:13,14,22 58:2,10 58:19 74:5 86:10,15,23 101:22 102:1
**pronounced** 107:1
**proper** 36:10,19 37:9 56:8
**prosecuting** 95:21 97:16
**prospective** 61:12,22
**protect** 30:14,23 31:7
**protection** 29:11 62:6
**PROTECTIVE** 1:12
**provide** 26:13 46:5 56:2,3
**provided** 63:17,21 107:9

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

**provides** 61:11,21
**providing** 55:22
**public** 1:22 132:23 143:16
  146:4,21
**pull** 21:19 22:8 23:18 42:16
  49:8 89:9
**pulled** 46:13 122:7
**purchase** 26:6 28:10 112:22
  123:24
**purpose** 34:5 141:10
**purposes** 64:11 69:18 73:12
  88:14 99:24 113:19,22
  114:24 115:22 116:11
  141:17 142:9 144:16
**pursuant** 1:19 141:6 142:19
  145:15
**put** 29:4 38:10 53:2 117:6
  118:17 119:16,18 140:21
  144:1,7

---

### Q

**qualified** 146:4
**Quarles** 2:17 3:14 4:7
**question** 13:6 25:16 30:11
  31:18 35:12 43:12 49:12
  51:4 56:8 61:17 64:1 79:4
  79:9 86:12 88:21 96:15
  129:23 137:15 138:21
  140:15 144:4
**questioned** 44:6
**questions** 9:8,9,12 17:7
  55:16 63:23 73:15,19
  100:7,12,13,20 140:23
  141:13,18,21 143:5,7,14,21
**queue** 46:13 122:8

---

### R

**R** 5:16 6:5 146:2
**ran** 33:14
**rap** 113:15,16 114:20
**rate** 101:2
**reach** 62:17 63:2 78:12
**read** 63:19 71:9 72:4,10
  75:17 86:4 92:11,12,16
  102:13 113:21 116:14
  126:22 145:16

**reading** 71:2 76:9 77:13
  94:13 119:1 146:11
**ready** 13:1
**realize** 41:9,18
**really** 40:12 41:4 42:1,2
  103:6
**reason** 8:23 51:8 82:8 83:4
  100:19
**reasons** 143:9
**recall** 19:15 70:1 100:11
  103:20 104:13 117:20
**receipt** 61:12,22
**receive** 28:11 36:21,23 68:5
  69:8 74:1,17 94:22 101:10
  101:11,17 102:23 103:4
  124:15 128:18 132:4
**received** 12:2 28:8 47:13
  48:19 66:2,6,7 67:22 68:1
  68:24 69:5 75:14,16 88:18
  88:22 89:6 97:22 107:15
  110:21 111:15,18,20 112:5
  140:3
**receives** 45:15,19
**receiving** 77:3 103:19 108:2
**recognize** 65:8,9
**recollect** 40:3
**record** 26:11,15,16,17,18,18
  27:16,18,20,22,24 28:1
  29:1 47:21 48:6,11,16,16
  52:24 61:10,20 62:12
  64:24 71:5,23 85:24 111:2
  112:2,4,11 115:19 117:11
  119:16 127:12 128:13
  130:23 131:1,8,23 132:23
  134:3,7,20,21,24 136:4,5,7
  136:9,12,13,18 137:3,20
  140:22 141:16 143:12
  144:2,7
**records** 24:6,8,13 52:1 61:5
  84:20 107:19 109:12,16
  110:6 117:7 130:22 131:23
  138:12 140:2,3
**reduced** 146:8,8
**referenced** 118:20
**references** 97:19
**regarding** 102:23

