UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) The Examiner received the transfer from the Fort Worth Call Center, pulled the NTN number, 2WCV-F64, to determine if the purchaser and the III matched based on the purchasers descriptive information provided on the 4473, (name, DOB, height, weight) and tried to make a quick determination to Proceed, Deny, or Delay the transaction (NCIC and III records are incorporated in Appendix D). The Examiner identified an III record containing a potential prohibitor, however, the same III record lacked a final disposition. At 4:04 pm, the Examiner advised the FFL the transaction was Delayed and the FFL marked a delayed response in box 21c of the 4473 and noted on the form the firearm could be transferred on 04/16/2015. Due to the additional research required for Roof's inquiry, and also due to the pending backlog of inquiries, the Examiner set the transaction in the Region II Delay Queue for further review by the team responsible for states including South Carolina.

(U//FOUO) On Monday, 04/13/2015, Business Day One, at 1:49 pm, a second Examiner pulled the transaction from the Region II Delay Queue and identified an III hit for a felony/drug arrest. The record indicated the arrest date was 03/01/2015, and the arresting agency was identified as the Lexington County Sheriff's Office (LCSO), Originating Agency Identifier (ORI) number, ████(H)████ Roof was charged with "MPD, SCH1 B,C,LSD and SCH II, COCAINE-3rd/SUB." After reviewing the record, the Examiner identified two potential federal prohibitors. Based on the record revealing a felony arrest: 922(g)(1), Persons Who Have Been Convicted In Any Court of A Crime Punishable by Imprisonment For Term Exceeding One Year could have applied. Further, because the arrest was for drug violations, 922(g)(3), Persons Who Are Unlawful Users of/or Addicted To Any Controlled Substance may also have applied.

(U//FOUO) The Examiner checked the External and Manual Automated Databases and found no additional information. The Examiner checked the Regional POC database and located the Lexington County Court website www.sccourts.org . The website led the Examiner to the Lexington County Eleventh Judicial Circuit Public Index, The State of South Carolina VS Dylann Storm Roof, Case Number 2015A4021600503. The website provided Roof's address as 10428 Garners Ferry Road, Columbia, South Carolina, along with the arresting officer's name with an address of "#1 Justice Square, Columbia 29201." In short, the website identified Roof as a defendant in a case wherein a disposition was not listed. A disposition confirming one of the aforementioned federal prohibitors would have likley resulted in an immediate Denial. The criminal history report did not identify the Columbia, SC, Police Department (CPD), nor its corresponding ORI, rather it noted the LCSO was the arresting agency [3]. The LCSO was not involved in the arrest, but did process Roof at the Lexington County jail.

---

[3] On approximately 6/20/2015 (following the shooting at the AME Church on 06/17/2015), the LCSO amended the III record to reflect CPD as the arresting agency and added CPD as the ORI.

UNCLASSIFIED//FOR OFFICIAL USE ONLY
12

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000161**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) The Examiner generated a Final Disposition Report, Form R-84, which included the pending charges, and faxed it to the LCSO at 1:58 pm in an effort to obtain clarifying information (Appendix E). The Examiner listed information NICS required on the R-84, including an incident report, whether the drugs were field tested, and if Roof admitted to using drugs. At 2:00 pm, the Examiner faxed a similar request to the Lexington County Solicitor's Office. That same day at 4:05 pm, the LCSO faxed the R-84 back to the NICS Section bearing a handwritten note on the R-84 stating, "No arrest or report for this date. The last Arrest was on 02-28-15, Columbia PD will have the report." The note did not contain a telephone number or other identifiers for the CPD. The Examiner reviewed the NICS Section POC List for Region II. The NICS Section POC list was sorted by county and the Examiner was unable to locate a listing for the CPD in Lexington County, but found a listing for the West Columbia Police Department (WCPD) in Lexington County. The Examiner was unaware Columbia, SC was located within two counties, Richland and Lexington, therefore pursued WCPD for the needed information. At 4:07 pm, the Examiner sent the same R-84 information, via fax, to the WCPD requesting the same information previously faxed to the LCSO (Appendix F).

