UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) **Recommendation 2:** The NICS Section should, at a minimum, consider an SOP wherein an Examiner confirms faxes are received and/or makes personal contact when necessary, and if feasible. The NICS Section should also devise strategies to encourage agencies to update NCIC records and ORI information.

(U//FOUO) **Issue 3:** While demand doubled over the last 10 years, resources remained essentially the same within the NICS Section. Consequently, proactive outreach efforts with agencies and FFLs suffered as resources were pulled to address the increasing number of NICS inquiries.

(U//FOUO) **Analysis 3a:** In 1999, the NICS Section had an FSL of (H) of which (H) employees were onboard and processed 4,538,020 NICS firearms background check inquiries. In 2015, the NICS Section has an FSL of (H) of which (H) employees are onboard and projected to process 8,611,726 NICS firearms background check inquiries. The following table describes the yearly staffing level since 1999 to present:

| Calendar Year | FSL | Onboard | Over/Under | FBI-Initiated Firearm Background Checks |
|---|---|---|---|---|
| 1999 | | (H) | | 4,538,020 |
| 2000 | | | | 4,260,270 |
| 2001 | | | | 4,291,926 |
| 2002 | | | | 4,248,893 |
| 2003 | | | | 4,462,801 |
| 2004 | | | | 4,685,018 |
| 2005 | | | | 4,952,639 |
| 2006 | | | | 5,262,752 |
| 2007 | | | | 5,136,883 |
| 2008 | | | | 5,813,249 |
| 2009 | | | | 6,083,428 |
| 2010 | | | | 6,037,394 |
| 2011 | | | | 6,875,625 |
| 2012 | | | | 8,725,425 |
| 2013 | | | | 9,315,963 |
| 2014 | | | | 8,256,688 |
| 2015 | | | | Projection: 8,611,726 |

Table 4

SUBJECT TO PROTECTIVE ORDER

FBI-00000173

(U//FOUO) **Analysis 3b:** The NICS Section FSL is appropriated by Congress. The 2015 Congressionally approved FSL is (H) The NICS Section was approved to backfill (H) positions. Of the (H) positions, (H) are designated as Examiner positions;

(H), (M)

(U//FOUO) **Analysis 3c:** Currently,

(H), (N)



(U//FOUO) **Analysis 3d:** On 06/28/2001, the Attorney General issued a directive to increase the NICS Section Immediate Determination Rate (IDR) which was averaging 71%, to at least 90%. In July 2002, the NICS Section increased its IDR to 90%, and also increased its onboard FSL from (H) in 2001 to (H) in 2002, an 11% increase in FSL. NICS assumed the processing of all firearms transactions for each state. In 2004, U.S. House Bill 2673-93, the Consolidated Appropriation Bill, signed by President George W. Bush, on 01/23/2004, modified retention guidelines for Proceeded NICS transactions. This required the NICS Section to destroy all identifying information on a Proceeded transaction within 24 hours after the FFL was notified of the Proceed status. The increase of the IDR resulted in a requirement for more inquiries to be resolved immediately. Due to this change in retention legislation, Examiners could no longer use previous transaction data as a research tool for subsequent requests as the data was promptly

SUBJECT TO PROTECTIVE ORDER

FBI-00000174

UNCLASSIFIED//FOR OFFICIAL USE ONLY

purged. Each inquiry, even for high volume firearms buyers must be initiated and researched again anew as previously discovered data was purged.

(U//FOUO) **Analysis 3e:** On 06/14/2002, Arizona ceased to operate as a full NICS POC state, meaning the NICS Section was required to absorb the workload. The NICS Section had (H) onboard Examiners. On 10/01/2003, Indiana ceased to operate as a full NICS POC state. The NICS Section had (H) onboard Examiners. On 07/01/2005, Georgia ceased to operate as a full NICS POC state. The NICS Section had (H) onboard Examiners. On 12/28/2012, Michigan ceased operations as a full NICS POC state. The NICS Section had (H) onboard Examiners. On 02/14/2012, the shooting at Sandy Hook Elementary School and subsequent discussions of potential changes in gun laws caused the NICS Section's workload to increase by 46% in 2013. The NICS Section onboard employees were (H) In spite of increasing workload, the NICS Section onboard resources have diminished since 2006.

