IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| FELICIA SANDERS, individually and as Legal Custodian of K.M., a minor, | ) ) ) | Civil Action No. 2:16-cv-2356-RMG |
| Plaintiff, | ) ) | *consolidated with* 2:16-cv-2350; 2:16-cv-2351; 2:16-cv-2352; 2:16-cv-2354; 2:16-cv-2355; 2:16-cv-2357; 2:16-cv-2358; 2:16-cv-2359; 2:16-cv-2360; 2:16-cv-2405; 2:16-cv-2406; 2:16-cv-2407; 2:16-cv-2409; and 2:16-cv-2746 |
| v. | ) ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) | |
| This document pertains to all cases | ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND
RENEWED MOTION TO DISMISS**

## I.    INTRODUCTION

These consolidated actions arose out of the horrific mass shooting perpetrated by Dylann Roof at the Emanuel AME Church in Charleston, South Carolina.  On June 17, 2015, Roof murdered nine people gathered inside the church using a Glock 41 semi-automatic handgun he purchased approximately two months earlier from a federally-licensed firearms dealer.  Before transferring the weapon to Roof, the dealer contacted the Federal Bureau of Investigation ("FBI") to request a background check of Roof as required by the Brady Handgun Violence Prevention Act ("Brady Act").

Plaintiffs in these cases are personal representatives and family members of the nine people Roof murdered at the church, as well as other individuals who were hiding inside the church during the mass shooting and survived the ordeal.  Alleging jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, plaintiffs claim that the FBI

employee who performed Roof's background check negligently failed to determine that Roof

was an unlawful user of a controlled substance whose receipt of a firearm would violate the Gun

Control Act of 1968, and that as a result of this alleged negligence the dealer was permitted to

complete the transfer of the weapon that Roof later used during the mass shooting.

The cases currently are on remand from the United States Court of Appeals for the Fourth

Circuit, which reversed this Court's dismissal of the actions on the grounds that plaintiffs' claims

were barred by both the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), and a

separate immunity provision contained in the Brady Act, 18 U.S.C. § 922(t)(6).  Following

remand, the plaintiff in the lead case filed an amended complaint, the allegations of which the

parties have agreed (and the Court ordered) also supersede the allegations in all the other

plaintiffs' original complaints (except for allegations identifying the plaintiffs in each of the

other cases and pleading their respective damages).

As this Court is aware, in moving to dismiss the claims asserted in plaintiffs' original

complaints the United States argued not only that their claims were barred by the FTCA's

discretionary function exception and the Brady Act's immunity provision, but also that South

Carolina law would impose no liability on a private person under circumstances like those

presented here, and that plaintiffs' claims therefore were not actionable under 28 U.S.C. §

1346(b).  In dismissing the actions, this Court did not reach the government's State-law

arguments, and the Fourth Circuit therefore had no occasion to address them on appeal.

Now that these cases are back before this Court, the United States again renews its

motion to dismiss, predicating its motion on the grounds that (1) no private analog exists with

respect to the FBI's performance of Brady Act background checks to determine whether receipt

of firearms by prospective purchasers would be unlawful; and (2) insofar as the Court finds a

private analog does exist, South Carolina law would impose no tort liability on a private person under similar circumstances. These cases therefore fall outside the scope of 28 U.S.C. § 1346(b), the terms of which define this Court's jurisdiction to entertain the suits.

## II.     STANDARD OF REVIEW

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit. Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)) (citations omitted, alteration in original).

The FTCA "grants jurisdiction to the district courts only with respect to a 'certain category of claims.'" *Kerns v. United States,* 585 F.3d 187, 194 (4th Cir. 2009) (quoting *Meyer,* 510 U.S. at 477); 28 U.S.C. § 1346(b). "A claim comes within this jurisdictional grant . . . if it is actionable under § 1346(b)." *Meyer,* 510 U.S. at 477. "[T]o be actionable under § 1346(b), a claim must allege, *inter alia*, that the United States 'would be liable to the claimant' as 'a private person' 'in accordance with the law of the place where the act or omission occurred.'" *Id.* (quoting § 1346(b)); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . in the same manner and to the same extent as a private individual in like circumstances").

"[A] defendant may challenge subject matter jurisdiction in one of two ways." *Kerns*, 585 F.3d at 192 (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982)). "First, the defendant may contend that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Id.* (citing *Adams*, 697 F.2d at 1219). This is a "facial challenge." Alternatively, the defendant may contend "that the jurisdictional allegations of the complaint [a]re not true." *Adams*, 697 F.2d at 1219. This is a "factual challenge." This motion presents a

facial challenge to the Court's subject matter jurisdiction; accordingly, the Court should apply the same standard of review as it applies to motions to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6). *Kerns,* 585 F.3d at 192; *Durden v. United States,* 736 F.3d 296, 300 (4th Cir. 2013).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

The existence and scope of a duty under South Carolina law is a question of law.  *Doe 2 v. Citadel*, 805 S.E.2d 578, 581 (S.C. App. 2017).  Negligence is not actionable without a duty of care.  *Bishop v. S.C. Dep't of Mental Health*, 502 S.E.2d 78, 81 (S.C. 1998).  A court may dismiss an action under the FTCA if it determines under state substantive law that the government did not owe plaintiffs a legal duty of care.  *Durden*, 736 F.3d at 301.

## III.    RELEVANT STATUTES, REGULATIONS, AND INTERNAL PROCEDURES

The Gun Control Act of 1968, as amended, prohibits the receipt or possession of firearms by certain categories of individuals, *see* 18 U.S.C. § 922(g) and (n), including those who are unlawful users of controlled substances, *id.* § 922(g)(3).  In 1993, Congress passed the Brady

Act, which directed the Attorney General to establish the National Instant Criminal Background

Check System ("NICS"), a system which any federally licensed firearm dealer may contact for

information on whether receipt of a firearm by a prospective transferee would violate 18 U.S.C.

§ 922 or state law.  Pub. Law No. 103-159, § 103(b) (1993), 107 Stat. 1541, codified at 34

U.S.C. § 40901(b).

Before transferring a firearm to a would-be transferee (*e.g.*, purchaser), the Brady Act

requires the licensed dealer (sometimes referred to as a "Federal Firearms Licensee" or "FFL")

first to request a NICS background check of the prospective purchaser; the dealer then is

prohibited from transferring the firearm unless a "Proceed" is issued or "three business days

(meaning days on which State offices are open) have elapsed since the licensee contacted the

system, and the system has not notified the licensee that the receipt of a firearm by [the

purchaser] would violate subsection (g) or (n) of this section."  18 U.S.C. § 922(t)(1).  If a dealer

knowingly violates section 922(t)(1) by transferring a firearm to a purchaser after being notified

by NICS that the individual's receipt of a firearm would violate 18 U.S.C. § 922(g) or (n), the

dealer is subject to criminal penalties.  *Id.* § 924(a)(5).