**region** 26:24 104:18 105:13
  105:16,17
**regional** 52:6,10 105:3,4
**Registered** 1:21 146:3
**regular** 40:13
**regulations** 36:14 60:4,12,18
  60:24
**related** 19:17 34:22 73:23
  74:5 101:5,22
**relationship** 94:12
**relative** 146:13
**Relevance** 16:24 34:15
**relevant** 17:9 63:7,11 107:18
  108:5,10 119:9
**remember** 41:3,4,12,13,17
  41:22 42:1,2 43:20 44:8,12
  44:13,14 46:14,16,23 47:8
  47:10,14 48:8,15,19,22
  49:2,20 50:2,3,4,10,12,12
  73:17,21 100:8 103:21,23
  104:7,11,12,14,15 118:3
**renewed** 142:10,11
**renounced** 29:11
**repeat** 61:17 88:21
**report** 34:20,21 46:19 47:12
  48:17 49:18 74:16,23
  75:14,16,17,19,21 76:1,13
  76:19,23 77:3,8,19 79:12
  79:14 81:9,15 82:9,13 84:6
  84:13 85:4,10,17 88:5,18
  88:23 89:3,4 94:2 95:7,8
  101:10 102:12,13,14,17,18
  102:24 103:3,5 104:15
  113:1 115:9 118:14 128:1
  134:3,8,9 135:2 136:11,17
  136:17,24,24 137:2,19
  138:7,17,24 139:4,11 140:4
**Reporter** 1:21 116:21
  144:10 145:1 146:4
**reports** 51:22 52:2,4 86:1
  87:13 95:8 110:17 135:19
  138:10
**Representative** 2:4,7,11,12
  2:14 3:4,8,9,11 4:4,9 5:4
**Representatives** 2:16 3:13
  4:7

---

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

Page 160

**representing** 8:13 142:1
144:5
**request** 48:11 70:18 72:7
107:16 108:3 112:11,20
**requested** 113:19 114:23
146:12
**requesting** 70:18
**requests** 45:16,19 70:14
145:14
**require** 42:6 44:17 58:24
126:2
**required** 9:6 25:12,19 42:13
44:20,23 60:19 62:16 63:6
63:10 64:14 107:17 108:2
108:4,10,14 120:2 122:24
123:14 126:8 127:5,11
**requirements** 146:16
**requires** 60:5
**research** 26:23 27:4,5,9,13
27:14 28:17 32:10,16,18,21
33:5,22 35:4,13,17,24 36:7
37:18 62:15,18 69:23
78:13 81:3,7 82:15 86:17
126:10,10,13 137:12
**researched** 44:2 116:24
**researching** 27:5 69:11 87:4
**reserve** 143:19 145:9
**residence** 16:16,19
**resort** 94:11
**respect** 143:17
**respond** 112:12 119:17
140:23 142:5
**responded** 27:22 117:11
**response** 13:16 34:2 36:20
37:10 48:8,9,10,20 65:22
66:12 68:24 69:5,8 71:3
72:7 112:10,14,18
**responses** 32:9 46:6 70:14
**responsibility** 26:23 124:23
125:8,9,14,23 126:19
**responsible** 104:16 105:17
**restoration** 57:10
**restrictions** 58:14 79:5
87:15
**result** 112:11
**review** 92:6

**reviewed** 70:20
**Richland** 71:6,24 80:19,21
81:1,24 131:10,11
**Richmond** 6:7
**right** 9:22 14:14 21:20 22:10
22:14 27:12 34:19 35:20
39:14 45:8 47:8 50:5 54:21
59:6,8 65:16,21,23 66:1,4
66:23 68:10 70:3 76:5,9
83:5,7,12,16 84:17 89:5
90:5 91:1,9 92:18,21 93:5
93:21 95:18 96:23 97:11
98:8,22 101:23 102:1,4,11
109:9,16 112:21 113:20
116:17 118:6 120:14 122:4
122:6,15,16,19 123:23
124:4,21 127:22 130:7
131:12,14 132:23 133:4
135:9,24 138:2 140:22
143:20 144:18
**right-hand** 66:24
**rights** 57:11
**Road** 6:7,15
**Robert** 17:12
**Robin** 107:3,4
**role** 18:24 20:1 42:19
**Roof** 40:9 42:19 46:12 68:14
70:22 90:18 103:18 112:5
123:6 137:19
**Roof's** 48:7
**routine** 49:6
**RPR** 146:21
**rule** 56:22 57:1 141:22,22
142:17,20,21 145:15
**rules** 1:20 9:7 36:14 55:9,10
56:18 142:19 143:23 144:3
**ruling** 145:6,13
**run** 27:16,20,23
**Russell** 75:10 76:22 88:18,22
105:5