(U//FOUO) On the second business day, 04/14/2015, at 8:46 am, the WCPD responded via fax with a handwritten note on the R-84 stating, "Not WCPD warrant...This is not a WCPD arrest." Based on experience, the Examiner knew responses from agencies indicating a lack of information may indicate a record existed but was not yet entered into the state's system. The fax requesting information from the Lexington County Solicitor's Office remained outstanding. At this point in the process, the Examiner had "Exhausted all Means[4]" as all possible agencies were contacted as outlined in the state-specific list maintained by NICS, and all database searches were conducted as defined by NICS SOPs. Since court records revealed no convictions and contacted agencies provided no definitive clarifying information or did not respond, the Examiner left the Roof inquiry in the Delayed Queue and processed other inquiries while awaiting a response from the Lexington County Solicitor's Office. According to NICS protocol, the transaction would remain in Delay status indefinitely or until it was purged per statute from the NICS system.

(U//FOUO) On Thursday, 04/16/2015, the fourth business day from the initial inquiry request, the Brady Transaction Date, the gun dealer exercised his lawful discretion and transferred the gun to Roof. The Lexington County Solicitor's Office did not respond to the Examiner's request for information. The Roof transaction went from Delay status to Open/Delay status awaiting any new information within the Examiner's inquiry history.

---

[4] The term "Exhausted all Means" is defined, referenced, and articulated in SOP 5.15, Documenting Research Comments, Section I, page 11. The section states, "When examiners have exhausted all resources obtaining information, the following must be entered into the transaction . All resources identified after reasonable research have been exhausted.(sic)"

UNCLASSIFIED//FOR OFFICIAL USE ONLY
13

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000162**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) On 05/11/2015, the Roof inquiry went from Open/Delay status to Expired/Delayed status and dropped off of the Examiner's history. The inquiry remained in the system pending new developments or statutory purge.

(U//FOUO) On 06/17/2015, Roof allegedly shot and killed nine people attending church services at the Emanuel AME Church in Charleston, South Carolina.

(U//FOUO) On 06/19/2015, after Roof's name was publically released, the NICS Section conducted a "Notoriety Check[5]" concerning Roof. According to NICS procedure, a Notoriety Check is conducted when, "special attention is being paid by the news media due to events related to the following: firearms, explosives, and terrorism." The Roof transaction was located within the NICS records and an Audit Flag was placed on the transaction for perservation.

(U//FOUO) On 06/20/2015, The III record was updated by LCSO. The updated record stated, " (H) (CPD ORI number) COLUMBIA PD...CIT-44-53-370(D)(2) – MISDEMEANOR, ARREST CHARGE1 –POSS OTHER, CONTROLLED SUB IN SCHED I, TO V – 1ST, OFFENSE DATE – 02/28/2015, PALM PRINTS AVAILABLE." (Appendix D)

(U//FOUO) On 06/24/2015, a separate Examiner contacted WCPD to obtain the incident report. The WCPD reported they were not the arresting agency and did not have this information. The Examiner began to research Columbia, SC and found it covered two counties, Richland and Lexington. The Examiner went online and found contact information for the CPD and called CPD to request information. CPD requested the Examiner to fax the request for information to CPD in order to have a written confirmation of the request. The Examiner faxed CPD a request for the incident report and also requested their ORI identifier. CPDs ORI ( (H) ) is in Richland County, not Lexington County.

(U//FOUO) On 06/26/2015 CPD faxed the final disposition and incident report to NICS (Appendix G).

(U//FOUO) On 06/29/2015, the NICS Section processed the incident report from the CPD along with the ORI information. The Regional Coordinator for Region II updated the NICS Region II POC contact list. The same day, the Regional Coordinator contacted the FFL by telephone and instructed him to Deny the transaction (pursuant to NICS SOP Number 3.4). The Regional Coordinator directed the FFL to fax the Roof 4473 Form to the ATF, which served to notify the ATF a prohibited individual was in possession of a firearm.

---

[5] Notoriety Assessment procedures are defined on page one of the "Procedures Regarding Notoriety Assessments of the NICS Audit Log."