**Recommendation 3a:** Efforts should be made to align resource growth with workload.

**Recommendation 3b:** The NICS Section was approved to backfill ▆ positions, of which ▆ are Examiners. (H), (M)   (H)   (H), (M)

**Recommendation 3c:** The NICS Section should request resources from DOJ to augment a portion of the ▆ (H), (N)

(U//FOUO) **Issue 4:** To meet statutory requirements, the NICS Section management amended SOPs and curtailed resolution efforts to focus on initial reviews within the Brady Transaction Period. The NICS Section should review SOPs to prioritize inquiries exceeding the Brady Transaction Period as well as inquiries within the period.

(U//FOUO) **Analysis 4a:** Due to the work volume of Examiners, the NICS Section amended SOPs to eliminate work processes (customer service and second faxes) to meet the three business day mandate. Expectations for Examiner efforts shifted as workload increased. Relevant NICS Section SOPs (Appendix J) were reviewed and appeared comprehensive:

- SOP Number 5.5.4 IN-HOUSE RESEARCH, page 1, states: All internal automated systems (NTN inquiry[by name, FBI, social security number], NGI, NCIC, DDF, ATFRDD, and Web sites) must be checked. The NICS library (e.g., state information pages, terminology pages) and Westlaw,

UNCLASSIFIED//FOR OFFICIAL USE ONLY
26

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000175**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

when applicable, must be researched by the Examiner. The LAT [Legal Analysis Team] may then be contacted **prior** to calling or faxing any external agency to determine the level/disposition of the arrest charge.

- SOP number 5.5.5. EXTERNAL RESEARCH, State/Federal/International Processing Pages/Contact Lists, Page 1, states: The Examiner will contact the state POC, the courts, district attorneys, probation offices, arresting agencies, etc. for disposition, level of offense, incident report, etc, via fax, phone, mail, email, and/or Nlets (sic) in accordance with the preference indicated on the State Processing Page and Contact List. If the preference indicates that other agencies can only be contacted if no response is received, or as a last resort, other agencies must be contacted, as soon as possible after the 10th calendar day. This will ensure that all resources, in keeping with NICS Standard Operating Procedure and established state contact procedures, are being exhausted. Every effort must be made to obtain the necessary information, in order to reach a final decision on a NICS transaction during the research phase.

- SOP Number 5.15 DOCUMENTING RESEARCH COMMENTS, Section I, page 11, states: When Examiners have exhausted all resources obtaining information, the following must be entered into the transaction. "All resources identified after reasonable research have been exhausted."

The NICS Section personnel articulated direction from management to expedite inquiries. Effective 10/01/2006, NICS management eliminated the second fax requirement[7]. Prior to 10/01/2006, when a fax was not responded to by an external agency, the Examiners were required to expend additional time to review the Delayed/Open transactions, prepare and disseminate a second follow-up fax request, and denote such in the transaction comments. The widespread reliance on the 2006 EC rather than current SOPs appeared to result in a broader practice of single, fax-based attempts to gather information as the operational definition of "exhausting all means." Efforts beyond this threshold certainly occured, but only at the occasional initiative of individual Examiners and at a risk of falling short of established quotas discussed below.

**Recommendation 4:** The NICS Section should ensure SOPs prioritize resolution as well as volume.

(U//FOUO) **Issue 5:** NICS SOPs prioritized volume over resolution allowing Delayed work to be reviewed on Day 3 which met the statutory requirement, but resulted in inquiries exceeding the Brady Transaction Date.

---

[7] EC from NICS Section dated 10/31/2006, ▓▓▓▓▓▓▓ (F)

UNCLASSIFIED//FOR OFFICIAL USE ONLY
27

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000176**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) **Analysis 5a:** INSD interviews revealed the NICS Section compliance policy was measured by working all transactions within the Brady Transaction Period. The number of firearms background check inquiries not addressed until the third business day have been as high 600 transactions in a single day. When NICS is processing more complicated Delayed inquiries on the third day, there was a little time allotted for external agencies to respond to a NICS request. As a natural consequence, even if agencies responded the next day, the inquiry exceeded the Brady Transaction Period.