Under implementing regulations issued by the Attorney General, licensed gun dealers in

most States, including South Carolina, initiate NICS background checks by contacting the FBI's

NICS Operations Center (also referred to as "the NICS Section").  *See* AG Order No. 2186-98,

63 Fed. Reg. 58303, 58308 (Oct. 30, 1998) (final rule) ("[The] NICS Operations Center [is] the

unit of the FBI that receives inquiries from FFLs to perform background checks, makes a

determination based on available information as to whether the receipt or transfer of a firearm

would be in violation of Federal or state law, researches criminal history records, tracks and

finalizes appeals, and conducts audits of system use.").[1]

Upon receiving a request from an FFL to initiate a background check of a prospective

transferee, NICS queries several national databases (specifically, the Interstate Identification

Index ("III"); files of the National Crime Information Center ("NCIC"); and the NICS Index) for

any records matching the prospective purchaser. 28 C.F.R. § 25.6(c)(1)(iii). The dealer then is

provided with one of three responses based on the results of these searches:

> (A) "Proceed" response, if no disqualifying information was found in the
> NICS Index, NCIC, or III.
> (B) "Delayed" response, if the NICS search finds a record that requires
> more research to determine whether the prospective transferee is disqualified from
> possessing a firearm by Federal or state law. A "Delayed" response to the FFL
> indicates that the firearm transfer should not proceed pending receipt of a follow-
> up "Proceed" response from the NICS or the expiration of three business days
> (exclusive of the day on which the query is made), whichever occurs first . . . .
> (C) "Denied" response, when at least one matching record is found in
> either the NICS Index, NCIC, or III that provides information demonstrating that
> receipt of a firearm by the prospective transferee would violate 18 U.S.C. 922 or
> state law. . . .

28 C.F.R. § 25.6(c)(1)(iv).

---

[1] In certain States, designated State or local law enforcement agencies serve as
intermediaries between dealers and NICS; these State and local law enforcement agencies are
known as "Points of Contact" or POCs. *See* AG Order No. 2186-98, 63 Fed. Reg. at 58308.
Licensed firearms dealers in these States must contact the designated POCs rather than the NICS
Operations Center to initiate NICS background checks. *Id.*; *see also* AG Order No. 2158-98, 63
Fed. Reg. 30430, 30431 (June 4, 1998):

> In cases where the checks are performed by state or local POCs, an authorized
> state or local official will receive and evaluate matching records forwarded by the
> FBI and any available state records and will determine whether the prospective
> purchaser is the subject of the matching records and whether the records provide
> reason to believe that the prospective purchaser is ineligible to receive a firearm
> under state or Federal law. In states where FFLs contact the FBI directly, an FBI
> analyst will make these determinations. In either case, only the decision whether
> or not the transfer may proceed (communicated in the form of a message stating
> "proceed," "delayed," or "denied"), and none of the underlying information, will
> be provided to the FFL.

The FBI's NICS Section has developed standard operating procedures ("SOPs"), contact sheets, and processing pages to provide further direction to NICS Legal Instrument Examiners in determining what kind of information demonstrates that receipt of the firearm by an individual would violate federal or state law, when more research is needed to determine whether the prospective purchaser is disqualified from receiving a firearm, how such research is to be conducted, and which state and local law enforcement and criminal justice agencies are to be contacted in order to obtain missing information to allow a determination to be made as to an individual's eligibility to receive a firearm.

## IV.     PRIOR PROCEEDINGS

In July and August 2016, plaintiffs filed 16 substantially identical cases wherein they sought damages for personal injury, wrongful death, or survival based upon allegations that the United States: (1) negligently created, maintained, indexed, and managed the NICS system; and (2) negligently performed the firearms purchase background check when Roof sought to purchase a handgun on April 11, 2015.  See generally Compl., ECF No. 1.[2]  Plaintiffs further allege that if the FBI had issued a "Denied" response to Roof's background check prior to the murders, "it would have prevented the foreseeable harm to those people affected by Dylann Roof's use of the obtained handgun."  *Id.* ¶ 39.

The United States moved to dismiss plaintiffs' actions.  U.S. Mot. to Dismiss, ECF No. 12.  In its first motion to dismiss, the United States argued that the discretionary function and misrepresentation exceptions to the FTCA barred plaintiffs' actions, Mem. on U.S. Mot to Dismiss 19-29, that plaintiffs could not advance a FTCA claim because there is no private party

---

[2]  Citations to document numbers are to those in *Sanders v. United States*, No. 2:16-cv-2356.

analog for performing handgun purchase background checks, *id.* at 29-30, and that South

Carolina law would not impose on the United States, if a private party, a legal duty to protect

plaintiffs from Roof's criminal acts, *id.* at 30-34. After full briefing, the Court denied the United

States' motion to dismiss with prejudice as to the misrepresentation exception and without

prejudice as to its other defenses. *Sanders v. United States*, No. 2:16-cv-2356, 2017 WL

1102612 (D.S.C. March 23, 2017) ("*Sanders I*")

With respect to the discretionary function exception, the Court held that "[w]hether the

examiner should have, or could have, acted differently under the 'circumstances' is a disputed

jurisdictional fact, as is the challenge of the FBI's database-maintenance conduct." *Id.*, 2017 WL

1102612 at *4. It thus permitted plaintiffs leave to conduct jurisdictional discovery and

authorized the government to "renew its discretionary-function exception arguments after

discovery." *Id.* at *1.

With respect to the United States' state law arguments, the Court found that "South

Carolina law imposes no civil obligations to conduct background checks before selling

firearms." *Id.* at *10. It also found "Plaintiffs' voluntarily undertaken duty theory to be

implausible on its face," noting that the "FBI performs background checks for firearms sales

because Congress requires the FBI to do so." *Id.* at *5-*6. But, the Court said it was

"sufficiently plausible" that the government either negligently increased the risk of harm to

plaintiffs or violated a statute or regulation intended to protect the plaintiffs from an injury that is

in the class of harms the statute intends to prevent. *Id.* at *6. The Court therefore denied the

United States' motion "without prejudice to the Government's ability to renew its motion with

regard to negligence *per se*, after jurisdictional discovery." *Id.* at *7.