**S**

**S** 7:6
**sale** 70:21
**Sanders** 1:5 2:4,5,5,5 3:4,5,5
3:5 142:14

**sat** 20:23
**Savage** 3:15,16 6:24,24
**save** 28:10 30:14
**saved** 28:10
**saw** 111:22
**saying** 47:14 55:3 58:21
59:18 84:24 131:6 132:19
145:2
**says** 20:8,10 26:22 29:21
52:9 60:18 71:2,3,17,21
74:22,23 75:14,17,19,21
84:19 85:15,16 90:21,22,24
91:21 92:21 93:5 94:16
95:21 97:14 98:18 100:19
100:20 101:1,3 112:9,15
113:14 114:6,7,8,16,22
121:16 124:22 125:7
130:22 131:13 135:13,14
136:2
**SC** 84:20
**Schedule** 75:24
**Schmutz** 4:18,19,19
**school** 14:5
**scope** 27:12
**screen** 23:8,12,17 24:23
110:2
**screenshot** 66:17 67:21 68:7
68:19 89:8 92:10 98:2
**screenshots** 90:4 91:2
**seal** 146:18
**search** 57:23 60:6,19 61:3
80:8 107:17 108:4,10,14,20
108:23 109:3,11,15,18,21
109:22 110:5
**searches** 45:22
**Sears** 14:23 15:5
**second** 71:14,17,17 125:7
**section** 9:19 10:14 31:6
39:13 49:10 51:8 112:24
**security** 18:3,5 116:18
**see** 22:21 23:14 26:5,9,10,19
27:4,6,12,17,17 28:3 34:21
43:23,24,24 44:1 46:18
51:1 61:7 67:19 68:17
70:13 71:1,7,14,15 72:2,8
72:21,23 74:18 75:19 76:1

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

80:12 83:9 92:24 93:5
94:18 95:1 96:22 97:3,21
100:3 102:8,15 109:19
111:6,8,19 112:15 117:7
120:10 122:15 124:3,10,22
130:13 131:11 145:11
seeing 82:18
seen 46:16 81:23 93:12
100:15 110:13,15 111:9,10
111:18 138:3
sent 66:4,24 67:16,24 68:21
69:2,7 82:9,13 85:4 132:11
sentence 78:9
separate 38:8 99:9,10
separately 71:7
Services 10:7
Sessions 93:4,10 94:12 131:5
131:7,13,15
set 31:19 69:14 70:10 146:16
146:17
seven 143:10,22 145:9
sexual 62:7
Shalisa 4:4
Sharonda 4:5 141:2
sheet 70:24 71:13 97:20
113:15,16 114:20 135:6
sheets 70:19 71:5,23
Sheppard 2:10 3:7
Sheriff 65:19 136:8
sheriff's 44:13 46:24 65:20
65:24 67:4,5 68:4,22 81:14
87:11,13 127:24 128:7
134:22 135:1 136:21
Shonsberg 106:24
shooting 40:19,22 41:10,15
41:16 100:23
shortly 41:15 88:23
shot 19:22
show 63:17 74:9 80:16,18
89:17,20 91:24 95:17 97:7
100:3 116:1 128:4,5 136:1
showed 64:5 115:9 116:2
showing 112:5
shown 88:19
shows 26:4 44:22 66:20
88:22 90:5 91:11 98:11

115:8 128:15
side 66:24 93:5 99:14
Siding 14:23
sign 145:16
significance 143:16
signing 146:11
similar 89:21 103:23 104:7
104:13 111:22
Simmons 5:4,5 142:2
Simultaneous 144:23
single 142:10,11
Singleton 2:15,17 3:12,14
4:6,7
situation 58:16,16
situations 104:13
six 20:22 75:8,8
six-week 20:21
skipped 66:9
SLED 84:17 85:3 133:23
134:2 136:10 138:6 140:1
140:9
Sloan 5:7
slow 116:21 135:17
social 116:17
sold 14:22
solicitor 67:23 78:24 79:3
87:14,16 95:1 103:1
130:13 132:20
solicitor's 67:7,20 69:8
130:15 132:18
somebody 23:10 41:23 50:1
50:9 54:18
soon 71:7 82:13 138:16
SOP 64:4 78:9 116:4 125:14
126:1,8 127:8
SOPs 30:18 32:2 42:5,6,12
42:14 43:16 44:17 54:16
64:14 125:15
sorry 49:11 65:6 76:5 104:5
116:23 123:4
sort 30:22 38:12 56:19 73:16
100:8
South 1:2 2:21 3:17 4:13,20
5:8 26:24 27:19 32:24
40:23 65:9 71:3,4,4,21,22
71:23 81:17 83:6,22 84:2,4