UNCLASSIFIED//FOR OFFICIAL USE ONLY
14

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000163**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) A review of the CPD incident report revealed Roof was contacted by the CPD on 02/28/2015 at 8:42 pm. CPD received a complaint from mall security at the Columbiana Centre Mall, 100 Columbiana Circle, Columbia SC, regarding a male wearing all black clothing, entering stores in the mall, and asking employees how many associates were working and what time they closed. A CPD police offier made contact with Roof at the mall, conducted a consent search, and located an unlabled white bottle containing multiple orange strips in Roof's jacket pocket. Roof advised the officer the strips were Suboxone and Roof admitted he did not have a prescription for the Suboxone. Roof stated he received the Suboxone from a friend. Roof was placed under arrest and charged with possessing Suboxone, a Schedule III narcotic. While the initial contact and investigation occurred on 02/28/2015, the III records denote Roof's arrest date as 3/1/2015.

(U//FOUO) Federal Prohibitor section 922(g)(3) – Persons Who Are Unlawful Users of or Addicted to Any Controlled Substance, section 2, prohibits, "A person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician" from obtaining a firearm. Since, the CPD incident report regarding Roof's arrest indicated Roof was arrested for possession of Suboxone, a schedule III narcotic and Roof admitted to using the substance, 922(g)(3) would have applied. Under 922(g)(3), if the Examiner obtained the information in the CPD report, the inquiry would have been Denied. A time-line of events related to the Roof transaction, beginning with the booking date as documented in the III record, is outlined on page 16, Figure 2 and incorporated as Appendix C.

SUBJECT TO PROTECTIVE ORDER

FBI-00000164

UNCLASSIFIED//FOR OFFICIAL USE ONLY



Figure 2

## IV. Findings

(U//FOUO) The Roof transaction represented one of many paths an FFL initiated background check inquiry could follow through the complex NICS process. The INSD review identified both areas of exemplary performance and improvement opportunities.

(U//FOUO) **Positive Outcomes:** This section contains specific analysis on effective performance by the NICS Section. In Fiscal Year 2014, the NICS Section resolved 97% of all NICS transactions within three business days, as required by law, with limited resources and systemic challenges.

(U//FOUO) **Positive Outcome 1:** The Examiner on the Roof Matter performed as required and in accordance with current policy and procedures.

> (U//FOUO) **Analysis:** Examiners processed numerous unique and complex inquiries each day. To function effectively, Examiners relied on accurate information being immediately available from external agencies along with accurate NICS POC database information. In spite of having neither immediately available in the Roof matter, the Examiner showed initiative and a clear understanding of responsibilities and SOPs in attempting to obtain missing information. Due to the incorrect ORI listed in the III record, the Examiner contacted the LCSO, the agency listed on the III record. The LCSO recommended the Examiner contact CPD. The Examiner, following NICS protocols, reviewed the NICS POC list and located WCPD in Lexington County. Unbeknownst to the Examiner, CPD was in the Richland County. The Examiner had no knowledge Columbia, SC stretched over two counties; Richland and Lexington. Further, the WCPD was located in the same county where Roof purchased the gun, and therefore the Examiner arrived at a reasonable conclusion. The Examiner reviewed the Lexington County Court website which indicated the arrest was in Lexington County, however, there was no disposition on the report. The Examiner faxed the Lexington County Solicitor's Office a request for information and waited for a response. The Examiner's efforts were reasonable given SOPs, expectations, and available information.

(U//FOUO) **Positive Outcome 2:** NICS Section EM worked proactively to predict and resolve resource and workflow challenges with available in-house resources.

> (U//FOUO) **Analysis 2a:** NICS is in the final stages of development of a comprehensive and purpose-built system, referred to as New NICS, to address the increasing NICS transaction volume and exixting process inefficiencies. The current NICS system, first developed in November of 1998, was constantly maintained and updated but is

SUBJECT TO PROTECTIVE ORDER

FBI-00000166

UNCLASSIFIED//FOR OFFICIAL USE ONLY

technically outdated and labor intensive. NICS leadership recognized the need for a new solution, identified resources, and implemented the creation of New NICS. The chart below illustrates the benefits for both internal and external users of the New NICS system, which will be implemented in two phases starting in January 2016. The full extent of efficiencies are anticipated by 2017 after testing and development allows for full implementation.