(U//FOUO) **Analysis 5b:** Examiners started at a GS-6 level and could attain a GS-8 status. Examiners could compete for promotion to a GS-9, however positions were limited (37% of the workforce). Examiners worked on a quota system based on GS level. To achieve a successful rating, a GS-6 had to produce between 1.5 and 1.99 transactions an hour, a GS-7 had to produce 2.5 and 2.65 transactions per hour, a GS-8 had to produce between 2.75 and 2.99 transactions per hour, and a GS-9 had to produce 3.25 and 3.5 transactions per hour. In addition, if an Examiner wanted to reach the next GS level, within grade accuracy baselines have to be at the "Successful" level which is between 98.09% and 98.64% for all GS levels. In so far as employee success was based heavily on the number of inquiries processed, the NICS Section system encouraged employees to meet a minimal "exhaust all means" threshold and then move on to the next inquiry. Further, encouraging this behavior was the policy wherein Examiners may not promote if the Examiner incorrectly Proceeded an inquiry twice in six months. Proceeding a prohibited transaction was rightly discouraged, however this created an incentive for Delaying a questionable inquiry because little attention wa paid to Delayed inquiries, especially once exceeding the three day review period. None of these efforts to promote the speed of inquiry resolution or discourage errors were improper, however in total, the impact of these policies encouraged volume over resolution and created a risk in inquiries being Delayed, exceeding the Brady Transaction Period, and resulting in the transfer of a firearm to a prohibited individual.

(U//FOUO) **Recommendation 5a:** The NICS Section should ensure SOPs result in intended outcomes.

(U//FOUO) **Recommendation 5b:** The NICS Section should not allow transactions to reach the Day 3 Queue. Delayed work should be reviewed no later than Day 2 in order to provide an agency a minimum of 24 hours to respond to the request for information prior to the expiration of the Brady Transaction Date.

(U//FOUO) **Issue 6:** The Brady Handgun Violence Protection Act does not define how an agency should respond to requests or require a response, the Act only focused on the sale or

UNCLASSIFIED//FOR OFFICIAL USE ONLY

SUBJECT TO PROTECTIVE ORDER

FBI-00000177

UNCLASSIFIED//FOR OFFICIAL USE ONLY

Denial of a firearm within three business days. The NICS Section did not ensure requests for information to outside agencies were received or reviewed by the recipient agency.

(U//FOUO) **Analysis 6:** The NICS Section did not ensure requests for information to outside agencies were either received or reviewed by the recipient agency (state, local, or judicial law enforcement partner). In many cases, the requests went unaddressed; in other instances, the faxed responses returning to the NICS Section were confusing, unclear, or contained no information. In the Roof case, the Examiner sent faxes to three agencies, however, one agency did not respond and the other two agencies did not clarify CPD was a neighboring police department in the adjacent county, even if they possessed this information. While it is not reasonable to expect responding agencies to predict what extra information might be of value, both the LCSO and the WCPD clearly knew more about CPD than provided on the faxed reply. A follow-up telephone call to LCSO or WCPD would likely have clarified the confusion regarding the arresting agency resulting in the location and review of the CPD report.

(U//FOUO) **Recommendation 6a:** The NICS Section should develop an SOP to prioritize efforts to ensure requests for information are received, addressed, and fully exploited.

(U//FOUO) **Recommendation 6b:** The NICS Section should coordinate with OCA to assess the possibility for legistlative relief to facilitate effective NICS Operations.

(U//FOUO) **Issue 7:** The NICS Section did not comprehensively review current or new information resources to increase overall effectiveness in conducting firearm background checks. Ad hoc efforts were undertaken when resources and SOPs permitted.

(U//FOUO) **Analysis 7a:** The approval process to incorporate a new dataset and to ensure it meets all internal and external requirements, was a resource intensive process which required dedicated resources to effectively implement change into the NICS system. The resource demand discouraged the NICS Section from reviewing new data sets as balanced against applying resources to call volume. Interfacing software with state agencies and reprogramming systems for compatability are expensive and complicated undertakings. In addition, the implementation of new database requirements, such as the purging of data, makes the approval process complicated and requires agreement by many stakeholders.