After the parties completed jurisdictional discovery, the United States renewed its motion

to dismiss.  U.S. Renewed Mot. to Dismiss, ECF No. 43.  The United States again argued that

the FTCA's discretionary function exception barred plaintiffs' actions.  Mem. on U.S. Renewed

Mot. to Dismiss 21-31, ECF No. 43-1.  The United States also argued that there was no private

party analog and that plaintiffs could not avail themselves to an exception to the general rule

under South Carolina law that a defendant does not owe a duty to plaintiffs to protect them from

harm from third-persons.  *Id.* at 31-40.

    After full briefing, a hearing, and post-argument briefing, the Court granted the United

States' renewed motion to dismiss.  *Sanders v. United States*, 324 F. Supp. 3d 636 (D.S.C. 2018)

("*Sanders II*"), *rev'd and remanded*, *Sanders v. United States*, 937 F.3d 316 (4th Cir. 2019)

("*Sanders III*").  The Court held that the discretionary function exception and the Brady Act's no

liability provision precluded plaintiffs' actions.  The Court accordingly noted, "[b]ecause the

Court concludes it lacks subject matter jurisdiction over this case, it does not reach the

Government's arguments under Rule 12(b)(6) for dismissal on the merits based on South

Carolina's public duty rule and other issues of South Carolina tort law."  *Id.* at 650.

    Plaintiffs appealed and the Fourth Circuit reversed.  It held that an internal FBI SOP

"prescribed mandatory directives that the NICS Examiner was required to follow in performing

the background check," such that the FTCA's discretionary function exception would not apply

to negligence claims predicated on that prescribed conduct.  *Sanders III*, 937 F.3d at 329.  At the

same time, the Fourth Circuit held that the discretionary function exception bars plaintiffs' other

negligence theories: that NICS should have provided NICS Examiners access to the National

Database Exchange database and that the FBI violated a "data integrity" regulation.  *Id.* at 332-

333.  Because the Fourth Circuit determined that neither the discretionary function exception nor

the Brady Act no-liability provision applies to plaintiffs' argument that the FBI allegedly

violated SOP 5.5.5 during Roof's background check, it "reverse[d] the district court's order granting the Government's motion to dismiss for lack of subject-matter jurisdiction and remand[ed] this case for further proceedings consistent with this opinion." *Id.* at 335.

The United States herein renews is state law defenses by this motion. No court has yet to address these defenses.

## V.    STATEMENT OF THE CASE

On Saturday, April 11, 2015, Dylann Roof visited Shooter's Choice, a FFL located in West Columbia, South Carolina, to purchase a handgun. Am. Compl. ¶ 15. The same day, Shooter's Choice initiated a NICS background check of Roof. *Id.* ¶ 20. An initial database search returned a single record (Roof's rap sheet, which was contained in III) indicating that Roof had been arrested six weeks earlier on an illegal drug charge, and that the arresting agency was the Lexington County (South Carolina) Sheriff's Office. *Id.* ¶ 24.

A review of information contained in the incident report relating to Roof's drug arrest was necessary before it could be determined whether Roof was disqualified from receiving or possessing a firearm. *Sanders III*, 937 F.3d at 324. A copy of the incident report, however, was not contained in any of the three databases queried during NICS background checks (*i.e.,* III, NCIC files, and the NICS Index). *See id.* (because database information alone was insufficient to adjudicate transaction Examiner tried to obtain incident report from external sources). Thus, because more research was required, a NICS Legal Instrument Examiner issued Shooter's Choice a "Delayed" response, and the transaction was assigned to a second Examiner to conduct further research and reach a determination as to Roof's eligibility to receive a firearm. Am. Compl. ¶ 25.

This Examiner sent an inquiry to the Lexington County Sheriff's Office, which had

erroneously identified itself as the agency that had arrested Roof, requesting the incident report relating to the arrest. *Sanders III*, 937 F.3d at 324. The Examiner also sent a separate inquiry to the 11th Circuit Solicitor's Office, which prosecutes cases in Lexington County. *Id.* Later the same day, the Sheriff's Office sent a brief handwritten response stating: "No arrest or report for this date. The last arrest was on 2-28-15. Columbia PD will have the Report." *Id.* at 324-25; Am. Compl. ¶ 27.

The Examiner mistakenly assumed that the Sheriff's Office was referring her to another law enforcement agency within Lexington County. *See* Am. Compl. ¶ 29; *Sanders III*, 937 F.3d at 325 (Examiner identified West Columbia Police Department). The Examiner therefore consulted the NICS Section's Contact Sheet for Lexington County law enforcement agencies. That sheet did not include a listing for the Columbia Police Department, but did include one for the "West Columbia" Police Department. *Sanders III*, 937 F.3d at 325. The Examiner sent a fax to the West Columbia Police Department requesting the incident report, but received a reply stating "not a WCPD Arrest." Am. Compl. ¶ 29. At that point, the Examiner turned her attention to researching other delayed transactions while waiting for a response from the 11th Circuit Solicitor's Office, which never responded to the Examiner's inquiry. *Sanders III*, 937 F.3d at 325.

After three business days elapsed from the date Shooter's Choice initiated Roof's background check, the dealer elected to proceed with the sale and transferred a Glock 41 semi-automatic handgun to Roof. Am. Compl. ¶ 30. Roof subsequently used this weapon to murder the nine people at the Emanuel AME Church. *Id.* ¶ 31.

In the wake of the shooting, the NICS Section obtained a copy of the incident report relating to Roof's drug arrest from the Columbia Police Department. *Sanders III*, 937 F.3d at

325.  The report recited that Roof had admitted to the arresting officer that a bottle the officer

found in Roof's pocket contained multiple strips of Suboxone, a Schedule III narcotic, and that

Roof admitted that he had no prescription for the drug and had obtained it from a friend.  *Id.*

Upon reviewing the incident report, a third NICS Examiner determined that it contained

information from which it could be determined that Roof was an unlawful user of a controlled

substance whose possession or receipt of a firearm was prohibited by 18 U.S.C. § 922(g)(3), and

issued a "Denied" response to Shooter's Choice.  Am. Compl. ¶ 33.

## VI.    ARGUMENT

As demonstrated herein, the Court should dismiss these actions for two separate, and

independent, reasons: (1) there is no private party analog to the conduct challenged here; and (2)

under the facts as alleged, South Carolina law does not recognize a duty of care owed by the

United States to the victims of Roof's criminal conduct.  Preliminarily, whether a private analog

exists, and whether (if one exists) a private individual would be liable in like circumstances, are

both inquiries that are separate and distinct from the issue of whether the FTCA's discretionary

function exception applies in the particular case.  Thus, even though in *Ayala v. United States,* 49

F.3d 607 (10th Cir. 1995), the Tenth Circuit already had reversed the district court's dismissal of

the action based on the FTCA's discretionary function exception, *Ayala v. United States,* 980

F.2d 1342, 1351 (10th Cir. 1992), it held in the subsequent appeal that no liability could be

imposed on the United States because a private individual would not be liable to the plaintiffs in

similar circumstances.  *See Ayala,* 49 F.3d at 609 (citing decision in earlier appeal); *id.* at 610-11

(discussing FTCA's requirement of comparable liability for private persons).