84:10,15 85:22,23 94:4,14
120:3 121:3 129:6 134:11
134:12 136:4,5,7,8,11,13
136:15,16,18 137:1,2,3,19
137:20 138:12 140:2 143:4
speak 11:15 12:24 76:24
77:4
speakers 144:23
speaking 55:9,19,20 129:9
129:10,21 130:1
specific 31:18 51:4 138:21
specifically 47:7 56:18
speculate 107:7 131:19
speculation 95:13 128:24
129:14 139:19
spouse's 143:2
Sr 5:5
SS 146:2
stand 10:2 24:2
standard 32:4 43:1,7 60:22
stands 10:6
start 8:15 55:15 56:16,21
started 15:13,16 90:13
state 1:22 8:8 11:7 24:5,13
26:17 27:19,19,22,24 28:1
46:21 55:14 56:18 77:16
77:23 78:1,18 79:12 80:20
83:7,7,21 84:7 85:16,18,24
107:10 112:2 115:4 116:19
117:11 119:16 120:8,16
127:7,13 128:13,15 129:4
130:22 133:22 134:21
135:13,15,21 136:1,2,3
138:9 143:4 146:1,4,22
State's 85:22
stated 61:6 75:18,23 80:3
84:14
statement 29:22 45:15
states 1:1,8 5:14 6:3 32:22
34:23 75:19 78:11 82:1
95:7 98:9,13 134:12 142:9
142:18,21 145:14
States' 72:6 142:7,12
stating 108:6
Station 5:18
status 65:15 101:23 102:22

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

**stayed** 15:5 20:10
**stenotype** 146:8
**step** 21:19 22:17 26:2,9
 44:11,11
**stepchildren** 17:23
**Stephen** 4:8,10,18 5:16
 96:13 142:4
**stephen.terrell2@usdoj.gov**
 5:21
**steps** 44:10 137:13
**steve@schmutzlaw.com**
 4:23
**sticker** 69:22
**stipulations** 54:14
**stop** 8:24 9:1
**Street** 2:21 3:16 4:12,19 5:8
**stress** 8:18
**stressful** 8:16
**stuff** 47:5
**styles** 110:18
**subject** 1:12 22:22 25:8
 26:10 58:12,13,14,14 65:15
 90:18 94:10 113:18 114:20
 123:6 143:10 145:13
**subject's** 108:12 109:18
**Suboxone** 75:23,24
**subpoena** 1:19
**subsequent** 125:15
**substance** 11:24 29:8 90:6
**substantive** 19:24
**suggests** 56:19
**Suite** 4:12
**summary** 26:22 75:4 88:6
**supervisor** 11:19 12:15,19
 106:18,21 121:11 122:1,13
 122:18 123:3,9,11,15,16,17
**Supervisor/Team** 121:18
**supervisors** 10:24 41:24
**supplements** 72:6
**supplied** 92:2
**suppose** 23:10
**supposed** 9:7 25:3 56:19
 125:17
**sure** 11:4 13:11 23:9 27:21
 29:23 30:7,22 40:6 46:2
 56:24 57:18 70:9 87:22,22

90:20,21 107:1,4 122:19
 123:17 126:16 135:12
 142:2,6
**surprise** 48:12
**Susie** 2:12 3:8
**suspend** 145:12
**sweepers** 14:22 15:3
**sworn** 8:3 98:7 146:5
**system** 15:14 49:14,16 50:15
 51:5,18 53:2 109:24 110:1
**systems** 116:16