**Benefits of New NICS**

|  | **Internal Users** | **External Users** |
|---|---|---|
| **Phase 1** | ✓ Refresh Outdated Design & Technology<br>✓ Accommodate Frequent Legislative Changes Through Increased System Flexibility<br>✓ Support Growing Volumes by Increasing System Capacity & Scalability<br>✓ Increase Efficiency by Automating Manual Processes | ✓ Improved Name Search Algorithm (More Immediate Determinations)<br>✓ Near Real Time 24 Hour Purge Upon Proceed Determinations<br>✓ Quicker Responses to Background Checks |
| **Final Operating Capability (FOC)** | ✓ Improve Service through Computer-Telephony Integration<br>✓ Full Integration with Next Generation Identification (NGI)<br>✓ Increased System Availability | ✓ Automated Status Checks<br>✓ 24-Hour Access to Electronic Check (E-Check)<br>✓ Improved Efficiency for Point-of-Contact (POC) States and Federal Agencies via Internet Accessibility |

Table 3

(U//FOUO) **Analysis 2b:** The NICS Section implemented an innovative resource review and allocation strategy, known as the Tiger Team. The Tiger Team was tasked with evaluating current region assignments and determining the most effective way to assign regions and workloads within the New NICS development. The Tiger Team determined primary, secondary, and tertiary assignments to Examiners based on grade level. As higher grades are held to a higher standard, additional Regions were assigned to Examiners based on pay grade to increase accountability, fairness, and Section capacity.

(U//FOUO) **Analysis 2c:** NICS Section EM effectively forecasted the surging of additional Examiner resources based on historical telephone call analysis, to minimize Examiner fatigue with increasing transaction work load. In October 2013, CJIS Division acquired a new Avaya Voice over Internet Protocol (VOIP) phone system, which provided software to assist the NICS Section in forecasting call volumes. This

SUBJECT TO PROTECTIVE ORDER

FBI-00000167

UNCLASSIFIED//FOR OFFICIAL USE ONLY

forecasting demonstrated NICS leadership's ability to incorporate new technology and develop new processes.

(U//FOUO) **Positive Outcome 3:** NICS worked collaboratively as a section and in an "all hands on deck" manner to meet a background check demand which doubled over the past ten years.

(U//FOUO) **Analysis 3a:** The NICS Section devised and instituted an "Escalation Plan[6]" to collaboratively address high firearms background check inquiry volume. The Escalation Plan was created to identify and communicate the need for assistance during the NICS Section's busiest times. The Escalation Plan was devised and utilized as a proactive approach to maintain manageable Delay Queue totals in order to meet the statutory three business day deadline and remain below the high/maximum risk level. Third day work was prioritized over second day work to remain compliant with the statutory three business day requirement. The two Escalation Charts below account for the NICS busy and non-busy seasons. The Busy Season Escalation Chart is used the second week in October through March 31st or anytime the national and/or political spotlight impacts the NICS Section's volume. The Non-busy Season Escalation Chart is used beginning April 1st through the 1st week of October. Resources are surged based on Escalation level from the following NICS Units: Research and Analysis (R&A), Legal Intstrument Examiners (LIEs), Legal Research and Analysis Team (LRAT), Call Center System and Statistical Team (CCSST), Management Advisory and Program Advisory Team (MAPs), NICS Advisory Unit (NAU), and NICS Operations Unit (NOU).

---

[6] As outlined in "2015 NICS Escalation Plan," Escalation is defined as the process of surging additional NICS Section resources to meet the demand of processing an increased volume of NICS transactions for a particular shift or day.