(U//FOUO) **Analysis 7b:** The N-DEx System is a national information sharing system, which enables users to search, link, and analyze more than 500,000,000 local, state,

UNCLASSIFIED//FOR OFFICIAL USE ONLY
29

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000178**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

tribal, and federal criminal justice records. The NICS Section could implement an automated process to cross-reference N-DEx data against the biographical identifiers annotated on the ATF Form 4473. Additionally, both Immigration and Customs Enforcement (ICE) and N-DEx queries could be modified to include possible matches. Currently, ICE searches were based on the exact data entered by the applicant or by the FFL, which left room for error. A similar search algorithm to Sentinel could produce additional information to exploit which would have otherwise gone unnoticed. The additional databases could increase the overall effectiveness when researching firearms background checks. Several states maintain court record databases, warrant databases, and mental health databases, all of which could enhance the overall decision making capability of the Examiners. N-DEx was reviewed by the NICS Section in 2013 and was not included as a dataset (Appendix K, Section 24) because the review determined a low information return rate at the time and a conflict with purging requirements. Since then, N-DEx was populated with significantly more data to potentially resolve inquiries, which would have been the case in the Roof matter. The NICS Section would still have to resolve purging conflicts with N-DEx.



(I), (K)

(U//FOUO) **Recommendation 7a:** The NICS Section should seek to identify and review additional database resources or stakeholders both internal and external to the FBI.

(K)

(U//FOUO) **Issue 8:** Quality assurance processes were resource intensive and reduced manpower available for inquiry resolution. Quality assurance was limited to full-time Examiners and the surged workforce was not regularly reviewed. (The New NICS platform is under development to resolve many of these issues.)

(U//FOUO) **Analysis 8a:** The NICS Assessment Unit (NAU) conducts a quality assurance (QA) check of two NICS transactions processed by every Examiner, limited to the NAU workday. At times where the Escalation Plan was activated at its highest level,

SUBJECT TO PROTECTIVE ORDER

FBI-00000179

the NAU was involved entirely in working inquiries and therefore not conducting any QA (Appendix K, Section 4). The NAU reviewed the QA process quarterly via roundtable discussion to ensure reviews were similarily applied. Beyond the quarterly roundtable, the NAU did not have definitions or deliniations to synchronize QA reviews more comprehensively.

(U//FOUO) **Analysis 8b:** Higher GS level Examiners were held to higher production and quality requirements as GS-9s were expected to be more knowledgeable and accurate than lower grade Examiners. A GS-9 was expected to produce between 3.25 and 3.50 of Delayed Queue baseline transactions per hour to be rated "Successful." This represented an 116% expected increase in productivity over GS-6 Examiners with a 36% pay increase according to the OPM GS payscale for the "Rest Of U.S." All Examiners conducted the same type of work, the higher grade employees were expected to be more efficient, especially with more difficult inquiries. Additionally, increased pay would result in greater retention resulting in a more experienced workforce. Increased experience would likely result in fewer quality assurance problems.

(U//FOUO) **Recommendation 8a:** The NICS Section should revise QA policy to make the QA process more efficient and comprehensive, especially during periods of Escalation.

(U//FOUO) **Recommendation 8b:** The NICS Section should consider replacing the GS-6 and GS-7 workforce with an expanded cadre of GS-9s. The higher standards applied to GS-9s, along with appropriate management engagement and oversight, would result in a more capable and experienced work force, improving quality and efficiency.

(U//FOUO) **Issue 9:** Emphasis on inquiry quotas, linking performance to the number of processed inquiries, and regularly redirecting employees from other units to work inquiries, shifted focus away from resolution, ▓▓▓▓▓▓▓(M)▓▓▓▓▓▓▓ .

(U//FOUO) **Analysis 9a:** The NICS Section promoted achieving quotas and rewarding employees based on the quantity of firearms checks processed hourly over resolution. The number of transactions or quota each employee was expected to process was based on an employee's GS level. Employees who achieved the quotas were rated higher on their annual PARs. Examiners unable to meet their quotas were rated below the successful performance level. The exceptions to this were Examiners who did not routinely conduct line transactions but were asked to join the line Examiners when

UNCLASSIFIED//FOR OFFICIAL USE ONLY

resources were needed in a region due to Escalation[8]. The "non-line" Examiners from other units were not responsible for meeting a quota (i.e. staff from the NICS Business Development Unit). (See NICS Operations Unit, Production, Accuracy, Compliance Cascading Goals Addendum, Appendix I)

(U//FOUO) **Analysis 9b:** The Escalation Plan was being instituted regulary and for longer periods of time. Interviews and observation revealed a (M) based on these elements. As noted, a common theme developed in interviews was concern about the more frequent use of the Escalation Plan, and for longer periods, to simply manage normal daily inquiry volume. Simply, personnel were concerned resources could not resolve current volume without using the Escalation Plan. (M) (M)

(U//FOUO) **Recommendation 9:** The NICS Section should review SOPs regarding inquiry quotas, performance, and Escalation to maximize resource efficiency of inquiry resolution.