Similarly, in *Myers v. United States,* 17 F.3d 890 (6th Cir. 1994), only after it first

concluded that the discretionary function exception was inapplicable did the Sixth Circuit

proceed to hold that the district court's dismissal of the action nevertheless should be affirmed because a private individual would not be liable to the plaintiffs under like circumstances. *Myers,* 17 F.3d at 894, 903-04; *see also Dorking Genetics v. United States,* 76 F.3d 1261, 1264 (2d Cir. 1996) (declining to decide whether discretionary function exception barred plaintiff's claims, and instead affirming dismissal of the action on ground that private person would not be liable to plaintiff in like circumstances); *Howell v. United States,* 932 F.2d 915, 917 n.1 (11th Cir. 1991).

In short, the requirement that State law must provide for comparable private liability before the United States can be held liable is a separate hurdle that plaintiffs must surmount in order to bring their claims within the scope of FTCA's waiver of sovereign immunity. As the Sixth Circuit succinctly put it in *Myers*:

> [F]ocusing solely on the applicability of the discretionary function exception, as the district court did, was "putting the cart before the horse." Unless the plaintiffs have pled facts sufficient to justify liability under ordinary state-law principles, and thus invoked the court's subject matter jurisdiction under the general waiver of sovereign immunity in 28 U.S.C. § 2674, there is no *need* to resort to the exceptions in 28 U.S.C. § 2680, to dismiss the suit. It bears repeating that the FTCA does not *create* liability, it merely waives sovereign immunity to the extent that state-law would impose liability on a "private individual in similar [*sic*] circumstances."

17 F.3d at 898-99 (quoting 28 U.S.C. § 2674; emphasis added by court). The court amplified this point later in its opinion:

> The greatest limitation upon the government's liability under the FTCA is not, and was not intended to be, the discretionary function exception. Rather, the principle limitation is that, for the government to be liable, state law must provide for private liability under similar circumstances. Where no similar circumstances exist or can even be imagined, or where private individuals would not be held liable even under similar circumstances, the government is not liable under the FTCA.

*Id.* at 905.

**A.      Plaintiffs' Claims are not Actionable under 28 U.S.C. § 1346(b) Because No Private Analog Exists.**

The plain language of the FTCA waives the sovereign immunity of the United States only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  "These words mean what they say, namely, that the United States waives sovereign immunity 'under circumstances' where local law would make a '*private person*' liable in tort." *United States v. Olson,* 546 U.S. 43, 44 (2005) (quoting 28 U.S.C. § 1346(b)).

Thus, in *Olson* the Supreme Court held that, even in cases involving "uniquely governmental" activities, whether § 1346(b) waives the sovereign immunity of the United States depends on whether local law would make a private person liable, not whether a State or municipal entity would be held liable under the circumstances presented.  To conclude otherwise, the Court stated, would "read[] into the Act something that is not there."  *Id.* at 45; *see also id.* at 45-46 ("The Act says that it waives sovereign immunity 'under circumstances where the United States if a *private person*,' not 'the United States if a state or municipal entity,' would be liable.").

Turning to the language of 28 U.S.C. § 2674—which provides that "[t]he United States shall be liable in the same manner and to the same extent as a private individual under like circumstances"—the Supreme Court in *Olson* went on to reaffirm the Court's prior precedents holding that "the words 'like circumstances' do not restrict a court's inquiry to the *same circumstances*, but require it to look further afield."  *Id.* at 46 (quoting § 2674) (citing *Indian Towing Co. v. United States,* 350 U.S. 61, 64 (1955); *see also Rayonier, Inc. v. United States,* 352 U.S. 315, 319 (1957) ("[T]he test established by the FTCA for determining the United States' liability is whether a private person would be responsible for *similar* negligence under the

laws of the State where the acts occurred.") (emphasis added).

The private party analog requirement is a condition Congress placed in the FTCA's jurisdictional provision, 28 U.S.C. § 1346(b). Congress limited this Court's jurisdiction to claims against the government where "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.* If plaintiffs' claims do not fall within this provision, the Court lacks subject matter jurisdiction and it should dismiss these actions. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

Here, federal firearms background checks have no private party analog. The challenged conduct at issue in these cases falls squarely within those circumstances where courts have concluded that there is no subject matter jurisdiction under the FTCA because plaintiffs challenge governmental activities with no private party analog. The facts of these cases are also readily distinguishable from those circumstances where a court determined, or the government conceded, that the challenged conduct had a similar (even if not identical) counterpart in private activity.

Courts lack subject matter jurisdiction under the FTCA where "plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States." *Feres v. United States,* 340 U.S. 135, 141 (1950). Cases applying this principle frequently involve exercises of quasi-legislative or quasi-adjudicative functions by Federal agencies. *See, e.g., Jayvee Brand, Inc. v. United States,* 721 F.2d 385, 390 (D.C. Cir. 1983) (federal agency's exercise of its rule-making authority to ban use of certain chemical compound); *C.P. Chemical Co. v. United States,* 810 F.2d 34, 37-38 (2d Cir. 1987) (same); *Akutowicz v. United States,* 859 F.2d 1122, 1125-26 (2d Cir. 1988) (federal agency's revocation of individual's citizenship); *Appleton v. United States*, 180 F. Supp. 2d 177, 185-86 (D.D.C.

2002) (federal agency's ban of import of ammunition); *PW Arms, Inc. v. United States,* 186

F.Supp.3d 1137, 1143 (W.D. Wash. 2016) (same); *Bhuiyan v. United States,* Case No. 14-cv-

00013, 2017 WL 2837023 *4 (D. N. Mar. I. June 30, 2017) (federal agency's withdrawal of

immigration benefits), *aff'd,* 772 Fed. App'x 564 (9th Cir. 2019).

No liability can be imposed in such cases because no private analog exists. *See Liranzo

v. United States,* 690 F.3d 78, 86 (2d Cir. 2012) ("[The FTCA] does not waive sovereign

immunity for claims against the government based on governmental 'action of the type that

private persons could not engage in and hence could not be liable for under local law.'") (quoting

*Chen v. United States,* 854 F.2d 622, 626 (2d Cir. 1988) (internal quotation marks omitted by the

court)); *Akutowicz,* 859 F.2d at 1125 ("[A]s to certain governmental functions, the United States

cannot be held liable, for no private analog exists. 'Quasi-legislative or quasi-adjudicative action

by an agency of the federal government is action of a type that private persons could not engage

in and hence could not be liable for under local law.'") (quoting *C.P. Chemical Co.,* 810 F.2d at

37-38, in turn quoting *Jayvee Brand, Inc.,* 721 F.2d at 390).