---

### T

**T** 7:6 8:6 146:2,2
**table** 143:10
**take** 14:18 63:18,19 65:3
 87:23 89:14 108:8 110:11
 126:11,15
**taken** 1:18,23 11:12
**talk** 11:12 50:10,14,14,23
 51:4 103:13
**talked** 10:18 11:18 19:5,7
 32:2 47:9 48:23 127:8
**talking** 18:19 27:10 33:15,16
 34:13 40:5 75:5,23 88:4,17
 99:5 102:20 109:5,6
**team** 52:15,17 123:3
**Technically** 119:21 131:4
**telemarketer** 14:23,24
**Telephone** 2:22 3:18 4:14,21
 5:9,19 6:8,17
**tell** 9:6,23 10:4,5,14,16 12:1
 13:4,21 14:11 17:10 19:13
 27:13 28:5,22 32:10 33:13
 35:20 42:17 43:14 45:14
 48:1 71:2 76:9 77:12 86:13
 92:11 109:21 118:24 119:8
 128:1 130:8
**telling** 44:14 56:5 73:21
 129:11
**tells** 17:2
**ten** 16:18
**Tendered** 65:4 89:16
**terminology** 116:20 120:9
 121:1
**terms** 121:3

**Terrell** 5:16 16:3,24 17:4
 18:15 23:3 25:5,14,20 30:9
 31:1,9,12,20 32:12 34:10
 34:15 35:7 38:18,21 39:10
 42:8 43:10 51:10 53:7,22
 54:22 55:6,8,17,19,22
 56:10 57:5,17 58:5 59:13
 60:7 61:14 63:4,20 71:15
 73:5 74:20 95:12 96:16,19
 99:16,18 104:3 105:8
 106:1,5 107:12,20 114:2,11
 122:20 128:23 129:4,7,10
 129:13,19,24 130:4 131:18
 131:24 133:9 134:10,18
 135:17 136:19 137:7,21
 139:5,12,19 140:5,11,18
 141:14,19 142:6 143:22
 145:12
**Terrell's** 72:14,19
**terrible** 41:8
**test** 9:3 58:15
**testify** 146:5
**testimony** 10:20 146:7,10
**testing** 87:15
**thing** 8:22 9:6 21:17 48:3
 61:1 77:8 94:16 137:14
**things** 28:7 30:14,21 32:6
 45:13 47:9 58:18,24 70:10
 90:10,12 92:9 108:11
 121:4
**think** 8:14 10:4,5 16:11 20:5
 20:10,21 30:2 35:19 38:1
 40:10 45:13 46:11 51:21
 52:9 67:11 73:15 74:15
 75:14 77:12,24 80:5 82:8
 83:1,14 88:7 89:8 90:11,16
 107:5 110:12 111:6 112:5
 112:9 118:5,14 120:14
 135:7 139:17 143:17
**Thompson** 2:15,17 3:12,14
 4:5,6,8 141:2
**thorough** 29:22 143:1
**thought** 41:8 128:11 136:20
 137:13
**three** 46:5 67:15 89:23 90:7
 143:1,4,13

**three-day** 123:20 124:14
**tied** 141:21
**till** 20:11
**time** 19:7 20:20 47:22 49:6
  80:7 93:12 105:5 123:20
  123:20 136:20 137:4,11,22
  145:5
**times** 143:7
**titles** 15:10
**today** 10:17,20 13:18 18:20
  18:21 19:5,6 141:4,12
  143:13 145:5,6,7
**told** 12:2,24 16:11 19:14,14
  19:15,20 20:5 29:3 32:17
  33:16 41:13,19,21 42:11
  44:8,10 47:10,17 54:3
  79:10,19 80:1 81:14 84:5
  84:12 86:8 103:21 104:14
  135:1
**top** 24:3 67:11 74:22 75:13
  91:21 97:17 99:14 100:5
  126:23
**topic** 12:6
**total** 120:17
**touch** 97:10
**trained** 20:21
**training** 20:18,22,24
**transaction** 19:1,8,17 20:1
  21:16,17,19 22:1,8,13,16
  22:24 23:7,18 25:22 29:24
  34:3 36:1,11,15 40:8 42:23
  42:24 43:2,9,21,22 44:3,11
  44:16 46:12,19 49:8,9
  58:19 61:4 62:18 63:3,7,11
  68:15 69:11 74:2,5 77:6
  78:13 86:16 88:6 121:17
  121:19,21 122:5 123:7,13
  124:9,12,16,24 126:16,18
  137:11,23
**transactions** 21:10,13 22:21
  26:24 32:11,19 47:5 75:5
  121:22 123:5,22
**transcript** 145:16 146:12,15
**transcription** 146:9,9
**transferee** 61:12,22
**trial** 87:18 142:20,22,23