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SUBJECT TO PROTECTIVE ORDER

FBI-00000168

UNCLASSIFIED//FOR OFFICIAL USE ONLY

| Busy Season 2nd Week in October to March 31st | | | | Non-Busy Season April 1st to 1st Week in October | | | | |
|---|---|---|---|---|---|---|---|---|
| Escalation | Estimated Queue Total | 2nd and 3rd Day Combined | Percentage of Employees | Escalation | Estimated Queue Total | 3rd Day | 2nd Day | Percentage of Employees |
| Normal | 0-4,000 | Up to 2,700 | 100% R&A | Normal | 0-6,000 | 0-500 | 0-2,000 | 100% R&A |
| Low | 4,001-5,000 | Up to 2,700 | 100% R&A 30% LIEs | Low | 6,001-7,000 | 501-1,000 | 2,001-3,000 | 100% R&A 30% LIEs |
| Medium | 5,001-6,000 | Up to 2,700 | 100% R&A 50% LIEs 30% State Support, Liaison Unit, LRAT, CCSST, MAPS, and NAU | Medium | 7,001-8,000 | 1,001-1,500 | 3,001-5,000 | 100% R&A 50% LIEs 30% State Support, Liaison Unit, LRAT, CCSST, MAPS, and NAU |
| High | 6,001-8,000 | Up to 2,700 | 100% R&A 80% LIEs CFEP Employees NOU Supervisors 50% State Support, Liaison Unit, LRAT, CCSST, MAPS, and NAU | High | 8,001-10,000 | 1,501-3,500 | 5,001-7,500 | 100% R&A 80% LIEs CFEP Employees NOU Supervisors 50% State Support, Liaison Unit, LRAT, CCSST, MAPS, and NAU |
| Maximum | 8,001+ | Up to 2,700 | ALL | Maximum | 10,001+ | 3,501+ | 7,501+ | ALL |

Figure 3

(U//FOUO) A common theme developed in interviews was concern about the more frequent use of the Escalation Plan, and for longer periods, to simply manage normal daily inquiry volume. Simply, personnel were concerned resources could not resolve current volume without using the Escalation Plan.

(U//FOUO) **Analysis 3b:** Examiners collaborated effectively, promoting efficiency, accuracy, and a positive work environment. Examiners helped one another navigate transactions using each Examiner's regional expertise to expedite inquiries when needed. During a prescribed training period, new trainees were paired with mentors for four weeks of one-on-one training. Immediately after the six-week CJIS Training and Advisory Process Unit (CTAP) training course, new Examiners were once again paired up with a mentor for an additional four weeks. This interaction developed the trainee skills providing context and confidence, as well as, creating a strong team environment.

(U//FOUO) **Positive Outcome 4:** The NICS Section recognized the importance of strong SOPs and devised standardized training for all new Examiners.

(U//FOUO) **Analysis 4a:** The NICS Section maintained extensive, detailed SOPs providing guidance and direction for the workforce. The spirit of the SOPs was to provide clarity and operational guidance. In spite of being operationally restrictive and/or outdated with the changing NICS environment, NICS Section management demonstrated a sincere effort to lead the section and provide appropriate oversight and guidance.

(U//FOUO) **Analysis 4b:** NICS maintained an effective standardized training regimen for all new Examiners. As described in Analysis 3b, during a prescribed training period, new trainees were paired with mentors for four weeks of one-on-one training session. Immediately after the six-week CTAP Unit (CTAP) training course, new Examiners were once again paired up with a mentor for an additional four weeks. The mentorship program ensured new Examiners developed a thorough understanding of the NICS process. Also, mentor Examiners enforced a sense of value and mission on new Examiners.

(U//FOUO) **Positive Outcome 5:** The NICS Section staff desmonstrated dedication and pride in the mission, in spite of heavy workloads and challenges with the receipt of timely information from law enforcement agencies.

(U//FOUO) **Analysis 5a:** A common theme developed during interviews and observations was one of enthusiasm for the mission and recognition of the importance of NICS. Articulated frustrations were cast in terms of a desire to improve performance and efficiency, not negative toward the leadership, process, or organization. The articulated recommended improvements were aimed at improving processes, not changing the NICS Section.

(U//FOUO) **Issues:** Of the unresolved transactions in Fiscal Year 2014, 288,006 remained in the Delayed Queue exceeding the allowed three days and of those inquiries, 172,879 transactions were purged from the NICS system with no resolution. While less than 3 percent of the total inquiries, the inquiry volume is large enough for concern. This section contains specifics issues and recommendations identified during the review.

(U//FOUO) **Issue 1:** Untimely responses and/or incomplete records represented the primary reasons for delayed inquiries. Record holders were not required to respond to NICS inquiries.