(U//FOUO) **Issue 10:** NICS Section examinations were complicated by statutory requirements, including short data purge windows and increased review required to verify prohibitors.

(U//FOUO) **Analysis 10a:** The Code of Federal Regulations required the NICS Section to destroy, within 24 hours, identifying information submitted by or on behalf of any person who has been determined not to be prohibited from possessing or receiving a firearm once the FFL has been notified. In support of the CFR, the NICS database system automatically purged all Proceed transactions within 24 hours, and all other transactions at 88 days except for Denied transactions which remain indefinitely. After Day 88, a Delayed gun purchaser can reapply for a gun permit, and no record of any prior Delayed gun transaction would exist in the NICS database system. After 24 hours, all Proceeded gun transactions were purged from the NICS system making it impossible to research any possible straw purchasers (straw purchasers are individuals who purchase firearms for someone else) or potential suspicious firearms transactions. After Day 88, all Delayed transactions were also purged making it impossible to research past firearm transactions. Complex inquiries must be re-worked each time an applicant applies to purchase a firearm except when the applicant voluntarily enrolls in the Voluntary Appeals Process (VAP). The VAP allowed NICS to maintain applicant data past purged periods.

---

[8] Escalation was the process of surging additional NICS Section resources to meet the demand of processing an increased volume of NICS transactions for a particular shift or day.

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000181**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

(U//FOUO) **Analysis 10b:** An active arrest warrant met the federal prohibitor criteria outlined in 922(n), which specifically prohibited the issuance of a firearms to individuals who are under indictment or information for a crime punishable by imprisonment for a term exceeding one year. Currently, if a warrant meeting this criteria appears as the result of an NCIC or III check, an internal SOP requires the Examiner to confirm the warrant is active with the originating agency before Denying the inquiry. The responsibility of accurate NCIC records resides with the contributing agency not the NICS Section. A denied patron could appeal the Denied decision and resolve the prohibited firearms request with the contributing agency.

(U//FOUO) **Analysis 10c:** The LCSO III report indicated Roof had been arrested for possession of Suboxone, a schedule III narcotic. Roof also admitted to using the substance. Federal Prohibitor section 922(g)(3) – Persons Who Are Unlawful Users of or Addicted to Any Controlled Substance, section 2, defines the prohibitor as, "A person who is a current user of a controlled substance in a manner other than as prescribed by a licensed physician." The use of the controlled substance by Roof would have been sufficient to deny the transaction. Currently, an Examiner is required to verify the arrest and underlying facts not listed in the criminal history report. Requiring the Examiner to Deny the inquiry based on the NCIC or III arrest record would result in the purchaser being denied the ability to purchase a firearm until able to establish the NCIC or III arrest record was inaccurate. Appeal processes exist allowing the purchaser to rectify inaccurate records. The responsibility for accurate records resides with the entering agency, and appealing a denial resulting from inaccurate records is the responsibility of the purchaser. If a Denial on the apparent records was permitted, the Examiner would immediately process the inquiry as Denied, thereby preventing the inquiry from becoming Delayed and allowing the Examiner to work on other inquiries without a Delayed inquiry exceeding the Brady Period.

(U//FOUO) **Recommendation 10:** The NICS Section should coordinate with OCA to assess the possibility for legistlative relief to facilitate effective NICS Operations.

(U//FOUO) **Issue 11:** The NICS Section demonstrated the ability to predict surge requirements; however, employees maintained schedules which did not maximize effectiveness.

(U//FOUO) **Analysis:** On average, Fridays and Saturdays have the highest NICS call and E-Check transaction volume (outlined in the graph below). The region experts should be staffed appropriately across all days/shifts to include weekends. Converting the four days a week/ten hour shifts to five days a week/eight hour shift, could increase NICS coverage by

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**SUBJECT TO PROTECTIVE ORDER**

**FBI-00000182**

UNCLASSIFIED//FOR OFFICIAL USE ONLY

adding an additional work day to every Examiner, to maximize staffing coverage for a standard work week. Further, shorter shifts allow more focused application of resources within a given day. The table below illustrates transaction volume by month, day, and full-time equivalent (FTE).