Here, the essence of plaintiffs' theory of liability in these cases is that the NICS Examiner

who was assigned to research Roof's drug arrest should have obtained a copy of the incident

report for that arrest from the Columbia Police Department, and based on the information

contained in that incident report should have issued a "Denied" response to Shooter's Choice

within three business days after Shooter's Choice requested a background check of Roof

pursuant to the Brady Act.  Had the Examiner issued a "Denied" response to the dealer within

this timeframe, plaintiffs contend, Shooter's Choice would have been prevented from

transferring the Glock 41 handgun to Roof, and Roof would not have been able later to use this

weapon to carry out the mass shooting at the Emanuel AME Church.

In conducting NICS background checks, however, the FBI's NICS Examiners perform functions that no private person is or could be empowered to perform. The conduct of a NICS background check entails searching FBI-maintained databases and accessing records to which private persons do not have and could not be given access; and if the searches of these databases return any matching records, making a determination based on the contents of these records (or the results of any further research that may be necessary) whether the prospective purchaser's receipt of a firearm would be unlawful.

That determination is, and must be, made either by a NICS Examiner, or in those states in which a state or local law enforcement agency serves as a NICS POC, by an authorized state or local official. *See* AG Order No. 2158-98, 63 Fed. Reg. 30430, 30431 (June 4, 1998), *supra* n.1 (explaining that only the FBI or authorized state and local officials "will make these determinations"). If the NICS Examiner (or a state or local official) determines that the available information demonstrates that the prospective purchaser's receipt of a firearm would violate 18 U.S.C. § 922(g) or (n) or state law, the dealer who initiated the background check receives a "Denied" response. Such a response is not a "warning" to the dealer, but instead is a command, that the dealer has no choice but to obey, not to proceed with the transfer of the firearm. 18 U.S.C. §§ 922(t)(1), 924(a)(5); *see also Sanders III*, 937 F.3d at 322 (4th Cir. 2019) ("If the background check reveals that a transfer would be illegal, the dealer cannot proceed with the transfer.").

Exercising such a power is analogous to exercises by federal agencies of their quasi-legislative or quasi-adjudicative powers to ban the use of certain chemical compounds in consumer products, *Jayvee Brand, Inc.*, 721 F.2d at 390; *C.P. Chemical Co.*, 810 F.2d at 37-38; to determine that an individual had relinquished his citizenship, *Akutowicz*, 859 F.2d at 1125-26;

to ban importation of certain kinds of ammunition, *Appleton*, 180 F. Supp. 2d at 185-86; *PW Arms, Inc.*, 186 F. Supp. 3d at 1143; or to withdraw immigration benefits from an immigrant, *Bhuiyan v. United States*, 2017 WL 2837023, *aff'd*, 772 Fed. App'x 564.[3]

Similarly, in *Florida Auto Auctions of Orlando v. United States*, the Fourth Circuit rejected the auction company's claim that liability could be imposed under the FTCA for the failure of Customs officials to prevent the exportation of stolen automobiles to Saudi Arabia. The vehicles had been entrusted to a dealer who was allowed by Customs officials to export them without first presenting certificates of title as required by 19 C.F.R. § 192.2(b).  74 F.3d 498, 505 (4th Cir. 1996).  The United States argued that there was no authority for holding a private person liable for anything even remotely resembling the alleged conduct at issue, *i.e.*, allowing exportation of stolen property without requiring proper documentation, but also conceded that finding such a close analogy might be unnecessary.  *Id.*  Notwithstanding this concession, however, the Fourth Circuit concluded that "South Carolina law would not impose liability for breach of a duty that is sufficiently analogous to the duty purportedly imposed on Customs officials by 19 C.F.R. § 192.2(b) to render the Government liable to Appellees for the Customs agents' actions."  *Id.*[4]  Here, likewise, plaintiffs can point to no private analog or

_____

[3]  Also relevant are cases where plaintiffs alleged that federal agencies failed to require contractors to furnish payment bonds required by the Miller Act, 40 U.S.C. § 3131 (formerly 40 U.S.C. § 270A), for the protection of subcontractors or materialmen supplying labor or materials used in carrying out federal contracts, wherein courts have unanimously held that Act has no counterpart in private activity.  *Devlin Lumber & Supply Corp. v. United States,* 488 F.2d 88, 89 (4th Cir. 1973); *Westbay Steel, Inc. v. United States,* 970 F.2d 648, 650 (9th Cir. 1992); *Arvanis v. Noslo Eng'g Consultants, Inc.*, 739 F.2d 1287, 1290 (7th Cir. 1984); *McMann v. N. Pueblos Enters., Inc.*, 594 F.2d 784, 785-86 (10th Cir. 1979); *United States v. Smith,* 324 F.2d 622, 624-25 (5th Cir. 1963).

[4]  In *Florida Auto Auctions* the Court of Appeals also considered and rejected the auction company's argument that the United States could be held liable based on the good Samaritan doctrine as that doctrine had not been adopted and applied by South Carolina courts.

sufficiently analogous duty that a private person would owe them under South Carolina law.

The Court should distinguish the facts of these cases from those in which courts held, or the government conceded, there was a private party analog.  In *Indian Towing*, the Court considered a claim that the Coast Guard had negligently maintained a lighthouse and failed to give warnings that the light was not operating, resulting in a tugboat and the barge it was towing running aground.  Even though private individuals do not operate lighthouses, the Court concluded that this claim was actionable under the FTCA because it was analogous to a claim of negligence by a private person "who undertakes to warn the public of danger and thereby induces reliance."  350 U.S. at 64-65.  "It is hornbook law," the Court noted, that such a person "must perform his 'good Samaritan' task in a careful manner."  *Id.* at 65.