**tried** 28:9
**tries** 54:19
**true** 93:3,6 146:9
**truth** 146:6,6,6
**try** 8:17 27:24 29:23 34:22
  35:10 86:17 123:24 132:17
  144:19
**trying** 20:3 21:15 26:6 27:12
  35:4,24 50:23,23 51:1
  57:15 58:3 112:22
**Tuesday** 1:15
**turn** 70:17 71:13,15 72:14
  72:14
**turning** 72:15
**two** 11:5 15:3 68:3 75:2
  91:10 101:24 111:8 115:15
  116:1,7 140:24 143:24
  144:19 145:5
**two-thousand** 20:11
**Tyrone** 2:4 3:4
**Tywanza** 2:5 3:5

___

**U**

**U.S** 5:17 6:6,15
**U.S.C** 61:13,23
**Uh-huh** 17:23 18:10 28:19
  46:10 78:4 90:15 92:13
  112:16,19 113:5 127:3
**unable** 73:22 74:3 86:9 87:8
  101:3,8,16,18 102:21,22
  103:2
**unavailable** 145:7
**unclear** 35:2 100:22
**understand** 8:16 9:13 13:4,5
  13:10 31:6,17 33:15 55:17
  62:16,23 74:18 77:7 81:6
  82:16 84:9 85:3 93:14
  108:9 114:18 137:5 142:23
  142:23
**understanding** 10:6,7,11
  31:18 36:13 51:24 141:8
**understood** 13:7
**undertake** 60:5
**Unit** 6:6
**United** 1:1,8 5:14 6:3 72:6
  142:6,9,12 145:14

**University** 14:13
**unlawful** 102:5,11
**unredacted** 96:14
**unused** 145:9
**update** 104:18
**updated** 90:17
**updating** 105:18
**use** 95:5 102:5,11 114:1,24
  121:4
**users** 29:8 54:7
**usually** 27:18 45:10,11 62:5
  62:7
**utilized** 70:20

___

**V**

**v** 1:7
**Vague** 18:15 23:3 25:14 31:2
  31:9 32:12 35:7 42:8 57:17
  60:7 63:4 136:19 137:7,21
**Vandergrift** 106:22
**VANESSA** 6:14
**vanessa.welch@fbi.gov** 6:21
**verbally** 71:11
**verbiage** 103:20
**verify** 95:23 96:5 97:21
  104:22
**versions** 70:22
**violate** 61:13,23
**violation** 59:11
**violations** 54:18,18
**violence** 29:12
**Virginia** 1:22,24 6:7,16
  13:23 14:13 146:1,4,16,18
  146:22
**Volume** 1:14

___

**W**

**W** 4:11
**wait** 143:18
**Waiting** 66:18
**waived** 55:12,13 56:7,7
**Walter** 2:11 3:7
**want** 8:15,24 9:4 10:3 11:6
  11:15 42:3,22 45:14 47:8
  49:1 57:18 65:3 69:13 70:6
  70:9,17 71:16 72:13,21

FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY

89:17,20 92:3,9 99:2,9
100:3 111:5 114:5,14,14
116:1 135:12 137:17
141:23 142:4 144:1
**wanted** 92:1 111:6
**wanting** 104:12
**wants** 63:23
**warning** 56:16
**warrant** 92:20,22 93:1 95:11
95:17 97:4 128:5,12,14,15
131:1 132:12 133:1,7,13,17
**warrants** 29:8 62:6
**Washington** 5:18
**wasn't** 40:12 117:15 118:7
131:23
**way** 73:16 137:17
**we'll** 8:24 9:2 43:19 63:24
69:13 90:1 99:11 115:15
140:23 143:18,23 144:18
144:19,20 145:2,6
**we're** 8:17 18:20 27:11 70:9
70:18 141:4 142:23,24
143:19 144:5 145:4
**we've** 28:8,9,10 45:13 99:5
143:3
**website** 29:2 32:24 33:3,9,18
65:9,10,14 68:9,11,17 79:1
82:16 83:2 87:19 89:11,12
93:19 94:23 98:3 120:3
130:11,15 132:19
**websites** 32:20 68:14 116:18
120:2
**week** 11:5
**weeks** 11:9 15:3 20:22
**WELCH** 6:14
**went** 14:5,13 15:17,17 44:10
47:14 48:2,4 77:24 79:21
81:11 82:21 87:10,18,19
96:10 132:18 135:3,4
**West** 1:22,24 6:16 13:23
14:13 47:15,18 48:2,7,17
66:2 67:9 68:4 69:2 79:22
81:11 82:23 135:4,5
138:19 144:16,1,4,16,18,22
**Westlaw** 116:20
**Wheeling** 146:18

**WHEREOF** 146:17
**willing** 9:14
**Wilson** 5:6,7 56:12,17,24
65:5 71:18 86:3 118:6,22
129:8,18,22 141:24 142:1
143:14 144:3,11
**Withdraw** 49:11
**within-named** 146:5
**witness** 1:18 7:2 56:20 63:21
86:5 87:21 99:19 104:5
116:23 118:12 129:12
140:24 141:20 142:16,22
143:24 144:4,19 145:5,15
146:5,8,10,17
**witnesses** 141:10
**wondering** 99:3 101:7 111:7
**words** 9:11 19:15 54:20
101:15 114:8
**work** 10:24 11:12 18:13
21:10,12 22:16 29:23
41:23 49:8 50:6 60:12
**worked** 14:23 15:11 19:1,17
42:23,24 50:9
**working** 43:2 49:4 121:23
123:8
**worried** 19:18
**worth** 143:20
**wouldn't** 45:7 53:14 102:15
**write** 47:22,23
**wrong** 30:7,15,23 31:8 71:2
111:23 143:17
**wrote** 48:2
**WVU** 14:13

---

**X**

**X** 7:1,6 8:6

---

**Y**

**yeah** 17:4,7 23:4 42:9 46:3
52:3 53:9 54:24 56:20
61:18 66:12 68:10 71:21
75:8 76:7 78:6 81:19 87:22
99:2,4,20 100:10 104:20
105:17 114:6 126:24
128:14 130:4 141:24 144:3
145:4

**year** 59:9 94:22
**years** 16:18
**yesterday** 10:22
**you-all** 12:6 17:14 19:24

---

**Z**

---

**0**

**00000326** 80:11
**003** 88:10

---

**1**

**1** 7:8 64:8,11 70:4,5 77:11
85:15 86:24 127:8 135:13
**1:32** 145:19
**1000** 6:15
**103** 142:20
**105** 112:9 113:6,14
**106** 113:8
**11** 71:6,24
**115** 7:13,14
**11th** 70:23 85:7
**12-3** 99:16,18,19,20
**12th** 71:18,21
**13** 1:15 17:21
**144** 7:15
**15** 3:16 98:15
**16** 98:15
**16/2015** 98:18
**17** 74:10 75:4 119:4
**18** 61:13,23 74:10 75:13
88:10,22
**18th** 91:6,8
**19** 74:10 88:10
**1970** 6:7
**1991** 14:10,12
**1995** 14:19,21
**1997** 15:6,8 20:6

---

**2**

**2** 7:9 69:14,18,24 77:24
**2-what** 126:21
**2/28/15** 79:13
**2:16-cv-2350** 1:6
**2:16-cv-2351** 1:6
**2:16-cv-2352** 1:6
**2:16-cv-2354** 1:6