SUBJECT TO PROTECTIVE ORDER

FBI-00000170

(U//FOUO) **Analysis 1a:** INSD reviewed a random sample of 13 NICS transactions from the Delayed queue. All of the reviewed transactions were past the Brady Transfer Date. Eleven (85%) of the 13 NICS transactions were delayed due to missing NCIC and/or III dispositions. Two out of the 13 (15%) NICS transactions were delayed due to missing records. The missing information in all transactions would have been leveraged to make a determination to proceed or deny the NICS transaction, and was not available to the Examiner. Interviews revealed NICS Section personnel believe in the cases where information is not listed, the record holders nearly always possess the needed information. Typically, the information is simply not listed in the federally maintained systems or the NICS Section does not have direct access to the resident system.

(U//FOUO) **Analysis 1b:** Approximately 119 Law Enforcement Agencies across the country have overtly limited or refused contact with NICS leading to incomplete or inaccurate data available to Examiners. Lack of participation by state and local record holders created an intelligence gap for Examiners to effectively process gun permit requests within these states. States are not mandated to provide responses to NICS requests. An "Uncooperative Contact List" is maintained by NICS (refer to Roof Case Binder, Appendix K, Section 17).

(U//FOUO) **Analysis 1c:** The NICS Section's manual process for identifying Regional Point of Contact (POC) information for all agencies with arrest authority within a region is time consuming, resource intensive, and difficult to maintain. During the Roof transaction, the NICS POC list did not list CPD as having jurisdiction in Lexington County. This information would have resulted in locating CPD and the information required to Deny the transaction.

(U//FOUO) **Recommendation 1a:** The NICS Section should consider automating external POC lists to ensure Examiners have comprehensive contact information for state/local law enforcement and judicial agencies.

(U//FOUO) **Recommendation 1b:** The NICS Section should consider leveraging the existing CJIS Executive Advisory Policy Board (APB), which is made up of state representatives who meet several times a year, to assist in updating of POC lists, increasing record availability to the NICS Section, or improving agency responsiveness. Additional enterprise outreach efforts should be leveraged, such as the Office of Partnership and Engagement, NJTTF, National Academy, and other similar organizations to assist in updating of POC lists, increasing record availability to the NICS Section, or improving agency responsiveness.

SUBJECT TO PROTECTIVE ORDER

FBI-00000171

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) **Recommendation 1c:** The NICS Section EM should consider leveraging relevant Headquarters and Field Office Representatives when an external agency is deemed unresponsive or uncooperative. The FBI Representatives, through proper liaison efforts, could obtain the information in an expedient manner. The NICS Section could potentially utilize field office resources/Task Force Officers/CJIS Coordinators to obtain the information and/or influence uncooperative agencies.

(U//FOUO) **Recommendation 1d:** Organizations such as the International Association of Chiefs of Police (IACP) and the National Sheriffs Association (NSA) could be utilized to message state, local, and tribal agencies' leadership components on the importance of working with the NICS Section to help prevent the transfer of firearms to prohibited individuals.

(U//FOUO) **Recommendation 1e:** The NICS Section should consider leveraging OCA to identify potential legislative remedies.

(U//FOUO) **Issue 2:** Examiners rely on inefficient means of communication with various state and local agencies which inhibited effective resolution.

(U//FOUO) **Analysis 2a:** Due to NICS Section SOP and workloads, Examiners do not routinely call external agencies for information. Largely, faxes are used because many external agencies require fax requests. Faxing is a widely accepted business practice and a method to ensure veracity of requests, however the NICS Section SOPs do not require Examiners to confirm a fax submission is received and current policy makes it optional for an Examiner to follow up or send a second request due to lack of resources, as outlined in EC dated 10/31/2006, [REDACTED (F)] Fax responses returned to NICS can be confusing, unclear, contain little useful information, or may never arrive.

(U//FOUO) **Analysis 2b:** NICS firearm background inquiry requests for information, regardless of the mode of communication or the time constraints under Brady, were not followed up with a telephone call or other direct, affirmative communication. Discussing potentially prohibiting data prior to the Brady Transaction Date, especially where potential leads exist and an agency is cooperative, would lead to resolutions. The Examiner could have clarified the inconsistencies with the 04/13/2015 Roof gun transaction request, if SOPs promoted directly contacting the LCSO or the WCPD in an affirmative manner. The LCSO and the WCPD both responded to fax requests, and therefore would have likely assisted the Examiner obtain additional information.

UNCLASSIFIED//FOR OFFICIAL USE ONLY
23

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000172**