2015 Project Data

| Day of Week | | Transfer Process | | | | Delay Queue | | | | Total FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Call Center | | E-Check Transfer | | New Unassigned | | Information Received | | |
| | | Volume | FTE | Volume | FTE | Volume | FTE | Volume | FTE | |
| September | Monday | 4,260 | (H) | 5,883 | (H) | 2,508 | (H) | 3,231 | (H) | (H) |
| | Tuesday | 3,752 | | 5,182 | | 2,242 | | 3,623 | | |
| | Wednesday | 4,372 | | 6,038 | | 2,628 | | 3,294 | | |
| | Thursday | 4,128 | | 5,700 | | 2,452 | | 2,780 | | |
| | Friday | 6,026 | | 8,321 | | 3,421 | | 2,371 | | |
| | Saturday | 6,212 | | 8,578 | | 3,560 | | 190 | | |
| | Sunday | 2,527 | | 3,489 | | 1,370 | | 108 | | |
| October | Monday | 3,294 | | 4,549 | | 2,206 | | 3,532 | | |
| | Tuesday | 3,514 | | 4,852 | | 2,275 | | 3,756 | | |
| | Wednesday | 3,629 | | 5,010 | | 2,383 | | 3,552 | | |
| | Thursday | 4,148 | | 5,728 | | 2,666 | | 3,183 | | |
| | Friday | 6,392 | | 8,826 | | 4,025 | | 2,801 | | |
| | Saturday | 5,924 | | 8,181 | | 4,145 | | 243 | | |
| | Sunday | 1,960 | | 2,707 | | 1,266 | | 133 | | |
| November | Monday | 3,668 | | 5,066 | | 2,717 | | 4,752 | | |
| | Tuesday | 3,455 | | 4,771 | | 2,540 | | 3,310 | | |
| | Wednesday | 3,986 | | 5,505 | | 2,938 | | 3,965 | | |
| | Thursday | 3,238 | | 4,472 | | 2,472 | | 2,768 | | |
| | Friday | 7,829 | | 10,812 | | 5,265 | | 2,938 | | |
| | Saturday | 5,336 | | 7,368 | | 3,689 | | 244 | | |
| | Sunday | 2,007 | | 2,771 | | 1,436 | | 237 | | |
| December | Monday | 4,721 | | 6,519 | | 2,920 | | 5,905 | | |
| | Tuesday | 4,877 | | 6,735 | | 3,201 | | 5,635 | | |
| | Wednesday | 4,911 | | 6,782 | | 3,447 | | 4,015 | | |
| | Thursday | 3,197 | | 4,415 | | 2,238 | | 2,437 | | |
| | Friday | 6,899 | | 9,528 | | 4,599 | | 3,118 | | |
| | Saturday | 6,811 | | 9,406 | | 4,527 | | 270 | | |
| | Sunday | 2,493 | | 3,443 | | 1,696 | | 192 | | |

Table 5

(U//FOUO) **Recommendation:** The NICS Section should conduct a review of existing scheduling practices and propose revisions to maximize efficiency.

UNCLASSIFIED//FOR OFFICIAL USE ONLY
34

SUBJECT TO PROTECTIVE ORDER

FBI-00000183

UNCLASSIFIED//FOR OFFICIAL USE ONLY

## V. CONCLUSION

(U//FOUO) The INSD review determined Examiners met established requirements, but the review also exposed challenges and deficiencies in protocols which require careful review to improve performance. Current SOPs and workload limit the flexibility of Examiners to explore databases not prescribed within the SOP and likely inhibited a simple search query, which in the Roof case, would have identified a CPD contact or could have facilitated the acquisition of information enabling the Examiner to identify the prohibited violation. From a corporate perspective, interagency communications, process adjustments, and resources present the most significant challenges. The lack of effective communication and information sharing among agencies routinely results in NICS inquiries exceeding the Brady Transaction Date enabling firearms to be transferred without a full vetting of charges, dispositions, or other prohibitors. Prioritization of the NICS process on volume over resolution increases the risk of unvetted firearm transfers. Allowing Delayed work to be reviewed on Day 3 met the statutory requirement, but increased the likelihood inquiries exceeded the Brady Transaction Date. CJIS management should continue to assess NICS resource alignment to maximize efficiency. Re-aligned resources, the addition of new data sets, and creation of an enhanced surge capacity should be considered.

SUBJECT TO PROTECTIVE ORDER

FBI-00000184