Likewise, in *Olson*—which involved allegations of negligence on the part of federal mine inspectors in inspecting a mine—the government conceded "that a private person analogy exist[ed]" in the case before the Court.  546 U.S. at 48; *id.* at 47 (noting that United States had conceded "that 'there are private persons in "like circumstances"' to federal mine inspectors, namely, 'private persons who conduct safety inspection'") (quoting U.S. reply brief at 3).  In addition, citing decisions from the Second, Fourth, Sixth, Tenth, and Eleventh Circuits in cases involving regulatory inspections, the Court noted that the courts of appeals in each of the cited cases had "found ready private person analogies." *See id.* at 47 (citing *Dorking Genetics v. United States,* 76 F.3d 1261 (2d Cir. 1996) (inspection of cattle); *Fla. Auto Auction of Orlando, Inc.,* 74 F.3d 498 (4th Cir. 1996) (inspection of automobile titles); *Ayala*, 49 F.3d 607 (10th Cir. 1995) (mine inspections); *Myers*, 17 F.3d 890 (6th Cir. 1994 (same); *Howell*, 932 F.2d 915 (11th Cir. 1991) (inspection of airplanes)).  The Supreme Court added that these decisions "all properly apply the logic of *Indian Towing*."  *Olson*, 546 U.S. at 47.

The performance of a NICS background check is fundamentally different from the kinds of activities that were at issue in both the *Indian Towing* and *Olson* cases, where ready private analogies for uniquely governmental activities were found to exist. Neither of those cases involved an exercise by the United States of its power to command anyone to do or forgo doing anything, let alone the exercise of the power to command one party not to complete a transaction with another party, a power the exercise of which necessarily implicates the rights of the other party to the transaction.[5] Unlike the operation of lighthouses, or the performance of safety inspections, the exercise of such governmental power has no conceivable counterpart in private activity. The Court therefore lacks subject matter jurisdiction over these actions.

**B.    Even if This Court Concludes that One or More Private Analogs Exist, the Court Should Still Dismiss Because Under South Carolina Law a Private Individual Would Not Be Liable to Plaintiffs in Like Circumstances.**

Even were this Court to determine that one or more private analogs exist, it should still dismiss these cases because South Carolina would not impose liability on a private individual under analogous circumstances. "Under South Carolina law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Faile v. S.C. Dep't of Juvenile Justice,* 566 S.E.2d 536, 546 (S.C. 2002); *Doe v. Wal-Mart Stores, Inc.,* 711 S.E.2d 908, 911 (S.C. 2011) (same). The South Carolina Supreme Court "recognize[s] five exceptions to this rule: 1) where the defendant has a special relationship to the victim; 2) where

---

[5] If the dealer receives a "Denied" response, the prospective purchaser who is denied a firearm is not without recourse. An individual who contends that he or she has been erroneously denied a firearm as a result of a NICS background check may file a lawsuit against either the United States, or the State or political subdivision responsible for denying the transfer, 18 U.S.C. § 925A, and also may seek relief administratively to obtain the correction of any erroneous system information upon which the denial may have been based, 34 U.S.C. § 40901(g); 28 C.F.R. § 25.10. The availability of these remedies underscores the fact that the exercise of the power to prohibit licensees from completing firearms transfers necessarily implicates the legal rights (indeed, the constitutionally-protected legal rights) of prospective firearms purchasers.

the defendant has a special relationship to the injurer; 3) where the defendant voluntarily

undertakes a duty; 4) where the defendant negligently or intentionally creates the risk; and 5)

where a statute imposes a duty on the defendant." *Id.* at 911-12 (citing *Faile*, 566 S.E.2d at 546).

None of the five recognized exceptions to South Carolina's general no-duty rule applies

in these cases.

### 1.    The United States had no special relationship with Roof's victims.

Plaintiffs do not appear to contend that the United States had any special relationship

with Roof's victims of the kind that would be necessary in order for the United States to have

owed these victims any duty to protect them from harm, nor could plaintiffs plausibly argue that

such a relationship existed. *Faile*, 566 S.E.2d at 334 n.5 (citing *Ballou v. Sigma Nu Gen.*

*Fraternity*, 352 S.E.2d 488 (S.C. App. 1986) (duty of fraternity to protect intoxicated pledge

based on its relationship with the victim)); *Madison ex rel. Bryant v. Babcock Center, Inc.*, 638

S.E.2d 650, 657 (S.C. 2006) (duty of private residential facility to protect mentally retarded

woman residing in facility from inappropriate sexual contact with other residents based on its

relationship with victim).  Thus, these cases do not fall within the first exception to South

Carolina's general no-duty rule.

### 2.    The United States had no special relationship with Roof.

Nor can plaintiffs plausibly contend that the United States had a special relationship with

Roof of the kind necessary in order for the United States to have owed Roof's victims any duty

to protect them from being harmed by Roof in particular.  *Faile*, 566 S.E.2d at 334 n.5 (citing

*Rogers v. S.C. Dept. of Parole & Cmty Corr.*, 464 S.E.2d 330 (S.C. 1995)).  "The defendant may

have a common law duty to warn potential victims under the 'special relationship' exception

when the defendant 'has the ability to monitor, supervise, and control an individual's conduct,'

and when 'the individual has made a specific threat of harm directed at a specific individual.'"

*Doe v. Marion,* 645 S.E.2d 245, 250 (S.C. 2007) (quoting *Bishop*, 502 S.E.2d at 81.

Here, the United States had no relationship with Roof, let alone one that gave it the ability to monitor, supervise, and control Roof's conduct, nor had Roof made a specific threat of harm directed at the nine people he murdered and the others present at the Emanuel AME Church. Accordingly, these cases do not fall within the second exception to South Carolina's general no-duty rule.

### 3.    The United States did not voluntarily undertake a duty.

These cases also do not fall within the third exception to South Carolina's general no-duty rule. *Faile*, 566 S.E.2d at 546 n.7 (citing *Caldwell v. Jim Walter Homes, Inc.*, 359 S.E.2d 518 (S.C. App. 1987), and Restatement (Second) of Torts §§ 323-324A)). Notwithstanding plaintiffs' conclusory allegations to the contrary, the United States did not undertake, either voluntarily or otherwise, a duty to Roof's victims to conduct Roof's background check in a non-negligent manner.

Insofar as plaintiffs contend that by issuing SOP 5.5.5 or other standard operating procedures the NICS Section undertook a duty to Roof's victims to conduct Roof's background check in a reasonable manner, their contention is unsupported by South Carolina law.

For example, *Doe v. Wal-Mart Stores* involved a claim that Wal-Mart failed to report information relating to suspected child abuse as required by S.C. Code Ann. § 63-7-310(A) (Supp. 2010) after the aunt of a victim of child abuse took photographs of the victim to the retailer to be developed. Concluding that Wal-Mart was not liable to the victim, the South Carolina Supreme Court first held that the cited statute gave rise to no private right of action for victims of child abuse, 711 S.E.2d at 910-11, and then proceeded to hold that liability also could not be imposed on the defendant based on the company's conceded violations of its own internal policy related to the handling of photographs depicting nudity, pornography, or child abuse:

> It is undisputed that Wal-Mart created an internal policy that was subsequently violated when the photo technician destroyed the photos and did not inform the store manager or keep them as evidence. However, this internal policy cannot be said to constitute the voluntary undertaking of a duty. Rather, it could simply serve as evidence of the standard of care, once that duty was established by law.