**2:16-cv-2355** 1:7
**2:16-cv-2356-RMG** 1:5
**2:16-cv-2357** 1:7
**2:16-cv-2358** 1:7
**2:16-cv-2359** 1:7
**2:16-cv-2360** 1:8
**2:16-cv-2378** 1:8
**2:16-cv-2405** 1:8
**2:16-cv-2406** 1:8
**2:16-cv-2407** 1:9
**2:16-cv-2409** 1:9
**2:16-cv-2746** 1:9
**20** 16:15 64:20
**20:07** 76:5
**2001** 17:15
**2004** 15:17 20:16
**20044** 5:18
**2015** 47:2 70:23 71:6 72:1
    85:5,7 134:2
**2015A4021600503** 92:14
    93:1
**2017** 1:15 71:18,21 141:7
    146:18
**202** 5:19,20
**2021** 146:24
**20th** 70:23
**23228** 6:7
**23rd** 141:7
**24** 4:19 146:24
**26301** 1:24
**26330** 6:16
**268** 116:2,3 121:10 125:5
    127:1,2
**269** 116:3 127:1,2
**26th** 146:18
**27** 146:16
**277-6655** 4:15
**277-6997** 4:14
**282** 63:14
**29401** 2:21 3:17 4:20 5:8
**29403** 4:13

---
### 3
**3** 4:12 7:10 59:5 68:8 73:9,12
    78:3,5 80:5 86:24 87:2
    103:8 110:11 118:4

**3/1/2015** 98:8
**3/15** 98:18
**3/16** 90:17
**3/16/2015** 98:12
**3/2** 98:13
**30** 74:15 75:2 88:10 123:12
    123:14
**30-day** 123:21 124:19
**30(c)(1)** 142:18
**30(e)(1)** 145:15
**30.04** 56:23
**30.4** 56:23
**304** 6:17,18
**31** 74:10 75:2 88:10
**312** 73:6
**314** 83:17 94:14,18 120:16
    135:6,9
**315** 83:17 120:16
**316** 83:17,21 86:5 120:16
    135:7,9
**317** 120:16
**321** 5:7
**326** 80:11 82:4
**341** 72:19 73:6
**353-1651** 5:19
**382** 65:5 66:14,15
**383** 65:5 66:15
**384** 65:5 66:15,22,23
**386** 99:5
**387** 99:5
**396** 89:22 90:10 99:7
**397** 89:20 90:5,8 91:15,21
    92:10
**398** 91:13,15 92:10

---
### 4
**4** 7:11 88:11,14,17,20 119:2
    119:3
**4/11/2015** 98:19
**4/13** 67:15
**4/13/2015** 98:20
**41** 64:20 65:12 68:8 89:19,20
**45** 64:20 65:4,19
**46** 65:4,22
**47** 146:16
**48** 65:4 66:2

**49** 65:4 66:8,10,11

---
### 5
**5** 7:12 99:24 111:8 113:7
    133:1
**5.5.4** 116:4
**5.5.5** 64:4 78:9 85:14
**56** 100:4
**577-5530** 4:21
**577-9204** 4:22

---
### 6
**6** 7:13 113:7 115:22 134:2
**6/17** 100:24
**6/29** 67:11 76:4,5,8
**601** 142:20
**606** 1:23
**616-5200** 5:20
**625-2000** 6:17
**625-3944** 6:18
**627-4432** 6:8
**627-4591** 6:9
**64** 7:8
**69** 7:9
**6th** 85:5 134:7

---
### 7
**7** 7:14 116:11
**720-7470** 3:18
**720-7478** 3:19
**722-2140** 2:23
**722-7732** 5:10
**722-7733** 5:9
**722-8048** 2:22
**73** 7:10

---
### 8
**8** 2:20 7:4,15 70:18 72:7,10
    144:10,11,16
**8:21** 76:7,8
**8:58** 76:8
**804** 6:8,9
**82** 65:4
**83** 65:4
**83.VI.02** 142:21
**84** 65:4
**843** 2:22,23 3:18,19 4:14,15

**FELICIA SANDERS v. THE UNITED STATES OF AMERICA 6/13/2017 JENNIFER CONLEY**

4:21,22 5:9,10
**88** 7:11
**888** 5:18

---
**9**
---
**9:58** 1:24
**922** 61:13,23
**922(g)(3)** 76:11
**97** 89:22 99:7
**98** 89:22 99:7
**99** 7:12