*Id.* at 912.

Similarly, *Citadel* involved allegations that The Citadel violated its own internal policies by failing to investigate whether one of the counselors who worked at a summer camp operated by the school was sexually abusing campers. The trial court granted summary judgment to The Citadel, and one of the victims who the counselor later abused while working for a different employer at another institution appealed. The South Carolina Court of Appeals rejected the plaintiff's argument that liability could be imposed on the school based on violations of its own policies. Relying on *Doe v. Wal-Mart Stores*, the court stated with regard to this argument:

> [W]e find the internal policies created by The Citadel do not establish a voluntary undertaking of a duty; rather, they can only serve as evidence of the standard of care if the duty is established by law. . . . Therefore, any violation of an internal policy does not give rise to the voluntary assumption of a duty and does not establish that The Citadel owed a duty of care as a matter of law.

805 S.E.2d at 583.

Thus, although the violation of the NICS Section's internal SOP governing the conduct of external research renders the FTCA's discretionary function exception inapplicable in these cases, *Sanders III*, 937 F.3d at 331-32, the violation of this internal policy cannot form the basis for imposing an actionable duty of care on the United States under South Carolina law.

Indeed, plaintiffs' allegations that federal statutes, regulations, and policies imposed mandatory and non-discretionary duties on the United States with respect to the conduct of NICS background checks (*see*, *e.g.*, Am. Compl. ¶¶ 37-44, 46-51, 53-58, 62-67, 70-77 & 81-84), are fundamentally at odds with a claim that the United States *voluntarily* undertook a duty in these

cases.  *See Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 970 (4th Cir. 1992) (plaintiff could not simultaneously argue that United States voluntarily undertook duty to provide police protection while also arguing that United States had mandatory, non-discretionary duty to provide police protection under Hague Convention); *see also Ayala,* 49 F.3d at 613 (conduct that is compelled by statute is not voluntarily undertaken).

In any event, a voluntary undertaking claim would fail as a matter of law for still other reasons.  Plaintiffs could not demonstrate that the federal statutes, regulations, and policies to which they refer "represent an effort to specifically 'render services' to [Roof's victims]."  *Fla. Auto Auction of Orlando, Inc.*, 74 F.2d at 504.  And even if plaintiffs could make such a showing, they could not demonstrate either (1) that Roof's victims in any way relied on the United States to perform its supposed undertaking, *see id.* at 505 (reliance requirement under Restatement (Second) of Torts § 323 not met where the plaintiff could not show that it would have acted any differently in absence of Federal regulation requiring certificates of title to be presented before automobiles could be exported to foreign country); or (2) that Roof's victims suffered any increased risk of harm than they would have suffered if the United States had never acted at all, *see, e.g., Sheridan v. United States*, 969 F.2d 72, 74-75 (4th Cir, 1992) (increased risk requirement under Restatement § 323 not met where Navy's failure to enforce regulations did not increase risk of harm to plaintiffs over what it would have been had Navy never promulgated regulations in first instance); *Ayala,* 49 F.3d at 614 n.5 (no increased risk to miners where plaintiffs could not show that mine inspector increased risk of injury to miners over what it would have been had inspector done nothing at all).

> **4.    The United States did not intentionally or negligently create a risk of harm.**

Nor can plaintiffs demonstrate that the fourth exception to South Carolina's no-duty

rule—which applies when the defendant negligently or intentionally creates the risk—is

applicable in these cases. *Faile*, 566 S.E.2d at 546 n.8 (citing *Montgomery v. National Convoy*

*& Trucking Co.*, 195 S.E. 247 (1938), and Restatement (Second) of Torts §§ 321-22 (1965)).

Before the fourth exception can apply, there must be some antecedent act by the

defendant that itself "creates," *i.e.,* brings into existence, the unreasonable risk of harm. *See*

Restatement (Second) of Torts § 321 ("If the actor does an act, and subsequently realizes or

should realize that it has created an unreasonable risk of causing physical harm to another, he is

under a duty to exercise reasonable care to prevent the risk from taking effect."); *id.* illus. 3 &

accompanying reporter's note (noting that illustration 3 is based on facts in to *Montgomery v*

*National Convoy & Trucking Company*, 195 S.E. 247 (S.C. 1938) (truck driver who skids on icy

highway and whose truck comes to rest blocking lanes of traffic has duty to warn approaching

vehicles of resulting danger)).

Applying these principles in *Edwards v. Lexington County Sheriff's Department*, the

Supreme Court of South Carolina held that by encouraging a victim of domestic violence to

attend her abusive ex-boyfriend's bond revocation hearing, the defendants "created a situation

they knew or should have posed a substantial risk of injury to the [victim]." 688 S.E.2d 125, 130

(S.C. 2010). The court concluded that because the defendants were well aware of the ex-

boyfriend's violent tendencies toward the victim, they had a duty to take steps to protect her

from being physically attacked by the ex-boyfriend at the hearing.

The facts presented in the instant cases are readily distinguished from those in *Edwards.*

Here, plaintiffs do not allege that the United States itself actively created the situation that

resulted in the harm that Roof inflicted on his victims. Rather, they contend that the United

States failed to issue a "Denied" response to Shooter's Choice after the dealer requested a

background check of Dylann Roof.  But this failure did not itself "create" the risk that Roof would later use the Glock 41 handgun the dealer transferred to him to carry out the mass shooting at the Emanuel AME Church.

To the contrary, the risk that Roof would use the Glock 41 handgun to perpetrate the atrocity at the church was created not by the United States, but by Shooter's Choice's decision to proceed with the sale of the weapon once three business days had passed without the dealer receiving a "Denied" response from NICS.  Absent the dealer's completion of the sale, no risk would have existed that Roof later would use the particular weapon he received from the dealer to murder and terrorize his victims at the church.

Nor did the United States do anything to bring Roof together with the people he harmed inside the church.  For this reason as well, the situation presented in the instant cases is entirely unlike the situation in *Edwards*, where the defendants specifically encouraged the victim to attend her abusive ex-boyfriend's bond revocation hearing, fully knowing of his violent tendencies towards her.

Finally, the United States did not create or exacerbate Roof's animus towards this victims.  Roof was intent on committing a mass shooting even before he attempted to purchase a firearm.  No affirmative act of the United States created that pre-existing risk.

For all these reasons, the fourth exception to South Carolina's general no-duty rule is inapplicable in these cases.  *See*, *e.g.*, *Wal-Mart Stores, Inc.,* 711 S.E.2d at 247-48 (retailer's failure to follow internal policies regarding development and retention of photographs depicting child abuse did not create risk of father's sexual abuse of daughter); *Citadel*, 805 S.E.2d at 583-84 (school's failure to follow internal policies regarding investigation of sexual abuse of campers by counselor at school's summer camp for youths did not create risk that counselor would later

abuse victim because victim was never camper at school's camp, became acquainted with abuser

after abuser left school, and abuser later was invited by victim's family to live in their home).

### 5. No statute imposed a duty on the United States.

Lastly, the fifth and final exception to South Carolina's general no-duty rule also is

inapplicable in these cases. *Faile,* 566 S.E.2d at 546 (exception "where a statute imposes a duty

on the defendant") (citing *Steinke v. S.C. Dept. of Labor, Licensing, and Regulation*, 520 S.E.2d

142 (S.C. 1999). Under South Carolina law, negligence *per se* may be premised on violation of

a statute, *Rayfield v. S.C. Dep't of Corrs.,* 374 S.E.2d 910, 913-15 (S.C. App. 1988), or a

regulation that has the force of law, *Norton v. Opening Break of Aiken, Inc.,* 462 S.E.2d 861, 862

(S.C. 1995), but cannot be premised on an alleged violation of an internal policy. Moreover, the

statute or regulation must have been "enacted for the special benefit of a private party," *Citizens*

*of Lee County v. Lee County*, 416 S.E.2d 641, 645 (S.C. 1992), and "a statute which does not

purport to establish civil liability, but merely makes provision to secure the safety or welfare of

the public as an entity is not subject to a construction establishing a civil liability." *Dorman v.*

*Aiken Commc'ns, Inc.*, 398 S.E.2d 687, 689 (S.C. 1990).

The South Carolina Supreme Court has considered the applicability of this exception,

which usually applies in cases involving State and municipal entities, in two cases involving

private defendants. *Marion*, 545 S.E.2d at 248-50; *Wal-Mart Stores, Inc.,* 711 S.E.2d at 244-46

& 248.

In *Marion*, the father of a child who had been sexually molested by a doctor who was

treating the child brought an action against several defendants, including a psychiatrist (Dr. Graf)

who once had treated the abusive doctor for his predilection to molest children. The father

claimed, *inter alia,* that Dr. Graf was liable for his child's injuries because she had violated the

duty imposed on her by S.C. Code Ann. § 20-7-510 (Supp. 2002) to report suspected sexual

abuse of a child. The trial court dismissed the case, and when the father appealed, the Court of

Appeals affirmed. The South Carolina Supreme Court then granted certiorari, and itself

affirmed.

In determining that Dr. Graf owed no statutory duty to the abused child, the Supreme

Court concluded that "the statute in question is concerned with the protection of the public and

not with the protection of an individual's private right." *Marion*, 545 S.E.2d at 249. Noting that

§ 20-7-510 was part of the Children's Code, the focus of which was on the duties of the South

Carolina Department of Social Services, the court rejected the father's contention that the statute

created a private cause of action. Distinguishing the case on which the father relied, which

involved the liability of a county Department of Social Services for allegedly failing to properly

investigate claims of abuse, the court pointed out that "Dr. Graf was not a public official." *Id.* at

250 (distinguishing on this basis *Jensen v. Anderson County Dept. of Social Services*, 403 S.E.2d

615 (1991)). The court thus concluded that no special duty existed between Dr. Graf and the

abused child, with whom she never had any contact. *See id.* ("Therefore, the Court of Appeals

did not err in . . . finding § 20-7-510 does not create a private cause of action for negligence *per

se*.").

Subsequently, in *Doe v. Wal-Mart Stores, Inc.,* the court extended its holding in *Marion*

to a case involving a private retailer's alleged violation of the duty to report suspected child

abuse under the same reporting statute, which had since been reclassified as S.C. Code Ann. §

63-7-310 (Supp. 2010) and which the Court referred to as "the Reporter's Statute." *Wal-Mart

Stores, Inc.*, 711 S.E.2d at 910. Quoting *Marion*, the court stated:

> The legislative intent to grant or withhold a private right of action for violation of
> a statute or the failure to perform a statutory duty is determined primarily from the
> language of the statute . . . . In this respect, the general rule is that a statute which
> does not purport to establish civil liability, but merely makes provision to secure

the safety or welfare of the public as an entity is not subject to a construction
establishing civil liability.

*Id.* at 911 (citations omitted).

As it had in *Marion*, the court in *Wal-Mart* noted that the Reporter's Statute was silent as

to civil liability for failure to report child abuse, but did impose civil liability for making false

reports of child abuse.  *Id.*  The court also noted that in *Marion* it had found that the legislature's

silence as to civil liability in the Reporter's Statute indicated its intent not to create civil liability

for failing to report as required.  *Id.*  Finally, the court further noted that in *Marion*, it had held

that the Children's Code, of which the Reporter's Statute was a part, "is concerned with the

protection of the public and not with the protection of an individual's private right."  *Id.*

Consistent with its prior decision in *Marion*, the court concluded that there could be no

private cause of action against Wal-Mart under S.C. Code Ann. § 63-7-310.  *Id.*; *see also id.* at

912 (holding that none of the exceptions to South Carolina's general rule that there is no duty to

control the conduct of a third person were applicable, and specifically that "Wal-Mart's duty to

report under the Reporter's Statute cannot give rise to civil liability").

The Reporter's Statute at issue in *Marion* and *Wal-Mart* cannot be meaningfully

distinguished from the Brady Act.  The Brady Act neither expressly nor impliedly creates a

private cause of action for failing to prevent the transfer of firearms to individuals whose receipt

of them is unlawful.  Indeed, the very fact that Congress did not itself provide for civil liability

indicates that the purpose of the statute is to secure the safety and welfare of the public as an

entity, rather than to secure the private rights of the victims of gun violence.  Accordingly, like

South Carolina's Reporter's Statute, the Brady Act cannot be construed to create a private cause

of action for negligence *per se.*

## VII.    CONCLUSION

For the reasons stated and upon the authorities cited, these actions should be dismissed for lack of jurisdiction over the subject matter.

Dated: December 13, 2019,

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

THOMAS G. WARD
Deputy Assistant Attorney General
Civil Division

JAMES G. TOUHEY, JR.
Director, Torts Branch

 s/ Stephen R. Terrell
STEPHEN R. TERRELL
Trial Attorney
Torts Branch, Civil Division
United States Department of Justice
P.O. Box 888
Washington, DC 20044
Stephen.Terrell2@usdoj.gov
(202) 353-1651